1    Mark A. Larranaga
     LAW OFFICES OF WALSH & LARRANAGA
2    705 Second Ave., Suite 405
     Seattle, Washington  98104
3    (206) 325-7900

4
     Thomas Monaghan
5    FEDERAL DEFENDER SERVICES OF IDAHO
     350 North 9th Street, Suite 301
6    Boise, Idaho 83702
     (208) 388-1600
7    Fax (208) 388-1757

8    Judy Clarke
     FEDERAL DEFENDERS OF SAN DIEGO, INC.
9    225 Broadway, Suite 900
     San Diego, California  92101
10   (619) 234-8467

11   Attorneys for Defendant
12   JOSEPH EDWARD DUNCAN, III

13                    UNITED STATES DISTRICT COURT
                             DISTRICT OF IDAHO
14                   (HONORABLE EDWARD J. LODGE)

15   UNITED STATES OF AMERICA,          )
                                        )
16            Plaintiff,                )      CR-07-23-N-EJL
                                        )
17      vs.                             )      MEMORANDUM IN SUPPORT
                                        )      OF MOTION TO SUPPRESS
18   JOSEPH EDWARD DUNCAN, III,         )      EVIDENCE
                                        )
19            Defendant.                )
                                        )
20   _____    )

21   TO:    THOMAS E. MOSS, UNITED STATES ATTORNEY
            TRACI J. WHELAN, ASSISTANT UNITED STATES ATTORNEY
22          WENDY J. OLSON, ASSISTANT UNITED STATES ATTORNEY

23                         **Procedural Background**

24          On May 16, 2005, Brenda Groene, Mark McKenzie, and Sl. Groene were found

25   murdered at their home near Coeur d'Alene, Idaho.  Two younger children, S.G. and D.G. could

26

27
                                         1

not be found by investigators.

On July 2, 2005, Mr. Duncan was arrested at a Denny's restaurant in Coeur d'Alene, when he was seen with a young child believed to be S.G.  On July 12, 2005, Mr. Duncan was charged in Kootenai County with state crimes relating to the murders and abductions of the individuals found on May 16th.  On October 16, 2006, Mr. Duncan pled guilty to those crimes, and the state court sentenced him to three consecutive life terms.

On January 18, 2007, a federal grand jury returned an indictment charging Mr. Duncan in ten (10)  counts with crimes relating to the kidnaping of S.G. and D.G.  Three counts allege that his conduct resulted in the death of D.G.  On January 23, 2007, the government filed notice of its intent to seek the death penalty as to those three offenses.

On March 22, 2007, following a hearing on the parties' motions for a continuance, the court set January 22, 2008 as the trial date.  The court also directed the parties to file pretrial motions by November 5, 2007.

## Searches and Seizures

In the course of this investigation, the authorities conducted numerous searches and seizures, involving multiple search warrants.  Those seizures range from items recovered from the Jeep searched by the authorities following Mr. Duncan's arrest on July 2, 2005, to items recovered beforehand from his apartment in Fargo, North Dakota.

On October 22, 2007, the government advised the defense that it intends to introduce in its case-in-chief evidence seized from the Jeep, including evidence extracted from a Dell laptop computer,[1] a 4 gigabyte (GB) microdrive, and a Global Positioning System (GPS) unit.[2]  The

---

[1]  It should be noted that the discovery provided by the government references two (2) Dell laptop computers.  The authorities located and seized a Dell Latitude laptop from the Jeep on July 2, 2005.  However, on July 15, 2005, the authorities also obtained from Mr. Duncan's former landlords a Dell Latitude CPX laptop computer allegedly belonging to him that had been in the basement at 810 7th

government also indicated it would introduce "Quicken" files extracted from a Hewlett Packard (HP) desktop computer seized from Mr. Duncan's apartment in Fargo on August 20, 2004, pursuant to a state search warrant.[3]

On October 30, 2007, the government supplemented its notice regarding evidence it intends to present during the case-in-chief to include a letter allegedly written by Mr. Duncan to the North Dakota State University that was seized from his Fargo apartment pursuant to a May, 2005, search by state authorities.

Also on October 30, 2007, the government provided notice as to the evidence it intends to introduce at any penalty phase that may become necessary.  Pertinent to the instant motion, the government advised that it will seek to rely on evidence admitted in the guilt phase of the trial.  Additionally, the government intends to present records seized from the Fargo apartment pursuant to the May, 2005, search, including an immigration document regarding Mr. Duncan's travel to Mexico in April of 1997, shortly after A.M. was murdered in California.[4]  The government also disclosed its intention to introduce a blanket and DNA evidence recovered near

St. N. in Fargo.  Because the government's October 22, 2007, notice regarding the evidence it intends to introduce in its case-in-chief addresses only the contents of the Dell Latitude laptop found in the Jeep, this motion does not address any potential search issues related to this other Dell laptop.

[2]  The government indicated that some of the contents of the Dell laptop computer and the GPS unit were to be introduced as evidence of Mr. Duncan's intent, preparation, purpose and plan that would be admissible under Fed.R.Evid. 404(b) or as evidence that is "inextricably intertwined" with the charged conduct.

[3]  Although the government's October 22, 2007, letter indicates it will introduce only evidence from Mr. Duncan's HP desktop in its case-in-chief, documents pertaining to the forensic examination of the computer media in this case make reference to CD/DVD disks from which files were extracted. While this motion hereafter refers only to the HP desktop computer seized on August 20, 2004, the instant motion encompasses and applies to all evidence from any and all computer media seized pursuant to that search that the government would intend to rely on at trial for any purpose.

[4]  The government has alleged the murder of A.M. as an aggravator in support of its efforts to obtain a death sentence.

3

Smelterville, Idaho, at a "pausepoint" recorded on the GPS unit seized from the Jeep on July 2, 2005.

The seizures of the evidence referenced above are the focus of the instant motion.

<u>August 20, 2004 Search of 810 7th St. N, Fargo, North Dakota</u>

On July 3, 2004, the Detroit Lakes, Minnesota, Police Department received a report of a sexual assault that occurred near the Detroit Lakes Middle School and the Roosevelt Elementary School playground.  During the investigation, officers spoke with two children, T.R.P. and N.J.C.  The children stated that they were playing when an adult male drove up in a red car.  The man approached them carrying a video camera.  The children claimed that the male pulled down T.R.P.'s shorts and touched the boy's penis and buttocks.  N.J.C. said that he believed that the male had the video camera going during the incident.  On March 4, 2005, Mr. Duncan was charged in a two (2) count complaint in Becker County, Minnesota with Criminal Sexual Conduct in the Second Degree and Attempted Criminal Sexual Conduct in the Second Degree based on his alleged encounter with T.R.P. and N.J.C.

On August 20, 2004, Investigator James Van Lith of the Fargo Police Department filed an application and sworn affidavit for a search warrant with the Cass County East-Central Judicial District in North Dakota.  The affidavit sought a warrant to search the premises located at 810 7th St. N., Main Floor, Fargo, County of Cass, North Dakota.  <u>Exhibit A</u>.  The state magistrate issued the requested search warrant on the same date.  <u>Exhibit B</u>.

Fargo police officers performed the search of 810 7th St. N. shortly thereafter, on August 20, 2004.  During the search, Fargo police seized forty-one (41) objects, including the HP Pavilion desktop computer hard drive, from which the "Quicken" files identified by the government in its October 22, 2007 letter were retrieved.  <u>Exhibit C</u> (Fargo Police Evidence Inventory and Receipt for August 20, 2004 search).

On September 1, 2004, Investigator Chad Jutz requested Detective Jess Schoon, an officer with the Minnesota Internet Crimes Against Children task force, to conduct a forensic examination of the computer hardware, including the Hewlett Packard Pavilion hard drive, and other storage media seized from 810 7th St. N. on August 20, 2004. <u>Exhibit D</u> (Officer Jutz's supplemental report). Detective Schoon retained possession of the computer hardware and media until on or about February 7, 2005, when he returned the items to Investigator Jutz. <u>Exhibit E</u> (Detective Schoon's report).[5] During the time he had this computer hardware and media, Detective Schoon regularly conducted forensic examinations of the material to identify the contents. <u>Id.</u>; <u>see also</u> <u>Exhibit F</u> (Affidavit of FBI Agent Eric Clemensen in support of federal search warrant, noting that Detective Schoon periodically examined the computer hardware and media seized on August 20, 2004 until January of 2005).

