## DECLARATION OF KEVIN COYNE

I, Kevin Coyne, declare:

1. I was a participant in Western State Hospital's Sex Offender Program during the 1980's. I entered the program in the Spring of 1981 when I was 20 years old, following an offense involving minor females. By the Spring of 1985, I had progressed to the outpatient phase of the program. I was still in counseling once a week when I was arrested for re-offending in August of 1986. I was sent to prison to serve out the remainder of my 15-year sentence.  Even though Joseph Duncan and I were at Western State at the same time, I did not know him.

2. When I was first arrested in 1981, I spoke to a counselor at the Pierce County Jail named Kit Bale. Kit told me about my options for sentencing: either sex offender treatment or prison time. Kit told me I could complete Western State's Sex Offender Program in 18 months, so I opted for that. Kit's estimate turned out to be unrealistic.  I ended up spending more than three times that in the program without ever completing it.

3. During my five years at Western State I was in "Sunrise" group. There were about 9 to 10 groups, including "Sunrise," "Phoenix," "Aquarius," "Sapphire," "North," "East," "West," and "South," with an average of 20 residents per group. There were three or four groups per floor, or ward. There were about 200 residents in the inpatient program at any given time.

4. The day to day program activities were fairly regimented. On Monday through Friday, we were up at 6:00 a.m.  We ate breakfast and attended work assignments. Work assignments were determined by the Group Charge, who was voted in by the group and

KC

Exh. 4 - 000027

ran the ward during the day. It was that person's job to designate work assignments for the other program participants, both on and off ward, as well as scheduling medical appointments for each resident. Being Group Charge was a privilege and reward for good behavior. After work assignments, which could be working in the laundry or kitchen, or somewhere off ward, we would have lunch.

5. Group therapy meetings began after lunch at 1:00 p.m. and lasted until 3:30 or 4:00 p.m. Therapists usually did not attend group therapy sessions. There was no set time for meetings to end and when sessions were intense, they could last quite a long time. Dinner break was at 4:30 p.m. and we were back in group therapy at 6:00 p.m. These evening meetings were usually over by 9:00 p.m. but I recall meetings going as late as 2:00 a.m.

6. There was a multi-purpose room, called the "MPR room", where participants were required to masturbate at least once a week. You had to create a sexual fantasy to use and share it with the group to make sure the fantasy was appropriate. There was a log kept on the door that notated when someone entered and left the MPR room. Most of the participants found this to be incredibly embarrassing.

7. The Sex Offender Program did not allow bisexuality.  They forced participants to "choose" whether they were heterosexual or homosexual. If someone identified himself as bisexual the therapist would force him to choose, stating that he could never have a healthy relationship if he didn't. I felt that this forced people to be less open with their sexuality for fear of being ridiculed and punished.

8. The overall attitude of Western State's Sex Offender Program was that we, as participants, were sick individuals and nothing but liars. The staff and therapists in the


KC

Page 2 of 9

program acted as if it were their job to punish and humiliate us. They referred to us as SPs – Sexual Psychopaths. We were always guilty, no matter the circumstance, until proven innocent.

9. There was no individual therapy offered at Western State's Sex Offender Program. Most of the therapists did not even regularly attend group sessions, so they relied on particpants' spotty note-taking or tape recordings to determine how the members were progressing. The only feedback we got was when the therapist would read the notes of the group's volunteer note-taker and make comments. The residents took turn taking notes so they were only as reliable as the note-taker for the session.

10. I had two therapists during my time in the Sex Offender Program, Charles "Chuck" Dockery and Beth Bierbaum. Chuck attended group once or twice a week, which was more frequent than many of the other therapists. The therapists had a very limited function. Treatment, to the extent there was any, was provided by the residents of the groups, not the therapists. This was a major problem since none of us had training in therapy and were all there as a result of problems of our own.

11. Since the therapists rarely attended group sessions, the senior-most members of the group controlled the "therapy" sessions and tended to be extremely aggressive. The goal was to break down the participants and the approach was extremely confrontational. It often became abusive and quite difficult to handle. Just witnessing the abuse on another resident was bad enough, but it was even more terrifying when it was directed at you. The approach was particularly damaging to the younger participants, especially those who


KC

Exh. 4 - 000029

were immature or naïve. The sexual stories of other group members would have been even more horrifying and shocking to a teenager without a developed sexual identity.

12. Senior members of the group were rarely singled out for scrutiny and were able to avoid dealing with their issues. They instead targeted the younger members for abuse and humiliation. Younger members weren't allowed to call older members on their behavior or thoughts, or defend themselves from attack. Whether the accusations were real or imagined you were required to take responsibility and blame, or risk the entire group turning on you even more.

13. By the time I became a senior member of my inpatient group I was fed up with the mistreatment of younger group members and I finally had the power to speak up. When a young member was being singled out by a senior member of the group, I stood up for the new member and reminded the group that the senior member had slit a goat's throat while having sex with it and he himself had things to deal with. Because I had been in the program as long as this man I was able to speak up without negative consequences. Very few of the senior members ever took similar actions to prevent the bullying of the younger members.  Unfortunately, the "methods" employed by the program were not effective for treatment and I learned nothing positive from the program.

14. In addition to regular "therapy" sessions, special meetings could be called at any time, including all hours of the day and night. Any resident or staff who had an issue with another resident could call a special session at any time. Depending on the issue, the special sessions could last hours. Inappropriate behavior was one of the reasons for calling a special session.  For example, a special session would be called if a participant

*KC*
KC

Exh. 4 - 000030

were to be caught masturbating on the ward. The issue would have to be discussed before the group could leave.

15. The program instituted "groundings" when more serious problems arose, such as escapes or sex between participants. Groundings occurred when a problem or issue surfaced within a group, a particular floor of the ward, or the whole program and could apply to a particular group, floor of the ward or the entire program. A therapist could also ground their group if they felt that the group was falling apart and was no longer cohesive. Staff and therapists instituted the grounding, decided who would be grounded, and determined when the grounding would be removed. Groundings could last days or longer, sometimes up to a month or more.

16. During groundings, group meetings lasted all day and night, except for breaks for meals. The therapist expected the group to determine what went wrong and caused the misconduct, how they missed the warning signs, and how they could have prevented it from happening. No one progressed through the program, all step movement was frozen and everyone in the group was held in limbo until the therapist determined the issue had been resolved. With all of the groundings, it could sometimes take a few years to progress from one step to the next.

17. The lack of sleep from meetings, groundings and special sessions was especially difficult to get used to. Sleep deprivation was a very real problem. It felt like treatment was 24 hours a day and every resident felt the constant strain of being scrutinized by other residents and staff.

*KC*
——
KC

Exh. 4 - 000031

18. Weekends were visiting days. Group therapy meetings were held in the evenings after visits ended. Therapists never attended weekend sessions. Meetings usually started at 9:00 p.m. and lasted for about an hour. Again, the meetings could last longer depending on what was being covered by the group. The weekend meetings were supposed to afford the residents an opportunity to discuss whatever might have come up during visits with family and friends.

19. One of the other therapists I remember well is Mike Shepherd. I was never in Shepherd's group but I interacted with him in the hallways, and heard about him from other participants. He was a big guy, heavy set with a gut. He was intimidating and overbearing, and he regularly talked over others. He had a reputation for being the most verbally abusive and aggressive therapist. He would walk down the hallway of the program, bullying participants from all groups and accusing them of all kinds of infractions.

