# *Office of the Public Defender of Kootenai County*

400 Northwest Boulevard, PO Box 9000 - Coeur d'Alene, Idaho 83816-9000
(208) 446-1700 FAX (208) 446-1701

## FAX TRANSMITTAL

**DATE:** _____

**TO:** *Tom* _____ *208 388-1757*

**FAX NO:** _____

**FROM:** *Bruce* _____

**AT:** **Kootenai County Public Defender's Office**

**RE:** _____

**PAGES TO FOLLOW**
**(INCLUDING THIS COVER SHEET):** _____

_____ **FOR YOUR APPROVAL**      _____ **FOR YOUR REVIEW**

_____ **AS REQUESTED**      _____ **OTHER**

**COMMENTS:** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**NOTE:**  This facsimile transmission contains CONFIDENTIAL AND PRIVILEGED information intended only for the use of the recipient identified above.  If you are not that person, or the employee or agent responsible for delivering it to the intended recipient, then you have received this transmission in error and you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited.  If you have received this transmission in error, you are asked to contact the sender at the number listed above for further instructions.

Exh. 53 - 000322

STATE OF IDAHO )
       )
vs.      )
       ) No.
LAPCOMPUTER )
and DIGITAL CAMERA )
OR MEMORY STICK )
_____)

STATE OF IDAHO    )
COUNTY OF KOOTENAI  }SS
FILED:

2005 JUL -5 PM 4: 06

**ORIGINAL**

CLERK DISTRICT COURT
_Shari L_
DEPUTY

## AFFIDAVIT

   Bradley Maskell , being duly sworn, upon oath, state that the following is true to the best of my knowledge:

### Affiant's Qualifications

   I am a Detective with the Kootenai County Sheriff's Department having been so employed since November 1989.  I have been with the Sheriff's Department approximately 15 years.  I have been assigned to investigate the triple homicide of Brenda Groene, Slade Groene and Mark McKenzie and the disappearance or kidnapping of Shasta and Dylan Groene which occurred on on or about May 15 and 16th, 2005.  I am a certified peace officer in the State of Idaho and hold a  advanced and supervisory level certificate from the Idaho Peace Officer Standards and Training Academy.  In the course of my duties I am responsible for enforcing state and local laws and have investigated a wide variety of crimes including but not limited to: homicides, rapes, and computer crimes.  Your Affiant has previously worked with Special Agent Eric D. Clemensen, FBI - Coeur d'Alene who has directed and/or participated in investigations dealing with internet pornography, computer crimes and child pornography during his eight year tenure with the FBI.  During this and previous investigations, SA Clemensen has relied upon consultation and advice, either directly or by reference, from the below-listed investigative and/or prosecutorial officials and has passed that knowledge on to Your Affiant:

     -Supervisory Special Agent (SSA) Kenneth Lanning, FBI-Retired, FBI Behavioral
      Sciences Unit, who is a nationally recognized expert in the behavior of sexual
      offenders, especially those who victimize children;

     -Unit Chief (UC) Michael Heimbaugh and SSA April Brooks, Crimes Against
      Children Unit, FBI Headquarters, who supervise the FBI's national and international
      investigative efforts regarding child sexual exploitation;

1

-SA Colleen Moss, SA Lamoyne J. Farr, SSA Stacey Bradley, all of the FBI *"Innocent Images National Initiative"* at the FBI's Baltimore Field Division. These agents have been assigned as primary investigators for *"Innocent Images."* They have each conducted numerous online undercover investigations in which individuals suspected of possessing or trafficking in child pornography have been identified, investigated and successfully prosecuted. These agents regularly provide numerous training sessions regarding the sexual exploitation and enticement of children via the Internet at the FBI Academy in Quantico, VA, for personnel assigned to *"Innocent Images"* and for a variety of local, national and international law enforcement groups.

-UC Mark Pollitt, Supervisor, Computer Analysis and Response Team (CART) Unit, Laboratory Division, Federal Bureau of Investigation Headquarters, Washington, D.C. UC Pollitt was formerly a Supervisory Special Agent assigned to "Innocent Images" in the Baltimore Field Division of the FBI.

-SA Roger Call, SA Norman C. Bender (retired), and SA Timothy Kroupa, Computer Analysis and Response Team (CART), FBI Salt Lake City Field Division. These agents are forensic computer examiners who were trained by the International Association of Computer Investigative Specialists in addition to the FBI CART program. They are knowledgeable about the workings of computers. Call analyzed computers, and the electronic data stored on them, for the FBI from the mid-1980's until his retirement in late 1998, and SA Bender has been doing so since 1999.

-Assistant United States Attorney (AUSA) James M. Peters, United States Attorney's Office, District of Idaho, who provided the citations to case law, which form an additional basis, and corroboration, for some information contained in these paragraphs, and Mark Eckenwiler, a trial attorney at the computer crimes and intellectual property section of the criminal division, U.S. Department of Justice, who provided technical assistance as set forth below.

## BACKGROUND INFORMATION REGARDING CHILD PORNOGRAPHY, COMPUTERS, THE INTERNET, AND SEIZING/SEARCHING COMPUTERS

Your affiant has learned through his own training and experience, and from the training and experience of other law enforcement officers (listed above) with whom I have consulted either directly or indirectly, the following information about child pornography and the individuals involved in possessing, distributing and manufacturing it:

Individuals who are sexually attracted to children often collect sexually explicit materials involving children, such as photographs, negatives, magazines, video and audio tapes, books, slides, and computer images for their own sexual gratification.

Some such individuals use computers to traffic in, trade and/or collect and sometimes profit from child pornography and erotic nudity involving minors. Computers are popular in part because they allow people to interact with many distant individuals while remaining largely anonymous.

2

Individuals who are involved in the sexual exploitation of children through child pornography and erotic nudity rarely, if ever, dispose of their sexually explicit materials. Those materials are treated as prized possessions and "trophies" by the individual procurers of the sexual exploitation materials.

The known desire to retain child pornography together with the sense of security afforded by using computers, provides probable cause to believe those computer images, especially child pornography and erotic nudity involving minors, will be retained indefinitely.

Individuals involved in the sexual exploitation of children collect books, magazines, newspapers, letters and other material relating to children, and other types of obscenities and erotic nudity that are prohibited or socially condemned. Correspondence between themselves and others who share their interests is generally treated as cherished possessions. Such individuals often collect other written material on the subject of sexual activities with children, which range from fantasy to medical, sociological, and psychological writings. Such correspondence or writings are often collected by computer and by mail. These materials are rarely destroyed and are usually maintained in their original condition because of the psychological support and reinforcement they provide.

Individuals involved in the collection and/or distribution of child pornography often maintain and possess their materials and documents in a place considered secure, most frequently within the privacy and security of their own homes. As mentioned above, child pornography, erotic nudity involving minors and other related materials may also be stored in computers, if one was used in the trafficking of such items, and the computers may be additionally protected by passwords and other security devices.

Individuals who possess, receive, traffic in and create child pornography and erotic nudity involving minors will also often collect, read, copy or maintain numbers or lists of persons who have similar sexual interests. These contacts are maintained for personal referral, exchange and/or commercial profit. They may maintain these names in the original publication or mode of receipt, or in phone or note books, address books or lists, or in scraps of paper, or in computers and may include information which leads to identifying the minors involved in the production of such materials.

Child pornography is not readily available in retail establishments. Individuals who wish to obtain child pornography do so by ordering it from abroad or by discreet contact with other individuals who have it available.

Child pornographers are sometimes also child molesters who not only collect, create and/or traffic in child pornography and erotic nudity involving minors but also sexually molest, abuse and/or exploit children under the age of eighteen. These individuals often keep evidence of the molestation and/or their interest in and contact with children, including but not limited to lists of children, their telephone numbers, interests, hobbies, and other profile information.

Your affiant has learned through his own training and experience, and from the training and experience of other law enforcement officers, the following information about computers and the Internet as they relate to storage of computer information and child pornography

3

and the individuals involved in possessing, distributing and manufacturing it:

Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contact, mailings and telephone calls. Any reimbursement would follow these same paths.

The development of computers has changed all of this. Computers serve four functions in connection with child pornography. These are: production, communication, distribution, and storage.

Pornographers can now produce both still and moving images directly from a common video camera. The camera is attached, using a cable, directly to the computer using a device called a video capture board. This device turns the video output into a form that is usable by computer programs. The output of the video camera can be stored, transferred or printed out directly from the computer. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. In addition, recent technological advances have led to the marketing of digital cameras, which allow a person to take a picture that is stored digitally and can be transferred directly to a computer without the use of a scanner. Because of this technology, it is relatively inexpensive and technically easy to produce, store and distribute child pornography. There is the added benefit to the pornographer that this method of production does not leave as large a trail for law enforcement to follow as have methods used in the past.

Previously, pornographers had to rely on personal contact, U.S. Mail, and telephonic communications to sell, trade, or market pornography. The development of the computer has also changed that. A device known as a modem allows any computer to connect to another computer through telephone lines. By connection to a host computer, electronic contact can be made to literally millions of computers around the world. A host computer is one attached to a dedicated network and serves many users. These host computers are sometimes commercial concerns, such as Compuserve and America Online which allow subscribers to dial a local number and connect to a network which is in turn connected to their host systems. These service providers allow electronic mail service between subscribers and sometimes between their own subscribers and those of other networks. Some of these systems, including America Online, offer their subscribers the ability to communicate publicly or privately with each other in real time in "chat rooms." Contact with others in this online format can be either very open and anonymous, in front of everyone else who happens to be in the same room at the same time, or very private and personal in the form of person to person instant messages. This communication structure is ideal for the pornographer. The open and anonymous communication allows the user to locate others of similar inclination and still maintain their anonymity. Once contact is established, it is then possible to send text messages and graphic images to a trusted conspirator. In addition to the use of large service providers, pornographers can use standard Internet connections, such as those provided by business, universities, and government agencies to communicate with each other and to distribute pornography. Additionally, these

Exh. 53 - 000326

communications can be quick, relatively secure and as anonymous as desired. These advantages are well-known and are the foundation of contact amongst pornographers.

The computer's ability to store images in digital form makes them an ideal repository for pornography. A single floppy disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly called the hard drive) used in home computers has grown tremendously within the last several years. Hard drives with a capacity of one gigabyte or larger are common. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board and to save that image to storage in another location. Once this is done, there is no readily apparent evidence at the scene of the crime. It is only with careful laboratory examination of electronic storage devices that it is possible to recreate the evidence trail.

The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution of child pornography. This pornography can be electronically mailed to anyone with access to a computer and modem. With the proliferation of commercial services that provide both electronic mail services and chat services, it is no wonder that the computer is one of the preferred methods of distribution of pornographic materials. UC Pollitt advised that all of the above described information is known to him as the result of his education and experience in the investigation of computer-related crime.

