**FEDERAL**

**DEFENDERS**

**OF**

**SAN DIEGO,**

**INC.**

*Confidential Communication Protected by Attorney-Client*
*and Work-Product Privileges re Joseph Edward Duncan III*

February 14, 2008

Dr. David Lisak

███████████
Framingham, MA 01701

RE:   *United States v. Joseph Edward Duncan*

Dear Dr. Lisak:

The Federal Community
Defender Organization
for the Southern
District of California

This letter confirms your agreement to be retained by the Federal Defenders of San Diego, Inc. in connection with the above-captioned matter now pending in the United District Court in Boise, Idaho. Jury selection for the capital sentencing hearing is currently set to begin April 14, 2008.

It is our understanding that you have agreed to consult with our defense team in the above referenced case, review appropriate records and discovery, conduct interviews that you believe are required, and if necessary, testify at Mr. Duncan's capital trial. We have budgeted a maximum of $30,000 in fees at your hourly rate of $300 an hour. This organization will also be responsible for your travel expenses, at the government rate travel and per diem. Should travel become necessary, we can either take care of booking your travel, or provide you contact information at Omega Travel who does the travel for this office. If at some point, this funding appears inadequate for the work that needs to be done, we ask that you let us know so that we can arrange for additional funds.

Please maintain time records indicating the date, time, and general nature of your work, and supply such records along with your invoices, as wells a receipts for expenses, addressed to Judy Clarke, c/o Federal Defenders of San Diego, Inc., at the address on this letterhead. It is fine to bill monthly, or in whatever periodic intervals you prefer.

It is also understood that all communications in relation to this case are confidential. All documentation, records, reports and work product you review in relation to this case is also confidential. Your obligation of confidentiality is not time-limited. It does not conclude upon the resolution of the case in court. Thus, unless expressly authorized by one of the undersigned lawyers, you cannot reveal the contents of your work outside of the protected Duncan legal defense team.

NBC Building
225 Broadway
Suite 900
San Diego,
California
92101-5030
**(619) 234-8467**
**FAX (619) 687-2666**

You must notify Judy Clarke at Federal Defenders of San Diego, Inc. 225 Broadway, Ste. 900, San Diego, CA 92101, 619-544-2720, Mark A. Larrañaga at *Walsh & Larrañaga*, 705 Second Ave., Suite 405, Seattle, WA 98104, 206-325-7900, or Thomas Monaghan, Federal Defender Services of Idaho, 350 N. 9th Street, # 301, Boise, ID 83702, 208-388-1600, if any of the following occur: (1) the exhibition or surrender of

1

Exh. 70 - 000371

any documents or records prepared in connection with this referral; (2) a request by anyone to speak with you about this matter or inspect documents or records; or (3) any attempt to serve or actual service of a court order, subpoena, or summons upon you that requires production of any documents or records relating to this retainer agreement.

Kindly indicate your acceptance of the above terms of this agreement by signing the enclosed copy of this letter agreement and returning the same to me. We're sending you an electronically signed copy, and can mail a hard copy to you as well if you need one. If the electronic copy is okay, please sign and return it by email (judyclarke@jcsrlaw.net). If you'd prefer a hard copy by mail, please let me know.

We all look forward to working with you.

Sincerely,

Judy Clarke

Judy Clarke
Mark Larranaga
Thomas Monaghan

I agree to the terms and conditions as set forth in this letter.

Date: _____2/14/08_____

Signature: _____

cc: Linda Acosta, Adminstrative Officer, Federal Defenders of San Diego, Inc.

2

**FEDERAL**

**DEFENDERS**

**OF**

**SAN DIEGO,**

**INC.**

The Federal Community
Defender Organization
for the Southern
District of California

*Confidential Communication Protected by Attorney-Client*
*and Work-Product Privileges re Joseph Edward Duncan III*

February 26, 2008

J.R. Merikangas, M.D., L.L.C.

Bethesda, MD. 20814

     RE:  *United States v. Joseph Edward Duncan*

Dear Dr. Merikangas:

  Enclosed are two CDs, both of which contain excel spreadsheets that link to various items of discovery in the case. The first [ND Linked] is of items seized from Jet's North Dakota apartment (where he was living prior to his arrest); the second [Correspondence Linked] is of the correspondence to and from Jet since his arrest in July 2005, which the government provided in discovery.

  I'm also enclosing an updated version of our chron. Additions in yellow. If there are source documents in the chron you'd like to see, let me know.

  Sorry about all the travel headaches. Look forward to seeing you in Spokane March 7.

       Sincerely,

       Judy Clarke

enclosures (2 CDs, chron)

cc: Mark Larranaga, Tom Monaghan (w/o enclosures)

NBC Building
225 Broadway
Suite 900
San Diego,
California
92101-5030
**(619) 234-8467**
**FAX (619) 687-2666**

1

Exh. 71 - 000373

# FEDERAL DEFENDER SERVICES OF IDAHO

SAMUEL RICHARD RUBIN
EXECUTIVE DIRECTOR

**BOISE OFFICE**
**350 NORTH NINTH STREET, SUITE 300**
**BOISE, IDAHO 83702**
**(208) 388-1600**
**FAX (208) 388-1757**

THOMAS MONAGHAN
CHIEF TRIAL ATTORNEY

ROBERT SCHWARZ
ATTORNEY

February 29, 2008

Thomas Moss
United States Attorney
Wendy Olson
Assistant United States Attorney
District of Idaho
Washington Group, Plaza IV
800 Park Blvd. Ste. 600
Boise, Idaho 83712

Traci Whelan
Assistant United States Attorney
District of Idaho
205 N. 4th Street, Room 306
Coeur d'Alene, Idaho 83814

Re:   *United States v. Joseph Edward Duncan III*
      Request to Withdraw Death Notice

Dear Counsel:

We write to reopen discussions regarding resolution of this case without the necessity of a capital sentencing trial. We recognize that the Department of Justice has direct authority only over the current federal case, and it is that prosecution that we ask you to bring to resolution.

We understand that in deciding to seek the death penalty you considered the interests of the surviving child, as well as the interests of the government and community. We also understand that this decision was made by experienced federal prosecutors and law enforcement agents weighing the alternatives. We do not know whether or not advice was sought from mental health professionals, and we do not know whether or not Shasta's counselors were consulted. We do know that experts retained by the government, as well as the court appointed guardian ad litem, have encouraged a speedy resolution of this case, citing the best interests of the child. We also know that time has passed since the Department of Justice made the decision to seek the death penalty and that circumstances have changed. Shasta has been in therapy for two and one-half years, and is now entering adolescence. In addition, Mr. Duncan has pled guilty to all of the federal charges, ensuring at the very least, multiple consecutive life sentences and that he will die in prison.

Our past experiences in reaching out to survivors of murder victims, as well as our conversations with you about Shasta's recovery process, caused us to think about the impact of the upcoming trial proceeding on Shasta. As a result, we feel compelled to ask you to consider whether there is a reasonable likelihood that this capital sentencing trial, and all that flows from

MOSCOW BRANCH
201 North Main Street
Moscow, Idaho 83843
(208) 883-0180
Fax (208) 883-1472

POCATELLO BRANCH
707 North 7th Ave
Pocatello, Idaho 83201
(208) 478-2046
Fax (208) 478-6698

1



Exh. 72 - 000374

FEDERAL DEFENDER SERVICES OF IDAHO
LAW OFFICES

it, will negatively impact Shasta's opportunity to heal and make a life for herself. Based on what we have learned from experts on trauma and recovery, the answer seems to be that resolution without public and extended proceedings would be in her best interest.

In pursuing an answer to the question of further victimization or harm to Shasta from proceeding with the capital sentencing proceedings, we reached out to a wide variety of specialists: (1) a licensed clinical psychologist who specializes in treatment of children (Dr. Rosemary Bower, Ph.D., Berkeley, California), (2) a Professor of Psychiatric Mental Health Nursing who has researched sexual exploitation of children, and authored texts on assessment and treatment of children, adolescent and adult victims of sexual assault and serial offenders including murderers (Dr. Ann Burgess, Boston, Massachusetts); (3) an LCSW and Ph.D. who has worked in the area of post traumatic stress and sexual abuse of children and who served as the trauma coordinator at a major urban hospital (Dr. Marti Loring, Atlanta, Georgia); (4) a medical doctor and Professor who has studied the impact of media on trauma victims (Dr. Andreas Maercker, MD, Ph.D., Zurich, Switzerland); (5) a prominent psychiatrist, who has studied the Chowchilla school bus kidnapping of 1976, the Challenger spacecraft explosion of 1986, and the Columbine High School shootings of 1999 (Dr. Lenore Terr, M.D., San Francisco, California) and (6) an MSW, Ph.D., Professor of Child Psychiatry and Director of the National Center for Children Exposed to Violence at the Yale Child Study Center (Dr. Steven Marans, MSW, Ph.D., New Haven, Connecticut).

The consensus of these experts in childhood trauma is that the consequences to Shasta Groene from proceeding to a capital sentencing are likely to be severe and adverse. These highly qualified individuals all urge the parties to bring an immediate end to these proceedings. Copies of their letters to us are enclosed, along with their C.Vs. We hope you will share these letters with the folks who have evaluated and/or treated Shasta since her recovery, and seek their opinions as to the legitimacy of the concerns they raise.

Dr. Bower has more than 30 years of experience specializing in the treatment of children, and has worked with survivors who had been imprisoned, tortured or suffered extreme abuse as children or adults. She concludes that "any further public exposure of what [Shasta] suffered can only be detrimental to any possibility she has for normal psychological growth and development." [p. 7]. She notes that she is not opposed to the death penalty, but concludes that:

> *proceeding with the sentencing phase and the resulting public information that will be revealed has such potential for the further victimization and damage to Shasta and may so delay, impede and thwart her therapeutic progress* that concern for Shasta should outweigh any benefit to society that would come from having Mr. Duncan executed.