On July 3, 2005, Investigator Jutz turned over all the evidence, including the Hewlett Packard Pavilion desktop computer, seized from 810 7th St. N. on August 20, 2004, to FBI Agent Van Roe. <u>Exhibit G</u>. Agent Van Roe shipped those items to the Salt Lake City FBI office on or about July 5, 2005.

The government has provided numerous reports of forensic examinations relating to both the Dell laptop and HP desktop computers. <u>See</u> <u>Exhibit H</u> (reports from Intermountain West Regional Computer Forensic Laboratory (RCFL)), <u>Exhibit I</u> (Limited Forensic Analysis Report by Curtis Rose for Dell laptop). The government has filed copies of these with the court in connection with its notice of its intention to call expert forensic examiners to introduce evidence taken from these computers.

Review of these reports shows that repeated searches of the hard drives of these

---

[5] In accordance with 18 U.S.C. § 3509, numerous attached exhibits to this memorandum are being filed separately under seal.

computers were conducted well after the time of their seizures.  With respect to the HP desktop, an October 19, 2006 RCFL report indicates that on September 8, 2005, Forensic Examiner (FE) Loren Mercer used forensic software to search the HP desktop's e-mails and documents.  FE Mercer extracted numerous documents of interest, including various letters and photographs. Exhibit H at 71.[6]  On August 28, 2006, the FBI requested the RCFL to extract Quicken data files from both the Dell laptop and HP desktop computers.  Id. at 1.  A June 15, 2007 RCFL report details another examination of the Dell laptop and HP desktop hard drives[7] for further information relating to the Quicken files.  Id. at 109.  In both instances, copies of the evidence recovered from the review of these hard drives were produced.

On August 1, 2005, FBI Agent Eric Clemensen filed an application and affidavit in the United States District Court for the District of Utah, seeking a federal search warrant for the computer media originally seized by the Fargo Police Department from 810 7th St. N.  Exhibit F. United States Magistrate Judge David Nuffer issued the search warrant on that same date. Exhibit J.  The Magistrate Judge's warrant directed the federal authorities to search on or before August 11, 2005.

### May 24, 2005 Search of 810 7th St. N, Fargo, North Dakota

On May 20, 2005, Officer Gregory Esposito of the Fargo Police Department filed an application and sworn affidavit for a search warrant with the Cass County East-Central Judicial District in North Dakota.  The affidavit sought a warrant to search the premises located at 810 7th St. N., Main Floor, Fargo, County of Cass, North Dakota.  Exhibit K.  The state magistrate issued the requested search warrant on the same date.  Exhibit L.

---

[6]  The page numbers for these reports are in the upper right hand corner.

[7] The forensic examiners utilized previously imaged copies of the hard drives when conducting their searches of the data on these computers.

On May 24, 2005, Fargo police officers conducted the search of 810 7th St. N.  The police seized ten (10) items or categories of items pursuant to that warrant, including the letter to North Dakota State University referenced in the government's October 30, 2007 discovery letter, mail, a computer zip drive, airline tickets reflecting travel to Denver and Fort Lauderdale, and other materials.  Exhibit M (evidence inventory and receipt).  On July 3, 2005, FBI Agent Van Roe took custody of the mail and zip drive seized during that search by the Fargo authorities.  Exhibit N (FD-302 report from Agent Van Roe).

July 2, 2005 Search of Jeep

On July 2, 2005, following the arrest of Mr. Duncan at the Denny's restaurant in Coeur d'Alene, Detective Brad Maskell of the Kootenai County Sheriff's Office sought a search warrant for the Jeep identified as the vehicle Mr. Duncan had been driving.  Detective Maskell provided verbal testimony to State Magistrate Scott Wayman in support of the warrant request.  Exhibit O. Based on that testimony, Magistrate Wayman issued the search warrant.  Exhibit P.  Numerous items were seized from the Jeep, including a Dell Latitude laptop computer, 1 Hitachi 4 GB microdrive chip, 1 Hitachi 4GB microdrive, a Magellan Sport Trak Map GPS unit, 1 JVC digital camera, 1 JVC video camera, assorted clothing and other personal items, a sawed-off shotgun, and various items of forensic evidence.  Exhibit Q (evidence/property receipt).

Later that same day, Detective Maskell sought a second search warrant for items found during the search of the Jeep that State Magistrate Wayman had authorized earlier.  Detective Maskell provided further testimony in support of the new warrant request, explaining that in the course of the search of the Jeep by other police officers, a GPS unit and video camera had been discovered; he sought authorization to review the contents of the specified items.  Exhibit R at 93-94.  Detective Maskell also supplied a written affidavit in support of the warrant request.  Exhibit S.  Magistrate Wayman signed the warrant for the laptop located inside the Jeep, as well

1   as the GPS, video camera, and other media.  Exhibit T.

2          Following seizure of the items from the Jeep, FBI Agent Paul Mortensen took custody of

3   the Dell Latitude laptop computer and transported it to the RCFL, where he turned it over to FE

4   Mercer.  FE Mercer apparently also received one of the microdrives around this time.

5          A September 20, 2006 RCFL report shows that after receiving the Dell laptop and one of

6   the microdrives, FE Mercer began a forensic examination of the items on July 3, 2005.  Exhibit

7   H at 13.  FE Mercer was assisted by FE Stacy Evans.  Id. at 9.  Using forensic software, FE

8   Evans and FE Mercer began searching data, images, documents, and internet logs on the Dell

9   laptop and microdrive.  Id. at 5, 8-18.  The RCFL report indicates that on July 4, 2005, FE

10  Mercer received the other Hitachi microdrive, JVC video camera, JVC digital camera, and

11  assorted peripheral devices from the FBI.  Id. at 17.  The forensic examination continued until

12  July 11, 2005, when it was stopped until federal warrants could be obtained.  Id. at 18.

13         On August 1, 2005, FBI Agent Eric Clemensen filed an application and affidavit in the

14  United States District Court for the District of Utah, seeking a federal search warrant for: two (2)

15  Hitachi 4 GB microdrives; the Dell Latitude laptop computer, a JVC digital camera, and a JVC

16  digital video camera.  These were the items seized from the Jeep and originally examined

17  pursuant to the state search warrants.  Agent Clemensen's affidavit sought leave to conduct a

18  forensic examination of the listed objects of the search.  Exhibit U.  United States Magistrate

19  Judge David Nuffer issued the search warrant on that same date.  Exhibit V.  The Magistrate

20  Judge's warrant directed the federal authorities to search on or before August 11, 2005.

21         The September 20, 2006 RCFL report contains an entry on August 1, 2005, indicating

22  that the federal search warrant had been received and that it provided "10 days to examine."

23  Exhibit H at 18.  Forensic examination of the Dell laptop and microdrives continued with entries

24  on December 12 and 14, 2005 reflecting extensive "keyword" searches of the data on the laptop,

resulting in numerous "hits." Id. at 18-65.

As reflected above, RCFL reports dated August 28 and October 19, 2006 indicate that FE Mercer conducted additional searches at the request of the FBI, producing derivative evidence from the Dell laptop and a microdrive for use at trial.  Additionally, a December 8, 2006 RCFL report notes that FE Mercer, in response to a request from the FBI, "reexamined the Dell laptop image (61046) for video files.  All video files that are playable were copied as a file (13) or extracted from unallocated space free space (free space number) (111)." Id. at 74.  The extraction and placement of these video files on a DVD were completed on December 8, 2006. Id. at 80.

A December 13, 2006 RCFL report indicates that, again in response to an FBI request, FE Mercer extracted appointment entries from the Dell laptop.  Those were extracted and copied to a CD.  Id. at 85.  A December 18, 2006 RCFL report further describes how FE Evans and FE Mercer extracted video and still image files from the 4 GB microdrive.  Id. at 88.  On December 20, 2006, 58,529 graphics files were examined on the Dell laptop image and placed on a DVD. Id. at 105.

The government has also provided the report from Curtis Rose, a forensic examiner retained to analyze the Dell laptop.  FE Rose received the imaged Dell laptop from the FBI on November 8, 2006 and issued his report on September 17, 2007.  Exhibit I.  That report details the various examinations conducted by FE Rose after receipt of the laptop image.

**Argument**

The defense moves the court to suppress all of the seized items described above based on the following violations of the Fourth Amendment.