20. I ended up spending more time with Mike Shepherd when I became the leader of my group and we attended group administrative meetings together during 1983 and 1984. All of the therapists were present for the monthly group meetings, including the program director Maureen Saylor, as well as one or two representative members from each group. The group leaders were usually in step 7 or higher of the program and were responsible for reporting their group's progress and any issues they were experiencing.

21. Mike Shepherd constantly interrupted while group leaders were making their reports to accuse them of causing the problems they were reporting. Maureen Saylor, the director, obviously supported this behavior as she would also verbally attack the group leaders


KC

Page 6 of 9

during their monthly reports. She made it clear that she didn't trust the men in the program and she had no compassion for them. If a group was grounded during that month, the group leader was blamed for failing to prevent the grounding and held responsible for justifying an end to the grounding. It was a grueling process.

22. Shepherd always acted as though nothing I said was important. Once he even berated me for failing to call him "Mr." Shepherd. He always had to be in control of everything around him or he would become angry. There is no way that anyone in Shepherd's group would have been able to voice his opinion or defend himself without facing Shepherd's aggression and abuse.

23. Once during a grounding of "Sunrise" group our therapist told us that we should all be put on an island with gun boats and shot. Mike Shepherd just laughed. Apparently the thought of killing us was a big joke to him.

24. Before I was put on outpatient status I had to take the plethysmograph test, a test which monitors sexual arousal in response to provided images. I was put in front of a screen which depicted children, both dressed and nude. Although I passed the test, I felt completely re-traumatized by the images I was shown. I started feeling old urges that had been absent since progressing through the program. I received no follow-up from the tester or any of the therapists about what I had viewed or how it might have impacted me. This kind of indifference to trauma and emotion was pervasive at Western State.

25. By the time I reached the outpatient and work release stages of program, my self-esteem and confidence were severely damaged. Yet they required me to not only find a job quickly, but also to start an intimate relationship. In addition to looking for and applying


KC

Exh. 4 - 000033

for jobs, I was required to visit 3 places a week that I might meet a woman and start a relationship. It was expected that I would develop a relationship, tell her everything about my past and then bring her into the group for couples' counseling. I found this requirement totally overwhelming as I was having difficulty just finding a job and dealing with my own emotions.

26. When I reoffended in 1986, I was sent to Clallam Bay Corrections Center. After five years I was transferred to Twin Rivers Correctional Center when space became available there, and I finished out my sentence at Twin Rivers. During my time at Twin Rivers I participated in the three-year inpatient sex offender program and aftercare they provided.

27. The Twin Rivers' Sex Offender Program was completely different than Western State Hospital's Sex Offender Program.  They were like night and day. Unlike the punitive and degrading attitude at Western State, the Twin River's program was compassionate and supportive. The therapists attended the sessions and ran the groups, controlling the group dynamic. Unlike Western State, Twin Rivers acknowledged that some of us were survivors of abuse, and offered a separate survivor's group to deal with these unique issues. Although offender and survivor groups were kept separate, the program managed to fold the two topics together into an effective, whole therapy approach.

28. Twin Rivers also offered one-on-one therapy which was not available at Western State. By the time I reached the program at Twin Rivers I was very shy and distrustful of therapists due to my horrible experience at Western State, and it took me a long time to open up to my assigned therapist. My therapist was understanding and patient but stern, and she eventually gained my trust and I was able to open up to her and learn from her

KC

Page 8 of 9

Exh. 4 - 000034

and the program. I feel that the program at Twin Rivers allowed me to repair some of the emotional damage and turmoil that Western State had caused, as well as prepare me for life after my release from prison.

29. I was released in 2001, and voluntarily stayed a year at IT House, a halfway house for parolees, in Seattle. I felt I needed a bit of extra assistance adjusting to society after having been locked up for so long.

30. I am currently a level 3 registered sex offender with the State of Washington. While at Twin Rivers Correctional Center I learned the commercial packaging business and I now have my own commercial packing company, as well several other businesses. I attribute my current success to having a compassionate therapist at Twin Rivers, as well as the support of my family.

31. I am giving this declaration to Dorothy Ballew and Erika Feyereisen, investigators for the Federal Defender in Sacramento, California. They came to interview me in December of 2016. Their office is currently representing Joseph Duncan in post-conviction proceedings.

I swear under penalty of perjury under the laws of the state of Washington and the United States of America, that the foregoing statement is true and correct.   *KC.*

Executed this __18th__ day of January, 2017, in Roy, Washington.

_____
KEVIN COYNE

KC

Exh. 4 - 000035

## DECLARATION OF STEPHEN R. HORMEL

I, Stephen R. Hormel, declare:

1.  I am an attorney, now in private practice in Spokane, Washington.  I began my legal practice in 1989.  From April 1993 until August 2009, I was an attorney for the Federal Defenders of Eastern Washington and Idaho (FDEWI).  From 2002-2007, I held the position of First Assistant (Chief Trial Attorney) to Roger Peven, who was then the Executive Director for FDEWI.

2.  I have known Roger Peven since before I began my employment at FDEWI. We were friends and colleagues for more than 20 years.  Throughout that time, I had tremendous respect for Roger, who I considered to be an extremely talented trial lawyer.

3.  The facts contained in the attached declaration dated November 13, 2007 are incorporated as though fully set forth herein.  This declaration is intended to supplement my November 2007 declaration, in order to provide additional detail relating to Roger's conduct in relation to his representation of Mr. Duncan.

4.  In paragraph 10 of the attached affidavit, I reported that by late May, "Roger's ability to focus on any administrative matter [in FDEWI] was so impaired that he commonly responded to office concerns by merely saying to me and our office administrator, Lisa Werner, 'whatever you decide.'"  In addition, Roger was not capable of maintaining sufficient focus on representing Mr. Duncan.  That is why "[h]e commented again on a desire to withdraw from the Duncan case."  *See,* Attached, Paragraph 10.

5.  During May or June of 2007, I specifically recall attempting to help staff get expert witness engagement letters completed for *Duncan*.  I was aware from speaking to staff that co-counsel, Mark Larranaga, was trying to get this task completed. I also recall Roger halting those efforts in spite of Mark's drive to get experts on the case.  It was during this time that

1

SH

Roger openly talked about his strategy to do nothing for the guilt phase, plead Duncan guilty, and then go from there. I never understood this. However, I heard Roger continually discuss this approach during that period with others. Roger would not accept anyone who questioned that approach. It was my impression that this "strategy" was one of convenience due to the distractions in Roger's personal life, rather than a clearly thought-out and rational approach.

6. I also knew that Roger, at times, consulted with Judy Clarke throughout the course of his involvement with Mr. Duncan. In 1993, I was hired by Judy as a trial attorney when she was the FDEWI Executive Director. I knew from my experience with Judy that she would not approve of, nor appreciate, Roger's "do nothing strategy" in *Duncan*. Likewise, from what I knew of Roger's co-counsel Mark Larranaga, I knew he would not approve of that approach. This was close-in-time to the efforts made by Mark to prompt FDEWI staff to complete expert engagement letters. I do not believe Roger ever shared his plan with either Judy Clarke or Mark Larranaga.

7. I believe it was in late-May or early June 2007, the *Duncan* team had assembled for a meeting somewhere, after which I had occasion to speak with Judy. I recall her stating that Roger had assured them that he was on top of matters on Mr. Duncan's case. Based on Roger's representations to her, Judy told me that she was reassured that things were being done to prepare the case.