A Usenet newsgroup may be thought of as an electronic "cork board" where people may view, post and reply to messages related to a specific topic or interest. The specific topic or interest is usually indicated in the news group's name; for example, alt.fan.seattlemariners could be a newsgroup carrying messages from fans of the Seattle Mariners baseball team.

Certain newsgroups have been established which are intended to carry images relating to the group's specified topic or interest. In these newsgroups, people may post a message, along with an attached image. These images, stored and transmitted as computer code, are known as "binary attachments" to newsgroup messages. Typically, if the newsgroup is intended to carry images with the messages, the word "binaries" will appear in the newsgroup's name; for example, alt.binaries.pictures.supermodels could be a newsgroup carrying messages which contain attached images of fashion or swimsuit models.

Once an individual posts a message to a particular newsgroup, that message is automatically transferred and replicated worldwide, via a global network of computer newsgroup servers. The message may then be viewed and/or saved from anywhere in the world where another person has access to a suitable computer and connection to the Internet.

When an individual posts a message to a newsgroup, that message is sent through a newsgroup computer server which automatically attaches certain information, known as a "message header" to the message. The message header information indicates where the message came from, any known information about its author, the news server it was posted through, and the Internet Service Provider that allowed the individual user to connect to the news server. This information may be used to discover the identity of the individual user and/or where the message

5

1   originated from.   Most header information must be decoded or otherwise
interpreted by experienced computer professionals, employed   at an Internet
2   Service Provider or Newsfeed Provider.  It is the policy of most such companies
only to release such information in compliance with a subpoena or other lawful
3   court order.

4   ## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

5   Your affiant has learned through his own training and experience, and from the

6   training and experience of other law enforcement officers, the following information about seizing

7   and searching computers:

8

9   Searches and seizures of evidence from computers commonly require agents to
seize most or all computer items (hardware, software, and instructions) to be
10   processed later by a qualified computer expert in a laboratory or other controlled
environment.  This is usually true because of the following:
11

12

13   **Volume of Evidence:**  Computer storage devices (like hard disks, diskettes, tapes,
laser disks, Bernoulli drives, and others) can store the equivalent of thousands of
14   pages of information. Especially when the user wants to conceal criminal evidence,
he or she often stores it in random order with deceptive file names.  This requires
15   searching authorities to examine all the stored data to determine whether it is
included in the warrant. This sorting process can take weeks or months, depending
16   on the volume of data stored, and it would be impractical to attempt this kind of
data search on site; and

17   **Technical Requirements:**  Searching computer systems for criminal evidence is
a highly technical process requiring expert skill and a properly controlled
18   environment. The vast array of computer hardware and software available requires
even computer experts to specialize in some systems and applications, so it is
19   difficult to know before a search which expert should analyze the system and its
data. The search of a computer system is an exacting scientific procedure which is
20   designed to protect the integrity of the evidence and to recover even "hidden,"
erased, compressed, password-protected, or encrypted files.  Since computer
21   evidence is extremely vulnerable to tampering or destruction (both from external
sources or from destructive code embedded in the system as a "booby trap"), the
22   controlled environment of a laboratory is essential to its complete and accurate
analysis.
23

24   Based upon your affiant's knowledge, training and experience and from the training

25   and experience of other law enforcement officers, your affiant knows that searching computerized

26   information for evidence or instrumentalities of crime commonly requires agents to seize most or

27   all of a computer system's input/output peripheral devices, related software, documentation, and

28   data security devices (including passwords) so that a qualified computer expert can accurately

6

retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices to read the data on the system. It is important that the analyst be able to properly reconfigure the system as it now operates to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

To fully retrieve data from a computer system, the analyst needs all magnetic storage devices and the central processing unit (CPU). In cases like this, where the evidence consists partly of graphics files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create or display the data (whether stored on hard drives or on external media).

In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem are all instrumentalities of the crime(s), within the meaning of Title 18, U.S.C., Section 2252, and should all be seized as such.

## PERTINENT DEFINITIONS

The term **"computer,"** as used herein, is defined pursuant to Title 18, U.S.C., section 1030(e)(1), as:

"an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

Your affiant knows that computer hardware and computer software may be utilized to store records which include but are not limited to those relating to business activities, criminal activities, associate names and addresses, and the identity and location of assets illegally gained through criminal activity.

The terms **"records," "documents,"** and **"materials"** include all information recorded in any form, visual or aural, including the originals and all non-identical copies thereof, whether different from the original by reason of any notation made on such copies or otherwise, including, but not limited to the following:

Written or printed matter of any kind, correspondence, memoranda, notes, diaries, statistics, letters, telephone toll records, telegrams, contracts, reports, checks, statements, receipts, returns, summaries, pamphlets, books, ledgers, journals, registers, records, vouchers, slips, bills, calendars, pads, notebooks, files, logs, lists,

Exh. 53 - 000329

bulletins, credit materials, data bases, teletypes, telefaxes, invoices, worksheets;

Graphic records or representations, photographs, slides, drawings, designs, graphs, charts, pictures, sketches, images, films, videotapes; and aural records or representations, tapes, records, discs.

The terms **"records," "documents,"** and **"materials"** include all of the foregoing in whatever form and by whatever means the records, documents, or materials, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing, or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, and printouts or readouts from any magnetic storage device).

An **image file** is so named because it contains images or photographs which have been produced using a digital camera or converted into computer format by use of a scanner. An image file itself can be either a single image file (one picture only, also known as a computer file), or a multiple image file (two or more pictures). Multiple image files can be distinguished from single image files by the extension ".zip" at the conclusion of the file title.

## PROBABLE CAUSE STATMENT

Your affiant hereby reaffirms and incorporates by reference herein the previous testimony and evidence presented in support of all prior search warrants obtained in this case included those obtained on this date. Further, your affiant was informed today by Capt. Clark Rawlins, Det. with ISP and one of the law enforcement officers involved in the execution of the search warrant on the 2005 Jeep Cherokee (who I know to be trustful), that located w/in said vehicle was a GPS unit & a video camera, (amongst other things).

## ITEMS TO BE SEARCHED

Any and all computers, computer hardware, software, documentation, passwords, and data security devices; any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop", "notebook computers, or "PDA" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, Zip and/or Jaz drives and

8

Exh. 53 - 000330

1  disks, optical storage devices); transistor-like binary devices (such as keyboards,

2  printers, scanners, plotter, video display monitors, and optical readers); and related

3  communications devices (such as modems, cables and connections, recording

4  equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers,

5  programmable telephone dialing or signaling devices, and electronic tone-generating

6  devices); as well as any devices, mechanisms, or parts that can be used to restrict access

7  to computer hardware (such as physical keys and locks).  Digital camera devises,

8  photos, memory sticks/cards and flash cards. *GPS unit, video camera, video*

9  *tapes and their contents, accessories, adaptors, connectors, hardware and peripheral items.*  **SUMMARY**

10  Based on the foregoing information, your affiant submits that probable cause exists to

11  seize and search the computer, hard drive, digital camera and memory stick/card which is

12  currently found in a 2005 Jeep Grand Cherokee Laredo bearing Missouri License Plate 355REP

13  currently housed in Kootenai County Sheriff's impound yard located at Government Way and

14  Dalton, Couer d'Alene, Kootenai County, Idaho.

15

16

17  Sgt. Brad R Maskell

18  Detective
Kootenai County Sheriff's Office

19

20  Subscribed and sworn to before me this 2 day of July, 2005.

21

22

23  Scott Wayman

24  Magistrate Judge

25

26

27

28

9

Exh. 53 - 000331

Gmail - State visit

Page 1 of 1



Raymond Whitman <raymond.whitman@gmail.com>

## State visit
1 message

**Mark Larranaga** <mark@jamlegal.com>                                                      Sat, Oct 27, 2007 at 5:55 PM
To: raymond.whitman@gmail.com

Bruce:

Sorry for all the emails, but wanted to add to the areas to ==ask the State folks about what, if any, involvement the federal defenders had and whether the federal defenders provided them (the State) any of its work product.==

*NOTHING — AGENCY ETC*
*@ MEETINGS IS*
*ALL*

Please call if you have any questions or need any clarification from me.

Thanks,

*B5 MWRZ PI FILED 8/24/06*
*9867.0815*
*9867.06 JAN 06 — JAN 05*
*4650 DEC 05 = DEC 05*
*ASK AMY ABOUT TAMMY POSINUL AS FBI*
*COMMISSIONED OFFICER KC 50*
*SMALLEY ?*

Exh. 53 - 000332

**Judy Clarke**

| | |
|---|---|
| **From:** | Judy Clarke [judyclarke@jcsrlaw.net] |
| **Sent:** | Friday, November 02, 2007 12:10 PM |
| **To:** | Andrew Lah; Angie Mason; Bruce Whitman; Deb Garvey; Gina Enriquez; Jennifer Davis; Judy Clarke; Karen Sanderson; Lisa Valenti; Mark Larranaga; Tom Monaghan |
| **Subject:** | Duncan team email addresses & update |
| **Attachments:** | order denying RJP withdrawal.pdf; Duncan - Withdraw Mtn and Decl. of Peven.pdf |

I'm sending this email to who should be on our "team emails". Lisa – if we should add Carmen, pls let us know. I added Gina. I've removed Jodi Thorp who is leaving the FD office to go into private practice.

The team emails should not include Jen McCann, or anyone from the Spokane FD office. When we need Jen for something, we can include her on those specific emails. If there's a laserfiche issue, we can add Ben Solis in as well. But for the general work of our team, we should limit the list to the actual working team. Please let me know if we should add anyone else, and check your group email to make sure you're sending to the right folks.

Karen – I'm sorry, somehow you got dropped from my "Duncan team" addresses – not intentionally.

I'm also attaching Roger Peven's motion to w/draw, filed last week, as well as the ct's order yesterday denying the motion. Both documents are sealed. The language of the order suggests that Roger has not been truthful with us, and/or with the judge about his role in, or the condition of this case, an issue that we will have to address. As you might imagine, this is a pretty sensitive issue for all involved and I'd ask that we not discuss it outside the team, until we can bring resolution to the problem.

We've all got a whole lot of work to do, and need to stay focused on getting it done. Thanks for your continuing hard work. And, if anybody feels like they need something to do, holler.

**FEDERAL**

**DEFENDERS**

**OF**

**SAN DIEGO,**

**INC.**

The Federal Community
Defender Organization
for the Southern
District of California

*Confidential Communication Protected by Attorney-Client
and Work-Product Privileges re Joseph Edward Duncan III*

November 7, 2007

J.R. Merikangas, M.D., L.L.C.