[p. 7 (emphasis added)]. Dr. Bower also notes that because Shasta was present during much of the abuse of her brother, witnessed his killing and was forced to participate in disposal of his

| MOSCOW BRANCH | POCATELLO BRANCH |
| 201 North Main Street | 707 North 7th Ave |
| Moscow, Idaho 83843 | Pocatello, Idaho 83201 |
| (208) 883-0180 | (208) 478-2046 |
| Fax (208) 883-1472 | Fax (208) 478-6698 |

2

Exh. 72 - 000375

FEDERAL DEFENDER SERVICES OF IDAHO
LAW OFFICES

remains, the evidence is linked in such a way that presentation of evidence about Dylan will also affect Shasta. [p. 2].

Dr. Burgess, Professor of Psychiatric Mental Health Nursing at Boston College, co-founded a crisis intervention program for rape victims in 1972 and authored textbooks on assessing and treating sexual assault victims. She concludes that "proceeding to a sentencing hearing will definitely increase the risk to Shasta's psychological health and ability to live some semblance of a normal life." [p. 1]. Dr. Burgess writes that she understands the government's interest in this case and decision to pursue the death penalty. Nevertheless, based on her experience in crisis counseling child sexual abuse victims, children who have had family members murdered, her work studying serial offenders with FBI Academy special agents and her research into the impact of trauma on the growth and development of young victims, she concludes that:

> the potential for further psychological damage to Shasta Groene, resulting solely from proceeding to a sentencing hearing, is severe. A sentencing hearing will result in further and detailed publicity about what happened to Shasta and Dylan, and even after the hearing ends, appeals and uncertainty are inevitable. As a result, *it is my strong recommendation, in the interest of not doing further damage to the opportunity for Shasta to heal, that all parties endeavor to reach a resolution that will end the court process now.*

[p. 3 (emphasis added)].

Dr. Marti Loring, an LCSW and Ph.D. has written extensively in the area of post traumatic stress and the sexual abuse of children and has many years of experience in treating adult victims of childhood trauma writes of her own work with adult survivors of childhood sexual abuse who have chosen *as adults* to confront their abusers in order to return feelings of power and control to themselves, and states that such an opportunity can provide the victim with a sense of control over her own life. [p. 2]. Dr. Loring notes that it is not possible to predict at this time whether or not Shasta, *as an adult*, would choose to confront Duncan, but that protecting Shasta now includes reserving to her control over this decision as an adult. Dr. Loring comments further on the effect of continuing media coverage, concluding that:

> any legal proceedings that would bring to public attention added details regarding Shasta's ordeal would exacerbate her PTSD symptoms and increase the peer cruelty and questioning already present in her life . . . *further publicity would add to the traumatic cues in Shasta's life and would be detrimental to the recovery process of a child who has been so greatly traumatized.*

[p. 3 (emphasis added)].

MOSCOW BRANCH
201 North Main Street
Moscow, Idaho 83843
(208) 883-0180
Fax (208) 883-1472

POCATELLO BRANCH
707 North 7th Ave
Pocatello, Idaho 83201
(208) 478-2046
Fax (208) 478-6698

3

Exh. 72 - 000376

FEDERAL DEFENDER SERVICES OF IDAHO
LAW OFFICES

Dr. Andreas Maercker, MD, Ph.D., Professor, Chair, and Co-Director of the University Psychotherapy Center, Zurich, Switzerland, has studied the reactions of trauma victims to media reports of their victimization, and found "significant evidence that survivors who had been greatly victimized showed negative psychological reactions to the media coverage of their case." [p. 1]. Dr. Maercker concludes that the mere continued existence of the video material taken by Duncan during the abuse and torture of Dylan and later shown to Shasta is "a serious ongoing threat to the healing process of Shasta Groene" and that "the continued danger that any portion of these videos material might become public information may further undermine her recovery process." Indeed, Dr. Maercker strongly recommends that "the public never become aware of this material; it should be immediately and irrevocably destroyed." [p. 2].

Dr. Lenore Terr, M.D., a well-known child and adolescent psychiatrist, has studied the reaction of children and adolescents to the 1976 Chowchilla school bus kidnapping, the 1986 Challenger spacecraft explosion and the 1999 Columbine High School shootings. She concludes that "continued proceedings will only thwart Shasta's ability to heal" and recommends imprisoning Duncan for life with no possibility of escape or of dying outside of prison, so that Shasta would not have to involuntarily ever meet eye to eye with Duncan and not be further chased by curious media. Dr. Terr also recommends offering Shasta and her family an opportunity to move to another location and be permitted to start a life unencumbered by schoolmates or strangers who know so many details of her experience.

Finally, Dr. Steven Marans, MSW, Ph.D. and Director, National Center for Children Exposed to Violence at the Yale Child Study Center cautions:

This risk of exacerbating post-traumatic distress and complicating recovery is especially pronounced when the individual has little, if any control over the frequency and content of the reminders . . . *the sooner that this case is resolved, once and for all, the sooner Shasta will be able to attend to the tasks of her present and future life with as little pull from her destructive past as possible.*

[p.2 (emphasis added)].

Dr. Marans challenges us:

Given the unusual circumstances of this case, the parties have an opportunity to consider the best interests of this child, and should do so in determining whether or not to proceed any further with sentencing proceedings and all that flows from such proceedings. The question about best estimates of the current impact on her current functioning and development of continued exposure and recurrent traumatic reminders

MOSCOW BRANCH
201 North Main Street
Moscow, Idaho 83843
(208) 883-0180
Fax (208) 883-1472

POCATELLO BRANCH
707 North 7th Ave
Pocatello, Idaho 83201
(208) 478-2046
Fax (208) 478-6698

4

Exh. 72 - 000377

## FEDERAL DEFENDER SERVICES OF IDAHO
### LAW OFFICES

should be considered by those adults who know her best, with her interests as their paramount goal. If requested by the court, or jointly by the parties, I would be willing to facilitate such a conversation.

[p. 2].

If the government, and those charged with protecting Shasta at this point in her young life, cannot say with certainty that proceeding with this litigation will do her no further harm, we believe that it is in everyone's best interest to end this litigation now. As you have access to Shasta's treating mental health professionals, we urge you to ask them what is best for her at this stage of her recovery, as she enters adolescence and then on into her adult years. It is imperative that this question be asked now; it cannot be deferred until after the capital sentencing trial is over - for, by then the damage that a public proceeding would cause will be done, and the set for many years to come. We urge you to share the reports we enclose with your experts; we believe they will be familiar with the work of several of the individuals who have weighed in on this issue.

We don't pretend that our suggestion to conclude this case now in the interests of the surviving child is solely motivated by altruism. Clearly, ending this litigation is in Mr. Duncan's legal interests as well. Nevertheless, it is obvious that the additional facts of this case, once made public, can never be hidden away again. As you know, Mr. Duncan has pled guilty, and will now spend the rest of his life in a maximum security prison, either at IMSI in Boise, Idaho, or at ADX in Florence, Colorado. He can do no more to bring a conclusion to this case than he has already done. As it is neither the function of defense counsel nor the court to assist a defendant in committing suicide, there will be legal conflict as long as the government seeks to obtain or carry out a death sentence. Anyone who is counting on Mr. Duncan waiving his appeals and seeking a speedy execution need only look to *United States v. David Hammer*, to disabuse that notion. Ten years ago, Mr. Hammer pled guilty mid trial and then sought *pro se* to waive all appeals. Three years ago, the trial count granted relief to Mr. Hammer on a §2255 motion, and today the case remains in the court of appeals, 10 years after Mr. Hammer sought his own speedy execution.[1]

We are very willing to participate in the joint conversation recommended by Dr. Marans, or in any effort to seek resolution of this – and any other potential case against Mr.

---

[1] It took some four years after the jury's decision to execute Timothy McVeigh, the most notorious of all of the modern federal death row inmates, despite the fact that he waived appeal of the denial of his post-conviction petition. Louis Jones spent seven and one-half years of federal death row before his execution; Juan Garza spent 8 years. And those three executions represent all the federal death sentences carried out since 1965. At the moment, a handful of others, who have been on federal death row for 12, 13 and 15 (3 defendants) years have been stayed pending resolution of issues around lethal injection.

MOSCOW BRANCH
201 North Main Street
Moscow, Idaho 83843
(208) 883-0180
Fax (208) 883-1472

POCATELLO BRANCH
707 North 7th Ave
Pocatello, Idaho 83201
(208) 478-2046
Fax (208) 478-6698

Exh. 72 - 000378

## FEDERAL DEFENDER SERVICES OF IDAHO
### LAW OFFICES

Duncan. We are open to conditions you would like to discuss, but at the very least we can offer the cessation of all litigation, publicity and any potential appeal and post-conviction challenges to Mr. Duncan's consecutive life sentences and other consecutive terms of imprisonment, the opportunity for Mr. Groene to meet with Mr. Duncan should he so choose, the opportunity for law enforcement interviews of Mr. Duncan, the encrypted codes, the prompt destruction of any and all pornography and images of Shasta and Dylan taken by Mr. Duncan, and an agreement to other appropriate terms and conditions of confinement that may assure the Groene family and others of their continued safety. King County has an open investigation that could be addressed. Law enforcement's interest in protecting the public by better understanding what has motivated Mr. Duncan, including discussing the information on the encrypted computers can be met by resolution, not continued litigation or a death sentence.