9

I.    **All Evidence Derived from the Hewlett Packard Desktop Computer
and any other Evidence Seized on August 20, 2004 Pursuant to the
State Search Warrant Should Be Suppressed**

_____The Application and Affidavit for Search Warrant supplied in support of the August 20,

2004 search warrant in Fargo, Northa Dakota provides:

> **IN THE MATTER OF APPLICATION** of Investigator James Van
> Lith of the Fargo Police Department, for a search warrant to search
> the following described premises, located at 810 7th St. N., Main
> Floor, Fargo, County of Cass, North Dakota
>
> . . .
>
> James Van Lith, being first duly sworn under oath, deposes and states
> there is probable cause to believe that certain property, hereinafter
> described, is now being concealed at the above described premises,
> in the County of Cass, State of North Dakota.
>
> The property referred to, and sought to be seized is either property
> which constitutes evidence of the commission of a criminal offense,
> contraband, the fruits of crime, or things otherwise criminally
> possessed, or property designed or intended for use which is or has
> been used as the means of committing a criminal offense, and is
> more particularly described on the attached "Exhibit A"
>
> In support of your affiant's assertion as to the existence of probable
> cause, the information contained on the attached "Exhibit B" is
> offered  Such Exhibit is incorporated herein as if set forth verbatim.
>
> **WHEREFORE YOUR AFFIANT REQUESTS** that the Court
> issue a search warrant directing a search and seizure as herein
> described.

Exhibit A.

The incorporated statement of probable cause outlined the information Investigator Van

Lith regarding the alleged molestation of T.R.P. on July 3, 2004.  Id.  It noted that the adult male

suspect was carrying a video camera, which N.J.C. believed was going while the male was

touching T.R.P.'s penis and buttocks.  It also indicated that the male told the boys he wanted to

take their pictures.

The probable cause statement also described how N.J.C. identified Mr. Duncan from a photo lineup.  It further observed that Mr. Duncan spent approximately eighteen (18) years in prison for a "criminal sexual conduct type offense," and that he "currently lives in Fargo, North Dakota and works in Moorhead, Minnesota."  Id.

The final four paragraphs provided:

> Affiant is aware that computers are capable of storing images. Affiant is further aware that video images, both digital and other kind, can be transferred from the camera device to a computer.
>
> Affiant is aware that computer images, text files, or other evidence, may be hidden on a computer system, password protected, or encrypted.  The hard drives on computer systems are getting increasingly larger.  That affiant is aware that specialized programs and methods must be used to insure the evidence on a computer system retains its original character for court purposes. A controlled environment is therefore necessary to insure the integrity of the computer data.  That the review of the data may take weeks or months, depending on the nature of the investigation, the computer knowledge of the suspect, and the type of operating system and programs that are present on the computer system. That outside specialists may be needed to assist in evaluating the evidence.  That for the above reasons, it is necessary to seize the computer system and remove it for evaluation by a specialist.
>
> Because of the differences in operating systems, programs used to create text or capture and modify images, all programs discovered should be seized in order to assist in the evaluation of the data on the computer system.  In addition, affiant knows that evidence may be present on a wide variety of media.  Data files may be stored on a hard drive, or on removable media such as data tape, magnetic optical disks or similar storage.  Passwords and access codes to web sites may be written down on pieces of paper near the computer or in the residence.
>
> That affiant knows that computer systems include, but are not limited to, the computer box, monitor, printer, keyboard, scanner, or other peripheral devices.  That computer systems are configured to work together as a system.  Further that the computer system may not only be the repository for the evidence, but an instrumentality of the offense, therefore seizure of the complete computer system may be necessary.  Affiant requests permission to determine the level of seizure of hardware and software when this warrant is executed.

> Several computers at one location networked together is becoming more frequent as DSL, cable modems, and other high speed access become the norm.  Therefore, permission to seize all computer systems present is requested.

Id.

Exhibit A to the search warrant application set forth the objects of the search.  It encompassed a wide range of items that "may be used" to possess images of T.R.P. and/or N.J.C., including digital camera and equipment, video camera, videotapes, computer systems, computer hard drives or other removable media, deleted files, email files, and "media in whatever form."  Id.

The state search warrant expressly incorporated "Exhibit A" and concluded that the affidavit established probable cause to believe that such property was concealed at the described premises, 810 7th St. N., Main Floor, Fargo, Cass County, North Dakota.  Exhibit B.  It directed the authorities to search that premises for the specified property within ten (10) days from August 20, 2004.  Id.

     A.    The August 20, 2004 State Search Warrant Was Not Supported by Sufficient Probable Cause

     To establish probable cause, the facts set forth in the affidavit in support of the search warrant "must provide a sufficient basis for the judge to conclude that the object of the search is probably on the premises to be searched at the time the warrant is issued."  United States v. Alvarez, 358 F.3d 1194, 1203 (9th Cir. 2004), citing, Illinois v. Gates, 462 U.S. 213, 238 (1983).  "Probable cause to believe that a suspect has committed a crime is not, however, by itself adequate to obtain a search warrant for the suspect's home. . . . The affidavit must demonstrate 'reasonable cause to believe that the things listed as the objects of the search are located in the place to be searched.'"  United States v. Pitts, 6 F.3d 1366, 1369 (9th Cir. 1993), quoting, United States v. Ramos, 923 F.2d 1346, 1351 (9th Cir. 1991).  All facts to support a finding of probable

cause to issue a warrant "must be contained within the four corners of a written affidavit given under oath." United States v. Stanert, 762 F.2d 775, 778, amended, 769 F.2d 1410 (9th Cir. 1985).

Investigator Van Lith's affidavit in support of the warrant application failed to demonstrate adequate probable cause to search 810 7th St. N.  Remarkably, the affidavit failed to establish the constitutionally required nexus between the place to be searched and the objects of the search, as there was no indication that Mr. Duncan had any connection to the premises.

In United States v. Hove, 848 F.2d 137 (9th Cir. 1988), an investigating police officer suspected that Hove was sending bomb threats to her husband.  The officer learned that Hove was staying at her father's residence by tracing a phone number and observing Hove's car at the home.  However, the officer neglected to include this information in the affidavit for the search warrant.  Rather, the affidavit only set forth facts indicating that Hove had sent the threatening letters, without any recitation of facts connecting Hove to the premises to be searched.

The Ninth Circuit reversed the district court's denial of Hove's motion to suppress.  The court held that it was "clear that probable cause to search the . . . residence was not established before the magistrate because the affidavit submitted to obtain the warrant did not explain the significance or relevance of searching this particular location." Id. at 139; see also United States v. Foster, 711 F.2d 871, 878 (9th Cir. 1983), cert. denied 465 U.S. 1103 (1984).

As in Hove, the facts provided to the magistrate in this case failed to explain the significance or relevance of searching 810 7th St. N.  Nowhere in the affidavit was there any statement that Mr. Duncan was living there, or that he had any association with that residence at all.  To the contrary, the affidavit only indicates that he was currently living in Fargo.  In the absence of any facts demonstrating such a connection, no probable cause was established to believe that the images sought by the search warrant would be found at this particular location.

An affiant's desire to search a location does not permit the broad inference that an individual suspected of criminal activity must live there.

The time lapse between the alleged molestation on July 3, 2004 and the August 20, 2004 search of 810 7th St. N. further precludes the conclusion that the warrant was based on sufficient probable cause.  "An affidavit must be based on facts 'so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'"  United States v. Lacy, 119 F.3d 742, 745 (9th Cir. 1997), quoting, Durham v. United States, 403 F.2d 190, 193 (9th Cir. 1968) (further citations omitted).  "The most convincing proof that the property was in the possession of the person or upon the premises at some remote time in the past will not justify a present invasion of privacy."  Alvarez, 358 F.3d at 1203.

It is true that information proffered in the search warrant affidavit will not be stale if "'there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises.'"  Lacy, 119 F.3d at 746, quoting, United States v. Gann, 732 F.2d 714, 722 (9th Cir. 1984).  The mere lapse of time is not controlling in a question of staleness; rather, staleness is evaluated "'in light of the particular facts of the case and the nature of the criminal activity and property sought.'"  Pitts, 6 F.3d at 1369, quoting, United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991).  For example, where there is proof of ongoing criminal activity, such as drug trafficking, "probable cause may continue for several weeks, if not months, of the last reported instance of suspect activity."  United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986) (emphasis in original).