8. I had some knowledge of the communications between Mark Larranaga and Roger from comments made by Roger to me. At some point after Mark joined the case, I recall Roger expressing a serious displeasure at Mark's attempts to prepare the case. Roger expressed how Mark was persistent in emails to try to get Roger to engage specific tasks in the case. Roger

2

SH

Exh. 5 - 000037

became openly hostile and disparaging, complaining about Mark's emails and stating that Mark "was the most passive aggressive person not in prison."

9.  I believe it was early to late May 2007, Roger told me that, unbeknownst to him, Mark had obtained a commitment from Tom Monaghan, an attorney working in the Idaho Federal Defender's office who had a limited role in *Duncan*, to dedicate more of his time to the case. It is my impression that Mark did that in order to get work done on the case that had not been getting done by Roger. When Roger found out that Tom and Mark had arranged for Tom to devote more of his hours towards *Duncan*, Roger was livid. I thought that Roger should welcome additional help on the case due to his personal circumstances. Instead, he viewed the situation as some sort of underhanded betrayal and conspiracy between Mark and Tom. Roger told me he reacted by calling and telling Tom that he had to prepare all motions from that point forward in order to punish him. Roger's angry reaction struck me as both unusual and unjustified.

10.  In paragraph 13 of the November 2007 declaration, I describe, "[a] disturbing event occurred the day before I left" for a vacation on August 17, 2007. I discuss how I was prepared to contact the FDEWI board president, John Maurice, in case Roger's circumstances warranted his intervention. It happened that my vacation was in San Diego, where Judy Clarke resided and worked. Due to the circumstances I was facing with Roger and his lack of work on *Duncan*, I felt obligated to contact Judy Clarke, who was acting in a Resource Counsel capacity in *Duncan*. By that point, I was seriously concerned that Roger might harm himself or someone else. I also believed Roger needed to seek professional help in order the assist him with his emotional condition. Upon my return from San Diego, I urged Roger to withdraw from *Duncan*, take administrative leave and to seek counseling. *See*, Attached Paragraph 14.

SH

11. On November 8, 2007, after a formal unannounced intervention was conducted by members of the FDEWI board with Roger, the board placed Roger on leave, and directed him to get professional help. Roger entered residential treatment for mental health and alcohol abuse. The treatment center recommended that Roger complete a 28-day inpatient program. *See* Attached, paragraph 20.

12. After Roger completed the in-patient program in December 2007, in January 2008, the board approved Roger's return to FDEWI and approved him to resume his duties as executive director. Upon his return, Roger no longer trusted me, trial attorney, Tina Hunt, or our office administrator, Lisa Werner, because we were the individuals responsible for bringing Roger's problems to the attention of the Court and the FDEWI board. Although we did so reluctantly, we felt we had no choice but to intervene due to Roger's impaired condition caused by the extreme stress in his personal life, and his increasing use of alcohol. As detailed above, Roger's condition was serious, and it negatively impacted his ability to perform his duties in representing Mr. Duncan.

13. After Roger returned to FDEWI in late January 2008, we attempted to move forward with him as director. Unfortunately, by that point many of the relationships among staff had been damaged beyond repair. Roger deeply resented that we had "outed" him with the board and we resented his outward resentment to us, even though we viewed our efforts as helping a friend and colleague in trouble. I know I was not alone in feeling conflicted for months about maintaining my loyalties to Roger as my friend and as my boss. However, in late-July and early August 2007, it became apparent that Roger's attention to the *Duncan* case and attention to the office was so lacking that I had to speak up.

SH

Exh. 5 - 000039

14. My relationship with Roger changed dramatically after my return from San Diego. Roger never forgave me for my efforts in reaching out to Judy Clarke in August 2007, and for arranging the subsequent intervention to address his personal circumstances.

15. After months of utilizing a professional facilitator hired by the board to address office turmoil, on August 6, 2009, Lisa Werner, Chief Investigator Bill Proctor, and I were terminated.  We three were terminated after an audit by the Administrative Office of the Courts informed Roger that all four of his administrators recommended his termination as executive director.  The only administrator who survived was the Yakima Branch Chief, Ben Hernandez.  Thereafter, in February 2012, Lisa, Bill and I favorably settled a lawsuit for wrongful termination.

16. All of us who worked with Roger had great respect for him as a lawyer before his decline. He was also a good friend of many years.  Unfortunately, my efforts with the others to help Roger was met with extraordinary resentment.  I firmly believe that what we tried to accomplish was in Roger's best interests, and what was in the best interest of the *Duncan* case.

I swear under penalty of perjury under the laws of the state of Washington and the United States of America, that the foregoing statement is true and correct.

Executed this _31ˢᵗ_ day of January, 2017, in Spokane, Washington.

STEPHEN R. HORMEL

SH

Exh. 5 - 000040

I, Stephen R. Hormel, declare the following:

1.  I am the First Assistant (Chief Trial Attorney) to Roger Peven, the Executive Director for the Federal Defenders of Eastern Washington and Idaho (FDEWI). I have worked in this capacity for over 5 years.

2.  I have been employed with FDEWI since April of 1993. Prior to my promotion to the Chief Trial Attorney, Roger held that position from the time of my employment with FDEWI until the Board of Directors hired him as the Executive Director in June 2002.

3.  Prior to my employment with FDEWI, I knew Roger as both a mentor in the defender community during my law school years and early in my career as a public defender. Roger and I shortly thereafter became friends. I have known Roger for over 21 years.

4.  During my employment with FDEWI, I have had ample opportunity to observe Roger both as the Chief Trial Attorney, and as the Executive Director. I know and understand his work habits and his administrative abilities in performing his job has Executive Director. I also know and appreciate his extraordinary talent as a trial lawyer.

5.  In the Summer of 2005, our office was appointed pre-indictment to represent Joseph Duncan. At that time, Mr. Duncan was pending capital charges in Idaho. Roger assigned himself to the case due to his experience. In October of 2005, Roger received a modest budget from the Administrative Office to aid in the defense of Duncan prior to formal charges in federal court. The work involved in this budget ceased near the beginning of April of 2006.

6.  During the Spring and Summer of 2006, Roger continued to maintain the necessary attention to his administrative responsibilities, including the ability to review two serious employment situations that led to the discharge of two employees. Also, during the Summer of 2006, I knew Roger was working with John Adams, Mr. Duncan's state defender, to help resolve the state charges. This eventually occurred in October of 2006.

7.  With the completion of the state case, Roger experienced a noticeable decline in his attention to the administration of the office. It started to become more difficult to get his attention on administrative matters, however, it was not impossible. This situation continued up and until the time that the Government received the Duncan Indictment in late January of this year.

8.  It is my opinion that Roger's attention to the office was being affected by his nearly year and a half devotion to the Duncan case, and the stress that the representation caused Roger. I do recall discussing the need for Roger to seek counseling at a Board of Director's meeting January 2007, a week or two before the indictment was returned. I also believe that Roger contacted a counselor very early in February of this year.