Bethesda, MD. 20814

RE:   *United States v. Joseph Edward Duncan*

Dear Dr. Merikangas:

Enclosed is a revised disk, which replaces the disk of prison records we provided you when we met on December 18, 2007. Also enclosed are hard copies of 11 pages from Mr. Duncan's "Offender Chrono Report" which were apparently missing from the notebook of "prison/custody" records. Though they cover 1995-2005, they should be inserted with the other chrono report records which are at the end of the records from 2000.

We look forward to meeting with you again in January, whenever it is that you are able to arrange a few days in Boise. Let us know the dates as soon as you are able as we need some lead time to make arrangements.

Hope you enjoy your holiday trip. Happy New Year.

Sincerely,

Judy Clarke

cc: Mark Larranga, Tom Monaghan

NBC Building
225 Broadway
Suite 900
San Diego,
California
92101-5030
**(619) 234-8467**
**FAX (619) 687-2666**

1

# FEDERAL DEFENDERS OF EASTERN WASHINGTON AND IDAHO

*Roger J. Peven*
Executive Director

Stephen R. Hormel
Chief Trial Attorney

Ben Hernandez
Yakima Branch Chief

Spokane Main Office
10 North Post Street Suite 700
Spokane, Washington 99201
Phone (509) 624-7606
Fax (509) 747-3539

Yakima Branch Office
306 East Chestnut Avenue
Yakima, Washington 98901
Phone (509) 248-8920
Fax (509) 248-9118

November 13, 2007

The Hon. Edward J. Lodge
United States District Court
District of Idaho
550 W. Fort St, MSC 039
Boise, Idaho 83724-0039

Re:   *United States v. Joseph Edward Duncan III*
Cr. No. 07-23-N-EJL

Dear Judge Lodge:

I write to you in my capacity as President of the Board of Directors of Federal Defenders of Eastern Washington & Idaho. Please be advised that after meeting with the Executive Committee of the Board of Directors on November 8, 2007, Roger Peven has taken an indefinite leave of absence from the office. This action was based upon information contained in declarations attached to this letter and supported as well by independent observations by members of the Executive Committee of the Board of Directors. We have appointed Stephen Hormel the Acting Executive Director in Mr. Peven's absence, and have notified Chief Judge Whaley and Chief Judge Winmill.

I am aware of Mr. Peven's appointment as counsel for Joseph Duncan, and also aware of the Court's decision not to permit him to withdraw as counsel of record. I felt it appropriate and necessary that the judge assigned to Mr. Duncan's case be made aware of Mr. Peven's circumstances, which date back at least to the return of the federal indictment. It is because of this appointment and ruling that I am forwarding you the declarations of Mr. Hormel, Ms. Hunt and Ms. Werner. As you are probably aware, Mr. Hormel and Ms. Hunt are the most senior lawyers with this organization. Ms. Werner has been the Administrative Officer since 1993.

I also believe it is appropriate to provide other counsel for Mr. Duncan a copy of this letter and attachments. I ask that my letter and the attachments be received *ex parte* and sealed due to the sensitive nature of the contents.

Sincerely,

John M. Manske
President
Board of Directors
Federal Defenders of Eastern Washington and Idaho, Inc.

Exh. 56 - 000335

**FEDERAL DEFENDERS OF EASTERN WASHINGTON AND IDAHO**
LAW OFFICES

cc:    Judy Clarke (w/attachments)
       Mark Larranaga (w/attachments)
       Thomas Monaghan (w/attachments)

I, Stephen R. Hormel, declare the following:

1. I am the First Assistant (Chief Trial Attorney) to Roger Peven, the Executive Director for the Federal Defenders of Eastern Washington and Idaho (FDEWI). I have worked in this capacity for over 5 years.

2. I have been employed with FDEWI since April of 1993. Prior to my promotion to the Chief Trial Attorney, Roger held that position from the time of my employment with FDEWI until the Board of Directors hired him as the Executive Director in June 2002.

3. Prior to my employment with FDEWI, I knew Roger as both a mentor in the defender community during my law school years and early in my career as a public defender. Roger and I shortly thereafter became friends. I have known Roger for over 21 years.

4. During my employment with FDEWI, I have had ample opportunity to observe Roger both as the Chief Trial Attorney, and as the Executive Director. I know and understand his work habits and his administrative abilities in performing his job has Executive Director. I also know and appreciate his extraordinary talent as a trial lawyer.

5. In the Summer of 2005, our office was appointed pre-indictment to represent Joseph Duncan. At that time, Mr. Duncan was pending capital charges in Idaho. Roger assigned himself to the case due to his experience. In October of 2005, Roger received a modest budget from the Administrative Office to aid in the defense of Duncan prior to formal charges in federal court. The work involved in this budget ceased near the beginning of April of 2006.

6. During the Spring and Summer of 2006, Roger continued to maintain the necessary attention to his administrative responsibilities, including the ability to review two serious employment situations that led to the discharge of two employees. Also, during the Summer of 2006, I knew Roger was working with John Adams, Mr. Duncan's state defender, to help resolve the state charges. This eventually occurred in October of 2006.

7. With the completion of the state case, Roger experienced a noticeable decline in his attention to the administration of the office. It started to become more difficult to get his attention on administrative matters, however, it was not impossible. This situation continued up and until the time that the Government received the Duncan Indictment in late January of this year.

Exh. 56 - 000337

8.   It is my opinion that Roger's attention to the office was being affected by his nearly year and a half devotion to the Duncan case, and the stress that the representation caused Roger. I do recall discussing the need for Roger to seek counseling at a Board of Director's meeting January 2007, a week or two before the indictment was returned. I also believe that Roger contacted a counselor very early in February of this year.

9.   In February 2007, Roger received a tremendous "blow" from his wife, announcing just two days after their anniversary that she wanted a divorce. This unexpected announcement placed obvious stress on Roger, including the affect on and concern for his 8 year old daughter. This news on top of the tremendous stress Roger had due to his representation of Duncan, combined to affect his ability to function, both inside and outside the office. He was nearly paralyzed at times with emotional stress and developed a severe inability to focus, which became much more acute than was present in October, 2006. As early as February, 2007, Roger discussed and contemplated the need to withdraw as lead counsel from the Duncan case. I fully supported that decision, however, Roger decided against it.

10.  Between February and May, 2007, Roger could compose himself enough at times to engage in administrative matters, however, his ability to maintain any amount of focus for a period of time was extremely impaired. When Roger was in Spokane, his time in the office had diminished to only one to two hours a day, rarely more the 4 hours was spent at work in a day. He often spent this time with his office door shut, resting or reading on his couch. At the annual board meeting on May 11, 2007, again Roger discussed his need for counseling. In late-May, 2007, Roger's ability to focus on any administrative matter was so impaired that he commonly responded to office concerns by merely saying to me and our office administrator, Lisa Werner, "whatever you decide." It was also about this time that the stress of his poor relationship with his wife became even more tumultuous than it was in February. The reasons for this are personal to Roger and will not be detailed. He commented again on a desire to withdraw from the Duncan case. Due to Roger's noticeable decline, I supported this decision. Roger, again, declined to seek to withdraw.

11.  By July, 2007, Roger was so impaired that his attention to the office was essentially non-existent, existing in matters that could be answered by a simple email. Because he rarely responded, we had to constantly prompt him to reply. And, he became more absent. Consequently administrative and personnel issues were either delayed, never addressed, or accomplished by others in the office without his assistance. This continued throughout July and August of 2007.

12.  My concern for Roger's well-being reached a critical point during the first week of August, when, on August 4, my wife and I invited Roger to our home for dinner. Throughout the evening, Roger was detached and wept much of the evening. During the last hour he maintained a "fetal position" on our couch. I was so concerned that I made him promise he would step down from the Duncan case immediately which

Exh. 56 - 000338

he promised he would contact Judge Lodge for that purpose. That was not done and over the next two weeks, Roger continued to deteriorate. I continued to notice an obvious stress on the office and many employees.

13. On August 17, my wife and I went on a vacation sponsored by my wife's office in San Diego. A disturbing event occurred the day before I left that lead me to be concerned and acknowledge that I may need to intervene with the FDEWI's Board of Directors. It was my opinion that Roger's mental impairment may require immediate attention, and that a leave of absence may be needed. I asked our office administrator, Lisa Werner, to be prepared to initiate a conference call with our Board President, John Maurice, while I was on vacation. After a couple of conversations with Roger over the weekend, I decided against contacting the Board President.

14. Upon my return from San Diego, I firmly believed that Roger needed leave from the office to address his extreme stress. I asked him to take administrative leave and to step down from the Duncan case. After a two hour meeting, Roger convinced me to observe him before determining if leave was actually needed. Again, he agreed to seek a complete withdraw from the Duncan case.

15. On August 28, 2007, I recall Roger calling me immediately following his meeting with Judge Lodge about his desire to withdraw. He told me that Judge Lodge did not want him completely off the case, but to stay on for a limited role.

16. At the next Board of Directors meeting on September 10, the Board of Directors approved the use of non-grant funds to assist Roger in counseling due to his involvement in the Duncan case.

17. Since the meeting between Roger and me in late August, 2007, I have observed Roger and his inability to maintain attention to office matters. After Roger returned from a 10 day trip to Detroit in late September, I observed a continued decline in his mental condition to the point that at times I could not engage him in simple conversation. His attendance and time in the office has been sporadic and less than ½ days.

18. On Tuesday, October 23, I received an alarming phone call from Roger. He was at home that day. He told me that he had experienced uncontrollable anger and did not know why. He told me he would be alright and that I should not worry about him. I then received an email that was very disjointed, but also conveyed the same message that Roger believed himself to be out of control.

19. After the October 23 phone call and email, I concluded that Roger needed more than just time away from the office, he needed additional and intensive help. At the last board meeting on November 5, 2007, Roger was noticeably distracted and disjointed in his comments. This was extremely unusual because Roger would normally pull

Exh. 56 - 000339

himself together for the board meetings.  Although it is my impression that Roger's symptoms are due to mental stressors, I also believe he has turned to alcohol more to medicate his stressors.  Looking back, it is my belief that Roger has needed additional help long before this time, however, all of us close to Roger have attempted every avenue  with hopes that Roger could do it on his own. Roger has been a dear and close friend of mine for two decades and what I have observed of Roger over the last year is not the Roger I know.

20.    On November 8, 2007, Roger took a leave for an undetermined length of time.  As a result the Board has appointed me the Acting Executive Director until his return.

I declare under the penalty of perjury of the laws of the United States of America, the foregoing is true and correct.

Dated this 13th day of November, 2007.