As we have noted, we fully recognize the irony that this plea to consider Shasta's best interests is made by the legal representatives of the man who committed these crimes against her and her family. There is no way for any of us, or the criminal justice system as a whole, to undo what has been done. We would welcome an opportunity to step out of our litigation roles and meet with you to discuss these issues, and see if there is a path to resolution and meeting at least some of the needs of the Groene family.

Sincerely,

Judy Clarke
Mark Larrañaga
Tom Monaghan

enclosures

MOSCOW BRANCH
201 North Main Street
Moscow, Idaho 83843
(208) 883-0180
Fax (208) 883-1472

6

POCATELLO BRANCH
707 North 7th Ave
Pocatello, Idaho 83201
(208) 478-2046
Fax (208) 478-6698

Exh. 72 - 000379



**Debra Garvey/CACF/09/FDO**
03/16/2008 05:10 PM

To  Jennifer Davis/WAWF/09/FDO@FDO

cc  deb_garvey@yahoo.com, mark@jamlegal.com

bcc

Subject  Re: Lisak Witness List - contact info

If we're all in agreement that Lisak is going to talk to each of these people, I'll call the people I interviewed and alert them. And, I'll organize Angie and/or Karen to contact their folks to talk to Lisak. I need to tell them approximately what days they might expect a call. What date range is it that Lisak is going to be making these calls? Please let me know and then I'll call my folks and get Angie and Karen to call theirs.

Here are my additions:

*Neom vivehoris not might not*
*Mark Hoffmaister*

1.    *Joni Buzick

West Fargo, ND
701.282.4889
jolee0723@cableone.net

        Jet's next door neighbor, woman w/ whom he had a relationship. Jet came over to her apartment, hung out and "lectured" her about things, including his life in prison. She mostly listened and didn't talk much. Can describe Jet's upset over     Detroit Lakes case and his suicide-like e-mail when he left Fargo.

2.  Lillian's DSHS records/ Rachel Carney

        Rachel Carney is the person at DSHS that Karen talked to about what her records mean. I don't know if you really want  Karen to set up Carney to talk to Lisak, but the interview memo that explains more about the records than is apparent on     their face.

        Rachel Carney, Vocational Rehabilitation Supervisor    [Karen's interview]
        DSHS
        Division of Vocational Rehabilitation, N27-16
        510 East Main Avenue, Ste. G
        Puyallup, WA  98372
        253.445.7284

3.    Lillian Duncan          in person interview

        Tacoma, WA
        253.752.5966

4.    Dorothy Duncan Stenchever  phone interview    [Angie's interview]

        Wadsworth, Ohio 44281

This was an Angie interview, but Jeanne Litten is her daughter. Mark, did you meet her when you went to see Jeanne w/ Angie? I don't know what you think of her ability to do an interview. Angie didn't provide her phone number, but I imagine you can get it from Jeanne.

Paternal family history - including Joe, Jr's mother, Alma abandoning Joe, Jr., James and Rhoda when she left w/ Butch Rapp. Dorothy wouldn't adopt Joe, Jr. when she married his father, so sent him to his paternal grandmother, but did adopt James. Rhoada went to stay w/ her maternal grandmother. Lots of stories about Joe, Jr. getting into trouble, etc. Most telling though, is her indifference to Joe, Jr.  Joe, Sr. forbade Joe, Jr. to ever bring Lillian to their house, even after they married. Believes Lillian was involved

Exh. 73 - 000380

in a religious group or sect.

5.    Peggy Gaynor, retired counselor at NDSU    phone interview

Fargo, ND  58102
701.293.8840

Jet came into the counseling center on campus at NDSU. Talked to her after the community mtg announcing he had moved into the area and was a level 3 sex offender. She described him as anxious, humiliated and sad. Gave him a referral to a therapist in the community specializing in sex offenders.

6.    Cheri D'Andrea Griffin    phone interview    [Angie's interview]

Port Orchard, WA  98367
360.876.0376

Bruce's ex-wife; married right out of high school. Observations of Lillian, including her dislike for being hugged or public displays of affection, thinking sex was dirty. Joe, Jr. beating Bruce as a kid as punishment. Bruce's family took things as a personal attacks, as if everyone was out to get them; none of them got along and all were very focused on themselves. Bruce brought home stolen goods, slept with other women, masturbating to hardcore pornography, drinking and marijuana use, and bad temper. Cheri visited Jet at McNeil 3 or 4 times, with Bruce.

7.    Helen Hoover    phone interview, Paul may not allow Helen to participate  [Angie's interview]

York, PA
717.846.1677

Lillian's one full sibling. She is a self-described slow learner; held back twice in school for learning and health problems. Can tell story of growing up very poor, without enough food. Can talk about their half-sibs, the Freeds. Don Freed - alcoholic and redneck, who threw his son around; Roy Freed - 3 wives, worked at local steelmill; John Freed, Jr. - alcoholic, tried to choke Helen once at a party, but she "got him between the legs"; Mary Freed Musser - died of dementia, long history of depression; Anna Esther Freed - institutionalized since age of 7 yrs;  Naomi Freed Narehood - slow.

Lillian told Helen that Joe, Jr. went after their daughters for sex. Lillian is a hypochondriac and a religious freak.

8.    Jeanne Litten    in person?  Mark, I thinks it's your call after you see her   [Angie's interview]

Wadsworth, Ohio  44281
330.780.9460

Family history. Thinks Lillian could have Munchausen by Proxy; describes Lillian's bad behavior toward her two sons, as distinct from her daughters. Bruce stayed with Jeanne when he was sixteen y/o. He told Jeanne about Lillian's religious rituals and having sex w/ both Jet and Bruce. Lillian was also physically abusive to her kids.

9.    Jesse Littleton    phone interview
      Inter-Island Automotive

Friday Harbor, WA  98250
360.378.5685  [business]
360.378.8989  [home]

Aquarius group member at WSH SOP. Remembers Jet as very young, confused sexually, and talking about his father or another male relative sexually abusing him. Remembers Jet got picked on, got in trouble a lot, was grounded more than anyone else in the group, and the victim of sexual advances.

10.    Dr. Richard Wacksman                          phone interview          [I'd want to check this w/ Judy.]

New Port Richey, FL  34655
727.534.0847  [cell phone]

In some ways, this is a problematic interview for Dr. Lisak, but I don't know how we otherwise get this part of Jet's story in - that he needed someone to help him when he was on the outside, someone to provide him structure after all those years in institutions. And that Wacksman got something from this relationship, it wasn't just Jet "using" him.

11.    David Wiedebush          [Karen's interview]

Olympia, WA  98513
360.491.8243

Jet's sixth grade teacher; remembers Lillian and the underpants song.

Finally, I think someone should talk to both former CCO Bartlett and Rodney Collins about Walla Walla, but I believe that's more likely Aiken than Lisak. If you want Lisak to talk to them, let me know.

/deb


Jennifer Davis/WAWF/09/FDO



Jennifer
Davis/WAWF/09/FDO
03/15/2008 04:50 PM

To  deb_garvey@yahoo.com, debra_garvey@fd.org, mark@jamlegal.com

cc

Subject  Lisak Witness List - contact info


Maria Anderson Thompson                phone interview

Oakville, WA
cell:  253.226.1566
wk:  360.725.4514

Ex-husband, Tim Anderson, was in Aquarius group with Jet. She knew Jet from the program and can describe how program might have impacted him. Had affair with Mike Shepherd, Aquarius counselor.

Rick Johnson                                    phone interview

Graham, WA  98338
cell: 253.226.1082
Aquarius group alum.  Can describe Jet's vivid imagination.  Had a crush on Jet.  Can describe program and Jet being the youngest guy in it and had difficulty adjusting to program.

Phil Schlottmann                                phone interview
Cedar Creek Corrections
DOC# 295599
Need to arrange phone call through his counselor, Mrs. Thorsen, 360.753.7278.
Aquarius group alum.  Believes that confrontational approach of program would have created a lot of emotional turmoil in a 17 year old kid.  Felt Shepherd singled Jet out for harsh treatment.  Thought listening to group members' fantasies and crimes could be somewhat shocking.

Vince Gillis                                    phone interview

Snohomish, WA
360.568.8093 (call in the afternoon)
Instructor at Monroe TRCC in computers.  Taught Jet, thought highly of his abilities, kept in touch with him after Jet left prison.  Can talk about prison education system.  He can talk about Jet being a guy with little humor, but one of his best students.

Jim O'Neil                                      phone interview
McNeil Island
DOC#269439
Need to arrange phone call through prison - 253.588.5281.
Aquarius group alum.  Will say that Jet divulged in group session that his father sexually abused him. How harsh Shepherd was in his treatment of the group members.  How disturbing the revelations of group members were to him.  Will talk about Jet's vivid imagination, his mother seeming to be alcoholic or an abuser of drugs, his impression that Jet suffered from low self esteem and was socially awkward.  Will talk about knowing Jet at McNeil, after both had left the program, and the relationship between Al Parks and Jet.

Anna Aylward                        phone interview is fine, but she is impressive to talk to in person
360.725.8690 is her secretary Barbara Manning - should schedule time through Barbara
Anna was a therapist at TRCC SOTP, then became the director.  Is now Programs Administrator for DOC in Olympia.  She can contrast WSH SOP to TRCC SOTP and the problems inherent in a program like WSH.  How the WSH model forced the participants into admitting to conduct they did not commit and that practices have changed significantly since that program was operating.  She can talk about how a skinny, awkward kid would have been preyed upon at WSH SOP and that real psychopaths ended up controlling the group sessions.  Anna will say that the system failed Jet.