In Lacy, supra, the defendant similarly argued staleness because he had downloaded child pornography ten months before the search warrant was sought.  Based on the affiant's explanation that collectors and distributors of child pornography value their sexually explicitly material highly, rarely if ever dispose of it, and store it for long periods in a secure place, the

Ninth Circuit concluded there was ample reason to believe the items sought were still in the defendant's apartment.   The court was "unwilling to assume that collectors of child pornography keep their materials indefinitely, but the nature of the crime, as set forth in this affidavit, provided good reason to believe the computerized visual depictions downloaded by Lacy would be present in his apartment when the search was conducted ten months later." Id. at 746.

The facts presented in Investigator Van Lith's affidavit did not establish proof of some type of ongoing criminal activity such as drug trafficking that would make it reasonable to conclude that the objects of the search would likely still be present despite this passage of time. Instead, this search more closely resembles the one at issue in United States v. Bailey, 458 F.2d 408 (9th Cir. 1972), which involved a bank robbery that had occurred six weeks prior to the challenged search of a house.  The affidavit in support of the search of the house stated only that one of the suspects had been seen there and that another suspect was arrested at that location.  Id. at 412.  The Ninth Circuit concluded that it was not reasonable to seek evidence of a bank robbery that had occurred six weeks in the past, at a house where the defendant may have been staying only as a social guest.  Id.

Not only did the affidavit at issue here fail to establish any connection between the searched premises and the suspected criminal activity, it also failed to provide any explanation why the nature of the criminal activity made it reasonable to expect the targeted images to be present there seven weeks later.  Given these deficiencies in probable cause, the affidavit failed to justify the search of 810 7th St. N. under the Fourth Amendment.  Accordingly, all fruits of that search should be suppressed.

B.    The August 20, 2004 State Search Warrant Lacked Adequate Specificity

To prevent officers from engaging in general, exploratory searches, the Fourth Amendment requires that search warrants be sufficiently specific in describing what is to be

seized.  See United States v. Adjani, 452 F.3d 1140, 1147 (9th Cir. 2006).  To determine whether a search warrant lacks sufficient specificity, two aspects of the warrant must be examined: its particularity and breadth.  United States v. Bridges, 344 F.3d 1010, 1016 (9th Cir. 2003), quoting United States v. Kow, 58 F.3d 423, 426 (9th Cir. 1995).  Particularity is the requirement that the warrant state clearly what is sought.  Breadth deals with the requirement that the scope of the warrant is limited by the probable cause on which the warrant is based.  United States v. Hill, 459 F.3d 966, 973 (9th Cir. 2006); United States v. Weber, 923 F.2d 1338, 1342 (9th Cir. 1991).

The August 20, 2004 warrant is unconstitutionally overbroad because the supporting affidavit provided no probable cause to believe that the listed computer systems and other media were likely to be found at 810 7th St. N.  See In re Grand Jury Subpoenas Dated Dec. 10, 1987 926 F.2d 847, 857 (9th Cir. 1991) (there must be probable cause to seize the particular things named in the warrant).  Investigator Van Lith's affidavit contains boilerplate language regarding the capability of computers to store images from a video camera, but lacks even a conclusory statement indicating that any computer was located at the targeted premises.  While computers may be capable of interfacing with video cameras in the manner described, video cameras can just as easily operate without the presence of the same.  Given the lack of probable cause as to the presence of any of the computer media sought, the warrant was invalid.

The warrant for 810 7th St. N. also failed to describe with sufficient particularity the things to be searched and seized.  The language of the warrant authorized seizure not only of items actually containing images of the specified minors, but any items that "may be used to possess [such] images," including "[m]edia, in whatever form . . . ."  Exhibit B.  The warrant's expansive language, without reference to any particular offense conduct or time frame, effectively transformed it into a "general warrant," improperly authorizing seizure of all computer media from the premises.  In United States v. Kow, 58 F.3d at 427, the Ninth Circuit

16

found unconstitutional a warrant that similarly authorized seizure of "virtually every document and computer file," while containing no suggestion as to how those items related to specific criminal activity.

In <u>Kow</u>, the court emphasized that the warrant could have been made more particular.

> Most obviously, the warrant could have specified the suspected criminal conduct.   Except for vague references to "fraudulent" transactions and possible disparities between actual and reported income, the warrant failed to give any indication of the alleged crime to which the seized documents pertaned.   We have criticized repeatedly the failure to describe in a warrant the specific criminal activity suspected. . . .
> The government did not limit the scope of the seizure to a time frame within which the suspected criminal activity took place, even though [the agent's] affidavit indicates that the alleged criminal activity began relatively late in HK Video's existence.   Furthermore, although Gordon's affidavit summarized in detail the various locations within HK Video where officers could find relevant documents, this information was excluded from the warrant. . . . Here the government did not contain the scope of the warrant by reference to limiting descriptions in the affidavit such as HK Video's tax identification number, HK Video's account number at the Bank of Trade, or the names of the foreign companies allegedly receiving the proceeds of the defendants' profit-skimming, to wit Ever Spring and J & P Studios. As drafted, the warrant simply was not sufficiently particular.

<u>Id.</u>

The August 20, 2004 state search warrant provided even less particularity to the searching officers than the one in <u>Kow</u>.  It lacked even a vague reference to specific criminal activity, as it failed to incorporate the summary of the alleged molestation contained in Investigator Van Lith's supporting affidavit.  <u>Cf.</u> <u>United States v. Hay</u>, 231 F.3d 630, 636-38 (9th Cir. 2000) (upholding as constitutionally particular a warrant that limited seizure of documents to child pornography, a definition sufficiently specific to focus the search).   It allowed not just the seizure of all computer media, but the wholesale search of all of the contents of not just those items containing the relevant images, but anything that might be used for such a purpose.  <u>Cf.</u>

17

United States v. Lacy, 119 F.3d at 746 (no particularity problem where affidavit in support of warrant request established probable cause to believe defendant's entire computer system was likely to evidence criminal activity and also explained the inability to determine precisely where the sought after images could be found).

The use of this vague and open-ended language, "may be used to possess images," and "including but not limited to," failed to provide the searching officers with any guidance in as to what could and could not be seized and searched, but instead gave them unfettered discretion to seize and search all computer or associated media, including all e-mail files.  The Fourth Amendment's specificity requirement demands that the warrant leave nothing to the discretion of the officers conducting the search.  Adjani, 452 F.3d at 1147, citing, United States v. Cardwell, 680 F.2d 75, 77 (9th Cir. 1982).  Far from seeking to eliminate the searching officers' discretion, in his affidavit, Investigator Van Lith went so far as to seek "permission to determine the level of seizure of hardware and software when this warrant is executed."  Exhibit A.

Like the warrant at issue in Kow, the warrant for 810 7th St. N. could have identified the objects of the search more precisely, thereby complying with the particularity requirement.   It could have restricted its scope to those items actually containing images of the specified minors, rather than those merely having such a potential.  Additionally, the warrant could have set forth the suspected criminal activity, sexual molestation, within its body, or, at a minimum, incorporated by reference the summary contained in the affidavit.

Because the warrant for 810 7th St. N. failed to provide sufficient particularity to satisfy the Warrant Clause of the Fourth Amendment, all fruits of that search should be suppressed.

C.      The Fargo Authorities Exceeded the Scope of the State Warrant

Even where a search warrant is properly issued, "agents are limited by the longstanding principle that a duly issued warrant, even one with a thorough affidavit, may not be used to

engage in a general, exploratory search." <u>Adjani</u>, 452 F.3d at 1150, <u>citing</u>, <u>United States v. Rettig</u>, 589 F.2d 418, 423 (9th Cir. 1978) ("Where evidence is uncovered during a search pursuant to a warrant, the threshold question must be whether the search was confined to the warrant's terms . . . . [T]he search must be one directed in good faith toward the objects specified in the warrant or for other means and instrumentalities by which the crime charged had been committed.   It must not be a general exploratory search . . . .") (internal quotation marks and alterations omitted);  see also <u>Franklin v. Foxworth</u>, 31 F.3d 873, 875 (9th Cir.1994) ( "[T]he reasonableness of a search or seizure depends not only on <u>when</u> it is made, but also on <u>how</u> it is carried out") (emphasis in original).