9.  In February 2007, Roger received a tremendous "blow" from his wife, announcing just two days after their anniversary that she wanted a divorce. This unexpected announcement placed obvious stress on Roger, including the affect on and concern for his 8 year old daughter. This news on top of the tremendous stress Roger had due to his representation of Duncan, combined to affect his ability to function, both inside and outside the office. He was nearly paralyzed at times with emotional stress and developed a severe inability to focus, which became much more acute than was present in October, 2006. As early as February, 2007, Roger discussed and contemplated the need to withdraw as lead counsel from the Duncan case. I fully supported that decision, however, Roger decided against it.

10. Between February and May, 2007, Roger could compose himself enough at times to engage in administrative matters, however, his ability to maintain any amount of focus for a period of time was extremely impaired. When Roger was in Spokane, his time in the office had diminished to only one to two hours a day, rarely more the 4 hours was spent at work in a day. He often spent this time with his office door shut, resting or reading on his couch. At the annual board meeting on May 11, 2007, again Roger discussed his need for counseling. In late-May, 2007, Roger's ability to focus on any administrative matter was so impaired that he commonly responded to office concerns by merely saying to me and our office administrator, Lisa Werner, "whatever you decide." It was also about this time that the stress of his poor relationship with his wife became even more tumultuous than it was in February. The reasons for this are personal to Roger and will not be detailed. He commented again on a desire to withdraw from the Duncan case. Due to Roger's noticeable decline, I supported this decision. Roger, again, declined to seek to withdraw.

11. By July, 2007, Roger was so impaired that his attention to the office was essentially non-existent, existing in matters that could be answered by a simple email. Because he rarely responded, we had to constantly prompt him to reply. And, he became more absent. Consequently administrative and personnel issues were either delayed, never addressed, or accomplished by others in the office without his assistance. This continued throughout July and August of 2007.

12. My concern for Roger's well-being reached a critical point during the first week of August, when, on August 4, my wife and I invited Roger to our home for dinner. Throughout the evening, Roger was detached and wept much of the evening. During the last hour he maintained a "fetal position" on our couch. I was so concerned that I made him promise he would step down from the Duncan case immediately which

he promised he would contact Judge Lodge for that purpose. That was not done and over the next two weeks, Roger continued to deteriorate. I continued to notice an obvious stress on the office and many employees.

13.   On August 17, my wife and I went on a vacation sponsored by my wife's office in San Diego. A disturbing event occurred the day before I left that lead me to be concerned and acknowledge that I may need to intervene with the FDEWI's Board of Directors. It was my opinion that Roger's mental impairment may require immediate attention, and that a leave of absence may be needed. I asked our office administrator, Lisa Werner, to be prepared to initiate a conference call with our Board President, John Maurice, while I was on vacation. After a couple of conversations with Roger over the weekend, I decided against contacting the Board President.

14.   Upon my return from San Diego, I firmly believed that Roger needed leave from the office to address his extreme stress. I asked him to take administrative leave and to step down from the Duncan case. After a two hour meeting, Roger convinced me to observe him before determining if leave was actually needed. Again, he agreed to seek a complete withdraw from the Duncan case.

15.   On August 28, 2007, I recall Roger calling me immediately following his meeting with Judge Lodge about his desire to withdraw. He told me that Judge Lodge did not want him completely off the case, but to stay on for a limited role.

16.   At the next Board of Directors meeting on September 10, the Board of Directors approved the use of non-grant funds to assist Roger in counseling due to his involvement in the Duncan case.

17.   Since the meeting between Roger and me in late August, 2007, I have observed Roger and his inability to maintain attention to office matters. After Roger returned from a 10 day trip to Detroit in late September, I observed a continued decline in his mental condition to the point that at times I could not engage him in simple conversation. His attendance and time in the office has been sporadic and less than ½ days.

18.   On Tuesday, October 23, I received an alarming phone call from Roger. He was at home that day. He told me that he had experienced uncontrollable anger and did not know why. He told me he would be alright and that I should not worry about him. I then received an email that was very disjointed, but also conveyed the same message that Roger believed himself to be out of control.

19.   After the October 23 phone call and email, I concluded that Roger needed more than just time away from the office, he needed additional and intensive help. At the last board meeting on November 5, 2007, Roger was noticeably distracted and disjointed in his comments. This was extremely unusual because Roger would normally pull

himself together for the board meetings. Although it is my impression that Roger's symptoms are due to mental stressors, I also believe he has turned to alcohol more to medicate his stressors. Looking back, it is my belief that Roger has needed additional help long before this time, however, all of us close to Roger have attempted every avenue with hopes that Roger could do it on his own. Roger has been a dear and close friend of mine for two decades and what I have observed of Roger over the last year is not the Roger I know.

20. On November 8, 2007, Roger took a leave for an undetermined length of time. As a result the Board has appointed me the Acting Executive Director until his return.

I declare under the penalty of perjury of the laws of the United States of America, the foregoing is true and correct.

Dated this 13th day of November, 2007.

Stephen R. Hormel

## DECLARATION OF RICHARD JOHNSON

I, Richard Johnson, declare:

1. In 1979, I was arrested and charged with sexual abuse of my twelve-year-old stepson, and confined to the sex offender program at Western State Hospital. There were a number of different therapy groups at Western State. I was in Aquarius group for the entire time I was at Western State. I graduated to the work release program in 1988 and eventually completed the program successfully.

2. Joseph Edward Duncan, who we called Ed, was also a member of Aquarius group. When Ed came into the program he had really bushy hair, and was a very tall, skinny, awkward, goofy, gangly kid with a wild imagination. He was not a loud kid. I related to him because we had committed similar offenses, our victims both being young boys.

3. Ed did not fit in well with the group, partly because he was so much younger than the rest. Ed was the youngest person ever admitted to the sex offender program, and I know it was particularly difficult for him. I brought up my concerns with the staff, and even the head of the program, because it was obvious that Ed was too young to be put into the same program as older predatory offenders, such as brutal rapists. I was told there were no treatment programs for juveniles.

4. Group therapy was particularly difficult for Ed. Aquarius group meetings could become quite hostile and aggressive. Meetings were often angry, and older, more seasoned participants often turned their aggression on the more vulnerable members, such as Ed. It took a while for new members to catch onto this and on a few occasions, members almost came to blows. Ed clearly needed individual therapy. He had trouble sharing his issues

RJ

Exh. 6 - 000045

and being candid with the group.  There were a couple of times when Ed was almost voted out of the program for failing to open up in group meetings or not following the program in some other way.

5. I remember Ed's fantasies (not sexual) being rather extreme and prolific. Once while he was sitting at a table with an almost empty water bottle he made up a story that included creatures and little people living in the bottle. He made up a lot of stories that alienated him from other members of the group.

6. All of us knew that, like many of us, Ed had suffered some form of abuse as a child, but he wasn't able to come to grips with it.  Ed was a smart kid who understood the program and patterns but wasn't able to get over his confusion about his sexuality.  I myself was abused, and it took me six years into the program before I was able to understand and come to terms with it.

7. I once met Ed's mother, Lillian, on a family visit. When I told Ed I thought his mom was very sweet, he told me his mother was a drunk and not very nice. One of the things Ed did reveal during group session was that his mother had been abused and beaten up herself quite a bit.

8. One of the counselors for the Aquarius group was Mike Shepherd.  Some of the counselors attended group meetings regularly, but not Shepherd.  When he did come to group it was to single people out for not dealing with certain issues.  Shepherd was a bully and was especially stern with Ed.