Stephen R. Hormel

I, Christina L. Hunt, hereby make the following declaration:

1.  My name is Christina L. Hunt. I have been licensed to practice law since June, 1985. I am employed by the Federal Defenders of Eastern Washington and Idaho, Inc. as a trial attorney. I have been so employed since February, 1996. Prior to that time, I was in private practice in Macon, Georgia where I practiced exclusively in the area of criminal defense. I served as an adjunct faculty member at the Walter F. George School of Law, Mercer University, Macon, Georgia teaching trial practice and Georgia Criminal Practice and Procedure. I was also the Associate Dean for the National Criminal Defense College in Macon, Georgia.

2.  With the exception of Roger Peven, the Executive Director, and Steven Hormel, the Chief Trial Attorney, I am the longest employed and most senior of the trial attorneys with this organization. With the exception of Roger, I am also the most experienced trial attorney. Because of Roger's extraordinary talent and intellect, I looked to Roger for advice and assistance on my cases. This was particularly true after I transferred to the Spokane office from the Yakima office in 2000. He was exemplary in that regard, and I looked to him as a mentor.

3.  I have been aware that Roger Peven has represented Joseph Duncan since late July 2005. I have not been closely informed of his day to day dealings with the case, but, as discussed in more detail below, I am aware of his mental deterioration that significantly impacted his job performance both on the Duncan case as well as his administrative duties with this office.

4.  As part of my job responsibilities, I maintain the training schedule for the attorneys in our office. My responsibilities include being a mentor to the less experienced lawyers. To this end, our office runs a monthly training for the attorneys on Saturday mornings. Attendance is mandatory at these trainings for all attorneys, including Steve Hormel and Roger Peven.

5.  In early 2006, I noticed that Roger started missing training meetings. I attributed those absences to his work in the Duncan case, but his presence was missed because traditionally he was able to bring his valuable trial experience and talents to these trainings. This was not the case anymore. Roger, when he did attend, had limited and sporadic attention to the point of being more of a distraction than an asset. His absences from, and distractions during, the training became more and more frequent until he quit attending them altogether in late 2006. The trial attorneys all suffered from his inability to attend and perform at these training sessions.

6.  In addition to the training, attorneys in the office have routinely sought out Roger for mentoring and assistance with their cases. He had previously been available to discuss cases as well as to assist in trial preparation. In many cases, during trial preparation, the attorneys called upon Roger to assist them in preparing clients to testify for trial by having Roger conduct mock cross examinations of their clients. By late 2006, however,

because his attention was sporadic and unpredictable, his once valuable contributions ceased to exist. For example, it was not uncommon for him to agree to conduct those mock examinations, then unexpectedly become unavailable. Once again, I attributed that unavailability to his attention on the Duncan case, but I became concerned that he was neglecting the other duties of his office.

7. In addition to a colleague, Roger was my friend and I noticed around the time the state case was ending, he was also withdrawing from socializing with his friends. While Roger has always been a drinker, I noticed when I did see him that his drinking was increasing. He frequently spoke of the toll that the Duncan case was taking on him, and I attributed the heavy drinking to the stress of the case. I now believe he was "self-medicating" by abusing alcohol in order to deal with the stress.

8. After the Duncan state case settled in October of 2006, Roger's office attendance became even more sporadic. He began to complain about the extreme stress he was feeling, and talked with me about the need for counseling. I encouraged him to seek counseling, and in early 2007, he told me he had begun seeing a counselor. I was relieved and hopeful that the Roger I had known and admired as both a friend and excellent trial lawyer would be able to attend to his duties again.

9. In February of this year, Roger confided to me that his wife of approximately nine years had advised him that she wanted a divorce. On the heels of that revelation, she also told him that she had been unfaithful to him over a period of years. Roger was devastated. At that time, I began to notice a steady decline in his ability to administer his duties both at the office and in the Duncan case. He became increasingly absent from the office. When he was in the office, he was unable to pay attention. I recall on several occasions going to him on case related matters of my own. His ability to track the conversation was nominal.

10. By late April or May, his job performance declined even more noticeably. Although I believed that he was going to Boise to work on the Duncan case, I was unclear as to whether or not he was actually able to work. For example, on one occasion, I was in Boise on another case while he was also there. He had arrived the day before I arrived, and was scheduled to depart Boise on the same late afternoon flight as I was. I was distressed to find him not working on the Duncan case, but instead reading a book unrelated to the case and later napping.

11. During June, July and August, he was mostly absent from the office. I assume that some of those absences were due to his presence in Boise. When he was in the office, he often shut his door and napped or read books. I never observed him actively working on the Duncan case, although I did see him working on a budget for the case once. He would arrive late to the office and leave early. He clearly had begun to shut himself away from his work.

12. While the above events were unfolding, Roger was having difficulty in resolving his

Exh. 56 - 000342

marital differences. He and his wife never actually separated, but instead were trying "to work things out." In early August of this year, he told me that his wife again told him she had been unfaithful. I recall specifically Roger arriving at my house one night clearly distraught. He was unable to participate in meaningful conversations, and incapable of logical thought. He was sobbing, pacing and eventually curled up in the fetal position on my couch. He was also drinking very heavily. Out of concern for him, I advised him to withdraw from the Duncan case. His reaction to my advice veered from one end of the spectrum to another, agreeing with me then, unexpectedly and without much insight, disagreeing. I perceived from his comments that he was reluctant to withdraw from the case for fear that he would be deemed a "failure." I told him it was never a failure to withdraw from a case which he was not emotionally able to handle, and I advised him he should meet with the defense team and explain to them he could not continue on the case. He stated to me that he was afraid he had "forgotten how to practice law" and that he did not feel comfortable taking cases on his own at this time. Although I suggested he should return to simpler cases, I feel that he is, at this time, incapable of handling cases due to his emotional state.

13.    In September he called early one morning, and asked me to meet him at the Satellite Diner in Spokane rather than going directly into the office. I did so. I noticed at that time that his hands were very shaky, and that his thought processes were somewhat disjointed. He also told me he wanted to meet at the Satellite Diner as he could order a bloody mary. I was somewhat taken aback by this as it was only 9:00 a.m. and a work day. It was my feeling that he was trying to treat his stress level with alcohol. After talking with him for approximately an hour, he left the diner. I went to my office, and Roger did not appear in the office until much later that day.

13.    In September, Roger left for a trip to Detroit, Michigan to assist his parents in moving into an assisted living facility. Since his return, his behavior had become more erratic and his attention to his job has become almost non-existent.

14.    In early October, my office hosted Terry MacCarthy, Sr. to give a six hour lecture to members of the local criminal defense bar. Mr. MacCarthy is the head of the Federal Defender's of Northern Illinois and is an icon among federal defenders. Because of his status, I asked Steve to make certain that Roger would be available to attend certain dinners with Mr. MacCarthy. On the last evening of Terry's presence in Spokane, I hosted a dinner at Churchill's Restaurant. Roger came to the restaurant with Terry, and he appeared to be functioning fine. About an hour after our arrival, and right before our entrees were served, I went outside the restaurant to smoke a cigarette. Roger came out and joined me. He told me he couldn't stay as he was too emotional. He was crying. He told me to tell the others he had to leave, and he then got in his car and left with no explanation to the others. There was nothing that had occurred at the dinner to prompt that behavior.

15.    During October, Steve came to me with concerns over another employee's job performance. I knew that Steve had been attempting to get Roger to deal with the

Exh. 56 - 000343

problem, but Roger was delaying meeting with Steve. Steve resorted to asking Roger to meet with both himself as well as with me to discuss the issue. Roger refused to do so, and instead met with the employee over drinks in the evening. On the following Monday, (October 22nd) Roger asked me to lunch with him. Again, his hands were very shaky, and again he ordered a drink. His conversation was disjointed and disoriented. I finally asked him why we were having the lunch meeting, as I could not make heads nor tails of his conversation. He told me that "people" in the office thought that Steve and I were "conspiring" against him. I asked him to tell me who was making such accusations. He would only respond that "people" thought so. He ended the conversation by handing me a copy of an email he had sent to his wife. As we had not been discussing his situation with his wife, I was confused why he would do so. The email had nothing to do with the situation at the office nor with me. His paranoia, physical shakes, disjointedness and overall inability to track the conversation reinforced my concern for his well-being. Since that meeting, I have seen Roger only occasionally in the office.

16. Because of my concern for Roger and the office, I have participated in several conversations with Steve Hormel, and John Maurice, the president of our Board of Directors.

17. It is my personal belief that Roger's mental state and self-medicating has rendered him unable to function as the Director of this office. I base this personal opinion on my observations of him over the last year, which during that time I have witnessed a serious decline in my close friend, colleague and mentor. On November 8, 2007, Roger decided to take leave from his duties with the office with the approval of the Board of Directors. The Executive Committee has appointed Steve Hormel as the Acting Executive Director during Roger's leave. It is my sincere hope that the Roger I have known in the past will return after this leave. The Roger I have dealt with over the last year has not been the person I have looked to for mentoring nor assistance in the past, and look forward to his healthy return.

I declare under the penalty of perjury of the laws of the United States of America, the foregoing is true and correct.

Dated this _13th_ day of November, 2007.

Christina L. Hunt

I, Lisa Werner, declare as follows:

1. I am the Administrative Officer for the Federal Defenders of Eastern Washington and Idaho.

2. I have been the Administrative Officer for the Federal Defenders of Eastern Washington and Idaho since February 1993. I have worked with Roger Peven since that time. He was Chief Trial Attorney when I started my employment and was promoted to Executive Director in June 2002.

3. During July 2005, Roger Peven and our office became involved in the Duncan case. Roger regularly traveled between Spokane and Coeur d'Alene until Duncan was moved to an institution in Boise in October 2006. From October 2006 through September 2007, Roger regularly traveled to Boise. During both of these periods he was away from the office a great majority of the time and I felt it necessary to copy Steve Hormel, the Chief Trial Attorney in our office, in on almost every administrative email I sent Roger. Even when Roger was not traveling, his physical presence in the office declined after the inception of the Duncan case. Beginning in January 2007 he regularly came in mid-morning then left for a few hours around lunch time. He returned for a few hours in the afternoon, but was rarely around the office after 3:30 p.m. On numerous occasions when Roger was not traveling, he would call the receptionist in the morning and tell her he would be in at 10 a.m. Then he would call back around 10 a.m. and say he would be in at noon. Then he would call again and say it would be around 2 p.m. Most of the time he eventually made it into the office, but was not present very long. (Examples of Roger's absence from the office are attached to this declaration).

4. Since February 2007, Roger's attentiveness to administrative office matters started to diminish dramatically. I regularly emailed him or told him in person that we needed to discuss a particular matter when he had time. I would then have to follow up to make sure the matter got discussed and finalized, but then usually with Steve Hormel's assistance. It often took days to get Roger's attention. Examples of this behavior are highlighted from some of my emails to Roger:

- 2/8/07 "When will you be back to the office to discuss the 08 budget that is due today?"