**FEDERAL
DEFENDERS
OF
SAN DIEGO,
INC.**

The Federal Community
Defender Organization
for the Southern
District of California

*Confidential Communication Protected by Attorney-Client
and Work-Product Privileges re Joseph Edward Duncan III*

March 21, 2008

J.R. Merikangas, M.D., L.L.C.

Bethesda, MD. 20814

RE:   *United States v. Joseph Edward Duncan*

Dear Dr. Merikangas:

Enclosed are three CDs. One contains Jet's telephone calls from the jail, after his arrest in July 2005; one is the video of Shasta Groene's recovery; and the third is the video of Shasta's interview by Det. Mattos on July 2, 2005. Hopefully these are good copies which can be played on your computer. We had some difficulty playing the other video copies as well.

I'm also enclosing the Idaho Health & Welfare and Kootenai County Sheriff Department reports regarding the Groene family which we have received in discovery (bates 7731-7762) and (bates 14935 - 14942).

Sincerely,

Judy Clarke

enclosures (3 CDs, referenced bates pages)

cc: Mark Larranaga, Tom Monaghan (w/o enclosures)

NBC Building
225 Broadway
Suite 900
San Diego,
California
92101-5030
**(619) 234-8467**
**FAX (619) 687-2666**

1

Exh. 74 - 000384



## U.S. Department of Justice

*United States Attorney*
*District of Idaho*



| | |
|---|---|
| *Mailing Address:* | *Main Phone: 208/334-1211* |
| *Washington Group Plaza IV, Suite 600* | *Main Fax: 208/334-9375* |
| *800 Park Boulevard* | *Cv Div Fax: 208/334-1414* |
| *Boise, Idaho 83712* | *Cr Div Fax. 208/334-1038* |
| | *DTP Div Fax. 208/334-1413* |

March 21, 2008

Roger Peven
Federal Defender's of Washington
10 N Post Suite 700
Spokane, WA 99201

Tom Monaghan
Federal Defender's of Idaho
350 N 9th
Suite 301
Boise, ID 83702

Mark Larranaga
705 Second Ave.
Number 405
Seattle, WA 98104

Judy Clarke
Federal Defenders of San Diego, Inc.
NBC Building
225 Broadway, Suite 900
San Diego, CA 92101-5030

Re:   United States v. Joseph Edward Duncan, III, Cr. No. 07-23-N-EJL

Dear Mr. Peven, Mr. Monaghan, Mr. Larranaga, and Ms. Clarke:

I have reviewed your letter dated March 21, 2008. I will not respond to the various accusations being made because if nothing else it is clear that the parties understood the stipulation differently. This seems to repeatedly be the circumstance in this case; the parties can agree on the big picture but the devil is in the details.

002/002

March 21, 2008
Page 2
Roger Peven
Tom Monaghan
Mark Larranaga
Judy Clarke

I note that your letter, although lengthy, does not address what inequities or deficiencies you perceived in the United States' last proposed stipulation. In review, I see that Ms. Whelan included much of your proposed language. I also am aware that many of the redactions you requested were agreed to by the United States. Perhaps, rather than responding out of anger based upon perceived "bullying," a dialogue that discusses our differences would be helpful.

We are all reasonable, intelligent people and, as such, I think we must acknowledge that each side had a different perception of what a stipulation entailed. Clearly, the United States believed the defendant was stipulating to all of S.G.'s statements--that is why Ms. Whelan provided copies of everything to Mr. Larranaga on December 3, 2007. Equally clear is that the defense believed only Sgt. Mattos' interviews would be admitted and then only after great redaction. Can we agree that rather than trying to trick the other side, each side had a legitimate position?

That being said, let us examine where we are at this juncture. It appears S.G. will testify at sentencing. The defendant has pulled his offered stipulation and rejected that proposed by the United States. However, the defendant then says he is open to reopening the discussion. I suggest that we meet on March 27, 2008, at 9:00 a.m., at the United States Courthouse in Boise, prior to the 10:00 a.m. status conference.

Sincerely,

Thomas E. Moss

THOMAS E. MOSS
United States Attorney
District of Idaho

**FEDERAL PUBLIC DEFENDER**
CENTRAL DISTRICT OF CALIFORNIA
321 EAST 2nd STREET
LOS ANGELES, CALIFORNIA 90012-4202
213-894-2854
213-894-0081 FAX

**SEAN K. KENNEDY**
*Federal Public Defender*
**DEAN R. GITS**
*Chief Deputy*

**CRAIG WILKE**
*Directing Attorney*
*Santa Ana Office*
**JESUS G. BERNAL**
*Directing Attorney*
*Riverside Office*

Direct Dial: 213/894.3936

March 25, 2008

Dr. James Merikangas

Bethseda, MD  20814

    RE:  United States v. Joseph E. Duncan, III

Dear Dr. Merikangas,

    Enclosed please find the following documents related to Jet's case:

CD of family photos, including school photos of Jet
CD of letters from Jet's mother, Lillian Duncan, to his father, Joe Duncan when Joe was
    deployed out of the country
A chronology of those letters
An updated life chronology, which includes those letters, incorporated in blue ink
A hard copy of the letters

    Please let me know if you have any questions about any of this material.

Thank you,

Debra Garvey,
Capital Case Coordinator

*Confidential Communication Protected by Attorney-Client*
*and Work-Product Privileges re Joseph Edward Duncan III*

April 1, 2008

J.R. Merikangas, M.D., L.L.C.

███████████████████████

Bethesda, MD. 20814

RE: *United States v. Joseph Edward Duncan*

Dear Dr. Merikangas:

Enclosed are two discs, both of which contain interviews of Shasta Groene after her recovery.

Duncan-013336 (1A SHASTAMED 007) is a DVD and the other is a CD which contains an MPEG file which will play in Windows Media Player.

Should you encounter any problems using these discs, please contact me at 619-573-7107.

Sincerely,

Ben Solis
Computer Litigation Specialist

enclosures (1 DVD, 1 CD)

cc: Judy Clarke (via e-mail)

**FEDERAL PUBLIC DEFENDER**
CENTRAL DISTRICT OF CALIFORNIA
321 EAST 2nd STREET
LOS ANGELES, CALIFORNIA 90012-4202
213-894-2854
213-894-0081 FAX

**SEAN K. KENNEDY**
*Federal Public Defender*

**MARK R. DROZDOWSKI**
*Supervising Attorney*
*Capital Habeas Unit*

Direct Dial: 213.894.3936

April 2, 2008

Dr. James Merikangas

Bethesda, MD 20814

Dear Jim,

Enclosed with this letter are the following documents and CDs:

Jet's Kootenai County Jail records [Bates #20758- 20899] and a mental health screening
report done at Kootenai County Jail by Chrystal Hodgson, LMSW [Bates #10359-
10362]

Jet's IMSI records - 37 pages plus a fax cover sheet dated 2/20/2008, representing our
client's medical files from IMSI, 21 pages from the Idaho Department of Corrections
responsive to a supoena for our client's corrections file with a cover sheet dated 3/4/2008,
and a one page memo referencing a suicide watch on our client [Bates #46337]

James Beasley report of 11/26/2007 and CV

Alan C. Brantley report of 2/5/2008 and CV

Dr. Sharon Cooper report of 2/10/2008 and CV

CD of Jet's Washington State Department of Corrections medical file and a hard copy of
Jet's Chemical Dependency Assessment from the Washington State DOC

Aquarius group members' assessment of Jet's [known as Ed Duncan while at Western State
Hospital Sex Offender Program] request to move to Step 5 in the program [Bates
#6730 - 6768 and 6773]

Government's exhibit list and cover letter to the list, dated 3/28/2008

CD of the government exhibits

Dr. James Merikangas
April 2, 2008
Page 2

Defense created summary of the government exhibits

Hard copies of the following DOC evaluations of Jet:

Dr. Felix Massaia  5/1982
Dr. Sally Sloat  7/1987
Dr. Sally Sloat  3/1989
Dr. Sally Sloat interview notes 1985, 1989-90
Jane Snyder, PSW II  1991
Dr. Richard Jacks  5/1991
Dr. Leonard Auclair  8/1993
Dr. Mark Whitehill  12/1997
Dr. Carla Van Dam  3/2000

Letters and/or affidavits filed in November 2007 by the government in opposition to a
defense motion to continue, from the following individuals:

Laura H. Taylor, MSW, LCSW, a letter addressed to John Sahlin, dated 11/1/07
Dr. Sharon Cooper, a letter addressed to Judge Lodge, dated 3/16/2007
Lana D. Hamilton, Principal of Fernan Elementary School, undated affidavit
Clare Lucas, MS, LMHC, letter addressed to Whom It May Concern, dated 11/1/07
Dr. Bruce D. Perry, letter addressed to Whom It May Concern, dated 3/14/2007
Affidavit of John Sahlin, Gaurdian Ad Litem, dated 10/3/2007

Please don't hesitate to let me know if you have any questions.  Take care.

Sincerely,


Debra Garvey,
Capital Case Coordinator

Exh. 78 - 000390

**David Lisak, Ph.D.**

Forensic Consultation

617-947-4119
davidlisak@verizon.net

Framingham, MA 01701

## INVOICE

**Date of Invoice:**      June 12, 2008

**Re:**      Joseph Edward Duncan

**To:**      Judy Clarke
Federal Defenders of San Diego, Inc.
NBC Building
225 Broadway, Suite 900
San Diego, CA 92101-5030

| Function | Dates (all dates 2008) | Hours |
|---|---|---|
| Review Documents | 2-23; 2-24; 2-26; 3-4; 3-5; 3-8; 3-17; 3-18; 3-29; 3-30; 4-9; 4-10; 4-11; 4-15; 4-17; 4-18; 5-27; 6-8: | 44 |
| Attorney Consultation | 3-10; 3-17; 3-18; 3-28; 3-30; 5-4; 5-9; 5-18; 5-28; 6-6; 6-9; 6-10; 6-11: | 20 |
| Preparation for Interviews | 5-3; 5-27; 6-9: | 6 |
| Interviews | 3-18; 5-4; 5-9; 5-28; 6-9; 6-10; 6-11: | 29 |

### Consultation Fee

99 hours @ $300/hr.      $29,700.00

### Expenses

| | |
|---|---|
| Lodging | 1,011.09 |
| Airport parking | 96.00 |
| Taxis | 122.00 |
| Meals | 270.06 |
| Total | $1,499.32 |

**Total Bill:**      $31,199.32

David Lisak, Ph.D.