Even if the August 20, 2004 warrant and Investigator Van Lith's affidavit could be considered to pass constitutional muster, the manner in which the search of the computer and related materials seized from 810 7th St. N. was conducted violated the Fourth Amendment. Detective Schoon, the officer requested to perform the forensic examination of the computer and associated media, flagrantly ignored the warrant's command to look solely for images of the two specified minors.  To the contrary, Detective Schoon conducted an unrestricted forensic examination, which resulted in his review and identification of data far beyond images of T.R.P. and/or N.J.C.

For example, Detective Schoon notes in his report that he examined "numerous images of the suspect that were located on the suspect's computer system," "a [sic] indication that the suspect purchased a Dell laptop computer on e-bay, specifically on 9-11-2002," "a digital image believed to be that particular Dell Latitude laptop computer and a photo of that computer showing the screen as being the Jet Gazette, believed to be the suspect's website," "images [showing] the suspect in various stages of undress," and "images of what appear to be minor children, one with being a minor male with a possible name of S.H., and a minor female with the

possible name of E.H."  Exhibit E.  Even though Detective Schoon acknowledged that "[b]oth of these children are unknown to this investigation," this did not stop him from continuing to open and view the images of these unrelated children repeatedly.  As he audaciously notes, "their photos were seen as recurring photos during the forensic investigation."  Id.  Indeed, Detective Schoon examined and identified all manner of images on Mr. Duncan's computer, except for any images of the minors actually sought by the search warrant.  His report even attaches photocopies of these completely unrelated images.  Id.

The timing of the search of Mr. Duncan's computer system and related media also exceeded the scope of the search warrant.  Despite the affidavit's claim that "review of the data may take weeks or months," the warrant placed a ten (10) day limitation on the authorized search from August 20, 2004.  Exhibit B.  Nevertheless, Detective Schoon's report establishes that he received the computer media on September 1, 2004, and then conducted repeated searches of the data found therein well into 2005.

In United States v. Brunette, 76 F.Supp.2d 30 (D. Me. 1999), the defendant moved to suppress evidence obtained from a particular computer seized from his home on February 9, 1999, pursuant to a search warrant.  The defendant argued that the search conducted was untimely, because the magistrate who issued the warrant directed that all evidence gathered from the computers was to be completed by April 8, 1999.  However, the search of the defendant's computer did not actually commence until April 10, 1999.  The government had even applied for and received a thirty (30) day extension of the warrant, thereby giving it sixty (60) days from the time of the seizure of the computer to conduct the search.  Id. at 42.

The district court found that the government had offered no legitimate reason for the delay.  Because the Government failed to adhere to the requirements of the search warrant and subsequent order, evidence gathered from the defendant's computer was suppressed.  Id.

Inasmuch as the search of Mr. Duncan's computer and related media did not even begin until after the deadline for the August 20, 2004 warrant expired, the evidence derived from that unlawful search should be suppressed under the Fourth Amendment.

**II.     The May 20, 2005 Fargo, North Dakota Search Warrant Lacked Sufficient Specificity**

On May 20, 2005, Fargo Police Officer Greg Esposito filed an Application and Affidavit for Search Warrant for 810 7th St. N., asserting that property was present at that location constituting evidence of the commission of a crime, contraband, things otherwise criminally possessed, or property designed or intended for use as the means of committing a criminal offense.  His affidavit attached "Exhibit A," which listed nine (9) objects of the search:

1.     Letters of correspondence to or from friends and or family as to his whereabouts.

2.     Letters form [sic] credit card Company's [sic] showing recent purchases.

3.     Letters from phone Company's [sic] showing recent to and from calls.

4.     Computer files showing email messages to or from persons stating his travel intentions.

5.     Indicia of occupancy of the apartment.

6.     Records of vehicle agreements.

7.     Record of ownership of vehicle registered to him.  Bearing vehicle identification number of 1G2nW14NXNC294064.

8.     Airline, train, or bus tickets.

9.     Travel plans.

Exhibit K.

Officer Esposito presented the facts to support a finding of probable cause in an attachment to the warrant application.  Id.  On May 4, 2005, he was advised that Enterprise car

21

rental agency had reported that Mr. Duncan had failed to return a rental car that was due back on April 20, 2005. The car had been reported stolen. At approximately the same time that Enterprise made its report, the Fargo police also learned that parts to a key tag belonging to the rental car were found by a park ranger in a park in Wyoming. Id.

Officer Esposito determined that the National Crime Information Center listed 810 7th St. N. as the address for Mr. Duncan and that Mr. Duncan had registered as a sex offender living at that location. Officer Esposito was aware Mr. Duncan had been living at that address on August 20, 2004, because a search warrant had been executed there in connection with his criminal sexual conduct charge. Id.

Officer Esposito contacted the owner of the premises at 810 7th St. N., Jeff Ware. Ware stated that Mr. Duncan's rent check for the month of May had bounced. Ware further advised that Mr. Duncan currently had property at that address, and that he had not seen Mr. Duncan since the middle of April. Id.

Joni Buzick, the woman who lived upstairs from Mr. Duncan, told Officer Esposito that she received an e-mail from him on April 16, 2005. In the e-mail, Mr. Duncan asked Ms. Buzick to take care of his cats, Cooper and Rusty. He also wrote in the e-mail that "life just isn't worth it," and that he was "truly sorry, more than anyone will ever know." The e-mail concluded by asking Ms. Buzick not to reply as he would be out of touch. Id.

The affidavit also noted that Mr. Duncan had an outstanding warrant from Becker County, Minnesota. Officer Esposito explained that through his education, training, and experience, he knows that the items identified in "Exhibit A" are sometimes documented or left behind when people leave for extended periods of time. Id.

The search warrant issued by the state magistrate that same day expressly incorporated Officer Esposito's "Exhibit A" and concluded that the affidavit established probable cause to

believe that such property is concealed at the 810 7th St. N., Main Floor, Fargo, Cass County, North Dakota.  Exhibit L.  It directed the authorities to search that premises for the specified property within ten (10) days from August 20, 2004.  Id.

        The fruits of the search conducted on May 24, 2005 pursuant to this state warrant should be suppressed because the warrant failed to state with sufficient particularity the things to be seized.  The warrant and "Exhibit A" directed the police to seize the targeted items without narrowing the scope to a particular person, criminal offense, or time period.  Instead, the warrant left it to the searching officers' discretion to determine what constituted "recent" purchases and calls without identifying the subject of those calls.  With respect to the travel plans and tickets, the warrant did not even impose the vague restriction of "recent," but rather provided no way for police to differentiate between those items whose seizure was justified and those that were not.

        This warrant could easily have been drafted with more precision to render it sufficiently specific under the Fourth Amendment.  It could have specified that only those pieces of correspondence, travel plans or tickets, credit card purchases, and phone records pertaining to Mr. Duncan on or after the date he was charged with Criminal Sexual Conduct in the Second Degree, March 4, 2005, were to be seized.

        By failing to limit the parameters of the officers' search, the warrant permitted seizure of practically all "mail" found on the premises, regardless of its content.  The overbreadth of the warrant is demonstrated by the seizure of the 1997 immigration document showing Mr. Duncan's travel to Mexico, which the government has identified as an exhibit it intends to introduce at trial.  The search warrant affidavit did not provide probable cause to seize travel documents dating eight years before Mr. Duncan's unlawful flight and failure to return a rental car in 2005.

        For the foregoing reasons, the May 20, 2005 search warrant violated the Fourth Amendment.  Consequently, the government should not be permitted to rely on the evidence

1   seized pursuant to that warrant for any purpose.

2       **III.**   **The Police Unlawfully Seized Evidence from the Jeep on**
3                   **July 2, 2005**

4       A   July 2, 2005 -- 8:16 a.m. Search Warrant

5       Following Mr. Duncan's arrest, Detective Maskell from the Kootenai County Sheriff's

6   Office applied to a state magistrate judge for a search warrant.  Detective Maskell provided no

7   written statement, but instead testified as to the facts offered as probable cause to justify the

8   issuance of the warrant.  See Exhibit O.

9         At the outset of the hearing, Detective Maskell requested the magistrate to take judicial

10  notice of the previous testimony he had offered in the case in connection with other applications

11  for search warrants pertaining to the original crime scene.  The magistrate granted that request.

12        Detective Maskell proceeded to recount the events relating to the discovery of S.G. at the

13  Denny's in Coeur d'Alene, as well as Mr. Duncan's arrest.  He testified that S.G. had identified

14  Mr. Duncan as the person who killed the three members of her household on May 16, 2005.  She

15  stated that Mr. Duncan subsequently took her and her brother to a campsite in Montana.  S.G.