9. Shepherd was much more interested in spending time with the couples in their weekly meetings and going to outpatient group meetings than dealing with the men in inpatient

*RJ*

Page 2 of 3

Exh. 6 - 000046

treatment. He was something of a playboy. Even though he was married, he was overly friendly and flirtatious towards the women who visited participants in the program. He would touch the women and speak to them inappropriately. He was inappropriate with my sister in this way. There were many rumors about Shepherd and his behavior toward women.

10. This kind of behavior by a person in authority obviously set a very bad example in a sex offender program. Shepherd often came to work looking rough around the edges, and would complain that he had a splitting headache. His wife eventually divorced him because she had apparently found out about some of his escapades.

11. I am giving this declaration to Dorothy Ballew and Erika Feyereisen, investigators for the Federal Defender in Sacramento, California. They came to interview me in November of 2016. Their office is currently representing Joseph Duncan in post-conviction proceedings.

I swear under penalty of perjury under the laws of the state of Washington and the United States of America, that the foregoing statement is true and correct.

Executed this ___19___ day of January, 2017, in Tacoma, Washington.

*Richard G Johnson*
Richard Johnson

Page 3 of 3

RJ

## DECLARATION OF MARK LARRANAGA

I, Mark A. Larrañaga, declare:

1. I am an attorney, licensed to practice law in state and federal courts in Washington, California (inactive), and Oregon. I have been practicing law since 1993. I began my legal practice as a public defender in Seattle, Washington. In 2001, after nearly a decade in public defense, I became Director of the Washington Death Penalty Assistance Center. During my tenure at the Death Penalty Assistance Center, I was responsible for providing resources and training to capital defense attorneys throughout Washington. In my capacity as Director, I also published reports examining the state's death penalty scheme and testified before the state legislature regarding the administration of the death penalty in Washington. In 2005, I opened my own firm, Walsh and Larrañaga. Additionally, since 2005, I have worked as an adjunct professor at Seattle University, School of Law, where I teach courses on capital punishment.

2. I have been designated "learned counsel," pursuant to 18 U.S.C. § 3005, on several occasions and have been appointed as lead capital counsel in Colorado, Oregon and Washington states and in federal court proceedings. In addition to experience representing clients charged with non-capital offenses, I have represented several clients facing the death penalty in state and federal court, as well as clients who have previously been sentenced to death, whom I have represented in their appeal and post-conviction proceedings.

3. In January 2007, I was appointed as learned counsel, 18 U.S.C. § 3005, in the Idaho federal capital prosecution of Joseph Duncan, III. Shortly after the federal indictment was

1

MAL MAC

issued, Roger Peven, Executive Director of the Federal Defenders of Eastern Washington and Idaho, asked that I be appointed along with him.

4.   Capital cases are always challenging.  This case, which involved multiple victims, multiple jurisdictions (both state and federal), and events spanning an extended period of time due to the kidnapping of two victims who were held hostage for several weeks prior to Mr. Duncan's arrest, was bound to be challenging. Additionally, as I quickly learned after joining the case, Mr. Duncan had significant mental health issues. However, as things began to unfold, it turned out that our efforts to prepare the case would be hamstrung by a variety of factors, both related and unrelated.

## LOGISTICAL FACTORS

5.   The defense team assigned to Mr. Duncan's case were located throughout California, Washington, and Idaho. The multiple locations of defense team members was the inevitable result of the need for individuals who possessed the experience and qualifications to work on a case of this magnitude and complexity and the impracticability of finding the requisite number of those individuals in one place. While this arrangement can be challenging, it is often a practical necessity.  As such, it is functional only when the team is healthy, functioning, communicative, and has a shared vision about how best to proceed on the client's behalf.  As described more fully below, that was not at all the case within Mr. Duncan's legal team, to his great detriment.  To my professional and personal frustration and chagrin, the difficulties working with Mr. Peven, the initial primary counsel in the case, were unfathomable and often insurmountable.

6.   One of the issues that forestalled our ability to prepare for Mr. Duncan's trial involved a protracted process of my gaining access to the voluminous discovery throughout the spring and early summer of 2007.  While Mr. Peven's office (in Spokane, Washington) received

2

MAL MM

approximately 30,000 pages of initial discovery in late January, 2007 I did not receive any of the discovery until the end of March of 2007 despite my having implored Mr. Peven that I needed to begin reviewing the discovery immediately. Other defense members receipt of the initial batch of discovery was even later.[1]

7.   Another issue that severely affected my ability to prepare for Mr. Duncan's trial related to what was a *de facto* funding freeze as it pertained to contracting with critically needed experts. From the time I was initially appointed in the case until September of 2007, all funding was to run through Mr. Peven's office and had to be personally authorized by him. As explained in more detail below, attempting to get Mr. Peven's authorization for expert expenditures was a time-consuming exercise in futility.

## INITIAL PREPARATIONS FOR MR. DUNCAN'S FEDERAL CASE

8.   Our first team meeting took place in February 2007, in Spokane.   During that meeting we discussed the need to obtain equipment for the dissemination and review of the Government's discovery and the need to develop a penalty phase plan.  To that end, we discussed the need to obtain the assistance of an experienced mitigation investigator.  It had recently been arranged to have Debra Garvey, a mitigation specialist working at the Office of the Federal Defender of Office for the Central District of California, to work on Mr. Duncan's case.  In February, 2007, I contacted Ms. Garvey to introduce myself and begin discussions about the work she would be doing.  It was my understanding that Ms. Garvey was slated to divide her time approximately 50% towards her duties in the Central District of California, with the other 50% being dedicated to the *Duncan* case.

---

[1] As of March 2007, the trial date was set for January 22, 2008, with all pre-trial motions due by November 5, 2007.

3

9.  Our second meeting took place in early May of 2007, at which time Ms. Garvey provided a memo outlining a proposed mitigation plan.  That memo was produced despite not having full access to much of the discovery in the case at that point.   At that meeting, Mr. Peven decided that his office (Spokane) would be responsible for the guilt phase of trial and Ms. Garvey and I would be responsible for preparing for the penalty phase of the case. Because the Government additionally noticed three separate incidents, which encompassed different states and multiple victims from more than a decade prior to the offenses for which he being charged in 2007 as aggravating factors, the defense was duty-bound to investigate all of those incidents as well, along with the related state charges from Kootenai County.  The guilt and penalty phases are uniquely intertwined in capital cases, so that, notwithstanding that division of labor, my expectation was that members of the team would coordinate closely throughout on all issues.  Communication and coordination though, were chronic problems on this case.

10. By late May of 2007, despite having been led to believe that meaningful mitigation work had been done in connection with the Kootenai County case, it was clear that very little had been done.  Ms. Garvey and I felt like we were starting from scratch. Our client had been institutionalized in the Washington state corrections system for nearly two decades and the potential witnesses numbered in the hundreds. State counsel had done almost nothing in the way of investigating Mr. Duncan's childhood, which is an essential part of any mitigation investigation.  Although Mr. Peven had been somewhat involved in the case at the state court level as well, it rapidly began obvious to me that he had done little work on either case.

11. Over the course of the following months, Ms. Garvey and I were repeatedly assured that the Spokane office, under Mr. Peven's direction was "working" on preparing for the guilt

MAL

Exh. 7 - 000051

phase of trial. However, despite multiple requests, I could not get him to provide us with any details of the work supposedly being conducted, let alone any work product pertaining to the guilt phase. Additionally, Ms. Garvey and I received almost no support from Mr. Peven with regard to the demands of preparing for the penalty phase and, at times, he actively resisted or rejected our efforts to do so.