- 2/21/07 "Marissa is running payroll Friday if you can get me a response to this by then please." This referred to a 2/12/07 email in which I asked him how much he wanted to give one of our employees for a raise.

- 3/26/07 "Please respond with your decision." This referred to a 3/8/07 email in which I asked him how much he wanted to give one of our employees for a raise.

- 8/1/07 "Please let me know if you think any changes should be made to this memo." This referred to a Board of Survey memo I drafted and emailed him on 7/9/07. On 8/22/07 I have another email to him asking if we can review and discuss the draft again. The matter wasn't finalized until mid September.

Exh. 56 - 000345

- 8/3/07 "Do you authorize the 12-8?" This referred to a 7/25/07 email and previously a 7/17/07 email where I asked him about a salary increase amount for an employee.

- On 9/27/07 I drafted an email to send to all staff regarding a change in office policy that we planned to put into effect on 10/1/07. I asked him to review it and if he wanted me to send it out to the staff or if he wanted to send it out. He said he would send it out. On 10/10/2007 I emailed Roger "I forgot to mention that we still need to get that ½ day vacation memo out to all the staff. What did you think of the draft I sent last week?" On 10/11/07 I sent him another email saying "this is the draft I sent you about a week ago". On 10/15/07 I sent him another emails saying "I re-worded the memo to everyone about the ½ day vacation on 10/11 and sent it to you to send out to everyone also. When you have time please do that too." As of today, 11/9/07, the email has still not been distributed.

- 10/16/07 "I'll need a response to this in the next 10 days please." This referred to a 10/05/07 email in which I asked him how much he wanted to give two of our employees for a raise.

- 10/19/07 "Here is the text portion of the report. Please review or revise. I've got the rest of the report done to show you along with projections for FY08 when you have time." The first part of this email is in reference to the FY07 Report of Operations that we have to submit to the AO. Roger never responded by email and delayed my verbal requests to discuss the matter. The second part of the email referred to my forecasting out my estimated expenses for FY08 and comparing that to the Grant amount we received for FY08 from the AO. Roger never responded by email and again delayed my verbal requests to review and discuss the matter.

- 10/29/07 "Kelly passed the bar and has been sworn in...Did you want to give her an increase as we roll her into the attorney position?" Roger has never responded to this email.

5. During FY07 as I prepared my monthly reports for the AO and went into Roger's office to explain them, he would sign off on the reports without looking at them or asking any questions. It was clear to me that he could not completely focus on certain matters discussed with him.

6. In November 2005, Roger and I actively worked together to provide budgets and narratives to the Office of Defender Services for the Duncan case. Funding was approved on the case through March 2006. Roger and I submitted an updated budget for April 2006 – September 2006 showing the unused funding approved through March was all that was needed to finish out FY06. Future Duncan submissions after this period were often submitted past the requested deadline. Roger seemed to struggle with what kinds of experts were needed and how much travel would be involved in the case. (Examples of this behavior are included in the attachement)

7. In July of this year, Roger spent 3 hours typing a narrative text for the Duncan budget into his computer only to find out it didn't save properly and he had to start all over again. When he finished the draft, I reviewed it and made comments. We went back and forth a few times with changes and input from others on the case. I observed him to become so emotionally and physically drained after a few days of continued work on it that he left the office. I recall making the final changes myself and submitting it without his looking at it one more time because he never returned to the office that week and we had to get it to the AO. He simply could not focus on it any longer.

8. Beginning in May of this year, Roger's ability to maintain his concentration on administrative matters became so severely limited that he would ask Steve and me to make decisions, or complete projects. This behavior has continued through the present time. Roger has attempted to engage in administrative matters more recently, but still fails to follow through completely on them. Many important decisions regarding administrative matters are still unresolved.

9. It is my opinion that Roger is incapable of performing the duties an Executive Director needs to preform to maintain a functioning office and he is in need of professional help. In my opinion, he has been unable to perform his job duties since February 2007.

10. After meeting with the Executive Committee of our Board of Directors, on November 8, 2007, Roger took leave from the office for an undetermined amount of time for personal reasons. Steve Hormel has been appointed our Acting Executive Director.

I declare under the penalty of perjury of the laws of the United States of America, the foregoing is true and correct.

Dated November 9, 2007.


Lisa Werner, Administrative Officer

# ATTACHMENT

Examples of Roger being out of the office can be seen from the following emails:

- 01/30/07 email from Louise at 10:14 a.m. "Roger – Dr. Appt. in this afternoon"

- 02/04/07 email from Louise at 10:45 a.m. "Roger – In around 12:00 pm"

- 02/07/07 email from Louise at 10:34 a.m. "Roger – In 10:30 (ish)"

- 02/27/07 email from Louise at 9:57 a.m. "Roger – In by 10:45 am."

- 03/14/07 email from Louise at 9:52 a.m. "Roger called and said that he may be in around 11:00am but had a Dr. appt. at noon so he may come in after Dr. appt."

- 03/14/07 email from Zana at 1:27 p.m. "Roger will be in between 2:30 - 3 pm."

- 05/24/07 email from Louise at 8:54 a.m. "Roger has a Dr. Appt at 11:00am - he'll be in after that"

- 06/18/07 email from Louise at 9:19 a.m. "Bill said Roger will be in around 11:00 (ish)"

- 06/27/07 email from Louise at 9:47 a.m. "Roger – In this afternoon"

- 07/05/07 email from Louise at 11:07 a.m. "Roger called and said he will not be in today - he'll be in tomorrow morning."

- 07/06/07 email from Louise at 10:03 a.m. "Roger – In around noon"

- 07/12/07 email from Louise at 9:58 a.m. "Roger - Doctor Appt. (in around Noon)"

- 07/13/07 email from Louise at 9:42 a.m. "Roger – In around 2:00 pm" Roger called in sick.

- 08/15/07 email from Louise at 10:37 a.m. "Roger – In this afternoon" Roger never came in.

- 08/20/07 email from Louise at 9:55 a.m. "Roger – In around 10:30am (ish)"

- 09/12/07 email from Louise at 9:48 a.m. "Roger – In around 11:00(ish)"

- 09/14/07 email from Louise at 10:18 a.m. "Roger – In 11:00(ish)"

Exh. 56 - 000348

- 09/17/07 email from Louise at 9:24 a.m. "Roger - In around 11:00(ish)"

- 10/12/07 email from Zana at 8:19 a.m. "Roger said he'd be in around 2pm today."

- 10/22/07 email from Louise at 9:35 a.m. "Roger - In around 10:30(ish)"

- 10/23/07 email from Zana at 8:29 a.m. "Roger's working from home today and can be reached on his cell."

- 10:30/07 email from Louise at 9:50 a.m. "Roger - In around 10:00 (ish)"

- 11/01/07 email from Louise at 9:43 a.m. "Roger - In around 10-10:30am."

Requests from our financial analyst, Marybeth Nassif at the Office of Defender Services, and the delays to those requests are evident in the following email excerpts:

- 10/3/06 Marybeth emails Lisa "I know we spoke about this last week...but I wanted to request again a Duncan budget from your office"

- 10/11/06 Marybeth emails Roger "Can you provide me a status on the Duncan case?"

- 10/11/06 Roger emails Marybeth "I am hoping to reduce cost by using a mitigator from one of the other FPDOs and won't have a response until early next week."

- 12/18/06 Marybeth emails Roger "Attached is a case budget to complete for Duncan. Please complete as soon as you can."

- 1/23/07 Lisa emails Roger "Here is the completed budget form that Marybeth provided." This referred to the 12/18/07 email. I ask him to review the Duncan form. He wrote the text to go along with the form.

- 1/31/07 we submit budget to Marybeth with a note saying please forgive the delay in getting this to you.



"Judy Clarke"
<judyclarke@jcsrlaw.net>
11/18/2007 02:03 PM

To   "'Debra Garvey'" <Debra_Garvey@fd.org>
cc
bcc
Subject   FW: Holes in the investigation to date.

**From:** debra garvey [mailto:deb_garvey@yahoo.com]
**Sent:** Thursday, November 15, 2007 5:33 PM
**To:** judyclarke@jcsrlaw.net; mark@jamlegal.com; thomas_monaghan@fd.org
**Subject:** Holes in the investigation to date.

Early life - before institutionalization.
    School records from 8th - 10th grade only
    Medical records - two hospital records only [paratyphoid & sinus injury] +
            NDSU student health file
    Friends - few and hard to find
    Teachers - one high school club advisor located only
    Juvenile records destroyed - trying to reconstruct what Dyslin was like and who knew
    client there.
  So very little trauma identified in this era of his life, from unbiased observers.

Mental illness in family - lots of anecdotal information, lots of records to seek from recent family
interviews to see what we can corroborate. Working on getting parents' mental health
records, but still need to do more work.

Institutional stuff :
    Need to talk to all WSH inpatients and DOC inmates we can find for client's symptoms and
program description. We've begun, but we have a long list of potential witnesses.

    Program staff - again begun interviews, but many DOC staff to still interview - again for
client's symptoms and program description.

Relationships

  We've interviewed three adults who had relationships w/ client [Ault, Woelfort & Parks]
  there at least a dozen more adults to pursue.

  Family relationships - we need a huge amount of time to get anywhere with the sibs and
  father and step-family. We suspect significant abuse, sexual and emotional, but need client's
immediate family members to help us.

Client living on the outside, when he seems to be okay [what triggers him]:

People who knew the client in 1994-96 - again we've spoken to some of these people
but we have a lot more witnesses to talk to.  These include friends, employers, co-workers,
roommates, sex partners.

People who knew client in Fargo [Joyce spoke to a dozen people approx., but didn't   gather
symptomatic information about the client.]


A competent mental health evaluation requires the generational family mental health records.  As
we heard Beaver say, that kind of information would help pinpoint testing and other
considerations in the client evaluation.

Trauma needs to be completely explored and document what's possible.  Sources of trauma in
this client's life can come from early childhood events and exposures, parental abuse,  sexual
abuse, instability, WSH at 17 y/o, DOC at 19 y/o for next 14 years.

The insult to the client's brain needs to be measured [PET, MRI] and considered.  Car
accident/cop shooting at him which results in him needing sinus surgery happened 1/79.
3/79 client steals father's car in running away from home and has another accident.  4/79 client
goes into Dyslin [4/24/79 to 9/79].  1/80 rape of Virgil Craven.

On the aggravators:  We're just now creating a plan for investigating these priors.

-------

Is this closer to what you need?  Do you want this in narrative form, together with the numbers
analysis?  Tell me how to be more helpful.

thanks/deb

11/23/07

T/c Wendy re JQ DP questions
    sent us Wed sealed pleading
- JQ introduction          dnot cunt!