**Marriott**
CLEVELAND AIRPORT

For questions regarding this folio, please call
Marriott Business Services toll-free 1-866-435-7627.

GUEST FOLIO

4277 West 150th Street, Cleveland, Ohio 44135 • 216.252.5333 • Marriott.com/CLEAP

264  LISAK/DAVID                    107.00 05/29/08 12:00  8585
                                                          ACCT#
GD<sub>ype</sub>                           05/28/08 17:20

71
     NEWTON        MA
Room  02458
Clerk  Address                     Payment              MR#:

| DATE | REFERENCE | CHARGES | CREDITS | BALANCE DUE |
|------|-----------|---------|---------|-------------|
| 05/28 JACK'S | 5082 264 | 95.20 → 47.60 Meal | | |
| 05/28 SUNDRY | X5838960 | 2.50 × | | |
| 05/28 ROOM | 264, 1 | 107.00 | | |
| 05/28 STATETAX | 264, 1 | 8.29 | | |
| 05/28 OCC TAX | 264, 1 | 4.82 | | |
| 05/28 CITY TAX | 264, 1 | 3.21 | | |
| 05/29 VS CARD | | | $221.02 | |

TO BE SETTLED TO:    VISA              CURRENT BALANCE  .00

THANK YOU FOR CHOOSING MARRIOTT! TO EXPEDITE YOUR CHECK-OUT,
PLEASE CALL THE FRONT DESK, OR PRESS "MENU" ON YOUR
TV REMOTE CONTROL TO ACCESS VIDEO CHECK-OUT.

------------------ EXP. REPORT SUMMARY  ------------------
05/28 JACK'S              95.20
      SUNDRY               2.50
      ROOM               107.00
      STATETAX             8.29
      OCC TAX              4.82
      CITY TAX             3.21

WANT YOUR FINAL HOTEL BILL BY EMAIL? JUST ASK THE FRONT DESK!
     SEE "INTERNET PRIVACY STATEMENT" ON MARRIOTT.COM

This statement is your only receipt. You have agreed to pay in cash or by approved personal check or to authorize us to charge your credit card for all amounts charged to you. The amount shown in the credits column opposite any credit card entry in the reference column above will be charged to the credit card number set forth above. (The credit card company will bill in the usual manner.) If for any reason the credit card company does not make payment on this account, you will owe us such amount. If you are direct billed, in the event payment is not made within 25 days after checkout, you will owe us interest from the checkout date on any unpaid amount at the rate of 1.5% per month (ANNUAL RATE 18%), or the maximum allowed by law, plus the reasonable cost of collection, including attorney fees.

Signature X

7-2955 Rev. 09/07                                    To secure your next stay, go to Marriott.com.



## MAYFLOWER PARK HOTEL

405 Olive Way, Seattle, Washington 98101
(206) 623-8700
FAX (206) 382-6997

| | |
|---|---|
| FOLIO NO: | |
| ROOM NO: | 28C6YC-1   CLERK: |
| ARRIVE | M0804               RC |
| DEPART | 06/08/08 |
| RATE: | 06/12/08 |
| PACKAGE: | 152.00 |
| AFFILIATION: | |

Lisak, David

Seattle, WA  98101                                1

| DATE | | DESCRIPTION | CHARGES | CREDITS |
|---|---|---|---|---|
| 06/08/08 | 1 | Government Rate | 152.00 | |
| 06/08/08 | 1 | Room Tax | 23.71 | |
| 06/09/08 | 1 | Government Rate | 152.00 | |
| 06/09/08 | 1 | Room Tax | 23.71 | |
| 06/10/08 | 1 | Government Rate | 152.00 | |
| 06/10/08 | 1 | Room Tax | 23.71 | |
| 06/11/08 | 1 | Government Rate | 152.00 | |
| 06/11/08 | 1 | Room Tax | 23.71 | |
| 06/11/08 | 1 | XXXXXXXXXXXX1761 | | 702.84 |

==============================
Subtotals       $     702.84        702.84
==============================
BALANCE DUE    $       0.00

Regardless of charge instructions, the undersigned guest acknowledges the above as a personal indebtedness. Please note that a subsequent charge to your credit card will be made for any charges incurred that could not be utilized at time of check out.

Guest Signature _____

Exh. 79 - 000393



**Preferred**
HOTELS & RESORTS

HOTEL PHILLIPS

Hotel Phillips
106 West 12th Street
Kansas City, Missouri 64105
(816) 221-7000
Fax (816) 346-4449
Toll Free 1-800-433-1426
www.hotelphillips.com

| | | |
|---|---|---|
| FOLIO NO | 12G2KF | |
| ROOM NO | 2009 | AGENT PM |
| ARRIVE | 03/17/08 | |
| DEPART | 03/18/08 | |
| RATE | 159.00 | |
| PACKAGE | ASKN | |
| AFFILIATION | 1 | |
| | 1.00 | |

Lisak, Dr. David

Framingham, MA  01701

| DATE | DESCRIPTION | | CHARGES | CREDITS |
|---|---|---|---|---|
| 03/17/08 ROOM | 1 Room Rate | TM | 159.00 | |
| 03/17/08 TAX-ST | 1 State Sales Tax | TM | 12.28 | |
| 03/17/08 TAX-LC | 1 Local Sales Tax | TM | 11.93 | |
| 03/17/08 DKN | 1 KC License Fee | TM | 1.72 | |
| 03/18/08 12BALT | 1 12th & Balti #\01-00012 | 1P | 17.27 *Meal* | |
| 03/18/08 SVSMC | 1 XXXXXXXXXXXX1761 | PM | | 202.20 |

Subtotals        $    202.20      202.20

==========================

PAID IN FULL --- THANK YOU!

Regardless of charge instructions, the undersigned guest acknowledges the above
as a personal indebtedness. Please note that a subsequent charge to your credit
card will be made for any charges incurred that could not be identified at time
of check out. I have requested a copy of the USA Today. If refused, a credit of
$.75 will be applied to my account.

Remit to : Hotel Phillips, P.O. Box 931588
          Kansas City, Missouri 64193-1588

Guest Signature:

Exh. 79 - 000394

Massport Parking Facilities
1 Harborside Drive, Suite 200S
East Boston, MA 02128
Phone: (617) 561-1673

Location of your car: Level 3  , Row X

Receipt: 5788/0665/665 03/18/08  Pg.1/1

Pay Parking Ticket $      48.00
Entered:    03/12/08 09:36
Paid:       03/18/08 18:22
Facility:   Central Parking
Epan        791501175807734S900
Total Amount        $       48.00
Credit Visa         $       48.00
xxxx xxxx xxxx 1761

---

Amount $ 42.00 ............. Cab No .................

## CAB COMPANY

Cab Fare    From Logan

            To Northeastern V.

Date ...................................................
            **RECEIVED PAYMENT**

---

Massport Parking Facilities
1 Harborside Drive, Suite 200S
East Boston, MA 02128
Phone: (617) 561-1673

Location of your car: Row 4

Receipt: 6094/0642/642 05/29/08  Pg. 1/1

Pay Parking Ticket $      48.00
Entered:    05/29/08 04:46
Paid:       05/29/08 12:16
Facility:   TE Lot 1
Epan        791401141814917169O
Total Amount        $       48.00
Credit Visa         $       48.00
xxxx xxxx xxxx 1761

---

**RECEIPT**

From: Mayflewer
To: Airport
Date: 5/12  Contract Rate: _____ Amount: 42.
Pickup Time: _____ Drop Time: _____
FHL#: _____
Cab: _____ Driver: _____

---

DATE  6/8/08
CAB NO.  42
DRIVER  _____
FROM  Airport
TO  Mayflower
AMOUNT  $40.00

*"Service with Pride"*
PHONE
**(206) 246-9999**

# STITA

**AIRPORT
TAXI**

Exh. 79 - 000395

```
              HMSHOST
        FOUNTAINS OF SEVILLE
        KANSAS CITY AIRPORT
   CHECK:    8218
   TABLE:    104/1
   SERVER:   154060 Kelly
   DATE:     MAR17'08  5:27PM
   CARD TYPE: VISA AO 4*
   ACCT #:   XXXXXXXXXXX1761
   EXP DATE: XX/XX
   AUTH CODE: 010407
           DAVID LISAK

   TOTAL:           15.29

   TIP:_____3.__

   TOTAL:_____$18.29

   X _____
   I AGREE TO PAY THE ABOVE AMOUNT
   IN ACCORDANCE WITH THE CARD
      ISSUER'S AGREEMENT.
```

```
          GREEN LEAF
           GRILLE
       Terminal C Gate 19
         Logan Airport
          Boston, MA
         617-567-4448

   30 Maria
   ------------------------------
   Check: 2172          Guests: 1
       06/08/2008 04:44PM
   ------------------------------
   1    TUNA              7.99
        CASH             10.00

        SUBTOTAL          7.99
        Tax               0.40
        PAYMENT           8.39
   Change Due          $1.61

   --------- Check Closed ---------
        06/08/2008 04:44:29PM

      We enjoy hearing from you

        www.marairfoods.com

   Order Number: 2172
```

```
         Au Bon Pain
        Au Bon Pain 227

   Office Catering Specialists 800-765-4227

        STORE #000227

      QUESTIONS - CONCERNS?
      Call us at 1 800 TALK ABP
      Visit us at our website:
      http://WWW.AUBONPAIN.COM

        Ticket #407
   2008-05-28           05:02:31
        000227 2 47 407
   16 oz Poland Springs        1.79

   TO GO                       1.79
   Tax                          .09
   Amount Due                 $1.88

   CASH                       $2.00
   Change                      $.12
```

**Colorado Sports**
Bar and Deli
Concourse B Gate 30
Denver, CO

1013 Kacy

Chk 3930        Jun08'08 09:23PM  Gst 0

1 Btl Spark H20                    2.75
  Cash                             2.97

  Subtotal                         2.75
  Tax                              0.22
  Payment                          2.97
-------------1013 Check Closed----------
------------Jun09'08 09:23PM------------

Thank you for visiting us
and please come again.