16  also advised the authorities that Mr. Duncan abused her and her brother while in Montana.  She

17  described how Mr. Duncan killed her brother, and how his body was disposed.  S.G. further

18  stated that Mr. Duncan had taken photographs of her and D.G. on a digital camera during the

19  time they were held captive.  Detective Maskell testified that employees at the Denny's identified

20  a 2005 red Jeep Grand Cherokee as the vehicle Mr. Duncan had arrived in with S.G.  The

21  magistrate indicated he would attach the impound notice containing the description of the Jeep to

22  the search warrant.

23        Based on this verbal testimony, the magistrate found probable cause and signed the

24  search warrant that Detective Maskell had previously prepared.  That warrant was a pre-printed

25

26

27

form that Detective Maskell had filled in with his own handwriting.  The warrant specifically

provided:[8]

County of Kootenai, STATE OF IDAHO, to:

Brad Maskell, or a sheriff, constable, marshal, policeman or other
peace officer in Kootenai County.

Proof of testimony under oath having been presented to me by
Brad Maskell that there is probable cause to believe that certain
property, to-wit:

forensic evidence, including but not limited to fingerprints, hair, semen,
blood, DNA, computers & discs, cameras & film, firearms, ammunition,
tools, duck [sic] tape, zipties clothes, personal hygiene items, papers,
rental/lease agreements, receipts, wallets, keys, maps, chains, cell phones,
duffel bags, 2005 Jeep Laredo Grand Cherokee, bank statements, gloves

which property is the fruits of the crime of:

kidnapping, rape, murder

and is presently located at the premises described as follows:

Kootenai County Sheriff's Impound Yard at Dalton & Govt Way.

WHEREFORE, you are commanded to:

1.      Forthwith search the above [X] premises and/or [X] vehicle
within 14 day(s) or [] --- hour(s), for the above described property,
which search shall be conducted [X] in the daytime only OR [] in
the night time or daytime.

2.      If the above described property, or any part thereof, is found,
then seize said property and leave a copy of this warrant, and a receipt
that describes in detail the property seized, with the person from whom
it was taken, or in the place where said property was found.

3.      If the above described property, or any part thereof, is found,
then prepare a written inventory, describing the property in detail, in the
presence of the person from whom it was taken, or in that person's
absence, in the presence of some credible person.

---

[8]  The underlined portions represent those sections of the search warrant form filled in with
Detective Maskell's handwriting.

4.      Return this search warrant . . . and the written inventory to any magistrate, at the Kootenai County Courthouse at Government Way and Garden Avenue, in the City of Coeur d'Alene, Idaho.

Dated this 2nd day of July, 2005, at 8:16 o'clock, a.m.

/s Scott Wayman, Magistrate Judge

Exhibit P.  The authorities seized eighty-two (82) items from the Jeep.  Exhibit Q.

1.      The Police Exceeded the Scope of the Search Warrant

A search is unreasonable under the Fourth Amendment, and thus unconstitutional, if it is performed without proper judicial authorization.  United States v. Hurd, 499 F.3d 963, 966 (9th Cir. 2007), citing, Groh v. Ramirez, 540 U.S. 551, 562-63 (2004) (additional citations omitted).  "[T]he scope of a lawful search is defined by the object of the search and the places in which there is probable cause to believe that it may be found."  Maryland v. Garrison, 480 U.S. 79, 84 (1987)  "[I]f the scope of the search exceeds that permitted by the terms of a validly issued warrant . . . the subsequent seizure is unconstitutional without more.  Horton v. California, 496 U.S. 128, 140 (1990).  Police have no discretion to seize items not listed on a warrant even if the warrant meets the Fourth Amendment's particularity requirement.  San Jose Charter of the Hells Angels Motorcycle Club v. San Jose, 402 F.3d 962, 974 & n.11 (9th Cir. 2005), discussing, Marron v. United States, 275 U.S. 192 (1927).

Suppression is generally the proper remedy when the police go beyond the scope of an authorized search warrant by searching places or seizing evidence not included in the warrant.  Hurd, 499 F.3d at 966, citing, United States v. Mittelman, 999 F.2d 440, 445 (9th Cir. 1993) (holding that "the district court should determine what evidence, if any, was seized in violation of the warrant and order suppression of that evidence"); United States v. Chen, 979 F.2d 714, 717 (9th Cir. 1992) ("Ordinarily, only evidence that is obtained in violation of a warrant is suppressed"); United States v. Crozier, 777 F.2d 1376, 1381 (9th Cir. 1985) (holding that "those

items which fall outside the scope of the warrant need be suppressed").  To determine whether evidence should be excluded, the Ninth Circuit uses an objective test:  whether a reasonable officer would have interpreted the warrant to permit the search at issue.  United States v. Gorman, 104 F.3d 272, 274 (9th Cir. 1996).

The authorities exceeded the scope of this warrant by seizing property from a place not authorized by its plain language.  The warrant failed to identify the 2005 Jeep as the location where the listed property sought would be found; therefore, it did not grant the officers the power to take objects from inside the vehicle.  Because this search warrant only authorized the police to search for the Jeep at the impound yard, rather than inside it for the other listed property, the police officers exceeded its scope by entering the vehicle and removing items.

The Supreme Court's decision in Groh v. Ramirez, 540 U.S. 551 (2004) highlights the significance of this warrant's complete misidentification of the place to be searched.  In Groh, in that portion of a search warrant form calling for a description of the "person or property" to be seized, the petitioner typed a description of the place to be searched, rather than the alleged stockpile of firearms to be recovered there.

The Court held that the warrant was "plainly invalid" under the Fourth Amendment because it "did not describe the items to be seized at all."  Id. at 557 (emphasis in original).  Because the warrant was "so obviously deficient," the resulting search had to be treated as effectively having been "warrantless."  Id. at 558.

Similarly, the search warrant at issue here failed to describe the intended place to be searched at all.  Detective Maskell's handwritten affidavit designated the Jeep not as the place to be searched, but as one of the items sought to be seized from the "premises" at the "Kootenai County Sheriffs Impound Yard."  Thus, the seizure of all the items from the Jeep must likewise be considered "warrantless" and unreasonable under the Fourth Amendment. "We have clearly

stated that the presumptive rule against warrantless searches applies with equal force to searches whose only defect is a lack of particularity in the warrant." Id. at 559 (citation omitted).  The Groh Court rejected the petitioner's argument that the lack of specificity in the warrant should be excused as long as the search was still reasonable and in otherwise keeping with the goals served by the particularity requirement.  See id. at 559-60.

These flaws are not minor technicalities that can be overlooked under the Fourth Amendment.  Cf. id. at 558-59 ("'We are not dealing with formalities'") (citation omitted). Moreover, even if Detective Maskell's verbal testimony correctly specified that the targeted items could be found inside the Jeep, this does not render the warrant constitutional.  "The fact that the application adequately described the 'things to be seized' does not save the warrant from its facial invalidity.  The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents."  Id. at 557 (citations omitted) (emphasis in original).

The police also exceeded the scope of the warrant by seizing items not covered by its terms.  The evidence/property receipt demonstrates that the police did not restrict their seizure of items from the Jeep to those specifically enumerated in the search warrant.  To the contrary, the officers removed all property from the vehicle.  See Exhibit Q.

Several items taken from the Jeep that cannot be characterized as falling within the parameters of the objects sought by the search warrant are: Exhibit X11 (1) Hitachi 4 GB Microdrive and (1) Hitachi 4GB Microdrive chip; Exhibit X20 (1) Magellan Sport Trak Map GPS; (1) Exhibit X28-1 (1) NetGear Wireless PC card; Exhibit X30 (1) pair VanGuard binoculars in case; Exhibit X44 (1) sleeping bag in storage bag (1) X81 (1) Cobra Model XRS 777 radar detector; Exhibit X68 (1) medium sized green/gray tent; Exhibit X74 Green "Ozark Trail" 4 person dome tent bag and contents; Exhibit X80 Missouri license plates, #355 REP (Apr. 07); Exhibit X05-1 (1) "Night Owl" scope (night vision goggles) and GPS case.  Id.