## ROGER PEVEN'S DETRIMENTAL IMPACT ON MR. DUNCAN'S CASE

12. As noted, Mr. Peven was appointed prior to issuance of a federal indictment due to the clear potential for federal capital charges. As I learned when I came onto the case, he had initial been working with and assisting the Kootenai County Public Defender's office in pursuit of a global settlement of all potential state and federal charges. According to Mr. Peven, once it became clear that there would not be global settlement, he shifted his focus to assisting state counsel with resolving that case. Although I have no way of knowing precisely just how involved Mr. Peven was at the state level I can say unequivocally that within weeks of my coming onto the case, it was clear very little had been done that would be of any use to us in the federal case. Moreover, by his own admission, between the time of Mr. Duncan's October, 2006 plea in Kootenai County until the federal indictment issued in January, 2007, neither he nor anyone else in the Spokane office was working on Mr. Duncan's case. Mr. Peven specifically stated that the only thing he did relating to Mr. Duncan's case during that four-month period was "maintaining contact with him."

13. Having to deal with Mr. Peven on this case was the most frustrating and disappointing experience I have ever had working with another lawyer. From very early on in my involvement, Mr. Peven was unengaged and unresponsive. That was, of course, frustrating as a general matter, but also had very specific implications for our ability to work on Mr. Duncan's case. Mr. Peven's attitude towards me and others working on the case, Ms.

MAL

Garvey included, was nothing short of hostile at times. Though ostensibly I had been appointed to partner on the case with Mr. Peven and contribute my skills as a capital litigator, Mr. Peven alternated between dismissive and antagonistic when I sought to engage him about the case and certainly when I asked anything of him.

14. This lack of professionalism had a particularly devastating impact on our ability to obtain the assistance of expert witnesses in the case, in a case where expert assistance was clearly of paramount importance. The defense team met of May 31, 2007 for the express purpose of discussing potential experts in the case. During that meeting we identified various potential areas of expertise and experts that might be helpful. However, we remained unable to retain experts for two primary reasons: 1) we had yet to do sufficient investigation to identify the best-suited experts or provide the same with the type of materials necessary for their review and 2) Mr. Peven would not approve funds directly resulting in our inability to obtain approval and funding for experts once identified. The authority to approval and fund experts rested solely with Mr. Peven.

15. As a direct result of Mr. Peven's failure to fulfill his responsibility, I drafted a supplemental budget in July of 2007, outlining the critical need for additional staffing and funding for experts and submitted it to Mr. Peven. His failure to respond was exceedingly alarming, and I gave serious consideration to going directly to the district court for the funding. Finally, at the end of July, Mr. Peven submitted a supplemental budget, which was both inadequate and incomplete.

16. After months of little to no communication from Mr. Peven, I received an email from him on August 8, 2007 indicating, for the first time, that he was considering withdrawing off Mr. Duncan's case. In an email to Tom Monaghan and me, Mr. Peven wrote, "I am gone from the office this week. I have not fully made up my mind but I (sic) fairly certain I will

MAL

be asking the Court to allow me to withdraw from the case for personal reasons. I will let you know (sic) later today for sure." Mr. Peven provided no further explanation for this and my attempts to reach him to find out what had prompted him to do so were unsuccessful. After a little more than a week had passed, Mr. Peven indicated he did, in fact, intend to withdraw from the case and, with it, terminate his office's involvement in the case. Mr. Peven asked that I inform the court at the upcoming status hearing (which Mr. Peven stated he could not attend) about his intentions.

17. On August 22, 2007, co-counsel Tom Monaghan and I, advised the Court of Mr. Peven's intention to withdraw from the case. During that status conference, the government expressed its concern over the apparent lack of progress by the defense in preparing for trial. The government specifically noted that there had been no attempts to view the physical evidence or interview crime scene witnesses despite its communications months prior to Mr. Peven to let him know about available times to do so.

18. About that time, Mr. Peven finally began to reveal to the rest of us what had actually been going on. In the days leading up to the *ex parte* meeting between Mr. Peven and Judge Lodge, Mr. Peven revealed certain personal things to the other defense team members that provided some explanation as to his erratic behavior and failure to perform work on Mr. Duncan's case over the preceding months. According to Mr. Peven, his behavior was due to a combination of a failing marriage, health problems of his elderly parents, a cancer scare, and overwhelming responsibilities at work, outside of the *Duncan* case. I was later to learn that there were additional problems about which he was much less forthcoming at the time: he was suffering from crippling alcoholism, which eventually led to him being directed by his Board to enter residential treatment.

7

MAL

Exh. 7 - 000054

19. We (Tom Monaghan, Judy Clarke – who was advising us in her role as Capital Resource Counsel, - and I) expressed our concerns that given the personal and embarrassing nature of some of Mr. Peven's revelations, there would seem to be a real risk that Mr. Peven would come up short in terms of being as forthcoming as he should be about the extent of his personal issues and the devastating effect they were having on his ability to provide constitutional representation to Mr. Duncan.

20. Approximately one week later, on August 28, 2007, I met with Mr. Peven at the Federal courthouse in Coeur d'Alene to discuss the reasons for his withdrawal. While it had been my initial understanding that Mr. Peven and I would meet jointly with the court, Mr. Peven told me he preferred to meet with Judge Lodge alone.  I was reluctant to agree to that because Mr. Peven's behavior up to that point had given me serious reasons to question his reliability.  Therefore, when Mr. Peven told Judge Lodge's clerk that he wanted to speak privately I told the clerk I wanted to be present.

21. The clerk returned a short time later to announce that Judge Lodge wanted to meet privately with Mr. Peven. In the lead up to this meeting, Mr. Peven had made some frank and embarrassing admissions to the other defense team members about his personal situation and his related professional failings.  Mr. Peven had also intimated to Tom Monaghan, and Judy Clarke and me that he intended to seek leave to withdraw completely from Mr. Duncan's case.  Given Judge Lodge's refusal to meet with me, I hoped that Mr. Peven would be candid with Judge Lodge and state unequivocally that he needed to withdraw from the case.  In my view, Mr. Peven's involvement in the case had been extremely detrimental, and I viewed his withdrawal as a necessary first step to getting the case on track.

8

MAL

22. Mr. Peven's August 28, 2007 meeting with Judge Lodge took place in chambers and off the record. After approximately 15 minutes, I was summoned to the chambers. Judge Lodge said his discussion with Mr. Peven was limited to private matters and did not include any discussion of the case. Judge Lodge further indicated that Mr. Peven would not be removed from the case but would be assuming role of some sort of "advisory counsel" going forward.

23. I was aghast at this outcome. Mr. Peven said his intent was to be removed from the case entirely. The court's proclamation that Mr. Peven would remain involved in an "advisory" capacity, which suggested to me that Mr. Peven was in agreement, was entirely inconsistent with my understanding of what would occur.

24. Shortly thereafter, the defense filed a motion for clarification of the situation, which the court denied. I have many regrets about this case, and not insisting on being present during the August 28, 2007 *ex parte* meeting in most definitely among them. I have no confidence that Mr. Peven was appropriately candid with Judge Lodge about his shortcomings. The court continued to adhere to the erroneous view that Mr. Peven could be an asset to the case and justified the denial of our subsequent pleas for more time based, in large part, on that view.