Term ditz - T/c re GP
    competence   - "based on what we knows"
    prejudice can be raised as found.
    Karen - visit w/ Jet 11/20 -
        MSg at trial.

    family wants GP
    [Try to deal away evidence

T/c @ re videos -  we prepare excl. dicum.

11/24/07
    T/c Tim, Munt re motion
    Beth
11/25/07
    Dunbert  Mark
    JQ

**Dr. Becker Interview by Mark Larranaga - 12/10/07**

Spoke with Dr. Becker today and after a brief discussion of the case, it was apparent she didn't have much knowledge of the specifics. This is not a comment on her ability, just feel like she didn't have much background to the case. Probably attributed to State case preparation style.

Anyway, she did understand the WSHSOP and prison trauma as being extremely important. I asked her for some references that may be useful with Jet's victimization/trauma during prison, here is what she provided:

1.     Dr. Janice Marques, Ph.D. – head of mental health research and evaluated treatment for sex offenders in California. Dr. Marques is retired but does take cases. I take it Dr. Marques was also appointed by the federal court here in Western Washington as a receivership to deal with the inappropriate facility housing SVP. This occurred in early 1990's and recall some of the litigation surrounding the SVP program. I don't think she would be good dealing with prison trauma, but may be useful analyzing the failures of WSHSOP.

2.     Dr. John Conte. I have spoken to Dr. Conte about this case and he is interested given a continuance. Dr. Becker said that Dr. Conte would be great as an expert of sexual victimization.

3.     Dr. Howard Barbaree: Dr. Barbaree is out of Toronto, Canada and is the head of (former) Clark Institute of Psychiatry. According to Dr. Becker, Dr. Barbaree would also be good for sexual victimization.

Other than Conte, I have not heard of the others – has anyone?

Different, but related: I have contacted John Messina and John Moceri, two attorneys that were working (or at least their firm was) on a civil case that sought to depose Gary Shepard and Maureen Saylor. Left a message for one, the other indicated that he was going to check his office records to see if he has anything.  I haven't contacted Gary Bass yet, wanted to finish reading what we have before I do.

**Judy Clarke**

| | |
|---|---|
| **From:** | Mark Larranaga [mark@jamlegal.com] |
| **Sent:** | Thursday, December 13, 2007 5:08 PM |
| **To:** | judyclarke@jcsrlaw.net; 'Tom Monaghan' |
| **Subject:** | Expert Contact Updates |

1) Sweeney – called waiting for reply
2) Kuper – left message (possible retain)
3) Aiken – left message (possible retain)
4) Haney – not available
5) Conte – still waiting for his reply (possible retain)
6) Merikangas – collecting materials
7) Becker – called waiting reply to visit (or retain)
8) Matt R – requested March

Exh. 60 - 000354



**"Mark Larranaga"**
**<mark@jamlegal.com>**
12/21/2007 01:27 PM

To   "'Judy Clarke'" <judyclarke@jcsrlaw.net>, "'Thomas Monaghan'" <Thomas_Monaghan@fd.org>
cc   "'Debra Garvey'" <Debra_Garvey@fd.org>, "'Andrew Lah'" <Andrew_Lah@fd.org>
bcc

Subject   RE: team mtg follow up conf call

I will scan Merikangas list and send it out when I get back to my office.

**From:** Judy Clarke [mailto:judyclarke@jcsrlaw.net]
**Sent:** Friday, December 21, 2007 10:45 AM
**To:** 'Thomas Monaghan'; mark@jamlegal.com
**Cc:** 'Debra Garvey'; 'Andrew Lah'; judyclarke@jcsrlaw.net
**Subject:** team mtg follow up conf call

We should talk sooner than later about some of these areas and our division of labor (I've noted some suggestions, but they are only that):

1.   Motions – my thinking is Tom is best to take the lead with help from Andrew and Rita. We should brainstorm some more motions to file.   *Tom holding*

2.   Subpoenas – we talked about a couple at the team mtg, I'd suggest Tom taking the lead in drafting and filing the 17(c) requests. Andrew can help – we have the format already from the one Mark did for the Stein records; Deb can arrange service with Jen

3.   Daubert challenges – DNA, poppers, firearm, child abuse (Cooper), future danger, anthropologist/dental/bone remains and working with our Daubert experts, who could become testifying witnesses at penalty - Andrew has been sheparding this – we need to assign Tom, Mark or me to work on each area with Andrew. My thinking is Tom for DNA, poppers, firearm, bones and child abuse; Mark or Judy for future danger.

4.   Discovery ltr (Riverside, Seattle, missing pages, more GPS raw data? Brady re Shasta) – I think Tom is already taking the lead here.

5.   Our MH or prison related experts – taking the lead in setting up meetings, making sure they get appropriate records.
       i.      Kupers – Mark → *Yes*
       ii.     Conte – Mark
       iii.    Merikangas – Judy → *Need dates*
       iv.    Becker – Judy →
       v.     Aiken – Mark or Tom → *future dangerousness*
       vi.    Beaver – we need to discuss Craig as a life hx witness, he said he feels comfortable participating as part of a larger MH team

6.   Pediatrician to review Shasta records, and perhaps refer sexual abuse expert -
   *Sex abuse expert in Tacoma*

Mark    *[handwritten: Judy asking from us: PTSD / me of sure ass in Spokane / Mark Mays   TRANSCRIPT / + Conferso description]*

7.    PTSD expert for jury motion – probably easiest to get someone from Spokane area since the videos are there.   What video's is govt likely to try to introduce?

8.    Phone records, bank records – integrating with GPS timeline. →

9.    Talking with Jet about Merikangas visit

10.    Talking with Jet about missing video tapes, other kids, porn rings

11.    Reducing investigator rates to be more in line with 9^th Circuit rates ($35 for   *[handwritten: ─?]* paralegals, $55 for investigators, $75 for mit specs) – how do we want to handle this?

12.    Staying on top of investigation assignments and record collection – Deb.

13.    DIVO follow up, draft of best interests of Shasta document, checking out Rosemary *[handwritten: 1/9 2pm]*  II and Gayle Goodman, or whoever else we should get – Judy/Deb    *[handwritten: Bowers ✓]*
    *[handwritten: ↳ 1/10 @ 130 uc Davis]*
14.    Scheduling weekend in late March or early April with Matt Rubenstein and Beth – Mark

15.    What to do with Riverside PD (Mark Johnson and I have traded calls and VM, I'll keep trying).

    What else are immediate (January) needs?

When can we do this call?  Would 12/27 or 12/31 work?

    Re DIVO, I'll forward Rosemary II's CV when I get it.
    Mark – I'll forward Jet's autobiography to Merikangas.
    Will also check on Merikangas' dates to see Jet.

    Tom – will you check with the prison on how much lead time they need to have to clear Dr. Merikangas?  He may also want to visit on a weekend, will we be able to schedule that?  He has visited death row before.  He needs an examining room to do a physical exam (Mark has the list of items he needs to bring in); and he then needs a room to meet with Jet for 3-4 hours on 2-3 consecutive days.  He is either going to make it mid January or early February. [We'll want to schedule Lillian in to Boise that same time period so he can meet her.]

*[handwritten: 16. Conclude video review]*
*[handwritten: 1/22 – Boise   1/23 – 25 ?]*

Exh. 61 - 000356

Transfer of Funding and Appointment of FDSDI
U.S. v. Joseph Edward Duncan III

On August 8, 2007, Roger Peven advised his co-counsel that he was inclined, for personal reasons, to move to withdraw as counsel of record. Thereafter, following an ex parte, and un-recorded meeting with the trial judge on or about August 28, 2007, Mr. Peven took what the court has called a "reduced role" in this case. On September 17, 2007, the trial court appointed Judy Clarke and Federal Defenders of San Diego, Inc. to essentially replace Mr. Peven on the defense team, and transferred funding, for all but the 3005 CJA appointed counsel's expenses (Mark Larranaga), to Federal Defenders of San Diego, Inc.

On October 3, 2007, the reconstituted defense team sought a continuance of the January 22, 2008 trial date arguing that the "legal and ethical obligations" of defense counsel had not been met because of "logistical and practical obstacles, administrative and budgetary delays, and other failures resulting from non-case related issues personal to one of the defense counsel."[1] The court denied the motion to continue.

On November 5, 2007, the defense filed approximately 16 pre-trial motions, including motions to suppress, motions relating to jury selection, the death penalty and notice of intent, discovery and *Daubert* challenges. By that time, the government had noticed some 14 different experts in the area of anthropology, odontology, duct tape, hair and fibers, DNA, liquids, metals, toolmarks, fingerprints, physiology and computer forensics. The defense also sought an extension of time to file notice pursuant to Fed. R. Crim. P. 12.2 (expert notice regarding mental state evidence).[2] That request was denied.

On December 3, 2007, Mr. Duncan pled guilty to all of the counts in the indictment. Pursuant to an agreement between the parties, the next day, both the defense and prosecution filed motions to continue - the defense asking for a September 2008 trial date, the government

---

[1] At an unrecorded status conference prior to Mr. Peven taking a "reduced role", government counsel complained that the defense had not interviewed any witnesses or reviewed any of the physical evidence. Indeed, it was not until late August 2007 that some potential guilt phase witnesses were identified. The government's observation was correct as to the guilt phase; however, a handful of life history witnesses had been interviewed.

[2] At the time of transfer of funding to FDSDI, no forensic, mental health, future danger or social history experts had been retained by the defense. The psychiatrist that assisted FDEWI and the Kootenai County Public Defender in connection with the state case was only willing to continue in a consulting role, and did assist in recommending experts for the federal case. CJA appointed 3005 counsel, Mark Larranaga, identified and repeatedly asked Mr. Peven to send retainer letters to a variety of experts. That was never accomplished, and by the time of transfer of funding, these experts were not available on the short time table. It was not until November 2007 that the defense was able to obtain a commitment from a mental health expert to actually work on the case. That expert was not able to meet with defense team members until December, and could not meet Mr. Duncan until early February 2008.

Exh. 62 - 000357

seeking an April 2008 date. The court continued the penalty phase until April 14, 2008.

On February 5, 2008, the defense sought another continuance, advising that because of the short periods of time that had been available, we had not been able to retain a social history expert witness.[3] The motion was denied. On March 12, 2008, pursuant to court order, the defense provided notice of a variety of experts it intended to call at trial, but was not able to provide summaries of the testimony because the work was not complete.