Customer Comments Please Call
1-877-702-4685

Lola
2000 4th Ave
Seattle, WA
206-441-1430

Server: Aleda          DOB: 06/10/2008
07:43 PM                     06/10/2008
Table 36/1                      3/30076

Visa                            3145808
Card #XXXXXXXXXXX1761
Magnetic card present: LISAK DAVID
Approval: 011426

       Amount:           66.80

       + Tip:            13.00

       = Total:        $ 79.80

X _Danny_____
Approval: 011426

DATE C6/09/2008 MON   TIME 11:36

BBQ                          $10.95
ALA CARTE                     $1.00
          2.00xITEMS
SUBTOTAL                     $11.95
TAX AMT                       $1.06
TOTAL                        $13.01
CASH                         $20.
CHANGE
CLERK 1        No.0

```
****************************|*************|*****
T.Number 59813   5/29/2008  7:56:50 AM
****************************|*************|*****
Table: Subcheck:0
```

     1 Greek Omelette     6.99
        **Rye              .00
                        ===========
     Sub-Total $          6.99
                        ===========
     Tax       $          0.42
                        ===========
     Total     $          7.41
     Cash      $         20.41
     Change    $        -13.00

```
****************************|*************|*****
```

STEAK ESCAPE DIA
8400 PENA BLVD  DENVER CO
303-342-3445

1 1/2 CHIKPHILLY          5.69
-------------------------------
   SBTL                   5.69
   TXB1                   5.69
-------------------------------
   TXTL                    .46
   TOTL                   6.15
   CASH                  20.00
   CHNG                  13.85

YOUR ORDER NUMBER IS
NIGHT1
#272                    IN
1522 21:19 #03 JUN.08'08  REG0002

WELCOME
TO
Caffe D'arte
DATE 06/10/2008 TUE  TIME 06:29

MISC FOOD T1              $2.00
TAX1                     $0.19
TOTAL                   $2.19
CASH                    $5.20
CHANGE                  $3.01
THANK YOU!
     No.378799   00001

Mayflower Park Hotel
405 Olive Way
Seattle, WA
98101
(206) 623-8700

**KITCHEN CH**

| Date | Table | Guests | Server | C |
|------|-------|--------|--------|---|
| 5-23 |       |        |        |   |

APPT-SOUP/SAL-ENTREE-VEG/POT-I

VISA    XXXXXXXXXXXXX1761 S
AUTH 023125    TBL 76    CHECK    38844
PRE-AUTH         Andaluca    Kathleen

AMOUNT            21.45
TAX               2.03
                -----------
SUBTOTAL  $    23.48

TIP  $......5.00

TOTAL  $....$28.48
                ===========

CUSTOMER COPY

WELCOME
TO
Caffe D'arte
DATE 06/09/2008 MON   TIME 10:48

12oz LATTE T1        $2.90
MISC FOOD T1         $2.20
TAX1                 $0.48
TOTAL                $5.58
CASH                $10.00
CHANGE               $4.42
      THANK YOU!
        No.378601 - 00001

```
          WELCOME
            TO
        Caffe D'arte
DATE 06/10/2008 TUE   TIME 06:13

12oz LATTE T1              $2.90
MISC FOOD T1              $6.00
TAX1                      $0.85
TOTAL                     $9.75
CASH                     $20.00
CHANGE                   $10.25
      THANK YOU!
          No.378795   00001
```

```
        JOHNNY ROCKETS C28
LOGAN INT'L AIRPORT - BOSTON, MA
          617-634-6000

9991 ESTHEFAN
--------------------------------
TBL 54/1      CHK 279
          MAR17'08 10:02AM
--------------------------------
          Subtotal

        ++++ SEAT 1 ++++
1 1-EGG                    0.79
   SCRAM
   3 SEE SERVER
1 COUNTRY POTATOS          1.99
1 COFFEE    20oz           1.59
   SUBTOTAL                4.37
TAX    0.22   AMOUNT       4.59
   ++++++ +++++++
   SUBTOTAL                4.37
   TAX                     0.22
   AMOUNT            $4.59

   Question Or Comments
Email Comments@HMSHost.com
```

```
    Thank You for Flying Delta!!!
Date: 3/18/2008
Time: 2:20 PM
Flight: Delta Airlines 62
Trans Type: Sale
Seat: 14

Item          Unit Qtq   Total
Lunch Fut      $11.60  1  $11.
Total:                     $11.60
Credit:                    $11.60

Credit Card: xxxx1764
Cardholder: PAN DAVID
Entry Method: Swiped

Be Best Care in the Air
```

# SUPPLEMENTAL BUDGET FOR FY2007
# AND
# REVISED FY2008 BUDGET

## UNITED STATES V. JOSEPH DUNCAN

## Submitted July 11, 2008

### I. INTRODUCTION

In February 2007, preliminary budgets were submitted for FY2007 and FY2008.  The FY2007 budget was approved on February 28, 2007.[1]  There was no decision made on the FY2008 budget.  At that time the trial judge had not set a trial date and the " death qualified"[2] lawyer had just been appointed.

At the time of the original submission for FY2008, the federal defense team had not had the opportunity to review the materials prepared by the state defense team for their capital defense.  It should be noted here, however, that no experts as anticipated herein were ever hired by the state defense.  Also, the case resulted in guilty pleas and an "incomplete" sentencing.[3]  Despite the fact that Duncan was charged in Idaho state court in July 2005 and I was appointed in the same month, no real preparation for the federal death penalty proceeding was able to begin in earnest until February of this year.

Two significant facts mandate a supplemental request for FY2007.  First, the new trial date of January 22, 2008.  This date was six months earlier than we requested.  Second, the incomplete status of the mitigation done by the state defense team.  This was not fully recognized until Debra Garvey had a chance to fully review it, which occurred after the previous budget was submitted.

---

[1]An update as to money remaining in that budget was included in the Supplemental Budget submitted for 2007 and will be further updated in an attachment to this submission.

[2]Mark Larranaga of Seattle was appointed January 26, 2007 and filed a Notice of Appearance February 5, 2007.

[3]Duncan was sentenced to three consecutive life without parole terms on pleas to Kidnaping.  The sentences for the three First Degree Murders were continued pending sentencing, if any, in the federal proceeding.

## II. STATUS OF THE CASE

The Indictment on this case was filed on January 18, 2007. It charges ten counts, three of which are death eligible. On January 23, 2007, the government filed their Intent to Seek the Death Penalty.

The Government has also indicated a list of non-statutory aggravating factors for which it intends, presumably, to elicit evidence to establish. Some of the aggravators listed are encompassed in the alleged facts of the underlining offense. Many of the aggravators charged, however, are not. For example, the Government alleges prior convictions of violent or sexual assault offenses in another State; as well as a list of non-statutory aggravating factors under 18 U.S.C. § 3593 (a)(2), to wit: that Mr. Duncan is a future danger. To advance this proposition, the Government cites to three separate incidents from three different states. More specifically, the Government has alleged – as evidence of future dangerousness – that Mr. Duncan committed two separate offenses; one of which is alleged to have occurred in Seattle, Washington and the other in Beaumont, California. In addition to the multi-jurisdiction is the allegation that these incidents involved multiple victims, and more problematic, occurred over a decade ago.

Defense is obligated to thoroughly investigate evidence to rebut each aggravator and to do so will require – in addition to counsels obligation to investigate potential mitigation – time, effort, and resources to investigate allegations of multiple incidents, with multiple victims, in multiple jurisdictions, dating over a decade.[4]

From the date of Duncan's arrest until his pleas in state court, Mr. Duncan was housed in Coeur d'Alene, Idaho, approximately 45 miles from Spokane. This allowed me to have client contact on a near daily basis. Immediately after the state sentencing, Mr. Duncan was transferred to Idaho's Maximum Security Prison outside of Boise, Idaho. Boise is an eight hour drive or a one hour flight from Spokane. To aid with client contact, the Chief Judge in Boise appointed the Federal Defender Services of Idaho as co-counsel.[5] Pursuant to Section 3005 of Title 18, United States Code, the Court appointed Mark A. Larrañaga on January 26, 2007.[6]

### Trial Date

At the time I submitted the initial budget, the trial date was March, 2007. As was

---

[4] Although we fully anticipate raising legal challenges to the admissibility of such evidence, we are nevertheless obligated to conduct a thorough investigation into potential aggravation evidence. *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 2537 (2003).

[5] At the time of Duncan's arrest the Boise Federal Defender Office was a branch of my office. At the time of the Duncan sentencing in state court, that office had become independent. This case is now an "out-of-district case" for my office.