Furthermore, this search warrant never authorized the search of the contents of the Dell Latitude laptop computer.  Because they were not described in the search warrant, the seizure of these items was unconstitutional.[9]

The record establishes that it was not objectively reasonable for the police to seize all the property in the Jeep beyond the limited scope of this search warrant.  Detective Fred Swanson of the Idaho State Police was assigned to process the Jeep for evidence.  Exhibit W.  At approximately 9:00 a.m. on July 2nd, he was advised that Detective Maskell had obtained a warrant to search the Jeep.  However, Detective Swanson began searching the Jeep at that point, prior to receiving the written warrant.  Rather, as he notes in his report, "I verbally served the search warrant at that time."  Id. at 13.  Regardless, the police began seizing everything inside the Jeep.

The seizure of items not specifically described in a search warrant cannot possibly be characterized as objectively reasonable when the police conducting the search and seizure do not even bother to review the warrant's contents.  "It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted.  Because petitioner did not have in his possession a warrant particularly describing the things he intended to seize, proceeding with the search was clearly 'unreasonable' under the Fourth Amendment."  Groh, 540 U.S. at 563.  In Groh, the Court rejected the petitioner's claim that such a principle imposed a "novel proofreading requirement on officers executing warrants."  Id. at 563, n.6.  Requiring that the officers leading a search team make sure they have a proper warrant that in fact authorizes

---

[9] In United States v. Hurd, supra, at 966, n.3, the Ninth Circuit noted that Hurd's challenge to under the Fourth Amendment's particularity requirement was limited to his argument that the warrant failed to authorize the search of the residence in question rather than as a separate challenge to the adequacy of the warrant's description itself of the place to be searched or the items to be seized.  The defense respectfully brings both related but separate challenges to the instant search warrant.

the search and seizure they are about to conduct does not impose a duty to proofread; rather, it

imposes a duty to ensure that the warrant conforms to constitutional requirements.  Id.  Detective

Swanson's premature actions reflect his disregard for and failure to comply with this

constitutional duty.

      2.    The Warrant was Overbroad

      Even if the impromptu search warrant completed by Detective Maskell could be

considered sufficient to authorize the seizure of all the property inside the Jeep, it was

unconstitutionally overbroad as to the Dell laptop computer, microdrives, and GPS unit.  Review

of the testimony provided by Detective Maskell to the state magistrate as probable cause reveals

nothing that establishes that the computer or these other devices constituted the fruits of a crime.

During the testimony, the magistrate specifically asked whether the items listed in Detective

Maskell's warrant related to his crime scene investigation and conversation with S.G.  While

Detective Maskell testified that S.G. told the police that Mr. Duncan had taken photos of her and

D.G. while being held by him, he provided no information to the magistrate linking these

particular items to the described criminal activity.  Rather, Detective Maskell's only comment

about the computer was: "Additionally there's a computer uh, that's located in that vehicle that is

a lap top uh, computer that's wired into the uh, electrical system of the uh -- the vehicle through a

uh, cigarette light jack.  Uh, that uh, computer uh, is a -- an item that the man uh, appears to have

been used.  I'm asking to seize that computer and all digital information from that computer."

Exhibit O at 75.

Detective Maskell's conclusory statement about the computer does not constitute

probable cause to believe it was a fruit of the crimes stated in the search warrant.  He provided

nothing in his testimony indicating how the computer was used in connection with the criminal

activity, such as any link between the computer and the photographs reportedly taken by Mr.

Duncan with a digital camera.  Accordingly, the warrant was unsupported by probable cause justifying the seizure of the Dell laptop, much less its contents.  Of course, no probable cause was provided as to these other items, the microdrives and the GPS unit.

Consequently, the seizure of all the items from the interior of the Jeep pursuant to this first search warrant on July 2, 2005 violated the Fourth Amendment.  That evidence must, therefore, be suppressed.

B.      July 2, 2005 -- 3:05 p.m. Search Warrant

Later in the afternoon on July 2, 2005, Detective Maskell returned to the state magistrate to seek a second search warrant.  The magistrate again took judicial notice of Detective Maskell's prior testimony in connection with his other warrant requests.  Exhibit R at 91-92.

Detective Maskell testified that during the day, while engaged with other responsibilities, he had directed other officers to conduct the search pursuant to the search warrant issued earlier that morning.  While so occupied, he was advised that during the search of the Jeep, officers came across a GPS unit, a video camera, and video media.  Detective Maskell provided no additional facts,  but told the magistrate that he sought to incorporate those devices "into the search warrant" and look at their contents.  Id. at 93.

The written affidavit also submitted by Detective Maskell described general characteristics of individuals involved in possessing, distributing, and manufacturing child pornography.  Exhibit S.  It also explained how individuals use personal computers in connection with child pornography.  Id.  It concluded with the summary assertion that "probable cause exists to seize and search the computer, hard drive, digital camera and memory stick/card which is currently found in a 2005 Jeep Grand Cherokee Laredo bearing Missouri License Plate 355REP currently housed in Kootenai County Sheriff's impound yard located at Government Way and Dalton, Coeur d'Alene, Kootenai County, Idaho." Id. at 9.

31

1      The state magistrate found probable cause and issued the requested search warrant.

2    Exhibit R at 94.  Another handwritten form, this warrant specifically provided:

3          County of Kootenai, STATE OF IDAHO, to:

4          Brad Maskell, or a sheriff, constable, marshal, policeman or other
5          peace officer in Kootenai County.

6          Proof vial affidavit & testimony under oath having been presented to me
           by Brad Maskell that there is probable cause to believe that certain
7          property, to-wit:

8          GPS unit, video camera, video tapes, computer, digital camera &
           electronic data, records, files, images, records, documents, materials,
9          and information (as defined by their ordinary meaning and as defined
           in the attachment hereto) & their contents, accessories, adaptors,
10         connectors, hardware & peripheral items.

11         which property is the fruits of the crime of:

12         homicide, kidnapping, child sexual abuse & possession of child
13         pornography

14         and is presently located at the premises described as follows:

15         See attached "ITEMS TO BE SEARCHED" currently located
           at the Kootenai County Sheriffs Impound Yard within a
16         2005 Jeep Cherokee Laredo (for which a search warrant had
           already been issued on todays date.
17

18         WHEREFORE, you are commanded to:

19         1.      Forthwith search the above [X] premises and/or [X] vehicle
           within 14 day(s) or [] --- hour(s), for the above described property,
20         which search shall be conducted [X] in the daytime only OR [] in
           the night time or daytime.
21

22         2.      If the above described property, or any part thereof, is found,
           then seize said property and leave a copy of this warrant, and a receipt
23         that describes in detail the property seized, with the person from whom
           it was taken, or in the place where said property was found.
24

25         3.      If the above described property, or any part thereof, is found,
           then prepare a written inventory, describing the property in detail, in the
           presence of the person from whom it was taken, or in that person's
26         absence, in the presence of some credible person.

27

4.      Return this search warrant . . . and the written inventory to any magistrate, at the Kootenai County Courthouse at Government Way and Garden Avenue, in the City of Coeur d'Alene, Idaho.

Dated this <u>2nd</u> day of <u>July</u>, 200<u>5</u>, at <u>3:05</u> o'clock, <u>p</u>.m.

/s Scott Wayman, Magistrate Judge

<u>Exhibit T</u>.

The warrant attached the "ITEMS TO BE SEARCHED" listed in Detective Maskell's affidavit, which covered:

Any and all computers, computer hardware, software, documentation, passwords and data security devices; any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop:, "notebook computers, or "PDA" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, Zip and/or Jaz drives and disks, optical storage devices); transistor-like binary devices (such as keyboards, printers, scanners, plotter, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks). Digital camera devises, photos, memory sticks/cards and flash cards. <u>GPS unit, video camera, tapes and recordings, accessories, adaptors, connectors, hardware, and peripheral items</u>.[10]

<u>Id</u>.

1.      <u>This Second Warrant Was Tainted by the Unlawful Seizure Based on the Earlier Search Warrant on July 2, 2005</u>

The second search warrant obtained by the police on July 2, 2005 cannot rescue the unlawful seizure of the property found inside the Jeep. As an initial point, this second warrant must fail because it was based largely in part on evidence taken in violation of the Fourth

---

[10] The underlined portion reflects items that Detective Maskell added in handwriting to the stock language in this section.