25. On September 17, 2007, the Court appointed Judy Clarke to replace Mr. Peven as counsel on Mr. Duncan's case. Along with the change in counsel, the funding of the case (with the exception of my CJA payments) was transferred from the Defender office in Spokane to the Federal Defenders of San Diego, Inc. (the office which Ms. Clarke worked out of).

26. At the time that the funding was transferred from Mr. Peven's office to Ms. Clarke's office no mental health, forensic, future dangerousness, or social history experts had been retained. As indicated above, I had repeatedly requested that Mr. Peven authorize

MAL

Exh. 7 - 000056

approval to retain various experts for Mr. Duncan's defense, but to no avail. Mr. Peven either ignored my requests or explicitly refused to comply with them. By the time funding was made available through the San Diego office, as facilitated by Ms. Clarke, the potential experts that I had previously tried to get approved through Mr. Peven were no longer available to work on the case, particularly in light of the January, 2008 trial date.

27. Throughout the fall of 2007, the toxic spillover of Mr. Peven's personal dysfunction into this case became more and more apparent. It became increasingly clear to the rest of us that many of Mr. Peven's representations about work he was purportedly doing on Mr. Duncan's case were untruthful. On October 3, 2007, the reconstituted defense team file a request for a continuance from the January 2008 trial date based on the myriad impediments to preparing for trial. The Court heard argument from both parties on October 22, 2007.

28. The Government's argument against the defense's request had three premises: 1) the defense's request was a "delay tactic;" 2) the interest of the child victim, Shasta Groene, dictated that the case be tried as soon as possible; 3) the defense had engaged in substantial preparation and, consequently, should be ready for trial as scheduled. The main argument of the hearing centered around the third point, i.e. readiness for trial. At the hearing, I argued extreme circumstances necessitated a continuance of the trial date. I noted that this case was, to begin with, highly complex and voluminous, with approximately 50,000 pages of discovery, close to 50 potential guilt phase witnesses for the prosecution, and more than a dozen prosecution experts. Our client had lived in 13 different locations, including outside the country. He had been incarcerated for two decades, across 16 different institutions, and was alleged to have committed other murders in multiple jurisdictions in the decade leading up to the offenses for which he was being tried in federal court.

MAL 

Exh. 7 - 000057

29. Under the best of circumstances, additional time would have been justified. However, as we attempted to explain to the court at the October 22nd hearing, the circumstances at issue were far from ideal. Beyond significant logistical obstacles, such as delays in obtaining discovery, delays in staffing the case, throughout August and September of 2007, the depth of Mr. Peven's incapacitation continued to emerge. Not only was he unable to perform even the basics of his professional obligations, but he had been actively misleading both his fellow defense team members and the court about the work he had supposedly performed on Mr. Duncan's case, which in an of itself became a further obstacle in our path.

30. For instance in denying our motion for continuance the court noted that the defense was equipped with Mr. Peven as "available and assisting" to the reconstituted defense team. The court erroneously believed and relied upon the supposed fact that Mr. Peven was "a valuable tool to the defense because of the information that he had . . . and he has assured the Court that information would be available to the defense."

31. On November 5, 2007, we filed several pre-trial motions. By that time, the Government had noticed more than a dozen expert witnesses. We sought another extension, this time asking for additional time in which to file any expert notices regarding use of mental state evidence, since we were not anywhere close to prepared to being able to make a cogent decision as to that issue. That request was also denied.

32. Approximately one month later, on December 3, 2007, Mr. Duncan pled guilty to all counts alleged in the indictment. All other things being equal, we did not believe that it was in Mr. Duncan's interest to plead guilty, but we nonetheless encouraged him to do so because the Government was willing to agree to a brief continuance of the sentencing trial in return for a plea. Because we knew we would not be ready for trial, we felt we had no choice but to acquiesce. The defense and the Government each filed motions, with the

11

MAL 

defense requesting a September 2008 date and the Government requesting an April 2008 date. The Court thereafter set Mr. Duncan's penalty phase trial to begin on April 14, 2008.

33. Our work on Mr. Duncan's case between his guilty plea and the start of jury selection in April 2008 could only fairly be described as frenetic. We were scrambling to accomplish in weeks what should have been done over a much more extended period of time.

34. Two days into jury selection for the penalty phase trial, Mr. Duncan announced that he wanted to proceed pro se. After further proceedings, the Court ruled the Mr. Duncan would be permitted to represent himself at sentencing. Judy Clarke, Tom Monaghan and I were relegated to the role of stand-by counsel. From time to time, Mr. Duncan asked us questions. Mr. Duncan's interactions with us throughout the sentencing proceeding reflected the same kind of bizarre thinking that we had had observed throughout our representation of him.

35. The failures in this case were early, often, plentiful and colossal. These failures included logistical and practicle chaos; lack of communication and funding; and personal issues that were unknown or withheld for a substantial period of time, resulting in a woefully inadequate investigation including the inability to timely retain experts due to unreasonable administrative and budgetary refusals or delays. By the time some of these failures were addressed it was too late. The need for more time, to conduct basic investigation and to obtain experts resulted in ill-advised decisions surrounding Mr. Duncan's plea, and true appreciateion Mr. Duncan's severely impaired mental condition. By far, this case was the most frustrating professional experience I've ever encountered.

I swear under penalty of perjury under the laws of the state of Idaho and the United States of America, that the foregoing statement is true and correct.

12

MAL

Executed this _____ day of February, 2017, in Seattle, Washington.

_____
MARK A. LARRAÑAGA

MAL_____

Exh. 7 - 000060

## DECLARATION OF THOMAS MONAGHAN

I, Thomas Monaghan , hereby declares as follows:

1. I am the Chief Trial Attorney for the Federal Defender Services of Idaho, a position I have held since 2006. I began my legal practice in 1994. After a 2-year federal clerkship for a district judge, I accepted a position in the trial unit of the Federal Defenders of Eastern Washington and Idaho (FDEWI) in 1996. I served as the branch chief of the Yakima division of the FDEWI from 1999-2002. In 2002, I moved to the Boise branch where I worked as Senior Trial Attorney. I was one of the lawyers appointed to represent Mr. Duncan in connection with his federal capital charges.

2. In October 2006, shortly after Mr. Duncan plead guilty in Idaho state court, he was transferred from the Kootenai County jail to the Idaho Maximum Security Institution (IMSI) in Boise. That month, Roger Peven, Executive Director of Federal Defenders for Eastern Washington and Idaho (FDEWI) in Spokane, contacted my office in Boise, which by that time had just become a separate, independent entity under the direction of S. Richard ("Dick") Rubin, about the possibility of assigning local counsel who could maintain regular contact with Mr. Duncan. Thereafter, my office requested appointment in Mr. Duncan's case. On October 20, 2006, Judge Winmill granted the motion and I was assigned to serve as co-counsel with Mr. Peven.

3. From late October 2006 until around April 2007 my role in Mr. Duncan's case was primarily to maintain contact with Mr. Duncan by visiting him regularly at IMSI. At that time, by agreement between Mr. Peven and Dick Rubin, no more than 50% of my time was to be dedicated to Mr. Duncan's case. Since I was averaging two to three visits a week with Mr. Duncan, each of which would consume a substantial portion of the day, visiting accounted for nearly all my *Duncan*-related time.