On April 14, 2008, some 300 potential jurors completed jury questionnaires. On April 16, 2008, prior to the start of individual voir dire, counsel advised the court of Mr. Duncan's desire to represent himself. Mr. Duncan advised that "I don't have an issue with counsel personally. I think they are, like you have always said many times, good counsel. It is ideological. I don't believe that they can ethically represent my ideology." The court deferred ruling on the motion, pending a hearing on April 18, and proceeded with two days of individual voir dire. Ultimately, the court ordered a "local" competency evaluation. Relying in large part on the reports of 3 defense retained mental health experts (neuropsychiatrist from the state case who had met Mr. Duncan in 2005 and who had consulted with the federal defense team; a neuropsychologist who reviewed existing neuropsychological testing, interpreted neuroimaging and conducted additional testing; and a neurologist/psychiatrist who had met for several hours with Mr. Duncan), the defense filed a motion to find Mr. Duncan incompetent to proceed. The government sought appointment of a second (local) evaluator selected by the government, however, later withdrew that request and asked the court to find Mr. Duncan competent on the strength of the court appointed evaluator's report. The court rejected the government's request, and on May 13,2008, ordered that Mr. Duncan undergo a competency evaluation at the BOP facility in Seattle, Washington.

Proceedings are currently on hold pending the competency evaluation. Jurors have been directed to call the automated juror number on June 23 for further instructions. The court has informally advised counsel that it is likely there will be no further court proceedings until July 14, 2008.

_____

[3]This was again the result of having limited time available to do the necessary work. One of the first experts identified by Mark Larranaga was a social history expert, but the identified person was unavailable by the time funding was transferred to San Diego. Thereafter, multiple social history experts turned us down because of limited time. We are currently working with an expert who has a background in working with sex offenders, and continue to pursue the work necessary to his conclusions and possible testimony.

**FEDERAL**

**DEFENDERS**

**OF**

**SAN DIEGO,**

**INC.**

The Federal Community
Defender Organization
for the Southern
District of California

*Confidential Communication Protected by Attorney-Client
and Work-Product Privileges re Joseph Edward Duncan III*

January 8, 2008

J.R. Merikangas, M.D., L.L.C.
███████████████
Bethesda, MD. 20814

RE:    *United States v. Joseph Edward Duncan*

Dear Dr. Merikangas:

Enclosed with this letter is an index of the enclosed materials - two notebooks of transcripts of statements made by our client, as well as those made by the surviving child, Shasta Groene. We have also included the video or audiotapes of these statements where they have been provided to us.

We are continuing to pull materials for your review, and will continue to forward.

Sincerely,

Judy Clarke

enclosures (index, two 3 ring binders of materials)
cc: Mark Larranaga, Thomas Monaghan

NBC Building
225 Broadway
Suite 900
San Diego,
California
92101-5030
**(619) 234-8467**
**FAX (619) 687-2666**

1

Exh. 63 - 000359



"Judy Clarke"
<judyclarke@jcsrlaw.net>
07/19/2008 11:54 AM

To   "'Debra Garvey'" <Debra_Garvey@fd.org>

cc

bcc

Subject   FW: Duncan - neuropsych records

I'm forwarding several emails sent to Gur with records.  1.

-----Original Message-----
From: Judy Clarke [mailto:judyclarke@jcsrlaw.net]
Sent: Friday, January 18, 2008 6:42 AM
To: 'Ruben Gur'
Subject: RE: Duncan - neuropsych records

Thanks so much!  I'm on the road so going to send some records as
attachments.  There will be this and 5 more emails attaching the neuropsych,
and what medical and school records we have right now.  I'll also send an
index of the records we have which indicate these as well as some family
records (maternal side only - Lillian is our client's mother), which I can
send on disk or by hard copy.

Let me know your rate so I can get my office to set aside some money.

Thanks, again, so very much.  What a pleasure to get to work with you again.

-----Original Message-----
From: Ruben Gur [mailto:Gur@upenn.edu]
Sent: Wednesday, January 16, 2008 10:31 AM
To: Judy Clarke
Subject: Re: a case, of course

so nice to hear from you judy!

it will be a pleasure to work with you on a case again, so please send the
material and we can take it from there. please send the materials to my home
address:

███████████████

Philadelphia, PA 19119

ph 215.247.2716

best, ruben
ps me busy?
--
**********************************
Ruben C. Gur PhD
Professor, Departments of Psychiatry, Radiology & Neurology Director, Brain
Behavior Center, http://www.med.upenn.edu/bbl University of Pennsylvania
Medical Center 10th Floor Gates Building, Philadelphia, PA 19104 voice (215)
615-3604 fax (215) 662-7903 email gur@upenn.edu
**********************************

On Jan 16, 2008, at 12:15 PM, Judy Clarke wrote:

> Ruben - I'm emailing to see if you might have time to review
> neuropsych records in a case of mine (done  in 2005 in connection
> with an earlier state case), with an eye toward recommending follow
> up testing, scanning, or whatever might be necessary?  We're looking
> at an April 14, 2008 penalty phase start, so time is somewhat of the
> essence.  Yes, I know, so what else is new.
>
> Hope you're doing well.
>
> Thanks.
>
> Judy Clarke
> c/o Federal Defenders of San Diego, Inc.
> 225 Broadway, Ste. 900
> San Diego, CA  92101
> (619) 544-2720 (work)
> (619) 279-3804 (cell)
> judyclarke@jcsrlaw.net



JED III 2005 Neuropsych Testing (Beaver).pdf



"Judy Clarke"
<judyclarke@jcsrlaw.net>
07/19/2008 11:59 AM

To   "'Debra Garvey'" <Debra_Garvey@fd.org>

cc

bcc

Subject   FW: Duncan - neuropsych records

7

**From:** Judy Clarke [mailto:judyclarke@jcsrlaw.net]
**Sent:** Thursday, January 31, 2008 4:26 PM
**To:** 'Ruben Gur'
**Subject:** RE: Duncan - neuropsych records

One more school record.

**From:** Ruben Gur [mailto:neuroforensics@gmail.com]
**Sent:** Wednesday, January 30, 2008 2:21 PM
**To:** Judy Clarke
**Subject:** Re: Duncan - neuropsych records

Hi Judy, I wanted to update you on our progress.  I have reviewed all of the hospital,
school, and birth records you have sent, and Ruben will now go over the extracted
information to see if there is additional info he would like, if available.  Also, I have
forwarded the neuropsych testing to Dr. Julie Thysen to see if there is enough information
to construct a behavioral image.

Be in touch,
Oren

--
***********************************
Oren M. Gur, M.S.
Criminologist

*ATTN: NeuroForensics*
815 St. Georges Rd.
Philadelphia, PA 19119
NeuroForensics@gmail.com
***********************************

On Jan 29, 2008, at 6:02 PM, Judy Clarke wrote:

Thanks, Oren.  I'm attaching birth records which we just got.  Let me know
if you think the Family Medical records in the index might be of value in
looking at the question of additional testing.  We also just got some more
medical records on his mother - they haven't been scanned yet however.

In December we retained Dr. James Merikangas, a neurologist/psychiatrist,
who will see our client late next week.  We fully expect he will recommend

an MRI and probably PET - we would very much like for him to consult with Ruben about this because of his specialized knowledge about imaging.

I'm going to send a retainer letter including the costs you set out below. Thanks, again. Very much look forward to working with the Gur family.

Our trial is currently set to go April 14. I know, we're pushing the envelope on time, all due to circumstances outside of our control. I'm not the least bit happy about it either, you can tell your dad.

-----Original Message-----
From: Ruben Gur [mailto:neuroforensics@gmail.com]
Sent: Tuesday, January 22, 2008 9:52 AM
To: judyclarke@jcsrlaw.net
Subject: Re: Duncan - neuropsych records

Dear Judy,

Thank you for your interest in Dr. Gur's services.   I have heard many great stories about your past work, and Ruben is so happy to hear from you again!  In an effort to improve efficiency, Dr. Gur's medical legal work is now handled through this neuroforensics@gmail.com account.  I am his son and assistant, Oren, and will help facilitate the evaluation.

Below please find the details you requested concerning hourly rates and time estimates.

An evaluation of the extent to which there is brain damage relevant to the client's behavior or crime usually consists of a review of school and medical records, any previous formal testing, and available neuroimaging data.  We have received six (6) documents to date, which we will begin to review 'with an eye toward recommending follow up testing, scanning, or whatever might be necessary,' per your instructions.  Dr. Gur is assisted by specialists at various phases of the process, so here are their skills and rates in case you decide to move forward with testing.

Record review by criminologist, Oren Gur, MS, to extract information from records related to issue of brain damage ---- $150/hr (estimate 15-20 hours)
Volumetric analysis of MRI by image analysis expert Christos Davatsikos, PhD ---- $300/hr (estimate 8-12 hours)
Analysis of neuropsychological data by postdoctoral fellow, Julie Thysen, PhD, under supervision of Dr. Gur ---- $150/hr (estimate 6-8

hours)
Analysis of PET scan by Andrew Newberg, MD ---- $300/hr (estimate 2-4 hours)
Review and integration of materials, preparation of report by Ruben
Gur, PhD ---- $300/hr (estimate 10-15 hours)

Usually, the total price should range from about $9,000 to about
$14,000.  The time spent on each case depends on the volume and
complexity of information, and sometimes the compatibility of media
formats.

Please let me know if you have any questions and I look forward to
working with you!

Best,
Oren M. Gur, M.S., Criminologist

<JED III Birth Record (military).pdf><JEDIII Clinical Birth Record (military).pdf>



Lakes High School (1979 10th Grade).pdf

Exh. 65 - 000364

| | |
|---|---|
| **From:** | Mark Larranaga |
| **Date:** | 1/25/2008 5:38:31 PM |
| **To:** | 'Judy Clarke' |
| **CC:** | 'Thomas Monaghan' |
| **Subject:** | RE: Tucson |

Those are the same documents that I have. I will contact **Lisak** today. I have requested Haney for a time frame to work if (1) he does it alone (which he indicated July/August before) or 2) if he has supplemental help (i.e. Sontag). Dr. Sontag mentioned to me that she would prefer 12 months, but that was if she was doing it alone. I hadn't asked her for a time frame if she was working with Craig - although we discussed that possibility, which she seemed interested in.

Yes, those are the three areas we wanted to cover. In my earlier conversations with Dr. Becker, I got the impression she had only scratched the surface on all three areas. She acknowledged the program was trying, difficulty placed on Jet, along with the prison trauma, but didn't have much supplemental background  - which I chalked up to not enough time on the case or materials to review. For preparation for my meeting with Saylor (Monday), I plan on completing my review of her "Rise and Fall" report, the legislative/accountability reports, and other relevant interviews (e.g., Compte/Sheppard) and should have cheat sheet that I can provide to you before your visit.

I also agree to ask her about time line if she were interested. She mentioned before the main reason for her lack of interest was school semester, so maybe if there is a god and a continuance is granted she might be placed back in the hopper.