[6] This budget does not include monies for Mr. Larrañaga's representation since he was requested to submit a separate CJA budget directly to the District Court. Mr. Larrañaga's submitted budget has been authorized by the District Court.

contemplated, the March 2007 trial date was continued. I fully anticipated, however, the trial date to be rescheduled for the latter part of 2008.[7]

On March 19, 2007, a hearing was held regarding the trial date. On March 22, 2007, United States District Judge Edward Lodge vacated the March 20, 2007 trial date and reset it for Tuesday, January 22, 2008, with all pre-trial motions to be filed before November 5, 2007.

The Initial Budget was premised on a trial date in late 2008. The Court's January 2008 trial date consequently requires counsel to accomplish more in substantially less time. Work contemplated to be accomplished over a 19 month period must now be done in half that time.

The trial has been set for January 22, 2008. This setting was seven months earlier than the defense requested. The defense is committed to doing everything in its power to meet this January date. As stated above, no experts worked on the defense of the state case. Therefore, we are starting from scratch. Our defense team has had numerous meetings with Judy Clarke and a consulting expert to as accurately as possible identify what type of experts are needed. We have been diligently identifying individual experts who can fill those roles and trying to determine their availability in light of our current trial date. Obviously, until budgeted, none have been formally hired.

The 2007 Supplemental budget section below requests three additional investigators. This was driven by three considerations. First, the shortened time frame. Second, the incomplete nature of the state defense mitigation. Third, the fact that most of the experts cannot begin their work until the investigators obtain the documents and information necessary for their work. As of this writing we have employed these additional investigators and are paying them out of money already allocated. I do not anticipate the need to employ these additional investigators past the end of FY2007. For that reason they are not included in the FY2008 section of this request.

It should be noted that the FY2008 budget submitted in February anticipated the case lasting the entire fiscal year. This supplemental request will assume we can meet the court's January 22, 2008 setting. That being the case, I believe it is realistic to assume the court proceedings would likely be completed by the end of March, 2008. There is some convenience to this assumption since the end of March is the halfway point of the fiscal year. For that reason you will see that some of the budget requests for 2008, submitted in February of this year (and included as an attachment), are simply cut in half.

What now follows is a FY2007 Supplemental request and a Revised FY2008 request. A narrative follows each item requested and a summary for both FY2007 and FY2008 is at the bottom of the document.

---

[7] After a preliminary review of some the materials in our possession, the defense, on March 8, 2007, submitted its <u>Motion To Continue the Trial Date to August 2008</u>, setting forth case law, American Bar Association Guidelines for Death Penalty Representation to support a reasonable trial date.

III. EXPERTS

### 1. **Three Investigators**

There are an estimated 125 − 150 mitigation witnesses that will need to be interviewed. Given that the trial is scheduled for January 2008, it is expected these interviews will need to be conducted prior to October 1, 2007. Under this schedule, we have three months to conduct over 125 witnesses or 25 a month. To facilitate these interviews in a timely manner, we will need the assistance of three investigators at 100% of their time dedicated to this case. We have sought and obtained the assistance of one investigator that worked on the State case.[8] Since they have previous knowledge of the case and client, this would reduce costs and increase efficiency.

**2007..............35 hours at $100/hour x 3 investigators x 12 weeks = $126,000**

### 2. **Neuropsychologist**

When the 2007 Supplemental Budget was submitted, we had not yet identified a specific expert to fill this need. I estimated a FY2007 cost of **$14,000** (40 hours at $350/hr) and the same amount for FY2008. We have now identified an expert who can provide what we need more. This expert charges $250 per hour. Much of the work will require reviewing medical and psychological reports relevant to Duncan and perhaps his immediate family. Those records are not yet fully retrieved and available.[9]

It will be the responsibility of this expert to include assessments of the client as a child, adolescent, pre-teen, teen, and adult. The expert will also address the issue of future dangerousness. As a result, I am removing the FY2007-2008 specific requests for a "Future Danger Expert." That request had been for FY2007- 15 hours at $350/hour (**$5,250**) and for FY2008 - 30 hours at $350/hour (**$10,500**). It is not clear whether any one-on-one meetings with Mr. Duncan and this expert will be necessary.

**2007..............................................40 hours at $250/hour     Total   $10,000**

**2008..............................................10 hours at $250/hour     Total   $2,500** [10]

---

[8] We attempted to retain the services of two investigators that had worked on the State case, but only one was available to work on the case.

[9] Because Mr. Duncan was incarcerated in Washington State for seventeen of the twenty years between 1980 and 2000, many such reports exist.

[10] Preparation of this case in the time frame currently allowed is a rather fluid process. To summarize the changes from the previous submissions: I previously requested $14,000 (2007-8) for a neuropsychologist and $10,500 (2007-8) for a Future Danger expert totaling $24,500. I have combined these positions and seek a total of $12,500.

Exh. 80 - 000403

### 3. **Jury Consultant**

This request is somewhat new to death cases. I have relied heavily on the advise of other defenders who have handled death cases. I must say that this case differs significantly from any other federal death case I have identified. There are certain identifiable factors that drive my request for such an expert. They are as follows.

a). District of Idaho:

While quite large geographically, Idaho does not have a large population. There are four identifiable population centers. 1) Boise is by far the largest. This is where the trial judge and the other District Court Judge chambers. This is where the trial is currently scheduled and also where Mr. Duncan is currently housed. 2) Coeur d'Alene is approximately 400 miles north of Boise on the Washington/Idaho border. This is where Mr. Duncan was charged in state court. There is a small federal court there. 3) Moscow is 85 miles south of Coeur d'Alene. This is the home of the University of Idaho. There is a federal court house here but it is seldom used for criminal cases. 4) Pocatello is in the eastern part of the state about 220 miles from Boise. There is a federal court house there.

The state is not culturally diverse. Boise and Pocatello are heavily Mormon. The Duncan case is extraordinarily well known state wide through heavy coverage by print, radio and television coverage.[11]

b). Procedural History:

Mr. Duncan was charged in state court in Coeur d'Alene with three first degree murders and three kidnapings following a seven-week abduction of two children. There should be no need to go into further detail here but suffice it to say the crimes alleged are extremely disturbing to the general population of the entire state. Mr. Duncan's guilty pleas to the state charges have been extensively publicized. The sentence received, and more importantly, the potential of having Mr. Duncan returned to state court to face a death jury if he doesn't receive death in the federal prosecution, has been extensively publicized. The fact that Mr. Duncan has been charged with a capital child murder in California which is pending the resolution of the Idaho state and federal cases, has been extensively publicized. The fact that Mr. Duncan has confessed to killing two children in Washington state, though not yet charged, has been extensively publicized.[12]

---

[11]In an effort to avoid additional change of venue issues, the parties requested a "gag order" which was issued by the court this week. That order itself resulted in extensive media coverage.

[12]The admissibility of the California and Washington matters is yet to be determined. They are charged as aggravating factors by the government. A motion to disallow this testimony will be filed in November, 2007 and heard sometime thereafter.

c). Jury Questionnaire:

The court has recognized that selecting an impartial jury in this case will be extremely difficult.  The court has asked the parties to work both individually and together where possible to provide a comprehensive, case-sensitive, jury questionnaire.

The request for funds to hire a jury consultant is based on the significant issues presented by the above.  The jury questionnaire will be a critical tool for the court and both parties in obtaining a fair trial.  From my perspective, I cannot hope to prepare a reasonable and appropriate questionnaire without expert help.

d). Trial Preparation:

The need for such a consultant is far more than just for a questionnaire.  With such a racially and religiously "homogeneous" jury pool; with such incredibly disturbing crimes alleged; with such extensive publicity of facts both admissible and potentially not; with a case that has already been litigated in state court and so strangely sentenced; the use of "focus groups" in preparation is essential.

In preparation for selecting a "death qualified" jury, Mr. Larranaga and I would seek two days of training on selection techniques.  This would also be the role of such a consultant.

e). Trial:

The consultant would also be unassailably valuable and necessary in the actual voir dire and selection process. Jury selection should take several weeks.

2007.................................130 hours at $175/hour      Total   $22,750

2008.................................195 hours at $175/hour      Total   $34,125

### 4. Sexual Psychologist

This position is also a "refinement" from the earlier requests.  I had identified in the February 2007 submission for FY2008 a "Sexual Abuse Witness."  The request was for 30 hours total at $300/hour, totaling **$9,000**.  I withdraw this request.

I request funding for a Sexual Psychologist.  This is a psychologist dealing specifically with the client's sexual victimization.  This expert will also review the client's family sexual history and impact on the client.  The expert will also evaluate the effects of the multiple prison rapes upon the client since age 17.

2007.............................80 hours at $300/hour           **Total $24,000**

2008..............................20 hours at $300/hour          Total $6,000[13]

### 5. Trauma Expert

In the February FY2008 budget submission I identified a "Social History Witness." I estimated 125 hours at $100/hour totaling **$12,500**.  I now withdraw this request and incorporate this position into a request for a Trauma Expert.  This witness would discuss client's entire social history as it relates to trauma, sex offender issues, victimization, prison rape, youth in prison issues and family abuse.

2007..............................60 hours at $250/hour          **Total $15,000**

2008..............................20 hours at $250/hour          **Total $5,000**

### 6. Institutional Psychologist

In the February 2007 request for FY2008 I included a "Prison Adjustment Expert." I anticipated 30 hours at $300/hour totaling **$9,000**.  I now withdraw that request and ask for funds for an Institutional Psychologist.

This expert would review all incarceration issues.  This expert would also discuss all issues relevant to client's experience in institutions over his 20 incarcerated years.  Numerous documents, records and reports will need to be gathered and reviewed and evaluated.