33

Amendment pursuant to the first warrant.  "[E]vidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search." United States v. Barajas-Avalos, 377 F.3df 1040, 1054 (9th Cir. 2004) (citations omitted). Detective Maskell testified that the objects of this second search warrant were located by Captain Rollins while the first search was conducted.  Exhibit R at 93.  Accordingly, the second warrant was fatally tainted by the unlawful seizure that took place earlier in the day.

       2.      The Police Exceeded the Scope of this Second Search Warrant

Even if this second warrant could be considered independent of that previous unlawful seizure, it still fails because the police exceeded the scope of this warrant as well.  The warrant specifically states that the targeted items are "currently located" at the impound yard "within" the 2005 Jeep.

In fact, at the time this second warrant was executed, the listed items had already been removed from the Jeep.  Detective Maskell's warrant return indicates that this second warrant was executed at 3:30 p.m. on July 2, 2005.  Exhibit T.  However, Detective Swanson noted in his report, "On July 2, 2005, at approximately 1353 hours, I turned this [Dell laptop] computer and the listed peripherals over to FBI Agent Mortensen so that he could transport it to a computer forensics expert."  Exhibit W at 17.  Thus, this particular item was removed at 1:53 p.m., over ninety (90) minutes before Detective Maskell obtained authorization for its removal from inside the Jeep.

The record further shows that the other items covered by this second warrant had also already been removed.  Detective Swanson's report lists the Dell laptop as Exhibit #X19.  Id. The Hitachi microdrives are listed as Exhibit #X11, which signifies they were removed before the laptop itself.  Id. at 16.

Detective Swanson listed the GPS unit as Exhibit #X20, the item immediately addressed

34

following the Dell laptop.  Id. at 17.  If the laptop was given to Agent Mortensen at 1:53 p.m., then it had to be removed from the Jeep prior to that time.  As the next item listed on his report, it stands to reason that the GPS unit was removed around the same time as the laptop, or shortly thereafter.

This inference is corroborated by the July 2, 2005 report of Detective Jerry Northrup.  Therein, Detective Northrup states, "On 07-02-05 at about 1600 hrs. Capt Clark Rollins contacted me at the Kootenai County Sheriff's Department in reference to obtaining data from a GPS unit recovered during a search warrant of Duncan's vehicle.  Exhibit X.  Capt Rollins handed me an evidence bag that contacted [sic] a Magellan Sporttrak GPS unit two instruction manuals and a computer data cable for the unit."  Id.  If the GPS unit was already out of the Jeep, packaged in an evidence bag with its accompanying manuals and cord, and in Captain Rollins' possession at 4:00 p.m. to be transferred to Detective Northrup, it surely was taken from the Jeep prior to the 3:30 p.m. time when the second warrant was executed by Detective Maskell.

This chain of events is consistent with the execution of the earlier search warrant.  There, Detective Swanson began the search before even receiving the warrant in hand.  Rather than waiting for any search warrant, the police immediately began seizing items from the Jeep.  The entries in these police reports confirm that the police neither waited for the first warrant to be provided, nor discontinued their search until the receipt of this second warrant.

3.    This Second Search Warrant Was also Fatally Overbroad

This second warrant failed to cure the overbreadth of the first warrant.  In his affidavit and testimony, Detective Maskell never provided probable cause establishing that the GPS unit, laptop computer, and microdrives were evidence or the "fruits" of the crimes listed in the warrant.  Although his written affidavit explained typical characteristics of those involved with child pornography and how those individuals often use computers in connection with that

unlawful activity, it did not establish Mr. Duncan as a member of that class of persons.  The affidavit also failed to explain how these items had been used for any illegal purpose.

In <u>United States v. Weber</u>, 923 F.2d 1338 (9th Cir. 1991), the authorities applied for and obtained a search warrant for the defendant's home.  The investigation began two years earlier, when a customs agent seized a package apparently addressed to the defendant at his address that contained two pieces of advertising materials that "apparently" depicted the sexual exploitation of children.  Twenty months later, the agent sent a test advertisement to the defendant containing the name and address of a purported distributor of child pornography in Canada.  The defendant, without actually seeing actual images of the advertised items, placed an order for four sets of such sexually explicit photos.  Based on this information and a general description of the proclivities of pedophiles, the agent stated in his affidavit his belief that the authorities would find additional visual depictions of minors engaged in sexual conduct.  <u>Id.</u> at 1340-41.

In concluding that the warrant was overbroad and not fully supported by probable cause, the court held that where the government presents expert opinion about the behavior of a particular class of persons in an affidavit in support of a search warrant request, for the opinion to have any relevance, the affidavit must lay a foundation showing that the person subject to the search is a member of the class.  <u>Id.</u> at 1345.  The court criticized the affidavit's attempt to portray the defendant as a child molester: "In this case, the 'expert' testimony in the affidavit was foundationless.  It consisted of rambling boilerplate recitations designed to meet all law enforcement needs.  It is clear that the 'expert' portion of the affidavit was not drafted with the facts of this case or this particular defendant in mind."  <u>Id.</u>

The Ninth Circuit's criticism applies equally to Detective Maskell's affidavit in support of the second warrant.  This affidavit obviously incorporates boilerplate language used in connection with federal applications for search warrants in child pornography cases.  However, it

fails to demonstrate how Mr. Duncan fell within the class of individuals involved with "possessing, distributing and manufacturing" child pornography.  Nothing in either the affidavit or the oral testimony explains how Mr. Duncan used the laptop or microdrives to store or create such material.  Weber identifies affidavits such as these as starkly deficient.

There is even less information provided with respect to probable cause to believe the GPS unit was the fruit of the stated crimes.  Detective Maskell's affidavit and testimony lacked any explanation whatsoever of the purpose of such devices, much less how the one found in the Jeep constituted evidence of a crime or contraband.  Rather, Detective Maskell simply interlineated into the affidavit the assertion that a GPS unit had been located inside the Jeep during the execution of the earlier search warrant.

Thus, this search warrant, and the seizure of evidence based on it, violated the Fourth Amendment, requiring suppression.

C.      Law Enforcement Exceeded the Scope of Both Search Warrants
        for the Jeep By Conducting Forensic Examinations of the Dell
        Laptop Computer and Microdrives Beyond the Warrants' Time
        Limits

In addition to the various problems rendering unconstitutional these two state search warrants for the Jeep and its contents, the records from the RCFL and Curtis Rose show that the authorities have searched the contents of the Dell laptop and microdrives repeatedly over the course of the two years following their seizure.  In his testimony in support of his request to search these items, Detective Maskell asked for thirty (30) days to examine these items, because he recognized they would have to be sent off-site -- to the FBI lab in Salt Lake City.  Exhibit R at 94-95.  The state magistrate, however, granted only fourteen (14) days to examine the contents of these items, indicating that if more time was needed, the police would have to address it at that point.  Id. at 95.

Despite the magistrate's express statement, the authorities never sought an extension of the time to conduct their forensic examinations under the state search warrant. Their failure to comply with the state magistrate's deadline, expressly stated in the warrant, is yet another reason why these searches should be found unconstitutional.

The fact that the government obtained the above-described federal search warrants in August, 2005, does not render the ongoing examinations of these items constitutional. The federal search warrants were predicated on the unconstitutional seizure of the contents of the Jeep. Accordingly, those federal search warrants were themselves tainted by the Fourth Amendment violations surrounding the execution of the state warrants.

**Conclusion**

Because the seizures of Mr. Duncan's property based on these assorted search warrants failed to satisfy the demands of the Fourth Amendment, all of the evidence deriving therefrom must be suppressed as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); United States v. Patzer, 277 F.3d 1080, 1085-86 (9th Cir. 2002) (holding that the defendant's arrest was unlawful; therefore, all evidence obtained thereafter, including his statements and evidence found in his car, had to be suppressed as "fruit of the poisonous tree"). This includes, but is not limited to, all of the seized items themselves, all results from forensic testing of the same, all of the contents of the various computers and storage devices, all forensic analyses of those objects and all of the coordinates downloaded from the GPS unit, including all evidence seized from investigating the corresponding locations. The government bears the

1  burden of showing that evidence is <u>not</u> "fruit of the poisonous tree."  <u>Patzer</u>, 277 F.3d at 1086.

2     Dated: November 5, 2007

3                                          Respectfully submitted,

4

5                                          ___/s/_____
                                           Mark A. Larranaga
6                                          Thomas Monaghan
                                           Judy Clarke
7                                          Attorneys for
                                           JOSEPH EDWARD DUNCAN, III
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27