1

TM ~signature~

4. Following the issuance of the federal indictment in January of 2007, Seattle attorney Mark Larranaga was appointed to Mr. Duncan's case as "learned counsel." Having someone with Mark's experience was an imperative. While Roger Peven was an experienced trial attorney, as was I, Roger was not qualified to sit as "learned counsel" in a federal capital case. As for me, I had very little capital experience at all. Besides Mr. Duncan's case, my only other experience was working for a few months on a drug related murder case in which the government was seeking death. I recall that learned counsel was appointed in that case. A few months in, however, I ended up having to conflict off the case, having done very little substantive work on it during my brief stint as co-counsel.

5. Sometime in the spring of 2007, with what little time I had left over from my visiting schedule, I began to review some of the voluminous discovery provided by the government, with a particular focus on correspondence to and from Mr. Duncan. That task was incredibly time consuming, involving thousands of pages.

6. Throughout 2007, I continued to carry a significant caseload, averaging between 12-15 felony cases in addition to Mr. Duncan's case. As a result, I was unable to do much substantive work on the *Duncan* case. Moreover, because I had virtually no capital experience, I looked entirely to Roger and Mark for direction.

7. Around that time, the office hired a new attorney, Robert Schwarz, which brought our attorney staffing to a total of three, with Dick Rubin and me being the other two. While Robert was an experienced state court lawyer, he was unfamiliar with the federal court system. As Dick was busy with a substantial caseload of his own and his duties as Executive Director, it fell mainly to me to supervise and train Robert. This hampered my ability to work on Mr. Duncan's case. I relied on Roger to direct me regarding my involvement in the *Duncan* case.

2

TM

8. Roger was one of my early mentors. When I first joined the FDEWI, Judy Clarke was the Executive Director, and Roger was the Chief Trial Attorney. I learned a lot from both of them. Judy, as Executive Director, set the bar very high. She excelled both as a litigator and as an administrator. Judy left in 2002, and Roger was subsequently appointed as Executive Director.

9. When I was initially assigned to work with Roger on Mr. Duncan's case, I looked forward to working with him and learning from him as we faced preparing what was sure to be a uniquely challenging case. However, as described more fully below, my experience working on this case was the most frustrating and demoralizing experience in my professional life. That was not due to the case or the client, though both were exceptionally complicated. Rather, it was a result of the dysfunctional defense team dynamics set into motion and perpetuated by Roger.

10. Roger's communication with me and other team members throughout the case was, at best sporadic and vague. At its worst, Roger's communication as it pertained to the *Duncan* case was, at times, nonexistent and, at other times, antagonistic.

11. I felt extremely conflicted throughout my time on Mr. Duncan's case, but especially so by the summer of 2007. I remember thinking that while I wasn't sure exactly what preparing for a capital trial would be like, it shouldn't be like this. Important tasks were being ignored and Roger's attitude seemed to be that there was no point to preparing for either the guilt/innocence or the penalty phase. As such, other team members, Mark Larrañaga and Deb Garvey especially, who were attempting a meaningful preparation for Mr. Duncan's trial, did not receive the support they needed to prepare the case properly.

12. Throughout that spring and summer I had an increasingly sinking feeling that we were not living up to our obligations to our client. At the same time, I still felt great loyalty and

3

TM

respect for Roger. When I voiced my concerns to Roger that we were not adequately

preparing for Mr. Duncan's trial, he was dismissive and defensive with me as well.

13.   In March 2007, Roger told Mark Laranaga and I that he (Roger) would be in charge of

preparing for the guilt/innocence phase of trial and that he or someone in his office would

be responsible for research and drafting any and all pretrial motions. Then, sometime

around May, Roger abruptly told me I would be responsible for filing all pretrial motions.

When I tried to talk to Roger about the case, he often seemed uninterested. Mark was

diligent in his own work on *Duncan* and dogged in his efforts to get Roger to work on the

case. Nevertheless, the friction between Roger and Mark grew over time. Eventually, when

Mark would inquire about funding for experts in the case, Roger would become

nonresponsive. I felt caught in the middle, torn between loyalties to Roger and feeling that

Mark was right about the work that needed to be done. There were instances where I

voiced support for something that Mark advocated for in the case. Not only did Roger

have a negative, knee jerk reaction to Mark's recommendations, but he seemed to feel

somehow betrayed by my support for Mark's position.

14.   There were times I considered going to Judy Clarke, going to FDEWI's Board, going to

Dick Rubin, or even going to the Court, to make them aware that Roger seemed to be doing

almost nothing on the case and was communicating very little with co-counsel about the case.

I was torn about what to do, and in retrospect, I clearly did not do enough. The whole

situation was untenable.

15.   Aside from the lack of preparation and the dysfunctionality of the team, I became

concerned about the unrecorded conferences between counsel and Judge Lodge. Over the

course of the case, there were unrecorded "status" conferences with Judge Lodge, during

which Judge Lodge routinely inquired about the progress of the case. Roger gave the Court

4

TM

Exh. 8 - 000064

an overly optimistic picture of how trial preparations were going. I remember during one of the conferences Roger rather gratuitously throwing John Adams, state counsel for Mr. Duncan, under the bus. Roger falsely claimed that he (Roger) was having to pick up the slack for Adams.

16. My experience with Roger during this case, particularly from the spring of 2007 into the fall, was totally uncharacteristic of any experience I had ever previously had with him. Roger was having some major personal problems, and those problems eventually derailed him, personally and professionally. One of the issues Roger was dealing with was problems in his marriage. Those difficulties seemed to contribute to the other major problem: Roger's drinking. I have had my own experience struggling with alcohol, and I certainly recognize the way it can impact all areas of one's life. With Roger, it certainly seemed that his drinking became excessive as he was dealing with his personal problems.

17. Roger was supposed to be coming to Boise regularly to visit with Mr. Duncan. His office paid for a town house for him to stay at during his Boise trips. While Roger did come on some occasions, and we went to visit Mr. Duncan together, he eventually stopped coming very often. I later learned there was at least one time, and possibly more, that Roger came and stayed at the apartment in Boise, without visiting the client or even letting me know he was in town.

18. By late summer 2007, Roger admitted he needed to withdraw from the *Duncan* case. Mark, Judy, and I all supported that decision. By then, it had gone far past Roger not being an asset to the case; he had become a liability. Unfortunately, Judge Lodge adhered to the view that Roger's past contributions to the case had been valuable; therefore, he could be of some kind of use to us. Judge Lodge refused to allow Roger to completely withdraw and, more importantly, rejected our pleas for a continuance.

5

TM

19. In November 2007, Roger was placed on leave by FDEWI's Board of Directors. Shortly thereafter, he was admitted for inpatient treatment for mental health and alcohol issues. In his absence, Steve Hormel was acting Executive Director. Steve had been active in bringing Roger's issues to the fore with the Board. When Roger returned after treatment, he resumed his role as Executive Director.

20. I deeply regret how badly things went in Mr. Duncan's case. The case was highly complex and Mr. Duncan was profoundly mentally ill, which made the need for investigation and preparation exceptionally acute. Despite my great respect for Roger's general abilities as a lawyer, his failures in this case are inexcusable.

I swear under penalty of perjury under the laws of the state of Idaho and the United States of America, that the foregoing statement is true and correct.

Executed this _9th_ day of February, 2017, in Boise, Idaho.

TOM MONAGHAN

6

TM