**From:** Judy Clarke [mailto:judyclarke@jcsrlaw.net]
**Sent:** Friday, January 25, 2008 9:14 AM
**To:** 'Mark Larranaga'
**Cc:** 'Thomas Monaghan'; 'Judy Clarke'
**Subject:** RE: Tucson

Mark - I've got the attached that seem to relate to Becker.  Do you have anything else?

After thinking about it, I'm fine with meeting Becker by myself, given travel time, it is only a day for me, and it looks like maybe 2 for you - you can decide whether the time away for you is worth it given what else is on your plate.  Since she's said she wasn't available given other commitments, it looks like what we want to talk with her about is her take on the SOP, her view of Jet, and what it was she was planning to do for the state case.  It seems to me that but for time restrictions, she might have been an option for the life hx witness.  We can find out if she were interested, what her time request would be, and if so she could go into the continuance mix.   Is this pretty much what we should cover with her?

Do you want to see if **Lisak** is available as a possible trauma/life hx testimony?  I'm attaching a CV of his I had gotten, and thought I had routed around awhile back.  I don't remember if or why he dropped off our radar, but for the scramble we've been in.   Let me know if you'd like to call him, or you want me to.

**From:** Mark Larranaga [mailto:mark@jamlegal.com]
**Sent:** Thursday, January 24, 2008 2:07 PM
**To:** 'Judy Clarke'
**Subject:** Tucson

Judy:

In order for me to get to Tucson, I have a flight in the a.m. that arrives at 11:00, which of course works; however, there is no return flight that day available. I will have to stay the night and fly back on Friday. I don't mind doing that, just wanted to check to see whether it made sense for me to arrange that for this visit with Dr. Becker. Just let me know and either way works for me - will make the necessary arrangements if you think I should.



"Judy Clarke"
<judyclarke@jcsrlaw.net>
01/31/2008 05:00 PM

To   "Andrew Lah" <andrew_lah@fd.org>, "Angie Mason"
<masonangie@yahoo.com>, "Bruce Whitman"
<raymond.whitman@gmail.com>, "Deb Garvey"

cc

bcc

Subject   Dr. Becker

I met with Dr. Becker for close to 90 minutes today at her office in Tucson.  She comes across as very gracious, warm and compassionate.  She says Jet is the most tortured soul she has ever seen.  He never should have gone to the SOP at such a young age, we know better now.  She launched into the "good and bad" news today in response to my question about the advances in SO tx – the good news being the recidivism rate for adults has always been about 14-15% (it is the politicians and press that make a big deal of SO's committing crimes) and for juveniles, even less, 10%.  There is a good risk assessment instrument today, "Static 99", it has been well researched in the US and Canada – rates and scores 10 static factors, looks to an actuarial table and shows the probability of reoffending.  Dynamic factors can be addressed in treatment.  The field has really advanced.  Have to be 18 to be tested.  Jet probably would have scored high risk, eg, less than 25, male victim, stranger, no romantic partner in past 2 years.  The "bad" or "troubling" news is that the best study looking at treatment [done by **Dr. Janice Marcus**, now retired former head of research in California Dept of Mental Health in Sacramento, also served as special master for the Washington State Civil Commitment program] – 10-15 years ago, Marcus got funding from Calif Dept MH and NIMH – studied men on relapse prevention model (1) who didn't seek tx (2) who did but didn't get it (3) who did and did get tx – results showed no difference in the groups.  Could be "psychopaths" got into the study , could be difference in treatment, no one knows the reasons for the results, but troubling.

I asked about her knowledge of research and work in understanding the brain function,  and hard wiring issues – that's not her area.  She recommends: **Dr. John Bradford**  of Vancouver, Canada or **Dr. Fred Berlin** (whom we have already retained).  She knows Fred well, says his specialty is in biological psychiatry, and psychopharmacology – I told her we had retained him to evaluate the "Copine Study" and Dr. Cooper's proposed testimony – she was horrified the govt wanted to put in those videos.

The SOP for Jet held him "captive", gave him a "diet of deviant sexual talk", a lot of focus on sex, and then it was capped off with betrayal by Shepard.  She wasn't aware of the masturbation room, but explained there was/is a theory of tx called "masturbatory satiation" in which the male masturbates to orgasm to a non-deviant scene, and then for the remainder of an hour masturbates to deviant material.  Somehow this helps reward good behavior, and not bad behavior.  **Dr. William Marshall** is an expert in this technique.  If we want to contact him we can email "Kelly" at Kelly@atsa.com and she can connect us to him (and apparently to another person she recommends, infra).

**Dr. Ron Longevin**, a Canadian psychologist has done work on right temporal issues.  Kelly can

give us his email as well (I think Kelly must be with the professional assn these folks belong to)

Becker opines that somewhere in Jet's life, sex and violence fused together.

Re the best interests of the child issue, Becker thinks that is all individual based, depends on Shasta's support system, and what her therapists are telling her and learning.  She thought **Briere** or **Kee McFarlane** (worked on McMartin case, works with kids) or **Lucy Berliner** (Director of Sex Assault Center at Harborview who Becker says will never align herself with the defense).

Becker has recently written a chapter in some book she'll send us; she will also send a recent book that addresses the causes of sex offenders.

Interestingly, she said there hadn't been studies of the impact on sex registration requirements on the behavior of sex offenders.

She's open to talking with us again.  Doesn't believe in evil, just believes people can do bad things.  This, after talking about psychopaths, but I think that is a term of art in the field..

I didn't ask about testifying about the SOP.



"Judy Clarke"
<judyclarke@jcsrlaw.net>
07/19/2008 11:59 AM

To  "'Debra Garvey'" <Debra_Garvey@fd.org>
cc
bcc
Subject  FW: Duncan (idaho)

9

**From:** Judy Clarke [mailto:judyclarke@jcsrlaw.net]
**Sent:** Tuesday, February 05, 2008 11:43 AM
**To:** 'Ruben Gur'
**Subject:** RE: Duncan (idaho)

Ruben (or Oren or whoever is watching) – attached is the current version of our chron – you'll
see we're way weak on paternal side records as well as other areas, but we're still working – I
talked with Dr. Merikangas, and told him what you noted, and that you're still considering what
other testing you might recommend. He said he'd like to talk with you after seeing Jet (so
nicknamed since childhood – for Joseph Edward the III). He's seeing him tomorrow afternoon
through Friday.

**From:** Ruben Gur [mailto:neuroforensics@gmail.com]
**Sent:** Monday, February 04, 2008 6:03 PM
**To:** Judy Clarke
**Subject:** Duncan (idaho)

Hi Judy, had a chance to review the materials that Oren prepared. I am ready to talk with Dr. Merikangas
after or before he sees Mr. Duncan. The most significant event is the '79 car accident, following which he
seems to show deterioration in school performance, even though he eventually recovered enough to attend
community college and do well. Current difficulties with his right eye may relate to that, and Dr. Merikangas
may want to examine this issue. I generally think he would be a good candidate for neuropsychs and brain
imaging. I am available to talk, my best time would be about 4 pm PST (215.450.4406, can text message
ahead to make sure i'm free), but earlier is also ok (215.662.2915).

Best, ruben

--
************************************
Ruben C. Gur, PhD, ABPP/CN
Professor, Departments of Psychiatry, Radiology & Neurology
University of Pennsylvania

*ATTN: NeuroForensics*

Philadelphia, PA 19119
NeuroForensics@gmail.com
************************************

2-5-08 Chron to Expert.pdf

Exh. 68 - 000368



**"Judy Clarke"**
**<judyclarke@jcsrlaw.net>**
02/14/2008 07:02 AM

To  '"Mark Larranaga'" <mark@jamlegal.com>, "'debra garvey'"
<deb_garvey@yahoo.com>, "'Thomas Monaghan'"
<Thomas_Monaghan@fd.org>, <jackie@jamlegal.com>,
'"Lisa Valenti'" <lisa_valenti@fd.org>

cc

bcc

Subject  RE: Dr. Lisak

History:    ⇨  This message has been forwarded.

Mark – as we discussed yesterday, I'll send Lisak a retainer, but you were going to tell him to consider himself retained. I'm attaching the chron we sent to Merikangas and Gur, as well as my current version (lifechron1.wpd, my additions to the 2-5 version in yellow). We need to figure out a way that as the chron is updated, and the experts who got earlier versions can know what has been added – either in some sort of color or something, or some note of the dates added. My latest version shows my additions in yellow – so Deb can know what to add to the main chron (Deb – some 96 dates seemed off to me).

Lisa/Andrew – the 2-5-08 chron to expert.pdf needs to go in Gur and Merikangas' LF files.

Seems to me in addition to a chron, you want to send Lisak the death notice, the factual basis for the GP.  Then, we need to figure out what records we have (I know what we sent Merikangas and Gur, but am lost in what else we have). But, the chron highlights all records we've gotten to date I think – Deb can confirm that.

**From:** Mark Larranaga [mailto:mark@jamlegal.com]
**Sent:** Wednesday, February 13, 2008 4:45 PM
**To:** 'Judy Clarke'; 'debra garvey'; 'Thomas Monaghan'; jackie@jamlegal.com; 'Andrew Lah'
**Subject:** Dr. Lisak

Judy:

Please see the email from Dr. Lisak. Let me know if you want me to draft a retainer letter. I am not sure about his request for the work-off retainer so let me know whether that is appropriate.

I would like to send him Deb's chronology now, and let him know that the other materials he requested will be sent later. Does that sound okay? If so, I want to make sure that I have the most recent chronology.

Also other expert update: I have contacted an expert here in Seattle to conduct adaptive testing on Lillian. I will let you know when I hear back.

mal

**From:** David Lisak [mailto:davidlisak@verizon.net]
**Sent:** Wednesday, February 13, 2008 4:34 PM
**To:** 'Mark Larranaga'
**Subject:** RE: CV

Mark,

The more information the better. I'll find time between now and when I evaluate Mr. Duncan to read through the documents and I've never felt I had too much information. A chronology, notes or memos from interviews with family members and other relevant witnesses to his life, school records, psychological/psychiatric records; basically, anything relevant to his childhood and/or history of trauma. I'll also need something that summarizes the facts of the crimes. If I end up testifying, I'll need more to prepare but that can wait (hopefully).

Documents should be sent to my home address:

███████████████

Framingham, MA 01701

My fee is $300 per hour. Without knowing the extent of the documentation it's a little hard to estimate the number of hours this will take. Let me know if you need an estimate of what this will cost and we can work that out. If it's manageable, I would prefer to work off of a $5,000 retainer and then bill for additional work at later points.

We should probably also nail down the dates for my coming out in March. The first part of the week, March 17-19 would work best for me.

I look forward to working with you.

David

David Lisak, PhD
Forensic Consulting
Associate Professor
U. of Massachusetts Boston

2-5-08 Chron to Expert.pdf   Lifechron1.wpd