This expert has been identified and we are awaiting hiring permission.

2007...........................60 hours at $195/hour          **Total $11,700**

2008...........................40 hours at $195/hour          **Total $7,800**

### 7. Pediatric Internist

In discussion with our consulting psychiatrist and other experts, this expert would evaluate and give a full assessment of the client's medical history as a child and adolescent including birth issues, illness as a child, and all medical records of client and client's family. This is a newly requested position.

2007...........................10 hours at $300/hour          **Total $3,000**

---

[13]This expert has been identified but not hired pending approval.

**2008...........................30 hours at $300/hour**      **Total $9,000**

### 8. Pediatric Neuropsychiatrist

This is a new request.  This expert would document psychiatric history of the client taking into consideration the medical, social and mental history of the client's youth.  This would also include evaluation of the client's incarceration as a young adult.

**2007...........................60 hours at $350/hour**      **Total $21,000**

**2008...........................20 hours at $350/hour**      **Total $7,000**

### 9. Psychiatrist

This is our consulting expert for issues evaluating mental health issues and expert needs in both the guilt and penalty phases.

**2008...........................50 hours at $450/hour**      **Total $22,500**

### 10. Radiologist

It may well be that this expert is never needed.  If we do decide to conduct brain scans a radiologist would be necessary.

**2008...........................20 hours at $250/hour**      **Total $5,000**

## IV.  TRAVEL

1. FY07 Three Investigators Travel:  Fifteen, three day/two night trips for each investigator. $949 estimate per trip ($500 flight, $220 lodging two nights, $117 meals for three days, $112 for car rental) = 3 x 15 x $949 = **$42,705**

2. FY07 Experts Travel: Nine, two day/one night trips to Boise (one trip each for Neuropsychologist, Sexual Psychologist, Trauma Expert, Institutional Psychologist, and Pediatric Neuropsychiatrist plus four, two day/one night trips for Jury Consultant). $760 estimate per trip ($500 flight, $100 lodging one night, $78 meals for two days, $82 for car rental) = 9 x $760 = **$6,840**

3. FY07 Debra Garvey Travel (paid by Federal Public Defenders for the Central District of California): I initially anticipated little travel by Ms. Garvey, but that will not be the case. Because she is working directly with counsel with interviewing, preparing, investigating for the penalty phase, she will be required to travel to accomplish these tasks. Fifteen, three day/two

night trips. $949 estimate per trip ($500 flight, $220 lodging two nights, $117 meals for three days, $112 for car rental) = 15 x $949 = **$14,235.00**

### FY07 Total Travel: $ 63,780

1. FY08 Experts Travel: Six, two day/one night trips to Boise (one trip each for Neuropsychologist, Sexual Psychologist, Trauma Expert, Institutional Psychologist, Pediatric Neuropsychiatrist, and Psychiatrist). $760 estimate per trip ($500 flight, $100 lodging one night, $78 meals for two days, $82 for car rental). One, 14 night trip to Boise for Jury Consultant. $3,076 estimate for trip ($500 flight, $1,400 lodging, $546 meals, $630 car rental) = 6 x $760 + 1 x $3,076 = **$ 7,636**

2. FY08 - Tom Monaghan's milage to the prison (paid by Federal Defender Services of Idaho): 60 miles at 3 trips per week for 25 weeks with reimbursement rate of .485 cents per mile = 60 x 3 x 25 x .485 = **$2,183**

3. FY08 - Debra Garvey (paid by Federal Public Defenders for the Central District of California): Five, three day/two night trips to Boise. $822 estimate per trip ($350 flight, $160 lodging two nights, $147 meals for three days, $135 for car rental, $30 airport parking) = 5 x $822 = **$4,110**

4. FY08 - Roger Peven; One, three day/two night trip to Boise per week for 15 weeks. $506 estimate per trip ($200 flight, $147 meals for three days, $135 for car rental for three days, $24 for airport parking for three days). One, six day/five night trip to Boise per week for 8 weeks. $812 estimate per trip ($200 flight, $294 meals for six days, $270 for car rental for six days, $48 for airport parking for 6 days). = 15 x $506 + 8 x $812 = **$ 14,086**

5. FY08 - Bill Proctor; One, three day/two night trip to Boise per week for 15 weeks. $506 estimate per trip ($200 flight, $147 meals for three days, $135 for car rental for three days, $24 for airport parking for three days). One, six day/five night trip to Boise per week for 8 weeks. $812 estimate per trip ($200 flight, $294 meals for six days, $270 for car rental for six days, $48 for airport parking for 6 days). = 15 x $506 + 8 x $812 = **$ 14,086**

6. FY08 - Lodging (furnished apartment for 6 months) at approximately $2,500 per month for Roger Peven and Bill Proctor in lieu of hotel rooms.  Total Lodging: **$15,000**

### FY08 Total Travel: $57,101

## V.  STAFFING/SALARIES

The February FY2008 Budget Request contained sections called **Explanation of Salaries for Staff Not Specifically Hired for the Case fiscal 2008, and Additional Resources-Case Specific-2008** anticipating the case lasting the all of FY2008.  It now appears that the case may end six months into FY2008.  Below is the new cost projections:

Exh. 80 - 000408

**Duncan Case Budget: First 6 months of FY2008 (October 2007 - March 2008)**

**I. Explanation of Salaries for Staff Not Specifically Hired for the Case fiscal 2008.**

1. Roger Peven, Executive Director, Federal Defenders of E.WA &ID. Mr. Peven will be devoting 100 percent of his time to this case in FY08. Half year salary estimated at $73,425 with 27.5 percent for benefits.

2. Bill Proctor, Chief Investigator, Federal Defenders of E.WA. & ID. Mr. Proctor will be devoting 100 percent of his time to this case in FY08. Half year salary estimate is $68,818 with 27.5 percent for benefits.

3. Marissa Egland, Paralegal/Administrative Assistant, Federal Defenders of E.WA. & ID. Ms. Egland will be devoting 60 percent of her time to this case in FY08. Prorated half year estimated salary is $29,853 with 27.5 percent benefits.

4. Jennifer McCann, CSA, Federal Defenders of E. WA & ID. Ms. McCann will be devoting 50 percent of her time to this case in FY08. Prorated half year estimated salary of $21,934 and 27.5 percent benefits.

5. Thomas Monaghan, Trial Attorney, Federal Defender Services of Idaho. Mr. Monaghan is devoting 50 percent of his time to this case in FY08. Prorated estimated salary of $36,350 and 27.5 percent benefits. (To be paid by Federal Defender Services of Idaho.)

6. Debra Garvey, Mitigation Specialist, Federal Defenders of Central California. Ms. Garvey will be devoting approximately 30 percent of her time to this case in FY08. Prorated estimated salary is $18,350 with 27.5 percent benefits. (To be paid by Federal Public Defenders Central District of California.)

**Totals: Half Year Salary $248,730.....Benefits $68,400**

**II. Additional Salary Resources-Case Specific–2008**

1. Provisionally Approved Temporary Lawyer for Spokane. Salary for half year $33,000 and 27.5 percent benefits.

2. Provisionally Approved Temporary Lawyer for Boise. Annual salary of $33,000 and 27.5 percent benefits. (To be paid by Federal Defender Services of Idaho.)

**Totals: Salary $66,000.....Benefits $18,150**

## SUMMARY

**FY07 Supplemental Budget Summary  (Note, this does not change the $200,900 already approved in February.  We still will be using all of those funds.):**

| | |
|---|---|
| Three investigators: | $126,000 |
| Neuropsychologist | $ 10,000 |
| Jury Consultant | $ 22,750 |
| Sexual Psychologist | $ 24,000 |
| Trauma Expert | $ 15,000 |
| Institutional Psychologist | $ 11,700 |
| Pediatric Internist | $  3,000 |
| Pediatric Neuropsychiatrist | $ 21,000 |
| Travel for experts including | |
| Debra Garvey increase paid by | |
| FPD Central California: | $ 63,780 |

Total FY07 supplemental request:     $297,230, but do not need funding for expenses being paid by other office ($14,235) so actual dollar amount needed is $282,995.

**FY08 Revised Summary combining the February 9, 2007 submission plus changes in this document.**

| | |
|---|---|
| Salaries for staff not specifically hired: | $248,730 |
| Benefits | $ 68,400 |
| Total: | $317,130 |

| | |
|---|---|
| Additional resources temporary attorney | |
| Spokane and Boise (½ of total paid by | |
| Federal Defender Services of Idaho): | $66,000 |
| Benefits (½ of total paid by | |
| Federal Defender Services of Idaho): | $18,150 |
| Travel Experts: | $ 7,636 |
| Travel Tom Monaghan: | $ 2,183 |
| (Paid by CDO Idaho) | |
| Travel Debra Garvey: | $4,110 |
| (Paid by FPD Central California) | |
| Travel Roger Peven: | $14,086 |
| Travel Bill Proctor: | $14,086 |
| Lodging (furnished apartment): | $15,000 |

Exh. 80 - 000410

| | |
|---|---|
| Neuropsychologist: | $ 2,500 |
| Jury Consultant | $34,125 |
| Sexual Psychologist | $ 6,000 |
| Trauma Expert: | $ 5,000 |
| Institutional Psychologist: | $ 7,800 |
| Pediatric Internist: | $ 9,000 |
| Pediatric Neuropsychiatrist: | $ 7,000 |
| Psychiatrist: | $22,500 |
| Radiologist: | $ 5,000 |

Total FY08 Revised request:          $557,306, but do not need funding for staff on board
or those expenses being paid by other offices so actual dollar amount needed is $191,808.