# SANDERSON INVESTIGATIONS

**705 2ND Avenue – Suite 401**
**Seattle, WA 98104**
**(206) 303 – 7214**
**festers206@aol.com**
**www.sandersoninvestigations.com**

## Confidential Memo

September 10, 2007

To:              Joseph Duncan's Defense Team

From:          Karen Sanderson
                     Licensed Private Investigator, #2363

Re:              <u>United States of America v. Joseph E. Duncan III</u>
                     **Conversation w/ Lillian Duncan on 9/9/07**

**On September 9, 2007 I met with Lillian Duncan for several hours and gathered the following information.**

### Childhood friend of Lillian's

Betty Reese was a classmate and good friend of Lillian's growing up. She doesn't know if Betty married and so may have a new last name. She recalls that her sister Helen flunked a couple of times and ended up a class behind Lillian and at some point in the same class as Betty. I suspect that Betty was a class behind Lillian in school.

Note: We may be able to locate Betty in yearbooks or find the family in a local phone book.

### Bruce

Teena told Lillian after Bruce's death, that Bruce had confided in her at some point that <u>Jet had been sexually abusing Bruce growing up.</u>

# United States v Joseph E Duncan III – Confidential Memo

Lillian claims that Bruce was a "bully" and very macho. She feels that the reason why both Jet and Bruce had difficulties was because Joe Jr had been spoiling them. She would discipline the girls appropriately and Joe Jr would not interfere. However, when she went to discipline the boys, Joe Jr would undermine her authority and give them money or whatever they wanted or allow them to do whatever Lillian said they couldn't do.

Note: Lillian writes similar ideas in letters that I have yet to distribute, but where written to the parole board in the mid 80's.

Lillian also thinks that Bruce was a bully because he was picked on by all of the sisters and Jet. She said that she couldn't blame Bruce for being a bully because he was bullied by four siblings. She also thinks that he ended up "getting worse" after the divorce when Bruce went to live w/ Joe Jr.

## Joe Jr

Lillian claims Joe Jr to be a "sociopath." She recalls that he was unwanted by his mother and lived mostly with his grandparents growing up. She recalls how he would bring things back from the military that he obviously had stolen and that she would lecture him that she did not want the item in the house. I asked her what specifically would he steal and she couldn't come up with anything.

## Abuse by Joe Jr

Joe Jr beat Lillian throughout their marriage. At some point she told him that if he ever beat her again, she would leave him for good. This seemed to stop the abuse for a long period of time until right before their divorce. Joe was seeing another woman and according to Lillian "was getting his lovemaking from her." She thinks that Joe Jr decided that he didn't need Lillian's "lovemaking" any longer and so was beating her again.

Joe Jr locked Lillian out of the house when they lived in Lakewood near Tacoma. She literally was locked out of the house. She ran across the street to the "pastor's house" and they called the police. They divorced following this incident.

Note: I don't know the name of the pastor, but how many could there be who lived in the neighborhood or across the street. Other long time neighbors will likely know who this person was.

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone -- 206-303-7214    Fax – 206-262-0335  Email – festers206@aol.com
Private Investigation License # 2363  --  Business License # 602422702

Exh. 99 - 000602

# United States v Joseph E Duncan III – Confidential Memo

## Janine

Lillian doesn't know Janine's last name. She was a girlfriend of Bruce's. She has a son named Christopher. At some point when Bruce and Janine were together, Janine took a bunch of pills and tried to commit suicide. Bruce called Lillian from a payphone and told her that he didn't know what to do because Janine wanted to die and so he apparently had left Janine at the apartment after taking the pills. Lillian lectured Bruce to go home and call the police.

On that same night, Bruce brought Christopher over to Lillian's house to care for him. He was three years old. At the time this occurred, Bruce and Janine were living in the Drake Apartments.

Lillian also knew Janine's mother. Again, she doesn't have any contact information on Janine or her mother.

## Sharee

Bruce married Sharee sometime between 1989 and 1991 at the courthouse in Tacoma. She had cancer. Lillian doesn't have any more information on her.

## Jadene

Lillian doesn't know Jadene's last name and also had no contact information on her except this very old phone number of 759-1005 (unknown area code). Jadene's daughter was Christina. Lillian does not like Christina because Christina was very upset at Bruce's funeral and at the hospital. I suspect that Christina was very emotional and animated and this upset Lillian, who doesn't think Christina has that right, since she is not Bruce's real daughter.

## Mental Health Treatment

Lillian obtained mental health treatment "after the whole Jet thing." This was through DSHS, which she signed a release while I was there.

## Bruce's son CJ

CJ was born Clifford Joseph Campbell on ███/82 or ███82 at Madigan Hospital.

Sanderson Investigations – 705 2ⁿᵈ Ave. Suite 401 Seattle, WA 98104
Phone – 206-303-7214   Fax – 206-262-0335   Email – festers206@aol.com
Private Investigation License # 2363  --  Business License # 602422702

Exh. 99 - 000603

# United States v Joseph E Duncan III – Confidential Memo

## Lillian's mentally ill sister

Lillian's mentally ill sister who is committed in a home is named Anna Ester Freed. She is 87 years old and acts like she is 2 years old. She contracted encephalitis and that was the reason for her being committed to the institution. The address of the mental hospital is ███████████ in Lewiston, Penn.

## Lillian's siblings in foster care

Lillian's siblings were all in foster care. They were broken up into two different homes. Roy and Mary lived at "Goss farm" which was someone's home. Don and Naomi lived at "Nails farm." Both foster families lived in the "country" and it is locally known as "big valley." She thinks that the Nails family had daughters who are still in the Pennsylvania area, and who would have been around Don and Naomi growing up. Naomi apparently knows more about this.

## Joe's sexual abuse of Cheri

Joe put "something" in Cheri's drink when they were at McDonalds when Cheri was 14. The thing was suppose to make it so that Joe could have sex with Cheri. He apparently learned this from his military friends.

## STDs

Joe Jr gave Lillian two sexually transmitted diseases. The first was the clap when he returned from Korea. The second one was also when he returned from overseas and was vaginal warts. Lillian was treated for the warts at the same time she was pregnant with Teena.

## Family addresses and contact information

Dot Duncan
███████████

High Point
Brooksville, FL 33512
904-596-3716

Mitzi and Clifford (CJ's grandparents or Ann Marie's parents)
███████████

Tacoma
206- or 253- 537-2832

Page 4 – Contact with Lillian Duncan

Exh. 99 - 000604

## United States v Joseph E Duncan III – Confidential Memo

David Saylor
Tested Lillian for vocation experience after Lillian's divorce when she was looking
for word. He worked for DVR (Dept of Vocationary Rehab). According to Lillian,
the testing showed that she was very intelligent.

James and Sandra Duncan
███████████████
Akron, OH 44320

Teresa – Don Freed's wife
███████████████
Lancaster Penn 17602
717-396-6787

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone -- 206-303-7214   Fax – 206-262-0335   Email – festers206@aol.com
Private Investigation License # 2363   –   Business License  # 602422702

Exh. 99 - 000605

Attorney Client Work Product
**Helen and Paul Hoover**
████████
**York, Pennsylvania**
**(717) 846-1677**
Paul's Date of Birth: ████████, 1939
Helen's Date of Birth: ████████, 1937

**Date of Interview: September 12, 2007**
**Follow up phone conference: October 3, 2007**

**Kathy Osborne Evans**
**Date of Birth:** ████, 1959

Helen is Lillian's sister. Paul is her husband. Paul drank daily and tended bar for 20 years. He stopped drinking in 1974. He has a bad arm.

Their daughter Kathy Evan was present for part of the interview. Paul and Helen also have a son, Paul Hoover, born ████████, 1974

Helen was a slow learner. They did not have special education in her day. She was held back twice for learning and health problems. Lillian skipped a few grades. Consequently, Lillian graduated from Chief Logan High School ahead of Helen in 1956. Helen graduated in 1957.

Their real mother (Susan Freed Osborne) raised Lillian and Helen. They were poor. From age 13, Helen worked as a waitress from earning $35.00 per month. To supplement their income, they took in borders, Don Snyder and Frank Freeze. Don Snyder had dementia and metal plate in his head. They ate rabbit, squirrel and brown gravy made of dry beef. They had no television or phone.

For discipline, Susan threatened them with a broom or a man's belt.

**Parents' Death**

Their father, William Osborne died in March 1947 of a heart attack. He lost a finger working in the steel mill in Burnham, Pennsylvania. He had breathing problems.

Their mother, Susan Freed Osborne died in March of 1973. She was 77 years old. At the end of her life, she had diabetes and Alzheimer's and lived with Naomi Narehood.

**Susan Price Freed Osborne**

Born in Burnham, Pennsylvania, Susan was very poor and had a rough life. She married Benjamin Freed when she was around 20.

Exh. 99 - 000606

Prior to the births of the older children, Susan had a child that lived six months and two miscarriages.

After she had Don, Mary, Roy, John, Naomi and Anna Esther, Susan's uterus dropped. She had to have surgery. It was during this time in the 1930's that she lost her children to foster care. After she got out of the hospital, Susan had no home. She lived with her brothers Herbert and Harvey.

**Helen's Siblings**

Don Freed was an alcoholic and a "redneck asshole." He drove a cab and was "gross and dirty." He married and had relationships with three women, Vivian, Twink, and Esther. Paul did not like the way he threw his son around. Don died of kidney problems related to alcohol.

Roy Freed had three wives, Dorothy, Kathy and Donna. He had a daughter, Brenda Freed, with Dorothy. He was in the Marine Corps and worked in the steel mill. He died of kidney and heart problems.

John Freed Sr. was an alcoholic. He married twice and had a large family. He tried to choke Helen at a birthday party but she "got him between the legs." His children are: Miller Irving Freed (Pleasantville, Pennsylvania), Gary Freed, John Freed Jr., Leonard Freed, Charles and Cheryl Freed.

Kathy said her Uncle John is "an asshole."

Both Don and Roy died between 1997 and 1999.

Mary Muser worked at a local rubber factory, Visco. She died of dementia and Alzheimer's. She was married three times and had a miscarriage. She has two sons, Steven and Robert Hedrick and a daughter, Faith Muser. Steven resides in Reedsville, Pennsylvania.

Anna Freed was sent to Polk State School when she was seven. She had measles, a high fever and was epileptic. She bit her mother in the face.

Paul described Naomi Narehood as "slow." She allegedly threw her diamond ring into a creek.

**Lillian Duncan**

Lillian was born with clubfeet. She had to wear special shoes. She was treated in Elizabethtown, Pennsylvania. On one occasion, Lillian became sick from heat stroke after swimming. She was weak, dehydrated and passed out. Susan got mad at Helen for walking her home in the sun. Helen also got sunburned.

2

U.S. vs. Joseph Duncan III
Mitigation Interview with Helen and Paul Hoover
Prepared by: Angela Mason, LCSW

Exh. 99 - 000607

When she was seven, Helen had ear surgery. A drunken doctor operated and Helen lost the hearing in her right ear.

During high school, Helen worked nights in a drive in restaurant. Lillian did not work but "messed with guys."

Lillian and Helen had a rivalry. Lillian got angry and pouted when Helen dated one of her boyfriends.

Helen knew Joe Duncan from roller skating. Helen attended their wedding in 1956. It was not planned. One day she was summoned from a girlfriend's house to come home for the ceremony.

Lillian had a miscarriage in May 1957.

Lillian told Helen her husband Joe went after their daughters when "she would not give him sex." In response, Lillian made Joe leave. After Lillian and Joe separated, he would not let her have his military pension.

Jet was molested in Germany. Lillian said Jet stayed in prison to finish a "cable job."

Lillian was a hypochondriac. Paul said, "She had more darn aches and pains than anyone I know. She had a night bag full of medications. If you had a pain, she had it worse."

When she visited, Lillian did not help clean up. She was a "guest."

Paul considers Lillian 'a religious freak." She hooked up with "some organization" and talked about church a lot. He does not know the name of the church.

Paul gave Lillian $2000 to avoid losing her house in Tacoma. Paul also sent her a few hundred dollars to fix her car. He sent her an $800 plane ticket to come to the family reunion in the 1980's. At the reunion Don made passing comments and dirty jokes but Helen did not take him seriously.

3
U.S. vs. Joseph Duncan III
Mitigation Interview with Helen and Paul Hoover
Prepared by: Angela Mason, LCSW

Exh. 99 - 000608

Attorney Client Work Product
**John Freed Junior**
**Patricia Freed (John's Wife)**

McVeightown, Pennsylvania 17051
(717) 899-7921
John's Date of Birth: ███████ 1947
Patricia's Date of Birth: ███████ 1950
Date of Interview: September 13, 2007

John Junior is the son of John Freed Senior, Lillian's half brother. He is Jet's cousin.

**Susan Price, Freed, Osborne**

Susan could not read. Patricia said there is a history of mental illness on Susan's side of the family. They were poor, no luxuries. Susan had emotionally issues and was not social. She stayed to herself and hoarded things.

## Lillian Duncan's Siblings and Their Children

**Esther Freed**

Esther Freed was institutionalized for her heart and mental disabilities. She cannot speak or walk.

**Mary Freed**

Mary Freed worked at Viscos (local factory) and married twice, to Mr. Muser and then Samuel Hedrick. She had numerous nervous breakdowns and was socially detached. After her last marriage she shut down and did not communicate in public. She never went out.

**Bob and Steven Hedrick**

Mary's and Samuel Hedrick had two sons, Robert (Bob) and Steven Hedrick. Bob is mentally and physically disabled. He drinks, lies, exaggerates and has a history of incarceration. He has been hospitalized on the seventh floor of the Lewistown Hospital (mental health ward). He resides in a group home and attends the Sunshine Connection Adult Day Care.

The doctor told Bob he had "water on the brain." He lived in some kind of home during his childhood. He was always picked on and guarded. He also worked at Viscos.

John described Steve Hedrick as "a violent thief." He punched and beat Mary and Bob. He was formerly employed at K-Mart.

U.S. vs. Joseph Duncan III
Mitigation Interview John Freed Junior
Prepared by: Angela Mason, LCSW

Exh. 99 - 000609

**Don Freed**

Don Freed was an alcoholic who molested young girls. During a family reunion he tried to grab Patricia sexually and made a pass at his sister Naomi. Don told "disgusting dirty jokes." John felt Don was untrustworthy.

**Connie Freed**

Don and his wife Shirley had a daughter, Connie Freed. John Sr. said he was Connie's real father; the result of an affair he had with Shirley. When he found out, Don allegedly tried to run Shirley over with his car. Shirley allegedly murdered Don's girlfriend. Connie allegedly witnessed the murder. Shirley lives in Paxton, Pennsylvania (near Selinsgrove).

**John Freed Senior**

John Senior cannot read or write. He and his wife Janet drank. Janet divorced John Senior because "he ran around with other women." His second wife, Bessie Yetter, may have had mental health problems.

**John Freed Junior's Brothers**

**Robbie Freed**

Robbie was visually impaired and attended special education classes. He went to a blind school and had a violent streak. Robbie was incarcerated for arson and sexually abused in prison. He is currently incarcerated for murder.

**Gary Freed**

Gary Freed allegedly tried to hit a police officer with a tire iron. After he "tore up the neighbor's house" he was sent away to the state hospital for three of four months. Gary had some learning problems but not as serious as John and Robbie. He was an alcoholic. Gary resides in McClure, Pennsylvania.

**Millard Fred Freed**

Fred is an alcoholic with a violent history toward the police.

**Charlie Freed**

Charlie was an alcoholic who had pneumonia.

**John Freed Junior's First Wife and Children**

U.S. vs. Joseph Duncan III
Mitigation Interview John Freed Junior
Prepared by: Angela Mason, LCSW

Exh. 99 - 000610

John was an alcoholic who stopped drinking 26 years ago. He was in special education. He has learning problems and failed the GED three times. He takes pain medication.

John stayed with his grandmother, Susan Price, during some of his childhood. He attended three different schools during the year he lived with her. A border, Daniel Snyder, also lived with them. Daniel died in 1972. His son, Bucky Snyder was an alcoholic and a suspected child molester.

John Junior's first wife was Barbara Harshburger. She died of a heart attack. Barbara and John had six children: Dawn Freed, born ▮▮▮▮▮ 1967; Denise Freed, born ▮▮▮▮▮, 1968; James Freed, born ▮▮▮▮ 1971; Johnny Freed III, born▮▮▮ 1972; Roy Freed, born ▮▮▮▮ 1974; and Shawn Freed born ▮▮▮▮▮, 1975.

Roy is currently incarcerated for parole violation. He has a history of domestic violence and alcoholism. Roy's daughter Cheyenne was molested by one of Dawn's boyfriends.

Denise lived with Daniel Groce for two years. They have two children, Kevin and Ashley Groce. Daniel's father, Ralph Groce, molested Kevin. (Note: the Groce family is known for molestation in Lewistown).

James Freed has a history of DUI and alcoholism.

Shawn Freed is incarcerated for drugs and failure to pay child support. Shawn was a heroin addict. His son Cody is psychotic and violent. He was removed from home for beating his mother. His behavior was similar to Steven Hedrick.

Johnny resides in Minnesota. Johnny Freed has a genetic disability. He has two children Brian and Amber Freed. His daughter Amber, now 6, is physically and mentally retarded. She is fed through a tube.

## John and Patricia Freed

John and Patricia were formally obese. Both had gastric bypass surgery. They had one son together, Jonathon Freed, born ▮▮▮▮ 1981. Pat and John are raising their daughter Dawn's four children, Tiffany, Joey, Samantha and Harry Junior. Tiffany is mentally retarded, Joey and Harry Jr. have Attention Deficit Disorder.

U.S. vs. Joseph Duncan III
Mitigation Interview John Freed Junior
Prepared by: Angela Mason, LCSW

Exh. 99 - 000611

███████████████████
**Naomi Narehood**
███████████████
Belleville, PA  17004
(717) 935-2333
Date of Birth: ████████ 1931

**Carol Jean Jurasz**
███████████████
(717) 935-2066
Belleville, PA 17004
Date of Birth: ██████████ 1964

**Miriam R. Burkholder**
███████████
Mifflintown, PA 17059
(717) 525-5374
Date of Birth: ██████████, 1952
Date of Interviews: September 13, 2007

Naomi Narehood is Lillian Duncan's half sister (Jet's maternal aunt).

**Naomi and John Howard Narehood**

Naomi married John Howard Narehood, born ████████ 1926. Their children are: John Howard Jr., born ███████████ 1949, Miriam Burkholder, born ████████ 1952, Betty L. Bonfiglio, born ███████████ 1954 and Carol Jean Jurasz, born ███████████, 1964.

Betty Bonfiglio has a severe alcohol problem. Carol and Miriam are seeking counseling to help "deal with her."

Carol and Miriam both work for Central Insurers' Group and were present for the interview. Carol suffered from depression and took medications, though none presently.

A church youth leader, Ellsworth Noll, molested Miriam. He made them touch his penis and hold it with a stick. He carried Miriam down the mountain. He was incarcerated twice for pedophilia.

Naomi, Carol and Miriam last saw Jet when he was nine. Lillian was firm with the kids. She made them sit down. They family moved around a lot.

**Naomi's Depression**

Naomi was treated for depression in 1985 and 1986. She was hospitalized for depression for twelve days on the seventh floor (mental health floor) of Lewistown Hospital. She

U.S. vs. Joseph Duncan
Mitigation Interview with Naomi Narehood and daughters
Prepared by: Angela Mason, LCSW

1

Exh. 99 - 000612

continued to take Lorazapan for years, prescribed by Dr. Fischter. In February 2002, Dr. Fox took over her care. He "re evaluated" and hospitalized her eight days. She said she was dehydrated. Dr. Dollar had tried her on different anti-depressants and she wound up visiting the emergency room. Currently she takes 30 mg. of Prozac per day. Previously she took four Ativan daily.

Naomi denies ever being molested.

### Naomi's Siblings and Mother

**Celia Marie Narehood**

Celia Maria Narehood was born █████ 1957 with a birth defect, half a heart and a hole in her diaphragm. She died when she was 12 days old.

**Anna Esther Freed**

Naomi's older sister Anna was born █████, 1920 in Lewistown, Pennsylvania. In April 1923 she had measles complicated by meningitis. According to Naomi, their mother, Susie Edna Price, institutionalized Anna at the Polk State School in Franklin, Pennsylvania in July 1927. While at Polk, Anna was diagnosed with a seizure disorder. In June 1978, Anna was transferred to Selinsgrove Center. In 2001 she sent to Raystown Developmental Services. Records from Raystown indentify Anna's caseworker as Shauna Brown of the Mifflin/Juaniata Base Services Unit.

**Mary Margaret Musser**

Naomi's sister Mary Musser was born █████, 1926. All of the siblings except Lillian and Helen were sent to foster homes. Mary was abused in her foster home. Miriam said she was "cracked on the ears" so she could not hear well.

Their brother John Freed Senior introduced her to Samuel Hetrick, whom she married. They had two boys, Steven and Robert Hetrick. Carol says Samuel was abusive. He threw Mary down the stairs, which she was pregnant.

**Steven and Robert Hetrick**

Carol and Miriam said Mary's son Steven Hetrick stole from his mother's bank account. He and Mary were estranged. Carol felt uncomfortable around him. Steven had a nervous breakdown and was treated at the Lewistown Hospital on the seventh floor.

Robert (Bobbie) Hetrick was born "slow" or mildly mentally retarded. Miriam shared, "He was sad and troubled" because he was stigmatized in special education classes.

**Faith Ann Musser**

U.S. vs. Joseph Duncan
Mitigation Interview with Naomi Narehood and daughters
Prepared by: Angela Mason, LCSW

2

Exh. 99 - 000613

Mary's second marriage was to George Musser. They had one daughter, Faith Ann Musser, born ████████, 1964. She is a lesbian who has learning disabilities. She is "slow" but graduated from high school.

**Mary's Depression and Suicide Attempts**

Mary was also hospitalized on the seventh floor of Lewistown Hospital. She was later institutionalized at University Park Nursing Center. Her medical account number was: ████████. Naomi has durable power of attorney. She is willing to sign a release to request Mary's records (releases have been sent to her).

Aunt Mary's nerves "went bad" while she and Faith worked at Honey Creek Inn in Reedsville. Carol remembered, "she was treated for her nerves" by Dr. Fischter (now deceased).

**Suicide Attempts**

Carol explained Mary tried to commit suicide three times. On one occasion, Mary overdosed on anxiety and anti-depression medications. Faith found her. The second time Mary overdosed on pills again and was put in a skilled or personal care home. After her third overdose of pills, she was hospitalized on the intensive care unit. Mary received group therapy and was prescribed Ativan. Upon discharge, she was placed at University Park Nursing Home in State College. She developed Parkinson's.

Mary's last residence was Goss Terrace, a low-income housing facility on ████████ ████ in Lewistown.

Attorney Thomas Torquato, address: ████████████████ Lewistown, PA 17044, handled the power of attorney.

**Roy Freed**

Roy married Dorothy Fisher. Their daughter, Brenda Freed is "backward and slow" Brenda always wet the bed when she came to visit. Brenda had her son, Christophe out of wedlock and gave him up for adoption. (Father and last name unknown.) Brenda lived with Roy in a trailer.

After Dorothy died in a car accident, Roy married Kathy Shaffer. When Kathy died, he married Donna Ciecierski.

**Don Freed**

Don was at the same foster home with Naomi. Don has two children: Connie and Tommie. Don was a drinker. After the service, Don went to live with their mother Susan.

**John Freed**

U.S. vs. Joseph Duncan
Mitigation Interview with Naomi Narehood and daughters
Prepared by: Angela Mason, LCSW

3

Exh. 99 - 000614

John lives at: ███████████████, Milroy, Pennsylvania, 17063, phone: (717) 667-3521.

John had three heart attacks and chronic bronchitis. He married Esther Mae Zook (born ███████ 1949) on March 28, 1970. Together they had Michelle Weyant, born:███████ ███, 1978 and Anthony Scott Freed (?), born ███████████ 1971. Anthony died suddenly June 25, 1980 of a brain aneurism. The family thought it was a congenital birth defect. Michelle later named her son after Anthony.

John was treated for depression and anxiety. Miriam and Carol heard him talk of suicide. He takes Effexer.

### Lillian Duncan

After "this thing happened with Jet," they flew Lillian back to Pennsylvania for a visit. Lillian visited Naomi in 1988 and 2001.

Lillian told Naomi she was molested by Don Freed when she was young. Roy Freed may have known about it.

Lillian told Miriam that her husband, Joe Duncan slept around and hit her.

During the last five years, Lillian told Naomi Jet was molested by his father and by a youth leader, from their church. She did not detail what Joe did to Jet.

### Naomi's Foster Families

Naomi and Don lived with the Leacy's in Big Valley (Allensville), Pennsylvania; they were Mennonite. Naomi also lived with the Dunmira family. They wanted to adopt her but her real mother would not allow it. Next, Naomi lived with the Smith's, and then at six years old, Walter and Edna Nail. At 16, Naomi lived with the Jack Janus family for two weeks. They were Jewish. From here she called her mother and asked if she could come home. Susan said yes.

### Living With Her Mother and Marriage

Naomi was used to her freedom. When she went to live with Susan during her junior year of high school, she found her real mother domineering. Naomi married John Narehood, and told her mother after the ceremony. When Naomi attended the Narehood family reunion, Susan was hostile. Naomi was afraid of her. She had seen Susan slap her sister Mary and push her up against a wall. Susan asked to see Naomi's marriage license but Naomi and John refused to show it to her. Naomi left Susan's house and was afraid to return. Naomi never went back. Susan would not return her cloths.

U.S. vs. Joseph Duncan
Mitigation Interview with Naomi Narehood and daughters
Prepared by: Angela Mason, LCSW

4

Exh. 99 - 000615

One day, Susan, Don Freed and the border, Don Snyder, went to Narehood home to "get Naomi" They wielded a gun. Naomi refused to return with them.

**Susan Edna Price**

The children were put into foster care when Susan was in the hospital for diabetes. When Susan could not care for them, the Mifflin County Child Welfare Society took custody. They also referred to it as "the poor house." Susan never took the children back out of foster care. Some lived with her later in life.

After her husband Ben Freed died, Susan lost all security. She wanted to control and dominate everything. For example, Susan would not let her daughter Helen marry the man who made her pregnant. And Susan would not allow the children to be adopted, even though Naomi's foster family wanted her.

In her older age, Naomi took care of Susan until she put her into the Friendly Nursing Home in Laurelton, Pennsylvania (off route 145).

Miriam and Carol remembered nicknamed Susan "Grouchy Grandma" because she frequently got angry.

**Nail's Foster Home**

Don Freed was in at the Nail's foster home with Naomi. Don and Naomi fought. Once Naomi was whipped with a switch for fighting. Their bathroom was an outhouse. Naomi was whipped for going to the outhouse while she was doing dishes.

The welfare office bought their clothes and shoes. Naomi was not allowed to go off school grounds because "Mother Nails" was ashamed of her shoes and did not want her to be seen. Naomi was whipped for leaving school grounds.

U.S. vs. Joseph Duncan
Mitigation Interview with Naomi Narehood and daughters
Prepared by: Angela Mason, LCSW

5

Exh. 99 - 000616

Attorney Client Work Product
**Ann Marie (Campbell) Cardwell**

Gig Harbor, WA 98329
(253) 691-2341
Sheslikethewind@msn.com
Date of Birth: ████████, 1965
Interview Date: September 26, 2007

Ann is Bruce Duncan's former girlfriend. She is currently married to Steve Cardwell. They have been together 17 years and married five years. Ann is a self-employed as a courier. She travels 300 miles a day delivering bank mail.

**Ann Meets Bruce Duncan**

Ann and Bruce met at the Adams Tacoma Roller Bowl around 1977. She was 12.

Ann remembered Lillian and Joe's house in Lakewood. They had just split up. Bruce went to live with his father. He and Joe were very close. Bruce chose to live with his father because Joe let him do what he wanted. From age 15, his dad treated him like an adult with his own apartment. Whatever Bruce did in his room was his own business. His father was easygoing.

**Ann and Bruce's Relationship**

Ann was in love with Bruce but he had a girlfriend named Debbie. When Ann was 15, Bruce and Debbie broke up. Ann pursued him. They were together for two years. Ann was 17 when she became pregnant by Bruce. Clifford J. Campbell (CJ) was born ████████████ 1982.

After CJ was born, Ann and Bruce lived together for three months. Bruce found Ann too disorganized and messy. Ann has Attention Deficit Disorder and has a difficulty completing tasks. She takes Aderol and struggles with depression. Bruce was obsessive and compulsive. They could not live together. Bruce had a hard time with trust, making it impossible to work out their issues. He said he was too young for the relationship and parenthood. He fled to Florida and returned three months later. He accused Ann of cheating, which she denied. They fought for years over CJ's paternity. Later h returned to Florida.

Bruce was not as in love with Ann as she was with him because she was a poor housekeeper.

After Bruce went to Florida, Ann got together with Peter Courter. They married in July 1983. Peter inflicted a severe head injury on CJ when he was two, a result of shaken baby syndrome. CJ was hospitalized for months. He was left incontinent, illiterate and unable to walk. CJ is very limited; he can dress himself but cannot fasten buttons or zippers.

Ann said CJ will likely be with her the rest of his life. (Note: During our interview, she left him in the car periodically checking on him).

Peter was convicted of stealing from the mailroom while in the army. He was charged with assault of CJ and served eighteen months for both offenses in a military prison. Ann and Peter divorced after his incarceration.

CJ's injuries changed things. Bruce observed CJ's therapy once or twice but otherwise did not see CJ for seven years following the injuries. Bruce wanted to wait until he felt CJ was capable of understanding and accepting their relationship.

## Jet

Ann received special permission to bring CJ to meet Jet. She visited Jet three or four times at McNeil and spent about a half hour each visit. The first time she visited with Bruce, then after, on her own. Jet was on the quiet side, nice and peaceable. They developed a friendship.

Ann thought Jet had a "dark streak." When they were writing and talking, Jet was into wizardry. He gave Ann a wizard candle.

Sometimes Jet got a "look" that gave you an uneasy, unsure feeling. Ann was not sure what he was thinking. It was like a different personality but it was still Jet.

Jet said he was an atheist during visits and in his letters. He asked, "How could there be a God if there was so much hurt in the world?" Jet was lonely. He did not say much about his circumstances but hated being incarcerated. He talked about things he wanted to do if he got out, like eating a hamburger. Jet and Ann wrote for about a year and exchanged about ten letters. Ann has since lost the letters.

Jet was in solitary part of the time. Ann is not sure why.

Ann described Jet as: feminine, soft, reserved, closed and guarded. Bruce was also guarded. Jet was disconnected sexually, "like he did not know how to be intimate." Ann thought he did not know how to take a friendship "past friends into a normal relationship." She felt he was naïve and lacked experience. She said, "Jet was the kind of guy...if he only had a girlfriend. He might have developed adult intimacy."

Bruce told Ann that Jet had a sexual encounter with another male, that Jet had raped another boy and stolen a car. Bruce told her "it had been one bad afternoon for Jet." Bruce lost respect and was turned off by Jet's homosexuality. He could not bring himself to be in the same room with Jet. . He wanted to be close to Jet but couldn't.

When Jet got out of McNeil, Ann was married to Steven. At Christmas Steven took CJ to pick up presents from Lillian. They met Jet at Lillian's. Steven did not like Jet. Steve told Ann he did not want her to visit with Jet ever again. He made it uncomfortable for Jet to

talk to Ann so they did not continue their friendship. Bruce' family does not like Steve because he is loud, opinionated and overbearing.

Ann regrets stopping the friendship with Jet but found it is too complicated with her husband.

### Family

Bruce told Ann Susan or Cheri might have been molested by their father. He did not believe the accusations. When Joe married Rae, Bruce was close to Rae's daughter Tammy.

### Lillian

Jet was always close to his mother because Lillian stuck by him. Joe dad "was there but wasn't." He was not supportive and did not visit Jet very often. Rae pushed visiting more than Joe. After a while she quit.

Lillian did not cope with stress well. She was distraught about the break up with Joe. She had been "homemaker type of mom." She complained a lot about Joe cheating on her. Ann does not know whether Joe was physically abusive.

They were an army family. Lillian nagged. Joe and Lillian grew apart. Lillian said most of her brothers and sisters were dead.

Bruce hated his mother but felt sorry for her. Bruce said his mother was really strict. She took things away or restricted them. Bruce described Lillian as a "nagger" who was constantly "on his case." Lillian could still get him to do things for her, i.e. taking her to doctor's appointments, but he kept his distance.

Lillian is close to the Sweet Adeline's singing group. They go to churches and nursing homes. Ann Marie saw Lillian a month ago when they spread Bruce's ashes on Mt. Rainer. Her husband Steve, CJ and Teena came as well. As the executor of his estate, Teena sold Bruce's house and truck and put everything in a trust fund for CJ. Teena lives in Poulsbo, Washington.

Ann remembers the excitement when Susan married. The girls were always close to their father except Teena, who was close to their mother.

Bruce suffered from depression. He disappeared for long periods of time. Over the past two years, Ann had more contact with Bruce (after ten years of little contact). He wanted to be close and see CJ more often. Ann had the feeling he knew something was going to happen. She swears he knew there was a problem with his heart.

Cheri was very stressed and depressed. She was very angry about Teena taking over at Bruce's funeral.

## Bruce's Computer

Ann has Bruce's computer and uses it daily. It was the one thing Ann requested out of his estate. Teena took everything off of it before she gave it to her. Ann is not sure whether Teena downloaded the contents before removing everything. Teena paid $189.00 to a Best Buy to have the files removed. Ann noticed this entry on the list of the estate expenses. Teena and Ann don't talk often. Teena is friendly but distant.

## Bruce's Other Girlfriends

Bruce dated Jaydeen. Her last name might be Rivers. She has a daughter named Christina Rivers who is 16. Christina lived with Bruce the summer he died while her mother was purchasing a house. They lived in the Puyallup or Sumner areas of Washington. Ann may have Jaydeen's last name in a coat pocket at home.

Ann does not know Janine but believes Bruce dated her after Ann. Bruce's friend Mark may know. Mark was Bruce's skating buddy. Ann did not like Mark. She does not know his last name. Lillian or Teena may know how to contact him.

## Drugs

Bruce tried crystal methamphetamine in Florida. Ann does not know about his drug use but suspected drugs weakened the muscles around Bruce's heart. Bruce was also an avid smoker. If he used drugs, Bruce did not tell Ann because drugs "were not her scene."

Lillian did not drink. Joe was a social drinker. He liked to have a beer and watch games. Ann does not remember seeing him drunk.

## Bruce's Personality

Bruce did not like being physically close a lot. He had a really nice body and was a great kisser. He maintained an intense look in his eyes like he was looking straight through you. Bruce did not like being close or tied down. He had commitment issues and preferred to be in control. He had a hard time if he was not in control. Sometimes, he disappeared for days. He disliked confrontation and disorder.

Exh. 99 - 000620

To:       Duncan Team

From:    Deb Garvey

Today's Date:    October 23, 2007

Case Name and FY #:    Joseph Duncan


Re:       Julia Witheril
          ███████████████
          Lakewood, WA
          253.584.4831

Other Identifying Information:    Former neighbor of Lillian and kids

Date of the Interview:    October 17, 2007

---

Julia Witheril is listed as an emergency contact person on Jet's Lakes High School enrollment form.  At the time Lillian and the kids were living at ████████████████, in Lakewood, Washington, Julia was their next door neighbor.

Julia remembers Lillian clearly, but did not know her that well at the time they were neighbors.  She was surprised to hear that she was listed as an emergency contact person on one of Lillian's children's school records.  Julia had an older child, a daughter, who did not attend school with any of the Duncan kids.

Julia did not socialize with Lillian, but spoke to her when they saw each other.  They did attend the same church, Lakes City Community Church.  Julia said Lillian was taken under the wing of an older woman, Dorothea Crane, who has since died.  She confirmed that Dave Stewart was the pastor of the church during that time.

Julia said Lillian always seemed harried, but Julia thought that was understandable in that she had five children to raise virtually by herself.  Julia could only remember seeing Joe Duncan, II, at the house once in the years the family lived next door to her.  Julia believes Joe's absence was a source of frustration for Lillian.  Other than that frustration and her being busy with the kids, Julia never saw anything unusual about Lillian's behavior.  She did know that Lillian and Joe got divorced at some point, but didn't know any details about the reason for the divorce.

Julia remembers hearing from Lillian that she was very proud of Teena.  Teena was the "smart one", the child that was going to "make something of herself", according to Lillian.  By contrast, Julia doesn't remember Lillian talking about her other children at all - with either good or bad comments about their school performance.



Memo
October 23, 2007
Page 2

Julia didn't see any punishment of the kids, couldn't remember Lillian yelling at the kids in front of her. Julia did know the neighbor, Eugene Murphy, who lived across the street from both Julia and Lillian. She remembered that his house was broken into and guns were stolen, but couldn't remember if it was Lillian's boys who were responsible for that or if another family that had boys had been responsible for the burglary. She couldn't remember the other family's surname.

Julia remembered that one of the Duncan boys had been arrested for hurting another child. She said she was never clear which part of the story was rumor and what part was fact. She did remember that Dorothea Crane, the woman from their church, was very upset when Lillian's son was arrested.

Julia described the Lawndale Avenue neighborhood as a very mixed neighborhood, both racially and military/non-military families. It was a fairly stable neighborhood, unlike some other parts of Lake City, because not all of the families were renters from nearby Fort Lewis. Julia's husband was not in the military; she has since become a widow.

/deb

Exh. 99 - 000622

# SANDERSON INVESTIGATIONS
**705 2ND Avenue – Suite 401**
**Seattle, WA 98104**
**(206) 303 – 7214**
**festers206@aol.com**
**www.sandersoninvestigations.com**

## Confidential Memo

October 24, 2007

To:          Joseph Duncan's Defense Team

From:       Karen Sanderson
            Licensed Private Investigator, #2363

Re:          <u>United States of America v. Joseph E. Duncan III</u>
            **Conversation w/ Lillian Duncan on 10/24/07**

**On October 24, 2007 I met with Lillian Duncan for several hours. This memo serves to document our contact.**

I picked Lillian up at her home in Tacoma and upon seeing me she gave me a big hug and held my hand for a moment. It was entirely appropriate, but more affectionate than she has shown.

We went to Madigan Army Hospital and were there for three hours so that she could do a variety of things.

At some point at Madigan, I had to take a phone call regarding another case and so I went outside and out of view to get some privacy. When I returned, I located Lillian who immediately asked me where I had been, as she had gone looking for me. I told her that I had "hid" around the corner to have some privacy and she asked me if I had been hiding out, talking to some GI's. She was vaguely kidding but I did find it a bit inappropriate, since she knows that I am married and I don't discuss my personal life with her much at all.

Exh. 99 - 000623

## United States v Joseph E Duncan III – Confidential Memo

Lillian also was laughing and somewhat beside herself when I had re-contacted her. She said that I would never guess what she had seen, she had seen one of those Iraqi women all dressed up in the towels and such. She said that she couldn't believe it that solders were now marrying Iraqi women, like they had done with the Germans and then the Vietnamese. She said that she knew that they would all get divorced anyway and that the women just wanted to come to the US. She said this really loudly and I can not express how mortified I was to listen to it, as people were looking at her.

We went to the Country Buffet Restaurant and stayed for 3 hours talking. As we were walking into the restaurant, I grabbed my notebook and folder and told her that Mark had some questions he wanted me to ask her since we were getting together. She seemed annoyed and said that she "figured." I sense that she wishes that these visits were more social and not related to Jet's case.

Lillian has NEVER once asked me about Jet's case. She has NEVER asked me what I do and what the others on the team do. She has shown no interest what so ever in his case. The only comments that she has made are when she refers to going to Boise for "the trial." She doesn't even ask me logistical questions about when the trial will be or what she should expect. NOTHING.

Lillian clearly did not want to talk about the case or my agenda. She dominated the conversation the entire time we were together and I was virtually a sounding board. Even when I told her that I had very specific questions for her, she ignored me or would reply to the question with some other nonsense. She clearly did not want to talk about what I wanted to talk about. I wouldn't say she was sabotaging the case, but I think she wanted to control the conversation.

I had a release for social security records that I produced and showed Lillian. I told her that this was the same release that Joyce had her sign and that Mark needed her to sign it, that it was really important, because we needed some additional social security records. She exclaimed "you need MY records" and then said that she couldn't imagine why and took the release and handed it back to me and then talked non-stop for the next 15 minutes. When I brought up the release again, she said she had to go to the bathroom and got up and said she would meet me at the car. I took this as a subtle way of her not wanting to deal with "records." I will make another go at her, however, when she is feeling less defiant.

I told Lillian that I had met Jet for the first time. Again, she asked me no questions about him or what I thought of him. I don't think she wanted our visit to be about Jet or bad memories, but rather wanted this to be a social visit.

Page 2 – Contact with Lillian Duncan

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone -- 206-303-7214   Fax – 206-262-0335   Email – festers206@aol.com
Private Investigation License # 2363  --  Business License # 602422702

Exh. 99 - 000624

# United States v Joseph E Duncan III – Confidential Memo

### Jet's schools

Lillian has a vague memory of schools that Jet attended. She said that he went to Parkway Elementary and then Woodbrook Middle School. She said that both of them were part of the Clover Lake School District. She recalled that Jet attended Kindergarten in Ft. Ord but can't recall the name of the school. She recalled that he attended a Manheim elementary school in the 2nd grade. He also went to Lake City Elementary school which was in the 5th grade or so.

Ft. Ord – Kindergarten
Manheim Elementary – 2nd grade
Parkway Elementary?
Lake City Elementary – 5th grade
Woodbrook Middle School
High School

### Joe Jr – Jet's dad

Lillian said that in 1955 and 1956 when Joe was in high school, he ran a "gang." This would have been in Pennsylvania. I asked a few questions about it, but Lillian doesn't know anything more. She also described Joe again as a sociopath and that she didn't know this about him until after she was studying psychology and that Joe fit the criteria for being a sociopath.

### Lillian's siblings

Lillian did not want to answer questions or talk about her siblings in specific ways, but wanted instead to go over the names of all of them.

Lillian said that she didn't spend very much time growing up with her half siblings. She spent a lot of time with Helen. She said that she, herself, did not do very well in school because of her eyesight. She said that Helen failed school twice and that Lillian had once been behind her in class and eventually Helen was behind Lillian. Lillian said that Helen was always jealous of Lillian and that the reason why she was jealous of her was because Lillian did so well in school. She had earlier said that she, herself, did not do very well in school because of her eyesight, but it sounds like Helen did even worse than she did.

I asked her if her and Helen were close when they were growing up. Lillian said that her and Helen played together "exclusively." She then went on to say how they each had friends and would involve the friends in activities with one another.

Page 3 – Contact with Lillian Duncan

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone -- 206-303-7214   Fax – 206-262-0335   Email – festers206@aol.com
Private Investigation License # 2363  --  Business License # 602422702

Exh. 99 - 000625

# United States v Joseph E Duncan III – Confidential Memo

I wonder, however, if Helen and Lillian did not play with other kids or didn't have very many friends.

Lillian knew that Helen had a stroke recently and said that she should have sent her a card. She asked me who had gone out to see Helen because she knew that there had been someone out to see her. I told her that it was Angie, who worked with us and whose job it was to document Jet's life and talk to family members. Lillian seemed really suspicious of this and said that she had a conversation with either Naomi or Helen about talking to us and that Lillian's suggestion was to pray and that they should do what they want to do.

Helen had two kids with Paul Hoover. The kids' names were Paul Jr and Kathy Osborne. Paul lives across the street from Helen and Kathy works at the post office.

Lillian said that the Fultz family were really smart people.

Lillian gave me the following names of her half siblings, which we likely already have.

Anna Ester is the oldest daughter and is still alive. She lives in a home.

John Franklin is the next oldest. He died of a heart attack. When he was younger, he went to Africa during the war and was a POW in prison. He went through death marches and being shot. He contracted Malaria. He refused to go to the VA because he was angry at the military. He came back to live in Lewistown after the war. He married Janet and they had 7 kids. He divorced her and remarried another woman.

Lillian describes having babysat John's "BOYS" when Lillian was 10 years old. This conflicts a bit with her accounts that she didn't have any real contact with the siblings growing up. **I would assume we would love to talk to the boys.** She was specific to mention the boys and not the girls.

**Mary Margaret Musser** is the next oldest. She **married three times** and ultimately died in a nursing home. Her first husband had the last name of Shuttze and the second husband was Hettnick. She had two kids named Steve and Robert. Robert was really slow and had black teeth. Mary didn't know why Robert was always crying and in pain and not wanting to eat, but Lillian suggested it was because of his black teeth. Mary's third marriage was to Musser and she had a daughter named Faith, who ended up being gay.

Page 4 – Contact with Lillian Duncan

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone -- 206-303-7214   Fax – 206-262-0335  Email – festers206@aol.com
Private Investigation License # 2363  --  Business License  # 602422702

Exh. 99 - 000626

# United States v Joseph E Duncan III – Confidential Memo

**Roy** is the next sibling. He had a girl with his first wife Dorothy. Dorothy had two children from a **previous marriage** named Audrey and Bob. Bob had deformed hands.

Naomi Marie is the next sibling. Naomi had 4 kids: Johnny Jr, Miriam, Betty Lou and Carol Jean. Her husband was John.

Donald Richard is the last sibling. He had a girl named Jeannie and twin boys.

Lillian described her own mother as not teaching Lillian how to cook or clean.

## Lillian's miscarriage

Lillian miscarried her first child. It was a 4 month old boy fetus that she then named Christopher. She lost the baby after Joe had beat her up. She described how she had gone to work and Joe was angry that she was not going to leave work in time to do some type of activity. She then grabbed all of her things at her job and left, without letting anyone know. I was not sure if this had to do with the miscarriage or not. It may have been the beginning of the fight that resulted in the miscarriage.

Lillian was in pain for several days following the beating by Joe. Her mom came to see her or help her. She described laying down on the couch or bed and being in pain and then having blood all over and trying to stop the blood. She went to the hospital and the baby had died. They were living in **Wadsworth Ohio** at the time and they went to the **hospital** there.

Lillian said that her first daughter Susan was conceived 9 days after she miscarried. There were complications with Susan's birth because her placenta did not have time to rejuvenate prior to Susan's conception.

## END OF MEMO

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone – 206-303-7214   Fax – 206-262-0335  Email – festers206@aol.com
Private Investigation License # 2363  –  Business License  # 602422702

Exh. 99 - 000627

████████ Attorney Client Work Product ████████
Steven Hetrick
████████████
Reedsville, PA
(717) 667-6896
Date of Birth: ████████ 1950
Date of Interview: October 30, 2007

Steven is Jet's maternal cousin, the son of Mary Musser. His is married to Oleda "Mickey" Hetrick, born ████████ 1945. Seven is a manager at Rent-a-Center in Burnham, PA. He served three years for forgery at Huntington Prison.

Steven attended technical college and has a high school certification. He was previously married to Ann Kearns, an alcoholic. They had a son, Eric Hetrick who is also an alcoholic.

Steven believes the family mental illness is hereditary.

Steven remembered when Lillian Duncan visited with her children 30 years ago. He recalled the children were noisy and active. One of her children was shy and stayed by Lillian's side, hanging on her leg. He does not remember which child. Lillian smothered the kids.

## Samuel Hetrick

Mary was married to Samuel Hetrick. He went to the Korean War. Steven was born while his father was away. On his first leave, Samuel brought home another woman (Amy, last name unknown) who was pregnant. Samuel and Amy's child was named Samuel Hetrick Jr. Steven does not know him. Later Samuel divorced his mother and married Amy. Samuel drank. He died of an alcohol related stroke.

## Susie Price Osborne

Susie had a sarcastic nasty personality. She lived on Walnut Street across from Standard Steel. Mary told Steven that Susie was a prostitute. Steven did not know further details of the prostitution except that Susie hung out outside the steel company. Legally, Susie was a house keeper. Susie lived with a boyfriend, Daniel Snyder, an alcoholic who was frequently incarcerated.

When Steven was five or six, he remembered Susie screaming and hollering at boyfriends.

According to Mary, Susie kept Don Freed in a dresser drawer rather than a bed. Susie tried to kill Don by throwing him into the coal bin. Don was later sent to foster care.

U.S. vs. Joseph Duncan III
Mitigation Interview Steven Hetrick
Prepared by: Angela Mason, LCSW

1

Exh. 99 - 000628

Mary despised Susie because she regularly beat and abused them (no further details known).

While Mary was pregnant with Steven, Susie tried to force her to have an abortion but pushing her down the stairs. Susie also burned Mary on the leg with an iron. Steven has a birthmark in the exact same location. He believes there were mental irregularities with both his mother and grandmother.

## Mary Musser

Mary tried to take her own life five or six times. Mary attached herself to whoever was around. She was a hypochondriac. Steven noted, "If you had it, she had it or would get it." Susie had similar concerns about illness.

Mary's house was immaculate, like a museum. Steven believes she had Obsessive Compulsive Disorder because she scrubbed the porch by 5:00 p.m. every day. Steven said, "You could eat off of her basement floor." If you tried to help out by washing her dishes, she had to rewash and dry them.

Steven was 15 when his mother became pregnant again, this time with George Musser. They married and Faith Musser was born. They worked at VISCOS textile mill. Faith suffers from depression and is in and out of the hospital. (Note: Faith refused to be interviewed.)

## Faith and Mary

Mary smothered Faith. After George Musser died, Faith took his place in all aspects except for sleeping with Mary. If Faith tried to separate, Mary became sick.

## Mary's Siblings

Donald Freed was an alcoholic. He had two wives and drove a taxi. There were rumors that Don was a child molester. Around 1968, Don was allegedly arrested three or four times for public indecency, drunkenness, flashing and other "sexual stuff." He was bailed out by the owner of the taxi company. Steven suggested looking in the Lewistown Sentinel for articles related to the arrests. (Note: Research of court and newspaper records was unsuccessful thus far. Further research should be conducted in Lancaster, PA).

John Freed St. suffered from Post Traumatic Stress Disorder from shell shock when he was a prisoner of war.

Roy Freed appeared "normal" but could be hurtful and mean. He accused them of stealing and hording Mary's things.

Helen and Susie were similar to Faith and Mary in their emeshment. Helen was a waitress who masked her problems with illness.

U.S. vs. Joseph Duncan III
Mitigation Interview Steven Hetrick
Prepared by: Angela Mason, LCSW

2

Exh. 99 - 000629

**Steven's Drug Use**

Steven has been in rehabilitation twice, at Charter Cove Forge in Williamsburg, PA and the Marworth Division of Danville Hospital in Danville, PA (near Scranton). He also received outpatient treatment for David King at Clear Concepts, phone: (717) 242-3070.

U.S. vs. Joseph Duncan III
Mitigation Interview Steven Hetrick
Prepared by: Angela Mason, LCSW

3

Exh. 99 - 000630

Attorney Client Work Product
Genevie Harpster
███████████████
Lewistown, PA 17044
(717) 242-1872
Date of Birth: ███████, 1927
Date of Interview: October 31, 2007

Genevie is a former neighbor of Susie Price and William Osborne, Jet's maternal grandparents. She knew Jet's mother, uncles and aunts.

Genevie lived at ████████████ Burnham, PA. The house was owned by the Logan Iron and Steel. Genevie was born and raised in the neighborhood. Her parents, James and Marion Folse bought the house from Logan Iron and Steel. Genevie bought the house from her parents in 1973. Presently, her son and his family reside there.

Margaret and Sparkey Bair were neighbors. Elizabeth Winn lived next to Susie Osborne.

**Susie Freed Osborne**

Genevie explained, "I would not have lived with Susie, no how, because she was mean." Susie "used to beat the living tar out of Don." She chased him with her fist. Genevie heard Susie beat, kick and swear at Don. She always picked on Don. He tried to run away from her. Susie had mood swings and a goofy personality. When screaming at Don, she said things that did not make sense then chased him down the road. Her mouth would be going like "a clacker on a duck's behind (screaming)."

Genevie described Susie as "an irritable person if she did not get her own way." Anything set her off. Genevie said, "Susie was very flighty. It was like talking to somebody that is there and isn't there." She was always grouchy, even with Dan Snyder (Susie's boyfriend and or border). Dan "worked his fingers off for Susie and took care of her children." Genevie never saw William Osborne; only Dan, who helped work on the house and took Susie places in his car.

All the neighbors thought she was nuts.

Genevie does not know whether Susie could read and write or if she worked. She noted, "They often wondered where her money was coming from."

Dr. McNabb came to Susie's house whenever she was sick. Don often told Genevie when the doctor had come around to see his mother. Genevie did not know about Susie's medical problems.

**Don Freed**

U.S. vs. Joseph Duncan III
Mitigation Interview with Genevie Harpster
Prepared by: Angela Mason, LCSW

1

Exh. 99 - 000631

Though they did not have the room, Genevie and her husband took in Don after Susie kicked him out. They made a room for him so he would not have to sleep outside. Whenever he and his mother were not getting along, Don went to Genevie's house. She trusted him with her six children. Susie was not welcome in Genevie's home because of the way she treated Don.

Don lived in town with a heavy set girl. Genevie recalled he dated another lady that was older. Don had a set of twin boys to another woman. One of the children may have been named Don and one died.

On one occasion, Genevie, her husband Art Harpster, Don and his girlfriend Evelyn visited Fort Hood in Texas.

Genevie last spoke to Don Freed after Art Harpster died (March 29, 1998). Toward the end of his life, Don was house bound and lonely so called Genevie. He wore a bracelet around his ankle because he was on house arrest, having been convicted of a DUI. He was not allowed to venture further than his front porch. She remembered Don lived in Lancaster and ran around with different women. Don was frequently arrested in Lancaster for disorderly conduct and DUI.

### Genevie is related to Joseph Duncan Senior (Jet's paternal grandfather)

Alma Colabine is Genevie's cousin. Alma ran around with different men. After she and Joe Sr. divorced, Joe Sr. lived in Maitland, PA with another wife. They had a house by the creek.

Rhoda Colabine Folse was Genevie's aunt. Rhoda's brother, Charles Hutchinson (Pete) Folse, was Genevie's father. Genevie's mother (Mary Helwig Folse) died during child birth. Genevie was raised by her Uncle James Melvin Ellsworth and Marion Folse.

Benjamin Franklin Folse and Susan Katherine Reed Folse had seven children: Frank, James, Pete, Milton, Eugene, Rhoda and Charlotta (Lodi) Folse.

Genevie saw Joe Duncan Sr. while visiting Alma Columbine. He was on leave from the military. Joe Sr., Alma and Joe Jr. lived together in an apartment. Genevie did not know Joe Sr. well.

### Lillian Osborne

Lillian and Helen were "Susie's pick." Susie got angry with the neighbors in Lillian's defense. Lillian was "Ms. Prissy, mommy always stuck up for her." Genevie described her as "a flighty little rip." Lillian acted as though she was better than everyone else. As a child, Lillian was sick. While hanging out the laundry, Susie told neighbors how she had been up all night with Lillian's medical problems. Genevie does not know what illnesses she had.

U.S. vs. Joseph Duncan III
Mitigation Interview with Genevie Harpster
Prepared by: Angela Mason, LCSW

2

Exh. 99 - 000632

Lillian was often alone. Genevie explained, "She acted like she was better and did not want to be bothered with other people." Susie had a similar attitude.

## Lillian's Siblings

Lillian's stepbrothers Roy, Don and John were in the military. John Freed was a prisoner of war. He never talked about it.

Don, Roy, Art and Genevie drank.

## Genevie's Sister Married Roy Freed (Jet's Uncle)

Genevie's sister Dorothy Stevens married Roy Freed. Roy was a guard at Standard Steel. When he drank, Roy became mean and hateful.

## Roy Freed

Genevie's sister Dorothy was married to Roy Freed. They lived in Anderson Station. They divorced because "Roy beat the hell out of Dorothy." He kicked her in the stomach while she was pregnant, causing Dorothy to lose the baby. Roy was arrested and spent a few nights in jail. Genevie saw her sister's face and arms bruised from Roy's beatings. Whenever he beat her, Dorothy came to Genevie's house, but she always went back. After the beating that caused the miscarriage, Dorothy and Roy got back together and had Brenda Freed (now Specht). She is a developmentally disabled. Roy had an affair during his marriage with Dorothy. After he and Dorothy divorced, he remarried the other woman.

U.S. vs. Joseph Duncan III
Mitigation Interview with Genevie Harpster
Prepared by: Angela Mason, LCSW

3

Exh. 99 - 000633

**Attorney-Client Work Product**
**Donna Freed**
█████████████
Lewistown, PA
(717) 248-1114
Date of Birth: ████████, 1941
Date of Report: November 1, 2007

Donna was reticent to be interviewed.

Donna Freed is the widow of Roy Freed, Lillian Duncan's older half brother.

Roy was the chief of security at Standard Steel. He quit school and received his GED then went into the military. He had heart problems and cancer and lost a kidney. Upon his return from the military, Roy was jumpy and anxious. Donna believed he suffered from Post Traumatic Stress Disorder. Dr. Vildiva treated Roy at Lewistown Hospital. (Note: The records officer at Lewistown Hospital found records on his treatment for heart and kidney problems, but no mental health records.)

Roy had a daughter, Brenda Specht with his former wife Dorothy Stevens (maiden name). Dorothy allegedly "ran around." Roy was also previously married to Kathy Dodson.

Brenda lost a daughter to Children's Services. She had been living in a motel. Her son Chris was also removed from her custody. Currently, Brenda's daughter Juanita has problems with alcohol and drugs.

Donna met Lillian Duncan twice. She believed Joe Duncan abused Jet but did not have further details to share about the abuse.

Donna remembered Roy's brother Don Freed was "mixed up with different women and children." He drank, swore and was loud.

Donna noted Roy's brother John Freed also had heart problems.

John's son, Roy Freed Jr. was always in trouble. Roy Jr. had a standoff with the police, threatened a girlfriend and burnt down a house. His brother John Freed Jr. stole from Donna. Another brother, Gary Freed resides at ████████████ McClure, PA., phone: (717) 543-5984.

U.S. vs. Joseph Duncan III
Mitigation Interview John Freed Junior
Prepared by: Angela Mason, LCSW

1

Exh. 99 - 000634

**Attorney Client Work Product**
**Ron Wilkins**
████████████████
**Hershey, PA 17033**
**(717) 533-9856**
**Rwilkins@GFnet.com**
**Date of Birth:** ███████, 1940
**Date of Interview: November 1, 2007**

Ron is nearly 68. He is married to Theresa Wilkins (many years his junior). Ron has been employed as a draftsman and private consultant for Gannett Flemming for 43 years. He graduated high school and had some technical training.

Ron grew up next door to Joe Duncan Jr. in Lewistown, PA. Joe and Ron spend time together from age 10 until junior high school. Ron lived at: ████████████████ in Lewistown. Joe lived next door with his grandmother Mae Duncan, in a very modest two story old house. It had poor furnishings and indoor plumbing. They were poor but "had what was needed."

Mae was single and older. Other than providing meals and clean clothes, Mae was not involved in Joe's emotional life or activities. They did not have a car and never went on outings. Ron believed Mae was the only family Joe had.

Ron hardly ever saw Mae outside the house. He does ever remember the presence of a male figure.

Ron had not been in contact with Joe until three years ago when Joe called out of the blue. They met at a diner for super in Highspire, PA. Joe seemed home sick. He was bored and planned to look for a part time job. Joe had a difficult time walking because he suffered from gout in his feet. Joe wanted to talk about their childhood. Ron said Joe was still the "same likable guy." Joe wanted to reconnect but did not want to discuss the gap in time (40+ years). He avoided talking about the military. They only spent an hour together getting reacquainted. Joe's wife Rae said he talked more that night that she had seen before. Since then Joe had been emailing Ron. Joe and Rae planned to move to a building with a different floor plan for easier mobility.

Even though he had difficulty walking from his own problems, Joe cared for Rae. He helped her put on and tie her shoes and helped her into the car.

**Military Service**

After high school, Joe joined the army. Joe had some physical ailments but was still allowed to enlist.

Joe would not talk about what happened to him in the military but saw some "serious things after his 20 or 30 years in the service." Joe was very reserved.

U.S. vs. Joseph Duncan III
Mitigation Interview with Ron Wilkins
Prepared by: Angela Mason, LCSW

1

Exh. 99 - 000635

When asked about mental health, Ron said the way they grew up "if you had mental health problems, they were not discussed."

Ron went into the air force in 1959. He left Lewistown in 1963 and migrated to Hershey.

## Growing Up

Ron remembered Joe as a follower.

Joe and Ron played marbles and hide n' seek. They also played baseball, threw rocks and went for hikes in the woods. Joe was too poor to have a bicycle. Later Ron was able to secure a second hand bike.

Ron and Joe had stone fights with kids from the other side of town. They defended their territory (the South side). They also threw stones at squirrels but hoped they would never hit any. This was something they had to do as boys.

When they reached the "fur on face" age, they got in trouble for taking a razor and trying to shave. Ron does not remember how Joe was punished but said he "was still alive the next day."

## Friendship

Ron said Joe was not his best friend. Some of their other friends were: Charlie Swisher, Charlie Beers and Terry Wade.

Ron and Joe went their separate ways in high school due to "different interests." Ron thought Joe might have gone to the VO Tech high school. Students who were not inclined to go to college attended VO Tech to focus on a learning a trade.

At 16, Ron had his own car. He stopped hanging around Joe when he got into "girls, cars and sports."

After high school, Ron worked at the Giant Supermarket. Joe came in one day and told him he was entering the military. Ron heard nothing from Joe until three years ago.

In Lewistown, the choices for boys after high school included: work at the grocery, gas station or Standard Steel, attend college or enlist in the military.

U.S. vs. Joseph Duncan III
Mitigation Interview with Ron Wilkins
Prepared by: Angela Mason, LCSW

2

Exh. 99 - 000636

To:      Duncan Team

From:   Deb Garvey

Today's Date:   November 4, 2007

Case Name and FY #:   Joseph Duncan

Re:      Ted Ault
         ███████████
         Concord, CA  94521
         935.686.3139  [unlisted]

Other Identifying Information:   Relationship with client

Date of the Interview:   November 2, 2007

_____

     In the summer of 1996, Ted Ault was returning from a camping trip to Crescent City, California. He had been camping with his sons. He was traveling in his own vehicle with his dog. Mr. Ault stopped in a park or a rest stop in Vallejo, California to let his dog run around and to use the restroom. He saw Jet sitting in the park with a backpack. They spoke to each other; Jet told Ault he was looking for a BART station. Ault explained that BART didn't go to Vallejo and asked Jet why he wanted BART. Jet said he was headed to San Francisco because he had heard computer jobs were easy to find there and he needed a job. Ault offered to take him to a BART station near Ault's home in Concord.

     On the way to the BART station, Mr. Ault offered to buy Jet a meal. They stopped and ate together. Ault said he really enjoyed Jet's company and that he seemed like a nice guy. When Ault asked Jet where he was going to go in San Francisco that night, Jet had no plan. Ault invited him to stay at his house for the night.

     The next day, Jet told Ault he was going to call his father and ask him to put some money on his debit card for him. With that money, Jet thought he would have enough to get to San Francisco and find work. It took Jet a day or two to reach his father, and when he did, Joe, Jr. put money on Jet's debit card. Jet spent approximately ten days with Ault before leaving for San Francisco. Ault said he really enjoyed talking with Jet - they had many common interests in world religions, philosophy and other cultures. When Jet left for the city, Ault wasn't sure if he would hear from him again or not.

     Several weeks later, Jet called Ault to say the temporary computer job he had gotten was finished. Ault invited Jet to come back to Concord while he looked for his next job. Jet came back and spent about two weeks with Ault. Toward the end of the two weeks, Jet said he wanted

Memo
November 4, 2007
Page 2

to go and see his father in Pahrump, Nevada. He also mentioned going to see his mother in Washington, and possibly picking up his car while he was there. By this time, Ault knew that Jet had a couple of sisters, including a sister in Missouri that he spoke of. Jet had also spoken to Ault about a younger brother, Jason, in the Tacoma area.

As Jet was getting ready to leave, he told Ault that the time he had spent in Ault's home was the most stable home he'd ever had. Ault was very touched by this.

When they first met, Jet told Ault that he was on the road because he had to get out of Seattle, as Jet had witnessed a crime. Jet said he had turned the assailant into the authorities and then he was threatened by associates of the assailant. Now, as he was getting ready to leave, Jet told Ault that he had previously lied to him and that he wanted to tell him the truth about himself. Jet told Ault he had assaulted a young kid when he was a kid himself and had ended up in prison with a 20 year sentence for that assault. Jet said his attorney had told him to plead guilty to the charges, that Jet would go to a special program and when he completed the program, his charges would be wiped off his record. Jet said he ended up in prison, but had been released on parole after 16 years with one condition - that he couldn't be around young people. Jet told Ault that after he was released on parole, he had a girlfriend and his girlfriend had a child. One day the girlfriend dropped her child off with Jet, asking him to babysit. Somehow, Jet said, his parole officer heard about this and wanted to bring charges of Jet violating his parole. Jet was afraid to go back to prison, so he packed up and took off.

Jet explained to Ault that he could not go back to prison because when he was there he had been forced to cross-dress as a woman. Jet told Ault he had to dress as a woman because most of the inmates were interested in sex with women, not other men. Because Jet was young and slender, he could look very feminine; he was forced to have a lot of sex in prison. Ault asked him why he didn't go to the guards or the warden for help. Jet told Ault the guards were having sex with him, too, so they weren't in a position to protect him.

Ault asked Jet if the police were looking for him now. Jet said yes. Ault told Jet he had to leave, that Ault wasn't interested in being involved in any violations of the law. He is the father of two now adult sons; he has grandchildren and he didn't want his family pulled into something related to Jet's parole violation. Ault said that Jet told him, "You're probably thinking you would never to what I did, but I'm telling you that you would. You would do what you had to in order to survive." Jet packed up and left. As far as Ault knew, Jet left for his father's house.

Jet called Ault a few days later to say he had gotten to Pahrump safely and to thank Ault for all that he had done for him. Jet said he was going to go to Missouri soon, to see his family there.

When Jet was arrested in Missouri, he called Ault once and then wrote him letters during the next three years or so, while in prison. He told Ault he thought his brother-in-law had turned him in and that was why he was picked up.

Memo
November 4, 2007
Page 3

     Ault knew that Jet met Wacksman during the time he was in San Francisco.  He described Wacksman as a doctor with a wife and family.  Ault said Wacksman had kind of adopted Jet, that he told Jet to get in touch with him when his problems were straightened out and he would try to help Jet.  Wacksman told Jet he should come to Fargo when he could and Wacksman would try to get him into school.  When Jet's prison term was ending, Jet wrote to Ault and told him he was going to Fargo.

     Ault went to see Jet in Fargo, once Jet got there and got settled.  He visited for a week or so.  He met Jet's boss and co-workers at the place where Jet was working [Ault didn't remember the name of the place or the co-workers].  Ault went to lunch with Jet and Jet's boss; Jet's boss told Ault how happy he was with Jet's work.  Jet had a nice apartment, he was taking scuba lessons, and he had money in his pocket.  Ault thought Jet had really turned his life around.  Jet was getting ready to graduate with a degree in computer sciences and was talking about going on to get his master's degree.  Ault also met Wacksman while in Fargo; he had never heard the name Joe Crary.

     Ault returned home and then didn't hear from Jet for four or five months.  He kept expecting to get an invitation in the mail to Jet's graduation.  Ault said Jet was also planning to invite Wacksman and his wife to his graduation.  The next thing Ault heard was a news report of Jet's arrest in Idaho.  Ault said he dropped the dish he had in his hand onto the floor when the news came on the television; he couldn't believe it.

Exh. 99 - 000639

To:      Duncan Team

From:    Deb Garvey

Today's Date:   November 4, 2007

Case Name and FY #:   Joseph Duncan


Re:      Warren Rich
         ███████████████
         Lakewood, WA  98499
         253.851.7515 [home]
         253.617.8454 [cell]

Other Identifying Information:   Former youth pastor at Lakes City Community Church

Date of the Interview:   October 31, 2007

---

Mr. Rich is now a hospital chaplain at:  St. Joseph Medical Center & Hospital, 1717 South J Street, Tacoma, WA  98405, which is where we met.

Mr. Rich was the youth pastor at Lakes City Community Church in Lakewood for approximately six years, from 1978 to 19884. He was responsible for programs for junior high, high school and college aged kids in the church. He was the sponsor of AWANA, the official church youth group. The AWANA group met usually one evening a week at the church. They usually met for a couple of hours - the time began with a game time, then time on a Bible memory program, as time talking about outreach into the community regarding their Christian faith. The Bible memory program gave out badges for memorization, similar to Boy Scout badges. A kid in the program earned a badge for memorizing and then reciting various Bible scriptures. Other adult church members often participated in this portion of the program, listening to kids recite what they'd memorized and then awarding badges for a recitation well-done. The conclusion of the evening was usually snacks. The AWANA group was open to any child in the neighborhood, independent of church membership. Mr. Rich had no assistants with AWANA, apart from the church members who periodically helped out. He did not have an African American man who participated as a leader or assistant with AWANA during Mr. Rich's time there.

In addition to AWANA, Mr. Rich planned "children's church", which was a companion program to the traditional church service on Sunday. The kids started out in the sanctuary with the adults and at some point prior to the sermon, the kids were excused to go to their own, separate program which was shorter and also allowed kids some time to talk and play. It was different than Sunday School, which was before the church service, but had a similar component

Memo
November 4, 2007
Page 2

of talking about some lesson from the Bible.

The church membership was large, for the area.  There were 300 to 350 church members.
The church ran a lot of community programs for the neighborhood, including a food bank, which
continues to exist today.  The community was mixed, both economically and ethnically.  There
was a large Special Forces Unit at Fort Lewis, which Mr. Rich believes brought very well-trained
and intelligent adults into the community.  There were a large number of foreign born wives from
Japan and Germany, as well as Vietnam and Korea - it depended on what era of the military their
husbands had served, as the wives reflected the country the troops were stationed in.

Mr. Rich looked at all the photos of the Duncan children and Lillian and Joe, Jr. and did
not recognize any of them.  He has no memory of a family named Duncan participating in the
church during his time there.  He said the kids were not likely to have been regulars in any of the
church programs, as he would have remembered them if they had been.  Mr. Rich couldn't think
of any other church member of staff person who would have spent time with children at Lakes
City Community Church consistently enough during the mid to late 1970's to be likely to
remember the Duncans.

/deb

To:      Duncan Team

From:    Deb Garvey

Today's Date:   November 5, 2007

Case Name and FY #:   Joseph Duncan

Re:      John Curry, MSW
         DSHS/ADSA Residential Care Services
         mailing address:
         ███████████████████
         Tacoma, WA  98405
         location:
         ████████████████████████████████
         Lakewood, WA  98499
         253.983.3828 [office]
         206.713.0697 [cell]
         360.794.8931 [home]

Other Identifying Information:    Former psychiatric social worker with Washington State DOC;
     met with Jet at Shelton in February 1983.

Date of the Interview:   October 31, 2007

---

Mr. Curry currently works for DSHS in adult family home licensing for elders and deal with complaints about elder care in that setting.  Prior to this position, Mr. Curry worked for the Department of Corrections in Washington, as both a classifications counselor and ultimately as a psychiatric social worker.  Curry worked for many years with inmates housed in Evergreen Hall at Shelton.  Curry started his career with the DOC at the reformatory at Monroe, in March of 1981.  He worked there for 18 months before transferring to Shelton.

Curry went to Shelton as a new MSW who still needed his supervised hours to get his license.  His supervisor was a psychologist, Dr. Marre.  Curry and an occupational therapist, FNU Connor, had been brought to Shelton to develop a special mental health program.  Dr. Marre had been in charge of mental health at Walla Walla, but transferred to Shelton to participate in setting up the mental health program.  The idea of the program was to deal with the mental health needs of the inmates there.  The community mental health programs were shrinking at about this time and more and more former inpatients in mental hospitals had been released and then became part of the criminal justice system.  The DOC was trying to respond appropriately and programs were begun in a few facilities throughout their system as a result.  The Shelton mental health program devoted approximately half of its resources to developmental disabled inmates and the other half to mentally ill inmates.

Memo
November 5, 2007
Page 2

Curry started a couple of groups at Shelton for the inmates in the mental health program -
one was on anger management, the other was about decision making. It was also possible for an
inmate to see Curry and/or Dr. Marre for individual counseling. The counseling was usually
designed to help an inmate calm down, settle into the prison, or talk about how to be safe there.
Inmates outside of the mental health program could also request to see Curry.

At the time Curry saw Jet at Shelton, Shelton was a reception center. Inmates entering
the DOC system usually went to Shelton for their initial intake and assessment for placement.
Some inmates with lower level custody also served out their term at Shelton. It was common for
inmates who were first offenders coming into the DOC to have a lot of questions about where
they would serve their time, what their custody level meant to their placement and how much
time they would have to serve.

Curry's memo to Jet's file, dated 2/25/83, indicates that Jet requested an appointment
with Dr. Marre, at the suggestion of another inmate. Curry's memo says Jet was unable to
articulate why he wanted to see either Marre or Curry, that Jet was not deeply emotionally
disturbed, and that Curry had not reviewed Jet's file before seeing him. Their meeting concluded
with Curry saying he'd review Jet's file and then call Jet back to talk with him. When I told
Curry that Jet went into protective custody from Evergreen Hall about a year after Curry saw
him, Curry hesitated to conclude anything from that. He agreed it was possible for a young man
to be pressured for sex, but not as common as the stereotypes suggest. Curry has no independent
recollection of Jet.

Curry reviewed Jet's DOC placements from Shelton [to McNeil Island, then Walla Walla,
then Twin Rivers/Monroe]. McNeil Island had an upper-medium custody classification and
Walla Walla had a high custody classification. Curry said Twin Rivers was opened in6/1984 and
approximately 80% of the inmates placed there were sex offenders. The other inmates were guys
who had worked on the construction of the place, who then stayed in the new facility once it
opened. There were eight units of 100 inmates each, or 800 inmates total. 200 inmates of the
800 total were able to get into the counseling program at Twin Rivers. [Curry worked at Twin
Rivers as a classification counselor for a period of time, beginning in 3/1984 even before it
opened. ] If an inmate was able to get into the counseling program, it didn't necessarily mean he
had been deemed in particular need or at higher risk - it was a combination of his counselor's
interest in the inmate and good luck. Inmates in that program were all housed in Unit D. Any
inmate in the counseling program at Twin Rivers was getting nearly an exact duplicate of the
former Sex Offender Program at Western State Hospital. The one difference was Twin Rivers
could not prescribe depo provera, which was used for chemical castration; they weren't allowed
to prescribe any hormones at Twin Rivers.

Curry believes Twin Rivers' counseling program had some advantages over the former
SOP at WSH. At WSH, if an inpatient missed a step in the counseling program, he was
obligated to go back and re-do the prior step in the program. An inpatient could be stuck
indefinitely working the same portion or steps of the program because he couldn't get it right.
WSH was very strict and considered working each step successfully as a measure of an inpatient

Memo
November 5, 2007
Page 3

learning personal control.  Twin Rivers was not as strict with the inmates about working each
step, but allowed for some flexibility and individualization; Curry suspects this was largely
because Twin Rivers had no mechanism for keeping an inmate indefinitely - they eventually
paroled out.  WSH on the other hand had a commitment process that allowed an inpatient to stay
indefinitely.  Curry is convinced WSH reported a very high success/non-recidivist rate because of
this.  Inmates who left Twin Rivers and went to another prison either didn't want to be a part of
the program there or something else about being there wasn't working for the inmate.  Twin
Rivers required a level of inmate cooperation; it wasn't possible to stay there and not participate
to some degree.

Curry cannot remember ever seeing any inmates cross dressing at Twin Rivers.

Curry estimated that there were 12,000 to 14,000 inmates in the Washington State DOC
during the years he worked there.  Approximately one-fourth of those inmates were sex
offenders.  The DOC had only the Twin Rivers' program for 200 inmates, total.

To:      Duncan Team

From:    Deb Garvey

Today's Date:   November 5, 2007

Case Name and FY #:   Joseph Duncan

Re:      John Deacon

         ██████████████
         Seattle, WA 98119
         206.284.8411 [unlisted]

Other Identifying Information:   Community Corrections Officer [parole], retired

Date of the Interview:   October 30, 2007

---

Mr. Deacon was a Community Corrections Officer in the Division of Offender Programs within the state of Washington's Department of Corrections.  Deacon was Jet's parole officer beginning with a pre-parole investigation Deacon completed in March of 1993 until April of 1995.  Deacon actively supervised Jet from the time of his release from custody in September of 1994 until  Jet's case was transferred to Carol Martin, another CCO, in April of 1995.  Jet's case was transferred to Ms. Martin because he moved and was assigned to the regional office closer to his new address [on Roslyn w/ Bartol & Ruan].  Deacon remembers Jet quite well.

The pre-release investigation report was prepared in March of 1993;  Jet was not released until September of 1994.  Typically, as an inmate got close to a possible release date, he was referred to for a pre-parole investigation to be done by a CCO in the regional office where the inmate would be paroled to.  That CCO in the regional office conducted an investigation into the inmate's proposed parole plan and then wrote a report to the Indeterminate Sentence Review Board [ISRB], who reviewed the plan and told the inmate what he had to do differently, or what he still had to accomplish in custody in order to gain parole.  Deacon was assigned to Jet's case in 1993, in anticipation of his parole date.  Deacon was in the Capitol Hill/Seattle Regional parole office at the time.  Jet's case was assigned to him randomly.  Deacon's caseload was from 60 to70 parolees at any one time, 80 to 90% of his caseload consisted of parolees, the remaining numbers were probationers.

At the time Deacon wrote the pre-investigation report, Jet's proposed parole plan was to move to IT House.  Deacon talked to Marny Pearce, the executive director of IT House at the time.  Ms. Pearce told Deacon that she had spoken to Dave Woelfort, Jet's sponsor, that she was aware of  Jet's criminal background and was willing to accept him at IT House.  Deacon knew IT House and its program because it was in his cachement area; he had other parolees on his caseload stay at IT House at various times.

Memo
November 5, 2007
Page 2

IT House had a good reputation. It was considered a place for parolees who were high profile and with no resources. The residents of IT House were required to attend a weekly house meeting, every Wednesday night. At the house meeting, residents could talk about any problems they were having and ask for staff assistance and support. The idea was that the residents were all dealing with the same transition-back-to-society issues and could be supportive of each other. IT House had a program run by an in-house program director, that had the residents working on whatever issues or life skills they needed to improve on. In addition, the residents were absolutely required to participate in an outpatient treatment program associated with DOC. Parolees got public assistance until they were employed. Part of their public assistance grant went to IT House toward their support.

Deacon wrote his three page report for the ISRB, on March 24, 1993. The report detailed Jet's proposed parole plan and Deacon's recommendations. Deacon's report notes that Jet has no employment prospects, but has gained computer skills in prison, that Jet has a reasonable amount of financial support from Woelfort, and that whether or not Jet can expect any support from his family is unclear. [Deacon has no independent memory of ever meeting or talking much with Jet about any of his family members.] Deacon's report also notes an evaluation done by Ken Von Cleve that Jet is treatable and could benefit from ongoing counseling. Deacon recommends that upon release Jet undergo a sexual deviancy evaluation, do a polygraph every 90 days, and have no contact with minor children. Jet would be required to register as a sex offender upon release.

Following the submission of the pre-release investigation report, the ISRB sent Jet to a pre-release program and required him to complete a victim awareness program or class, as well as an anger management class. Deacon said this was common - the ISRB required steps or particular programs prior to the release of a long-term inmate. He remembers that Jet was unhappy that he was required to complete more programs before he could be paroled, but that Jet did complete everything required of him by ISRB within a year. Deacon estimated the normal time span from a pre-release report to actual release at 6 months. He did think there was anything really unusual about Jet's being closer to 18 months. Deacon suspects that amount of time was required because Jet had to be transferred to two different facilities to complete the pre-release classes that he needed.

The theory of parole at the time Jet was being released was that it was better to have an inmate parole out of prison early and have a few years to supervise him in the community, rather than to have the inmate max out in prison and be released without supervision. Generally inmates who were in custody for many years needed some time to transition back into the community. A good CCO working with a motivated parolee, could keep the parolee on track and out of the custody. It also gave the CCO a good idea of whether or not the parolee was going to be able to meet the requirements and make the transition to living on the outside. In Deacon's opinion, if an inmate was kept locked up to the end of his sentence and released with $50 and a bus ticket, it was guaranteed that inmate would re-offend.

From 1984 to 1988, the Washington State DOC underwent a change, as sentencing was converted from indeterminate sentencing to determinate sentencing. Before the change in

Memo
November 5, 2007
Page 3

sentencing, the ISRB had the option to release an inmate early and allow him to be supervised in the community. In Deacon's mind, having an ISRB gave both the inmate and the community a much better system, a system designed to allow for parole success.

When Jet was first released to IT House, Deacon met with him frequently. Deacon was tracking every condition of parole that Jet had been given, as well as his employment search and outpatient treatment. He remembers Jet as being very institutionalized and very cautious. Jet checked in with Deacon on all kinds of issues, issues other inmates usually did not call him about. For example, whether or not to meet his mother for a couple of hours at the Seattle Center one afternoon - that plan was completely within Jet's parameters both geographically and programmatically. Deacon said most inmates would not have asked him about that in advance. When Jet came in to see Deacon to ask him if that was okay, Deacon said he almost fell off his chair he was so surprised. That was the kind of parolee Jet was - he was anxious, cautious, didn't want to violate his parole conditions. Jet might complain to Deacon about a requirement of his parole, or blame the bureaucracy, but he was generally very compliant.

Community corrections did not care about whether or not someone was gay, bisexual or heterosexual, according to Deacon. Who Jet was sleeping with wasn't an issue, unless someone was being taken advantage of. Jet's crime involved having been a sexual predator with a younger child. Consequently his parole parameters were focused on him staying away from kids. Deacon also took comfort from Jet's group residential setting. He knew that IT House staff would call him if Jet didn't show up for a group meeting one night or if he was otherwise having problems getting along there or if there was any concern about Jet's sexual relationships. Deacon doesn't remember meeting Woelfort and doesn't think he knew that Woelfort and Jet were in a sexual relationship. Deacon's memory of Woelfort is only that he was an important source of support for Jet.

It was fairly common for parolees to complain about their assigned therapist. The therapy was always put into place before an inmate was paroled, which often meant the inmate had been assigned to a therapist or had picked a therapist based on availability. It was hard for parolees to change therapists once they were in the community. Deacon's attitude on this was to tell the parolee he had to keep going to therapy whether or not he liked or connected with his particular therapist. He doesn't remember anything specific about Jet and Von Cleve.

All sex offenders released on parole during this era had to take periodic polygraphs. There were specialists in the community release program that administered the polygraphs. The ISRB considered polygraphs valid evidence, even though they were inadmissible in court. A polygraph test result something the CCOs and the ISRB definitely gave weight to in considering whether or not a parolee was violating his conditions. Urine tests were also very common, even for those parolees who were not known to have any drug or alcohol problems in the past. Deacon said sex offender parolees were commonly required to do every kind of test available to the CCO because the liability in their potential parole violation was so high.

Today, an inmate like Jet with the criminal history he had and the time he spent in

Memo
November 5, 2007
Page 4

custody, would have paroled out to a special sex offender community corrections unit.  Deacon
said he had supervised enough sex offenders that he had developed a certain understanding or
expertise, but he didn't have any specialized training at the time he was supervising Jet.

Exh. 99 - 000648

# SANDERSON INVESTIGATIONS

705 2ND Avenue – Suite 401
Seattle, WA 98104
(206) 303 – 7214
festers206@aol.com
www.sandersoninvestigations.com

## Confidential Memo

November 7, 2007

To:      Joseph Duncan's Defense Team

From:   Karen Sanderson
        Licensed Private Investigator, #2363

Re:     United States of America v. Joseph E. Duncan III
        Conversation with Chesterene Cwiklik on November 7, 2007

**On November 7, 2007 I went to Chesterene Cwiklik's office in order to pick up photographs and her notes and reports generated from her work on the state case, as a hired expert by the defense.  This is a summary of my contact with her.**

I received the negatives of the photographs that she had taken of the crime scene and promised to return them once photos were made. I am dropping off the photos today and will return the negatives to her immediately thereafter.

I also went with her to Kinko's because she did not want to have her notes turned over to anyone or outside of her possession. We copied her notes, including color copies of them.

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone – 206-303-7214   Fax – 206-262-0335  Email – festers206@aol.com
Private Investigation License # 2363  –  Business License  # 602422702

Page 1 – Contact
with Chesterene
Cwiklik

Exh. 99 - 000649

## United States v Joseph E Duncan III -- Confidential Memo

During my contact with Chesterene, I asked her about her experience working on the case. She said that she was never able to finish her report because she was never given the blood and DNA results back. She said that in order to complete her work, she needed to know the blood types of all of the blood on the scene and it was a lot of blood. She recalled that the FBI had already done all of the work or most of that work and that she had made several requests to John Adams for the results but did not receive them. Later, when I reiterated this to her in a question, she backed down a bit and was more defensive of them and said that their priorities had shifted and they were resolving the case, so it wasn't necessary to have the DNA results.

Chesterene said that she got involved in the case because of Mark Durant, whom she had worked on a previous case with. She said that Mark was her main contact. She said that Mark was spread way too thin and was overworked and there was too much work for the investigators and they really needed more investigators. She described Mark as working really hard.

I asked her if she drew any conclusions about the scene from her time there. She said no, that without the DNA work she couldn't draw any conclusions.

I told her that the deal that got worked out was the Jet plead guilty to three counts of murder and three counts of kidnapping and the state agreed to postpone sentencing after the FEDS case. I told her that he might in fact face the death penalty still in state court. She seemed surprised by this. I asked her why they would have had her stop work, without finishing her analysis after she was so invested in the case, instead of giving her the DNA results and have her finish her work. She said that she thought it was because of money, that Idaho is such a poor state. She said that if it was Oregon or Washington, they would have likely told her to finish her work. She said that Idaho was very tight with money and so she suspected that was the reasoning.

It made me wonder if the Public Defender's office where Adams worked has an internal budget which would influence how monies are spent. In King County, Washington for example, we have an Office of Public Defense which funds the public defender agencies, so attorneys have to make the request outside of the office for money for experts and therefore, reduces the chances of conflicts/budget and money concerns. In

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone – 206-303-7214    Fax – 206-262-0335  Email – festers206@aol.com
Private Investigation License # 2363   –  Business License  # 602422702

Page 2 – Contact
with Chesterene
Cwiklik

2

Exh. 99 - 000650

## United States v Joseph E Duncan III – Confidential Memo

Pierce County, Washington, the public defender office maintains the budget and I would assume might regulate a bit more when it comes to money for experts, or expenses.

It sounded to me as though Chesterene had very little contact with John Adams but more so with Mark Durant. She said that she would be happy to talk to Mark Larranaga about the case.

---

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone – 206-303-7214   Fax – 206-262-0335  Email – festers206@aol.com
Private Investigation License # 2363   --  Business License  #  602422702

Page 3 – Contact
with Chesterene
Cwiklik

3

Exh. 99 - 000651

# SANDERSON INVESTIGATIONS
**705 2ND Avenue – Suite 401**
**Seattle, WA 98104**
**(206) 303 – 7214**
**festers206@aol.com**
**www.sandersoninvestigations.com**

## Confidential Memo

November 7, 2007

To:     Joseph Duncan's Defense Team

From:   Karen Sanderson
        Licensed Private Investigator, #2363

Re:     <u>United States of America v. Joseph E. Duncan III</u>
        **Conversation w/ Lillian Duncan on 11/6/07**

**On November 6, 2007 I spent most of the day with Lillian Duncan. This memo serves to document my impressions of her and what she told me.**

I picked Lillian up in Tacoma and took her back to Seattle. My plan was that she could pick out some food items on-line for Jet and I would place the order for her. I had also suggested that we would find a book for Jet that she could "give him" for the holiday season. She seemed interested in the idea and at the time that we did it, she was very pleased. She enjoyed looking through the pages of items, I think in large part because they were food items. The food items were special for the holiday season but were the typical junk food and candy stuff that inmates can get. She seemed genuinely pleased about doing the task. She was less interested in picking out a book for Jet, but still seemed engaged in the process.

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone -- 206-303-7214   Fax – 206-262-0335   Email – festers206@aol.com
Private Investigation License # 2363  --  Business License  #  602422702

Page 1 – Contact
with Lillian Duncan

Exh. 99 - 000652

## United States v Joseph E Duncan III – Confidential Memo

When we were driving back to Tacoma, Lillian mentioned how thankful she was that we did this for Jet. She thought that the food items would "show Jet that he was loved." This was a rare moment when Lillian actually acknowledged her appreciation for anything.

Lillian spoke a lot about her time in Seattle and that she worked at a time for a bakery in the Pike Place Market. This was after she divorced Joe and needed a job. Her employer was Connie Conner or Connie Benedict. I made some phone calls to track her down but hit a dead end. Lillian spoke about working there as though it was the greatest job she ever had.

Later on, when we were having lunch together, Lillian was complaining about her vegetables being over salted. She told the waitress who sort of shrugged it off and said that she, herself, can't really tell if something is over-seasoned. Lillian told the waitress "you are talking to a cook" and that she knew what she was talking about. As soon as the waitress left, Lillian said to me that she only said that to make the woman feel better, which of course didn't make any sense. She definitely gave the waitress an impression that she was some type of professional chef or something, which of course was not true.

Lillian again mentioned her time when she was "railroaded" by her old employer, the Dept of Health. She said that the reason why she was fired or let go was because the ladies who worked there were jealous of her. In the midst of two minutes, she repeated how they were jealous of her like 6 times. She said that they were jealous because she was older than them but looked their age. This was a departure from her old assessment of why she was fired, which I believe was because they had "used her" or something.

Lillian was careful to bring her voter's guide and absentee voter's ballot with her when we left Tacoma. On the drive back to Tacoma, she filled out her ballot and was very careful about who she was voting for and why. She seemed to be very "community oriented" which surprised me because she is so self-involved. She also asked my opinion about one of the issues and when I told her what I thought, she said okay and proceeded to vote the same way.

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone – 206-303-7214   Fax – 206-262-0335  Email – festers206@aol.com
Private Investigation License # 2363  -- Business License # 602422702

2

Page 2 – Contact
with Lillian Duncan

Exh. 99 - 000653

## United States v Joseph E Duncan III – Confidential Memo

I had previously asked Lillian to sign off on a Social Security release and she had dismissed it and refused to sign. Mark L came over when Lillian was in my office and talked to her for about 20 minutes or so. He was firm and persistent and she finally signed off on it. Angie and I had talked about Lillian before and Angie had suggested a very structured and controlled interaction with Lillian to get useful information from her. After seeing Mark keep her in line, I would definitely agree that this way works well for her.

Lillian was very emotional driving to Seattle as she was talking about Bruce. She said that it was very hard to have to "throw away his ashes" referring to physically throwing his ashes on the mountain. She said that she was worried that she would have to do the same with Jet, when he was executed. She cried quite a bit.

Lillian was very ruthless and angry at Steve Groene. She referred to him having reaped rewards from this experience in the way of receiving money which he bought a motorcycle and also that people had sympathy for him, which she apparently begrudges him for. She referred to Shasta as being the only one who deserved sympathy for what she endured.

Lillian talked about her dad and how they had moved residences right before he died. She has talked about her dad dying a lot in the past and comparatively, hardly ever talks about her mom or her mom's influence. Her father dying when she was 9 is a pivotal point in her life and she brings it up often. On this occasion, Lillian talked about her dad dying right after her birthday. She said that she had wondered if it was her birthday party that had killed him. She talked about her memories of walking upstairs or into a room and seeing her dad and asking him "daddy, are you okay?" and that he was taken to the hospital and having only one visit at the hospital, he died.

Mark L also showed Lillian some computer parts and asked her about them. Lillian told us that Jet's employer had sent them to her and that they were bundled in the same manner that we had. We actually received them from Joyce who had received them from Lillian. Lillian said that the employer, INVIE had sent them to her back around the time of the incident when they were cleaning out Jet's desk. They must have attributed the computer parts as belonging to Jet, as opposed to something from their company. Mark L still has possession of these parts.

---

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone – 206-303-7214   Fax – 206-262-0335  Email – festers206@aol.com
Private Investigation License # 2363  -- Business License # 602422702

Page 3 – Contact
with Lillian Duncan

3

Exh. 99 - 000654

**United States v Joseph E Duncan III – Confidential Memo**

**END OF MEMO**

---

Sanderson Investigations – 705 2nd Ave. Suite 401 Seattle, WA 98104
Phone – 206-303-7214   Fax – 206-262-0335  Email – festers206@aol.com
Private Investigation License # 2363   -- Business License # 602422702

Page 4 – Contact
with Lillian Duncan

4

Exh. 99 - 000655

Memo

To:     Duncan Team
From:   Jennifer Davis
Date:   11/8/07
Re:     Interview of Lesley Watkins on 11/4/07

**Lesley Watkins (St. Pierre)**
████████████
**Ridgewood, NJ 07450**
**h: 201.447.0228**
**DOB:** ████ **'66**
**SS#** ██████ **5085**

On November 4, 2007, I spoke with Lesley Watkins (married name now St. Pierre) by telephone. After confirming with my office that I was really Jennifer Davis, and my call was legitimate, she agreed to be interviewed.

Mrs. St. Pierre confirmed that she was the Lesley Watkins who worked at the Time Life Libraries office near Gasworks Park in Seattle in the mid 90's, although she only worked there for about one and a half years. She was one of the human resources managers who was contacted by Sandra Silver on April 2, 1997 and again on April 20, 2007, when Jet absconded. (See DOC chrono pgs DOC 242-243)

Although Mrs. St. Pierre does not recall speaking with Sandra Silver, she does have a vague recollection of Jet, but had no specific memories to relate with regard to him personally or his work habits. Mrs. St. Pierre recalled Dee Ellis, but did not remember anything specific about her either. Mrs. St. Pierre described the workers they employed at Time Life as having quite a wide variety of "issues" and "situations." She advised that during her tenure, they employed quite a few people and they seemed to have a rather high employee turn over.

Mrs. St. Pierre job-shared with Darlene Crowder and she felt that Ms. Crowder might remember more about the people they employed. Mrs. St. Pierre is no longer in touch with Ms. Crowder, but believes that she lives in Issaquah, WA.

Time Life Corporate was located in Alexandria, VA, when Mrs. St. Pierre worked for them and she suggested contacting their office directly regarding employment records. (**Note:** I can contact corporate if we need to locate his employment records, although there is a letter of recommendation signed by Robert Doell, National Sales Manager for Time Life, dated 11/2/95 on the internet and presumably in the discovery. There is a bates number on the bottom of this letter: 0322.)

Mrs. St. Pierre does not know whether the office at 1900 N. Northlake Way, Suite 235, Seattle, WA 98103, is still operating. (**Note:** I checked the yellow pages business listings and there is no listing for Time Life Libraries in Seattle. I called the old number for that office: 206.632.6322

Page 2
Memo: Lesley Watkins Interview 11/4/07
by J.Davis

and it has been disconnected.)

Mrs. St. Pierre left Time Life in approximately 1997.

If I would like to e-mail Mrs. St. Pierre a photo attachment of Jet during that time frame, she would be happy to take a look and let me know if that brings back any memories. Her e-mail address is philnlesley@verizon.net. If Mrs. St. Pierre recalls anything regarding Jet or other employees at Time Life, she will give me a call.

Mrs. St. Pierre further suggested that Brian Galvin and Brock Musgrave might be good people to contact since they worked closely with the employees and might remember Jet more distinctly and have background information to offer on him.

(**Note:** I ran an Auto Track search on Ms. Crowder, Brock Musgrave, and Brian Galvin and will contact them for further information regarding Jet's employment at Time Life.)

Memo

To:     Duncan Team
From:   Jennifer Davis
Date:   11/9/07
Re:     Casper Moses - attempted interview 11/7/07

**Casper Donna Moses**
███████████████           ████████████
Scottsdale, AZ 85257
DOB: ████ ██73
SS#: ███████-1073

On November 7, 2007, I flew to Scottsdale, Arizona, with hopes of interviewing Casper
Moses, former pseudo-girlfriend of client. (See DOC chrono pgs DOC 234-235.) After arriving in
Phoenix, I drove to her apartment complex and found no one home. I went back a few more times,
and at 8:30 pm noticed a red VW Rabbit drive up and park near the apartment. This vehicle's
license plate was the vehicle Casper Moses was driving when pulled over for running a red light in
February of 2007. The vehicle is registered to a Kenneth Fraizer, also listed as living at the above
address. (Note: His telephone number is nonpublished according to Autotrack.) Out of the vehicle
stepped a woman who appeared to fit Casper's general description from her driver's license
information.

This woman reached the apartment before I was able to speak with her. I knocked on the
apartment door, and the woman responded by stating that she did not know me and asking my
identity. I advised her of my identity and that I was there to talk to Casper Moses. I asked if she
knew Casper or if she was home. She would not open the door to speak with me. She stated "that
person" (presumably talking about Casper) had been "kicked out." She wanted to know why I would
come all the way from Seattle just to talk to someone. I told her that was my job to find and
interview people in order to properly represent our clients. She was yelling through the door by this
time and told me to leave or she would call the police. I complied. I did not tell her the name of our
client or the nature of the charges against him.

I left my business card on her car windshield with a note on the back indicating that if she
changed her mind about talking with me, she could call my cell phone, which I also wrote on the
back of my card. I have not heard from her since leaving my card.

If someone else is to contact Ms. Moses in the future, I have an outline of the questions I was
going to ask of her, and background information to pass along.

Memo

To:     Duncan Team
From:   Jennifer Davis
Date:   11/29/07
Re:     Interview of **Deryle Hovinga** on 11/16/07 - WSH SOP alum

**Deryle D. Hovinga**
**McNeil Island -SCC**
█████████
**Steilacoom, WA 98388-0647**
**253.582.9604 or 9686 or 9613 or 9685 (day room phones)**
**SS#:** ████-0220
**DOB:** ███/39

I met with Deryle Hovinga at the McNeil Island Special Commitment Center. As is the case with all offenders housed at SCC, he is not a DOC (Department of Corrections) inmate. He is under the control of DSHS (Department of Social and Health Services). Our meeting began at 11:30 a.m. and ended at 1:00 p.m.

Mr. Hovinga participated in the WSH SOP program from March, 1982 through October, 1987. He successfully completed the inpatient program and went on to work release in 1985. He advanced from work release to outpatient in 1986. Unfortunately, half way through outpatient, he reoffended and went back to court and was subsequently incarcerated. Mr. Hovinga was 41 years old when he entered the WSH SOP program. He had been a chiropractor and was sent to the program for rape of a minor female.

Mr. Hovinga has only one felony conviction.

I showed Mr. Hovinga the photos I had brought of Jet to see if he had ever run into Jet during the many years of incarceration both had spent in Washington State. Deryle thought that he might have seen him while at TRCC, but isn't sure.

I asked Mr. Hovinga about Maureen Saylor. He remembered her as the director of the WSH SOP program and that she had enjoyed some notoriety as the savior of the sexual offender problem. He thought that she had completed a nursing degree in the 1970's. According to Mr. Hovinga, Saylor ran a tight ship, was sophisticated, wore high heels, and was well dressed. He also offered that he found her to be arrogant, a know it all, with little emotion or humanity. She called the participants in her program SP's, which stood for sexual psychopaths. It was Mr. Hovinga's opinion that she viewed the participants as having very little value in society.

I asked Mr. Hovinga his opinion of the WSH SOP program. He felt the materials provided to the residents were informative and helpful. It was a good program for him, but he didn't think it

Page 2
11/29/07
Memo: Deryle Hovinga interview on 11/16/07
by J. Davis

was a good program for everyone.  Since WSH SOP, Mr. Hovinga has participated in the program offered at Twin Rivers (TRCC) and the program at McNeil Island.  He felt that the major difference between all of these programs was the degree of intensity.  At WSH, they had 30 hours a week of group therapy.  At TRCC, they had a couple hours of therapy a week - up to possibly six hours a week.  At McNeil, therapy is held six hours a week.  TRCC was geared towards learning and providing information in a non-threatening way.  Deryle pointed out that with different learning modalities, one program might work well for some and would fail miserably for others.

The main problem at WSH, according to Mr. Hovinga, were groundings.  There were individual groundings, group groundings, floor groundings, and program groundings.  These frequent groundings greatly impeded the progress of the participants.  There were groundings just about every month.  There were 10 groups on three different floors.  The participants were told it was an 18 month program, but no one completed the program in 18 months due, in part, these groundings.  He felt that there was really no way to understand what he was getting into when he entered the program since he wasn't given a realistic assessment of the length of the program, nor was he able to map one out once he entered it.

Special meetings could be called at any time and by any individual in the program, as well as counselors.  He recalled that these meetings could last quite a long time.  The reason for the special meeting could be real or fabricated.  As Deryle pointed out, it really didn't matter if the reason was legitimate or not since the meeting was held and the grievance was treated as if it were real.  Some residents made up stories about other residents simply because they did not like the other person.

According to Mr. Hovinga, there were several suicide attempts, one successful where the man wrapped an electrical cord around his testicles and plugged it in.  There were escapes, too.  One was David Sterling.  Apparently Sterling's escape ended the program.  These all occurred after Jet had left the program.

Mr. Hovinga was in the Phoenix group.  Counselors rarely attended group sessions unless they had something significant to say.  He estimated the counselors attended sessions once every six months, maybe.  The group sessions were recorded and one of the participants was assigned note taking duties.  The counselors theoretically listened to the recorded sessions and reviewed the notes in order to monitor the residents' progress.  Each group had a leader who was voted into that position and served a term.  Mr. Hovinga served as group leader.  A group member could become leader if they had reached step 4 or 5.  It was not a set requirement, but usually worked out this way.  If a group member needed to become the leader to progress in treatment, then the group voted him in.  This was the case when someone was withdrawn or needed to take a more active role in the group, and so the group would promote that individual.  Thus, according to Deryle, the group leader was not necessarily the best qualified person.

Page 3
11/29/07
Memo: Deryle Hovinga interview on 11/16/07
by J. Davis

I asked Deryle about the criteria for each step advancement. He could not recall the specifics of the criteria, although he did say that memorizing word definitions was part of each step and reading a book was usually also required.

Deryle's group counselor was David Weston. Deryle described Weston as bright, an up and comer. In 1995, Weston was the director of SCC program at McNeil. Deryle indicated that the WSH SOP program came to an end due to the escape of an Oregon participant, David Sterling, in the Summer of 1986. Sterling began the program in either 1984 or 1985. According to Deryle, the program made special accommodations for Sterling to join Phoenix group, including added security. Sterling appeared to be the model program participant, but he was devious and with the aid of a visiting friend, escaped. Deryle believes that Weston was demoted after Sterling's escape. Maureen Saylor took over Phoenix Group when Weston left.

There were about 200 participants in the program. Deryle believed there was also a waiting list to get into the program. Phoenix was a newly formed group when Deryle arrived at WSH. Other groups included: Brotherhood, Sunrise, East, West, South, North, and Aquarius. Counselors were assigned to only one group. He ran into counselors from other groups while he was there, but did not know them well or receive treatment from them.

I asked Deryle his opinion of the following staff members:
Sally Wing - He liked her, but felt that she was more of an evaluator than a counselor. He believe she had a Ph.D.
Brett Trowbridge - Did not know.
W. Harmala - Did not know.
Lang Taylor - He had no direct contact with Lang Taylor, except as an outpatient. When Deryle was out on a date while on outpatient status, he saw Taylor at the dance hall and they chatted briefly. According to Deryle, Taylor was a nice dresser and personable.
Mike Shepherd - Deryle recalled Shepherd's name and that he had visited his group on one occasion. He could not recall what group Shepherd counseled.

Deryle said that, except for groundings, the groups did not mingle. During groundings, they met in the cafeteria to talk about the groundings and any progress that was being made to resolve the grounding, but that was the extent of their interaction as groups.

Deryle described the group sessions as quite confrontational and members became extremely aggressive. According to Deryle, the adult rapists were the most aggressive during group meetings. Their approach could be more damaging to other members due to their approach. Deryle found the child rapists to be much less aggressive.

Deryle believed that a 17 year old who entered the program may very well encounter

Page 4
11/29/07
Memo: Deryle Hovinga interview on 11/16/07
by J. Davis

difficulty in adapting to it than he did at the age of 41. He felt it would have had a negative impact, especially if the 17 year old suffered from a poor self image. Deryle added that if that 17 year old were homosexual or thought that he was, that could also be a problem with assimilating into the group. Deryle pointed out that back then, there was very little known or discussed about homosexuality in society. Lack of life experiences of a 17 years old, would also be a factor in making this a difficult program for a young person to participate in. Overall, Deryle thought that such a program would prove pretty traumatic for a 17 year old.

Even at 41 years of age, the program was a shock to him. Some of the other participants' crimes, especially those involving homosexual acts, shocked him. He felt that until entering the program, he was rather naive about homosexuality. The suicides and attempted suicides of program participants were surprising to him, as well. He could not recall any suicides occurring in 1982, but there were some escape attempts.

Deryle pointed out that the group showered together in one large area. They undressed in front of each other, too. This occurred more regularly during groundings since they did everything as a group during those times. He felt this might have been somewhat intimidating for a 17 year old.

I asked Deryle if he believed there were residents engaging in sexual contact or relationships in the program. He indicated that there were incidents of homosexual contact, but believed this was mutual contact and not rape. Residents also exposed themselves out of the windows of the day room on the 3rd floor with some regularity. One of the night charges who was assigned the task of bed check, was caught exposing himself.

Deryle did not know of any relationships developing between residents and staff, although one group disbanded in the late '70's or early '80's due to some issue with their counselor.

There were no women participating in the program.

I asked Deryle to describe his daily schedule. They would get up early in the morning, shower, and eat breakfast. At about 9:00 a.m, they had group for three hours, then break for lunch. Lunch was from noon to 1:00 p.m. At 1:00 p.m., they would return to group for another three hours. There was also an evening group meeting which lasted from two to three hours. Special meetings could also be called at any time of the day or night and for any reason by any member of the group or their counselor. Saturdays and Sundays were geared toward family visits.

I asked Deryle if he recalled the following residents:
Les Bergeson - Deryle thought that his first name might have been Wes and that he was in Deryle's group. Wes/Les quit the program in 1983 and went to McNeil Island. In 1988, Deryle ran into him while at Longacres race track on a couple of occasions. Deryle described Wes/Les as a pretty

Page 5
11/29/07
Memo: Deryle Hovinga interview on 11/16/07
by J. Davis

intellectual guy, but they were not friends.  Wes/Les was homosexual.

Lonny Finn - Recalls the name, but nothing specific.

Jim O'Neil - Deryle got Jim O'Neil confused with Tim O'Neil who is now at SCC - McNeil.

Bill Duncan - Now at SCC.

Davere Sarrf - He was old when they were at WSH, and believes he is probably dead by now.

Howard Wingfield - This is the same Howard Wingfield who once lived on Mercer Island.  Ron Golder, 1983-87 WSH SOP alum, keeps in touch with Wingfield.  Wingfield came to the program after Jet had already left.  Deryle had been out to Wingfield's place in Kent, which has since been sold, and met his wife, Ruth.

Kevin Coyne - Deryle knows Kevin well, as they were living together when he reoffended.  They were also at TRCC together.

Ed King - Now at Airway Heights.  Received 100 year sentence for five rapes.  Steve Titus was wrongfully convicted of one of King's rapes.  Deryle thought that King was a bright guy and might have some good information to share about the program.  He came to the WSH program in about January of 1982.

Deryle advised that there were at least a dozen men currently housed at McNeil SCC who were participants in the WSH SOP program.  He offered to talk with these men to see if they were in the program during 1980-1982 and if they would be willing to speak with me.  He mentioned Lance Klienman, Bill Duncan, and Tim O'Neil.

If I meet with Deryle in the future, it should take place at noon, as he works outside of the gates until 11:30 each day.  He is willing to meet again, if the need should arise.

To:      Duncan Team

From:   Deb Garvey

Today's Date:  November 10, 2007

Case Name and FY #:  Joseph Duncan

Re:      Sharon Winget Morrisey
                      ▇▇▇▇▇▇▇▇▇
          ~~Tacoma,~~ WA  98908
              509.972.4349
              ssn: ▇▇▇▇ xxxx
              dob: ▇▇ 1965

Other Identifying Information:  Client's girlfriend in 1978, Lakes High School

Date of the Interview:  November 7, 2007

_____

      Sharon met me at her door; we talked in her doorway for approximately 20 minutes. She confirmed that she knew a Joe Duncan when she was in high school. They met when she was a freshman and he was a sophomore; she doesn't remember exactly how they met, but said it would have been at school. They were boyfriend and girlfriend for about two months. They broke up after Jet was arrested in 1978. Sharon said her father forbade her to have anymore contact with Jet once he was arrested, and she hasn't spoken to him since that time. His arrest came as a complete shock to her. Sharon was 15 years old and Jet was 17 years old when they were together.

      Jet and she didn't really go out on dates, they mostly hung out together at school, after school and occasionally at her house. She met Lillian once and said she had a very negative impression of her. She had a hard time articulating what that negative impression was built on, but did say Lillian yelled at Jet in front of Sharon in a way that made Sharon very uncomfortable. I asked Sharon if in hindsight she thought there was something off about Lillian or if was possible she was mentally ill from what she had seen. She responded by saying she was only 15 years old and just wouldn't have known to think about those kinds of things at that time in her life. Sharon didn't know Bruce at all and said she may have met a sister of Jet's once, but couldn't remember her name.

      Sharon said she always felt safe and never pressured or uncomfortable around Jet. She said they "made out", but didn't have sex.

      Sharon was shocked to hear that Jet ended up doing a full 20 year term for his arrest. In her mind it was horrifying to think something someone did at the age of 17 y/o could cause them

Memo
November 11, 2007
Page 2

to do more time in prison than they had been alive at the time the crime was committed.  She was very troubled by this.

Sharon couldn't think of any names of friends of Jet's from high school.  She hasn't kept in touch with anyone from high school herself.

No one has previously interviewed her about Jet.  I can call her again.

/deb

Exh. 99 - 000665

**Confidential Memorandum**

To:     **Duncan Defense Team**

From:   **Angela Mason, LCSW**
        **Mitigation Expert**

Date:   **November 11, 2007**

Re:     **Brenda Specht and Robert Hetrick**


**Brenda Specht**

Brenda is the daughter of Jet's deceased uncle Roy Freed. I attempted to interview Brenda on November 1, 2007 outside her mobile home on the outskirts of Lewistown, Pennsylvania. She was very reticent and appeared developmentally delayed or slow. Her date of birth is: ▮▮▮▮▮ 1953. Her husband Russell Specht was present. His date of birth is: ▮▮▮▮▮▮ 1947. Brenda and Russell reside at: ▮▮▮▮▮▮▮▮▮, Lewistown, PA, phone: (717) 242-0999.

Brenda attended Chief Logan High School until ninth grade when she became pregnant. Her child was given up for adoption.

Brenda has three children: Juanita, Paula and Amy.

Brenda receives medical care from Geisinger Medical Center. She refused to sign a release form.

Roy's wives were: Dorothy Sevens Fisher Freed (Brenda's mother), Kathy Dodson and Donna Freed. Brenda said her father died of a heart attack and cancer. She denied knowledge of Roy's history of drinking and or domestic violence.

Brenda said her Uncle Donald Freed was an alcoholic. Don came into her bedroom when she was in eighth grade and tried to force her to go to school. Brenda refused to go. She denied any sexual abuse but admitted "Don had a mouth when he got to boozing." Roy threw him out.

At this point Brenda went into the house and did not come back outside for a long time. She did not want to continue the interview or sign a release form. She might be worth approaching again later.

**Robert Hetrick**

Robert is Jet's maternal cousin, the son of his Aunt Mary Musser (deceased). He is diagnosed with paranoid schizophrenia. He is mentally retarded and was housed on the seventh floor of Lewistown Hospital up until October 31, 2007. His records have been requested. Most of what Robert said did not make sense; however, he did mention that his father Samuel Hetrick pushed his mother down the stairs causing her to lose a baby she was carrying. Robert receives medical

care from Dr. Sheth. Robert resides at: ████████████ Lewistown, PA 17044, phone: (717) 242-2938. His case manager is Jodi Rimmey. She can be reached at: (717) 242-0351 or cell (814) 571-3231

Exh. 99 - 000667

**Confidential Memorandum**

| | |
|---|---|
| **To:** | **Duncan Defense Team** |
| **From:** | **Angela Mason, LCSW**<br>**Mitigation Expert** |
| **Date:** | **November 11, 2007** |
| **Re:** | **Naomi Narehood, Robert Freed and John Freed Jr.** |

### Follow Up with Naomi Narehood (Jet's maternal aunt)

I met with Naomi Narehood October 30, 2007. She provided some medical records and contact information for other witnesses. Naomi cared for her mother, Susie Price Osborne in her older age. Naomi recalled how Susie walked across a field in confusion and appeared to have dementia. Susan died March 3, 1973.

### Robert "Robbie" Freed (Jet's maternal cousin)

Jet's maternal cousin, Robert "Robbie" Freed, was convicted of murder in 2000. Copies of the court dockets of the trial were obtained. His attorneys may have conducted but not filed a psychological evaluation. The attorneys are: Steve Manbeck, phone: (717) 436-8936 and Rick Germak, phone: (717) 463-3686

### Follow Up with John Freed Jr. (Jet's maternal cousin)

I had a follow up meeting with John Freed Jr. Unfortunately his wife Patricia was ill and could not participate. In our previous interview, she was very helpful. The home smelled strongly of animals and developmentally delayed children were present. John signed release forms for his SSI and medical records.

John said his Uncle Don Freed was married to Mabel. He tried to run her over when she had an affair with John's father, John Freed Sr. Connie Freed was the product of the affair between Mabel and John Freed Sr. Connie drives a mail car and resides in Troxelville, PA (near Selinsgrove).

Don married four times. Don's last wife was Theresa Freed. She resides in Lancaster. Don had another wife who may work at Lewistown Hospital but John could not remember her name.

John Freed Sr. married three times. Roy Freed married five times.

John remembered Lillian babysitting a few times. John denied any sexual abuse by Lillian or others. He could not recall other details about Lillian.

1

Exh. 99 - 000668

Susie, his grandmother, made him sit on an old wooden squeaky chair for long periods. He did not recall other punishments.

John attended first grade at three different grade schools. He began special education classes in third grade. He attended Lewistown High School before attempting the GED and failing it on three separate occasions. The last attempt was in 2001 or 2002.

John denied ever being treated on the seventh floor (mental health) of Lewistown Hospital but was treated with Ativan by his medical doctor. He refers to himself as "frayed" from multiple health problems (pneumonia, bypass surgery for obesity, heart problems). He was treated by Dr. Jose Acosta, 27 Sandy Lane, Suite 140, Lewistown, PA 17044, phone: (717) 242-2711 and Dr. Jean M. Reams, 16 North Brown Street, Lewistown, PA 17044, phone: (717) 248-3002.

John Jr. reiterated that his father John Freed Sr. could not read or write. His father attended junior high school in Yeagertown (Mifflin County), PA. He died at a hospital in Harrisburg. His death certificate may be in York County.

Neither John nor his brother Millard Fred Freed had a power of attorney for John Freed Sr. According to Millard, John Freed Sr. deserted the family. He last resided with Bessie Yetter before his death in1977.

John Freed Jr. has his father's wallet but could not locate it during our meeting. He promised to look for photographs and documents for follow up later.

2

Exh. 99 - 000669

Memo

To:     Duncan Team
From:   Jennifer Davis
Date:   11/13/07
Re:     Interview with **Wolf Fletter** on 11/12/07 - former DOC employee - McNeil Island

**Wolf Fletter**
████████████████
Steilacoom, WA 98388
253.582.2760

On November 12, 2007, I interviewed Wolf Fletter at the Denny's restaurant in Steilacoom, Washington. The interview began at 8:30 am and concluded at 9:15 am.

Prior to our meeting, I had talked with Mr. Fletter by telephone at his home. He indicated that he was not an inmate at the WSH - SOP program, but rather a former DOC employee at McNeil Island. He worked at that institution, off and on, from the mid-'80's until 1990. Mr. Fletter did not recall the name "Joe Duncan" as someone he knew while working at McNeil, but agreed to meet with me to review the photos I have of our client to see if that helped spark his memory.

At our meeting, Mr. Fletter reviewed the photos of Joseph Duncan, but did not recognize him. I read him a list of DOC inmates and teachers, and the only one he recalled was Allen Parks.

Mr. Fletter indicated that he was the leader of a group of three who oversaw Operations Support Services in DOC Correctional Industries. The divisions for inmate labor, at that time were located at Monroe (printing), Clallam Bay (upholstered furniture), Walla Walla (license plates and metal fabrication), and McNeil Island (furniture). His group consisted of CPA, Rob Connor who handled accounting and the inmates who assisted in that department; Mary Ellen McCarty who screened and conducted intake on inmates working in the system; and a man who has since died who handled procurement activities. Mr. Fletter could not recall that man's name.

Mr. Fletter worked at McNeil Island off and on from 1984 through 1990. He retired from working for the State of Washington about two years ago.

A few of the inmates Mr. Fletter remembered having worked for him at McNeil were Al Parks, Dudley Moore (a young black man who murdered his grandmother), Casey Fasey, and a Dale or Dan Putnam. These inmates were hard working, self-policing, went by the rules, and never misused the computers or copiers for personal matters. These were what people within the system referred to as "the cream of the crap." Mr. Fletter recalled his inmate employees as being well-kempt, and motivated to work in this rather interesting job setting.

Mr. Fletter never found out any details about the crime for which Allen Parks was serving his time on. He recalls Al walked with a distinct limp, but did not ask about the disability or discover whether it was genetic or the result of an accident. According to Mr. Fletter, Al was a

Page 2
Memo: Wolf Fletter Interview 11/12/07
by J. Davis

valued worker and when he wasn't able to come to work, they felt it.  Al was the mainstay of the organization.  He always came to work prepared to work hard, was smart, and efficient.  Mr. Fletter had nothing but high praise for Al.

If we have further questions of Mr. Fletter, I am welcome to contact him again.

Memo

To:     Duncan Team
From:   Jennifer Davis
Date:   11/18/07
Re:     Interview of Kevin Coyne on 11/14/07

**Kevin Coyne**
███████████
**Spanaway, WA 98387**
**cell: 425.923.3872**

On November 14, 2007, I met with Kevin Coyne at his home in Spanaway, WA. The interview started at 12:50 p.m. and conclude around 2:50 p.m. Mr. Coyne is a level 3 registered sex offender with the State of Washington. He is self-employed and owns a commercial packaging business. His underlying offenses were with minor females.

Mr. Coyne was 20 years old when he entered the WSH-SOP program in the Spring of 1981. He was able to progress to the outpatient phase in the Spring of 1985 and was still in counseling once a week when he was arrested for re-offending in August, 1986. In January, 1986, he was sent to Twin Rivers CC and served his 15 year sentence at TRCC. During that time, he participated in the three year inpatient sex offender program and aftercare. He was released six years ago and upon release, stayed at IT House for one year in 2001, although that was a voluntary placement on his part. Mr. Coyne felt that he needed a bit of extra assistance in readjusting to society after having been locked up for so long. He goes back to TRCC and speaks to inmates who are about to be released and assists IT House with screening new counselors.

I asked Mr. Coyne if he remembered a Joe Duncan during his time at WSH SOP and he indicated that there was a guy named Duncan there, but he wasn't in Mr. Coyne's group, and he did not know the man well. Mr. Coyne does not believe it was our client.

Mr. Coyne was in Sunrise Group at WSH for his entire stay. He lived with Mark Parrino when they were both in the outpatient program. There was an average of 20 residents per group, with 9 to 10 groups in the program. There were three of four groups on each floor, or ward. Mr. Coyne estimates there were about 200 residents involved in the inpatient program at any given time. These are the groups he could remember: Sunrise, Phoenix, Aquarius, Sapphire, North Group, South Group, East Group, and West Group. Phoenix, Sunrise, and West Group were on the same floor.

In work release, there were nine people in that program for each of the groups. Also, there were about nine individuals from each group in the outpatient program.

The day to day activities of the SOP program were fairly regimented. Monday through Friday, they were up by 6:00 a.m., had breakfast, and then after breakfast, were given job

Page 2
Memo: Kevin Coyne Interview 11/14/07
by J. Davis

assignments by the group charge who ran the ward during the day. The group charge was voted in by the group. That person's job was to make work assignments, either on the ward if you were still under the 90 day observation period (new to the program) or off ward, and schedule medical appointments for each resident. Anyone could become a group charge even after only being in the program for a short time.

After work, which could be working in the laundry or kitchen or somewhere off ward, they would have lunch. Group therapy meetings began at 1:00 and lasted until about 3:30 or 4:00. There was no set time for the meetings to end. If there was an intense therapy session happening, they could last quite long. Dinner break was at 4:30 p.m. They were back in group therapy at 6:00 p.m. and these meetings typically lasted until 9:00 p.m., although Kevin recalled some of the meetings going as late as 2:00 a.m.

Weekends were visiting days. Group therapy would be held in the evenings, after the visits ended. Usually they started at 9:00 p.m. and lasted for about an hour. Again, the meetings could last longer depending on what was being covered by the group. The purpose of the weekend meetings was to afford the residents an opportunity to discuss whatever might have come up for them during their visits with family and friends.

There was no individual therapy at WSH SOP. They got feedback from the notes that were taken by residents during the meetings from the therapist who would read these notes. The residents took turns taking notes, so the reliability of those notes was incumbent on the individual assigned that task being accurate. This was not always the case. Therapists rarely attended group therapy sessions. Instead, they relied on the notes and the tape recordings of the sessions to determine how things were progressing. As Kevin pointed out, the therapists didn't really do anything and paying them seemed like a waste of money to him. Treatment was provided by the residents of each group. This was a problem since none of the residents had any training in therapy and were all locked up because of their own problems.

According to Kevin, the upper residents (those who had been in the program the longest), were the ones who controlled the therapy sessions. He described those sessions as a "feeding frenzy." They were on the verge of being very abusive in therapy and although perhaps justified on some occasions when a resident was caught in a lie and in deep denial, it was rough to participate in. The tough treatment was designed to breakdown the individual who was not facing their issues. In Kevin's opinion, it must have been terrifying to a 17 year old to be in such an environment. Just observing the abuse on another resident was bad enough. If the abuse was focused on that 17 year old, it could be quite upsetting. Also, if the 17 year old was slow or naive, it would be particularly hard on them and perhaps shocking to hear the stories of the other residents.

Kevin told me about an incident in group where a senior member was running the therapy (this member had committed rape on an adult) on a newer member (who was in for child molesting)

Page 3
Memo: Kevin Coyne Interview 11/14/07
by J. Davis

and was being extremely verbally abusive. Kevin spoke up on behalf of the new member by saying that the senior member had slit the throat of the family goat while he was having sex with it and he most certainly had things he needed to still deal with. Because Kevin and the senior member were on the same level, he was able to do this without experiencing any negative impact. A junior member would not have been able to do this. The group went silent and the senior member shut up. Unfortunately, Kevin learned treatment methods by what he saw in group and this was not an effective teaching tool.

Kevin pointed out that the lack of sleep from the meetings and special sessions that were called at all hours of the day and night, was especially difficult to get used to. It seemed to him that it was 24 hour a day therapy and the residents felt the constant strain of being scrutinized by other residents and staff. Any resident who had an issue with another resident or with himself could call a special session at any time. The session could last for hours. One reason for calling a special session could be for someone acting inappropriately. A resident or a therapist could call the session. If someone was caught masturbating at night by another resident or the "charge of quarters" (residents who were assigned to make rounds each night - this assignment rotated among the members of the group), a special session was called immediately.

Groundings occurred within each group, the whole program, or floor. It seemed that groundings could be of any duration and when a group was grounded, there were more meetings and no progress within the program. They were held in limbo until the grounding was lifted. A group could be grounded for inpatient misconduct, but also if one of their work release or outpatient members re-offended or ran away. The group would then need to sort out what went wrong and caused the misconduct, how they could have prevented it from happening, and how they could have missed the signals that something was going awry. Kevin recalls that when a grounding was instituted, the meetings lasted all day and all night until they were able to work out the issues. If the therapist felt that the group was falling apart or not cohesive, the therapist could ground the group. Kevin said some of the therapists were more involved than others, but generally they did not attend sessions with any regularity.

On three occasions, while Kevin was in the program, residents were caught with drugs. The whole program was grounded for each incident. There were no alcohol related groundings. One of those drug related groundings was over the rumor that someone had drugs, but no drugs were ever found. The grounding took place, nonetheless.

Kevin indicated that his therapists were a mixed bag. Kevin's therapists were Chuck Dockery and Beth Bierbom (sp?). Chuck was a disabled vet in a wheelchair. Kevin described him as being the most understanding of the therapists. Chuck tried to attend more meetings than once a week, which was the norm for the other counselors. Chuck actually tried to show up daily for the last 15 minutes of a session.

Page 4
Memo: Kevin Coyne Interview 11/14/07
by J. Davis

I asked Kevin if he knew a therapist by the last name of Shepherd. He recalled Mike Shepherd quite well. Although Kevin was never in Shepherd's group, he heard stories about his methods. Kevin recalled Shepherd as being the most aggressive of all the therapists and particularly stern. Kevin felt that residents could not say anything to Shepherd without him interpreting it negatively and calling the resident a liar. Kevin had a few encounters with Shepherd, but basically tried to stay away from him. Shepherd treated the program participants as if they could not tell the truth. Kevin heard no rumors about misconduct on the part of the therapists.

Kevin had the impression of Shepherd, from Shepherd's group members, that he was more abusive than any other group therapist and Kevin never wanted to be put in Shepherd's group for that reason. Many of Shepherd's group members talked about how verbally abusive and aggressive he was. Kevin came away with the impression that there was no way to speak up in Shepherd's group to protect oneself. Kevin related one encounter he had with Shepherd where Kevin spoke to Shepherd and Shepherd demanded that Kevin refer to him as MR. Shepherd and that nothing Kevin had to say was important. This demonstrated to Kevin just how much Shepherd needed to be in control of everything around him. Shepherd was a big guy, not obese, just firm, heavy set, with a gut. He was intimidating in the way that he held himself and regularly talking over people.

Kevin heard nothing about residents have relationships with each other. He does not recall any allegations or rumors of residents and counselors being involved, either. There was only one rumor about a relationship between a resident and a member of the ward medical staff.

Kevin remembered Maureen Saylor as running a tight ship, which he believed she needed to do since she was the head of the program. When Kevin was voted group leader on occasion, he would meet with her weekly, with the other group leaders and therapists. Saylor ran those meetings and made it clear that she felt as though residents could not be trusted. It was all business for her when it came to dealing with the residents.

Kevin became a group leader in 1983 and 1984. He was about 3/4's of the way through the program. He did not believe that anyone could become a group leader after being in the program only 22 months. However, he did say that it might have happened in other groups, just not in his group. If the individual showed substantial progress, they could be voted into the group. Usually a resident could become a group leader after reaching step 7. There were 10 steps to the program. Kevin thought that it sometimes took about two years for an individual to make it a step since they were grounded so often and no progress could be made during groundings.

I asked Kevin if he recalled a social worker by the last name of Harmala. He did not.

Kevin described Lang Taylor as a pleasant individual, but that he had very little contact with Taylor. Taylor ran the Phoenix group which was on the same ward as Sunrise group.

Page 5
Memo: Kevin Coyne Interview 11/14/07
by J. Davis

There was only one female ever in the program. She came just before Kevin left in 1985, and he never saw her. In meetings with staff and group leaders, there was talk about ways the program could accommodate a female. Kevin added, that in these same meetings, if you were the group leader and your group was being grounded, you got grilled by the other group leaders and the staff about why you hadn't been able to make the group more cohesive. Nothing the grounded group leader said would be right during these meetings and it was rough going. The longest grounding that Kevin could recall was three months. His group was grounded at least once a year. In order to get off grounding, the group leader needed to attended these meetings and make a pitch for why his group should no longer be grounded. These meetings could be grueling.

I asked Kevin about the MPR room and whether a resident was required to keep a log each time they went in. The only log he could remember was writing down the time you went into the room and the time that you left. What you did in the room was contained in an individual log that you kept and the therapist reviewed. It was then read out loud to the group. These logs were turned in to the therapist. Kevin indicated there were logs for everything: progress on treatment plan; day to day activities; MPR room fantasies, visitors log. He has no idea whatever happened to those logs.

According to Kevin, bisexuality was not allowed at WSH SOP. If someone came out in group as being bisexual, the therapist would make that individual choose between being heterosexual or homosexual. Therapists stated that it was only by being one or the other could someone have a healthy relationship. Kevin thought that sometimes individuals were not that open in these meetings because, as he told me, "How open do you want to be in a shark frenzy?" He felt that it forced people to be more neutral.

Apparently there were residents in the inpatient program who were trying to make a name for themselves with the therapists as being successful at changing other residents' behavior and influencing the group dynamic, and that they would be viewed as worthy of step increases. This did not equate to good counseling techniques within group sessions. New members could not run therapy on senior members of the group. Once a resident made it to levels 7 through 10, Kevin did not believe they were really required to deal with their issues any longer and the issues of the new members were put on display.

I asked Kevin to compare the WSH SOP program to TRCC. He said it was the difference between night and day. He gained so much more insight from the TRCC program, in part, because it was offered in a more supportive, stern but compassionate way. The staff ran the TRCC program, attending each session and controlling the meetings, unlike WSH SOP where the residents ran the program and therapists were seldom seen. WSH SOP program philosophy of tearing the resident down, but never building them back up, took a huge toll on self esteem. When Kevin made it to the work release and outpatient components of WSH SOP, his self esteem was so low and public pressure by the group on his behavior, dating, meeting women, and getting a life so great, that it was extremely difficult to manage.

Exh. 99 - 000676

Page 6
Memo: Kevin Coyne Interview 11/14/07
by J. Davis

At TRCC, Kevin learned the commercial packaging business which is what afforded him the background to open his own business. Kevin also attributed his success at making the transition from the sexual offender program to society to his supportive family. When he was first released from WSH SOP, they were dealing with their own issues and unable to offer much support. When he was released from TRCC, they had settled down and were extremely supportive of him. He also credits Anna Alyward, his therapist at TRCC, who eventually became the director of TRCC. She is now in Olympia working with DOC. He believes she turned his life around by being stern, but compassionate. She dealt with him in an open manner and got Kevin to open up. He was very quiet when he started the program and she encouraged him to talk to her about anything at all without consequences. Later, she told him that she might have regretted making that one time offer to Kevin.

Another difference at TRCC, was that inmates were also there to deal with their own victimization and that was never addressed at WSH SOP. Kevin was sexually abused as a child and it was something he had never come to terms with. At TRCC, they had a survivors group to work on those issues, separate from the offenders group. There was also one on one counseling offered at TRCC, which was not the case at WSH SOP. The TRCC program kept the offender issues separate from the survivors issue, but managed to fold them into the whole therapy approach in an effective fashion.

Where WSH was very cold and impersonal, TRCC was very warm and compassionate. It sounded like a safe environment in which offenders could seek treatment and not get abused in the process.

According to Kevin, Ms. Alyward hated the WSH SOP program. TRCC was trying to learn from the mistakes of that program and bring in elements of European and Canadian models that had been effective in dealing with sexual offenders.

Kevin recalls the name of Allen Parks, but doesn't recall him specifically. He gave me the name of another WSH SOP alum, Mike Mauch, although Mr. Mauch did not successfully complete the program. I also asked him about the following names:
Les Bergeson - had back issues due to logging. Thought he had lung cancer. Remembers that he was also at TRCC.
John Barbee - Went though Clover Park flight training. Great sense of humor.
Lonny Finn - recalls the name only.
Taber Gard - recalls the name only.
Deryle Hovinga - lived with Mark Parrino and Kevin as outpatient and was in Phoenix group. Knew him at WSH and TRCC.
Robyn Murphy - new therapist at TRCC who took over Anna's group when she became director.
Howard Wingfield - knew at WSH, and thinks he also lived in IT House. Believes he is still in Seattle area.

Page 7
Memo: Kevin Coyne Interview 11/14/07
by J. Davis

No one else has contacted Kevin regarding this case.  I can contact him in the future at any time if I need more information.

To:        Dun⎦ꞏ ꞏ⎦eam

From:   Deo Garvey

Today's Date:   November 19, 2007

Case Name and FY #:   Joseph Duncan

Re:        Willis Harmala, MSW

           ███████████████████
           Vancouver, WA  98694
           360.892.1732

Other Identifying Information:   Retired MSW from Western State Hospital

Date of the Interview:   November 16, 2007

_____

Mr. Harmala  began working at Western State Hospital in July of 1973, as a social worker.  Prior that time, he worked as a case worker in the State of Washington Dept. of Welfare from 1961 to 1969.  He had gone to graduate school at Western Washington University on a state stipend.  Part of the agreement in accepting the stipend, was that Harmala would agree to return to work for the state when he got his degree; working for the welfare department met that requirement.  He graduated from WWU in 1960, following a stint in the Army.

From 1970 to 1972, Mr. Harmala worked in the New Careers Program, a program designed to get welfare recipients jobs.  That program folded when Nixon became president and withdrew the needed federal funding to keep the program going.  Harmala applied to work at Western State Hospital in 1972, at the close of the New Careers Program and was hired in 1973.  WSH was the site of Mr. Harmala's placement during grad school, which made him a known quantity to the hospital staff.  Harmala was employed at WSH from 1973 until his retirement in 1992.

At the time Mr. Harmala wrote Jet's social history [dated 5/20/1980], Harmala was the social worker assigned to the Mentally Ill Offender Program[MIOP] at WSH.  His job within that program was to participate on a WSH team in determining the competency of defendants referred to them from the court for evaluation.  In the era of indeterminate sentencing, WSH was given 90 days to conduct the competency evaluations.  When the state law changed, competency evaluations were limited to 15 days.  While Mr. Harmala appreciated the sped up process because it moved referred defendants out of the hospital more quickly, the work load also increased.  Harmala described the WSH MIOP as swamped with people.  He said they got five to ten admissions a day, during this time period and there was a tremendous pressure to keep all the patients moving through the system.

Exh. 99 - 000679

Memo
November 19, 2007
Page 2

The only people who came to the MIOP unit at WSH were those whose competency to stand trial was being determined or who were being evaluated for what Mr. Harmala called "legal insanity", by which he meant insanity as a defense. The evaluations were done and the referred defendant was either returned to the court or kept with a request to the court to extend the evaluation period for 90 days. Mr. Harmala estimated that over 80% of the defendants referred presented without psycho-pathology.

Harmala insisted that the "sending" entity deliver the defendant with a probable cause statement, any witness statements and the statements of the arresting officers. He said he realized quickly that if he didn't demand these documents come with the referred defendant, MIOP would never otherwise get the relevant paper to allow them to do a competency evaluation. As Harmala described it, the MIOP staff had to be evaluated a defendants' competency to stand trial for a specific crime and therefore they needed to know the person's charges.

Harmala worked briefly with a psychiatrist, Dr. Curt Browend, when Harmala first started at WSH. After a short time, he was assigned to a team with Dr. Allison, who is the psychiatrist he worked with for the bulk of his career at WSH. In addition to a psychiatrist and a social worker, each team also had a psychologist and a psychiatric nurse assigned to it  When defendants came into their unit for evaluation, Dr. Allison, Harmala and a psych nurse met with the individual to do an intake. Dr. Allison led the interview. If the interview didn't cover all of the areas that Harmala needed to write up his social history report, he would ask follow-up questions of the inpatient during the interview. The psychologist did testing with the inpatient, usually an MMPI. There were four psychologists assigned to their unit. Harmala frequently worked with Dr. Trowbridge, but not always. The psychologists were not assigned to teams, rather rotated through the inpatients and their cases. The psych nurse participated in the intake process so that s/he was aware of any medical problems the inpatient had. Following the interview, Harmala put his social history notes into the person's file, sometimes handwritten, but more often dictated and then typed into the report form. If there were people other than the inpatient who wanted to give input for the person's social history, family members for example, Mr. Harmala listened to the input from these additional witnesses and incorporated whatever was appropriate for the inpatient's social history.

Once Mr. Harmala completed his social history intake portion of the inpatient's evaluation, he usually never saw the person again. His job was then to get the inpatient moved to the next place in the system the person was headed - whether that was back to court as a competent defendant or admitted to WSH for an extended evaluation period. Even when inpatients were found to be incompetent and kept in the program for another 90 days, Mr. Harmala rarely had any other interaction with the person.

Mr. Harmala said that Jet would have been housed in a congregate living setting while he was in the Mentally Ill Offender Program at WSH; he would have slept in a dorm. Harmala said it was very unusual for a 17 year old to be sent to the MIOP for evaluation. There were many times when the jail would want to send under-age defendants to MIOP that the program

Memo
November 19, 2007
Page 3

absolutely refused to admit, including juveniles who were going to proceed as adults in a criminal matter.  Harmala was very clear - his unit was intended for adult defendants.  He was at a loss to explain how a 17 year old Jet would have ended up in their unit; however once the inpatient was there for a competency evaluation, Harmala said the MIOP was likely to go ahead and do the evaluation.  Mr. Harmala had no memory of Jet, personally.

Exh. 99 - 000681

Memo

To:     Duncan Team
From:   Jennifer Davis
Date:   11/25/07
Re:     Interview of Jim Burton 11/20/07 - DECA teacher at Lakes High School

**Jim Burton**
**hm: 360.491.8210**
**Olympia, WA**

I had arranged to meet Jim Burton at the 5th Avenue Red Lion Hotel in downtown Seattle at 11:00 a.m. on November 20, 2007.  Unfortunately, he forgot about our meeting.  Since he was in Seattle at the hotel for a DECA conference, I began asking adults with the various student groups if they knew him and was thereby able to locate Mr. Burton to interview him around 12:30.

Mr.  Burton looked at the yearbook photographs of his three DECA groups at Lakes High School in Tacoma, WA, for the class year of 1978-79.  Jet looked vaguely familiar to Mr. Burton, but he recalled nothing specific about Jet.  That class was Mr. Burton's second year of teaching and he remarked that he usually remembered the kids who either excelled or were troublemakers.  The kids in the middle did not stick in his memory.

Mr. Burton was able to identify the popular kids in the program and suggested that I contact them to see if they remembered Jet.  From the Chargers group, he recommended: Deanne Beckelman, Michael Slee (he was a troublemaker student), Glenda McGovern.  From Creditors (the group in which Jet participated): Teri Hurley, Nikki Takemoto, Kurt Olson.

I left Mr. Burton my card and asked him to call me if he remembered anything else that might be helpful.

To:      Duncan Team

From:    Deb Garvey

Today's Date:   November 26, 2007

Case Name and FY #:   Joseph Duncan

Re:      Randy Luoma
         ████████████
         Windham, Maine  04062
         207.893.1450  [home]
         207.373.1035  [work - prefers to be contacted here]

Other Identifying Information:    Inmate at McNeil Island in Electronics Dept.

Date of the Interview:   November 26, 2007  [phone]

---

        Randy was an inmate at McNeil Island from the mid-1980's until his release in 1988. Prior to McNeil, Randy was an inmate at Shelton.  He was convicted of a murder, when he was 17 years old.  He did a term of 14 years and three months.

        Randy described himself as a teacher's aide to the teacher in the Electronics Department at McNeil, Fred Schunamen.  Schunamen taught at McNeil through Pierce College.  When Randy was at Shelton, he worked repairing electronic items for the state - he mentioned specifically two way radios and other miscellaneous equipment.  When McNeil Island switched from being a federal facility to a state prison, Randy was asked if he wanted to go to McNeil to assist in the electronics program, as well as to repair and maintain equipment for the prison.  He agreed.

        Randy met Jet, whom he also knew as Joe Duncan, when Jet was a student in the electronics class at McNeil.  Jet signed up for the class and was admitted to the electronics program.  Randy said it was clear that Jet was very smart and had a gift for electronics.  Within a short time, Jet was also working as a teacher's aide to Schunamen.  The electronics class met daily, a couple of hours  a day.  McNeil had a minimal computer system at the time, Randy said they were working with Apple 2E's and 2C's.  He and Jet kept those computers running.  In addition, Pierce College had a small administrative office at McNeil, and to the extent the College had computers, Randy and Jet also maintained those.

        Jet was quite young, compared to other inmates at McNeil.  Randy noticed this because he himself had come into the Washington state DOC when he was 17 years old.  Randy estimated Jet was about 21 when they met; Randy was five years older than Jet.  Randy said McNeil was a very safe prison, in his experience and he was not aware of any concerns for personal safety Jet

Memo
November 26, 2007
Page 2

might have had when he knew him there.  Randy never saw any inmate, including Jet, dressed in other than prison issue clothing in good repair.  Randy wasn't aware of Jet being in a relationship with any other inmate at McNeil for the four or five years he knew him there.  Randy didn't know Jet personally, he explained to me, he knew him in the context of the electronics department and their work together.  Jet was always professional and hard working.  Randy described him as quiet with a little bit of a temper; however when Jet got made he went inward and became more quiet.  Randy said that was memorable in a situation where so many other guys got louder when they were mad.

When Randy was released in 1988, he continued to visit the electronics department at McNeil frequently.  He enjoyed the work there and felt it was a great place for inmates to learn a trade that would offer employment when they were released.  He went back to the prison to tell the students in the electronics program this and to see his friends in the department.

Randy moved to Maine nine years ago.  He is married and doing well.  I can call him anytime.

Memo

To:     Duncan Team
From:   Jennifer Davis
Date:   11/28/07
Re:     Interview of **Bob Benn** 11/26/07 - Former Director of Education at McNeil Island

**Robert Benn**

<span style="background:black">████████████</span>

Shelton, WA 98584
360.427.3443
cell: 360.490.8586

I met with Bob Benn as his home in Shelton, Washington, on Monday, November 26, 2007. I spent about an hour talking with Bob and his wife, Lynda. They provided me with a copy of a letter of recommendation dated 2/2/88, that Bob wrote for Jet regarding his exemplary school and work performance while at McNeil Island. Joyce had provided this to them when she came out to interview Bob.

Bob was the Director of Education at McNeil Island from 11/5/83 until 11/10/88. He was working through Pierce College. He has some memory of Jet, but nothing very illuminating. Bob described Jet as a hard worker, pleasant, knowledgeable, and helpful. He does not recall writing the letter of recommendation for Jet. Another inmate working with Jet was Randy Luoma. He worked on the computer network system for most of the time Bob was there and he found Randy's work to be outstanding. He was their go to guy and Jet was Randy's backup. Both were well regarded by the staff and were indispensable, according to Bob. There were only a few guys (inmates) who worked on the computer network. However, Bob could not recall the names of the those inmates.

Because of Jet and Randy's expertise, they never needed to go outside of the program for system maintenance or repair. Bob described it as a rather sophisticated system for the time. Bob had purchased the system on the recommendation of another individual. Besides the installation of the hard drive, everything else was done by the inmates.

I asked Bob if he ever talked with Jet about anything besides the computer system. He said that once in awhile he would go down to the electronics program area and b.s. with the guys there, but his recollections of Jet are quite vague. Bob added that if there was anything negative about Jet, he would have remembered. He did not recall Jet ever losing his temper, getting aggressive or acting weird.

Bob believed that the inmates were actually employed by DOC, but worked for the education department. There were 30 inmates working for the education program in various jobs. Some were clerical staff, teachers aides, and office typists. Their math teacher was an inmate with a masters degree in mathematics. He felt their electronics program was unique in that the inmates did the

Page 2
11/28/07
Memo: Bob Benn Interview 11/26/07

electronics repairs throughout the entire program.  Students who were in the electronics program, were also employees.  Part of the electronics program was run by Glen Backman.

I asked Bob if he knew why Jet was in prison.  Bob said that he never knew.  He tried not to look at the inmates' records so that whatever trouble they had with the law, would not bias him.  He did come to find out that Randy had murdered his niece or nephew and that really surprised him since he thought of Randy as this very young, nice guy.  It was clear that Bob was closest to Randy and quite fond of him.

Bob has never heard of Earl Erskine, Allen Parks or Paul Aizenman.

Bob knew the name Wolf Fletter, but never dealt with him.

Dennis Wheeler might still be a counselor in DOC.

I asked Bob why he left as the Director of Education at McNeil.  He responded by saying that he felt as if he had gone as far as he could with the state and it was time to move on.  He started his own contracting businesses and owned a contracting company until April of 2005.

While I was at his home, Bob called Nancy Houck, who is now the assistant to the president of Pierce College, Michelle Johnson.  He thought Nancy might have kept in touch with Glen Backman, Karen Lindberg (now Johnson) and Fred Shuneman.  Bob felt that these individuals may have had more contact with Jet while Jet was at McNeil.  He left Nancy a message advising that I would be calling her about making contact with these folks.

Bob thought that Fred Schuneman was VP of Bates College now.  He did not have any information on the whereabouts of Karen Lindberg or Glen Backman.

If we have other questions, I may contact him at any time in the future.

Exh. 99 - 000686

Memo

To:      Duncan Team
From:   Jennifer Davis
Date:   11/29/07
Re:     Interview of **Deryle Hovinga** on 11/16/07 - WSH SOP alum

**Deryle D. Hovinga**
**McNeil Island -SCC**
**████████**
**Steilacoom, WA 98388-0647**
**253.582.9604 or 9686 or 9613 or 9685 (day room phones)**
**SS#: ████-0220**
**DOB: ███39**

I met with Deryle Hovinga at the McNeil Island Special Commitment Center.  As is the case with all offenders housed at SCC, he is not a DOC (Department of Corrections) inmate.  He is under the control of DSHS (Department of Social and Health Services).  Our meeting began at 11:30 a.m. and ended at 1:00 p.m.

Mr. Hovinga participated in the WSH SOP program from March, 1982 through October, 1987.  He successfully completed the inpatient program and went on to work release in 1985.  He advanced from work release to outpatient in 1986.  Unfortunately, half way through outpatient, he reoffended and went back to court and was subsequently incarcerated.  Mr. Hovinga was 41 years old when he entered the WSH SOP program.  He had been a chiropractor and was sent to the program for rape of a minor female.

Mr. Hovinga has only one felony conviction.

I showed Mr. Hovinga the photos I had brought of Jet to see if he had ever run into Jet during the many years of incarceration both had spent in Washington State.  Deryle thought that he might have seen him while at TRCC, but isn't sure.

I asked Mr. Hovinga about Maureen Saylor.  He remembered her as the director of the WSH SOP program and that she had enjoyed some notoriety as the savior of the sexual offender problem.  He thought that she had completed a nursing degree in the 1970's.  According to Mr. Hovinga, Saylor ran a tight ship, was sophisticated, wore high heels, and was well dressed.  He also offered that he found her to be arrogant, a know it all, with little emotion or humanity.  She called the participants in her program SP's, which stood for sexual psychopaths.  It was Mr. Hovinga's opinion that she viewed the participants as having very little value in society.

I asked Mr. Hovinga his opinion of the WSH SOP program.  He felt the  materials provided to the residents were informative and helpful.  It was a good program for him, but he didn't think it

Page 2
11/29/07
Memo: Deryle Hovinga interview on 11/16/07
by J. Davis

was a good program for everyone.  Since WSH SOP, Mr. Hovinga has participated in the program offered at Twin Rivers (TRCC) and the program at McNeil Island.  He felt that the major difference between all of these programs was the degree of intensity.  At WSH, they had 30 hours a week of group therapy.  At TRCC, they had a couple hours of therapy a week - up to possibly six hours a week.  At McNeil, therapy is held six hours a week.  TRCC was geared towards learning and providing information in a non-threatening way.  Deryle pointed out that with different learning modalities, one program might work well for some and would fail miserably for others.

The main problem at WSH, according to Mr. Hovinga, were groundings.  There were individual groundings, group groundings, floor groundings, and program groundings. These frequent groundings greatly impeded the progress of the participants. There were groundings just about every month.  There were 10 groups on three different floors.  The participants were told it was an 18 month program, but no one completed the program in 18 months due, in part, these groundings. He felt that there was really no way to understand what he was getting into when he entered the program since he wasn't given a realistic assessment of the length of the program, nor was he able to map one out once he entered it.

Special meetings could be called at any time and by any individual in the program, as well as counselors.  He recalled that these meetings could last quite a long time.  The reason for the special meeting could be real or fabricated.  As Deryle pointed out, it really didn't matter if the reason was legitimate or not since the meeting was held and the grievance was treated as if it were real.  Some residents made up stories about other residents simply because they did not like the other person.

According to Mr. Hovinga, there were several suicide attempts, one successful where the man wrapped an electrical cord around his testicles and plugged it in.  There were escapes, too.  One was David Sterling.  Apparently Sterling's escape ended the program.  These all occurred after Jet had left the program.

Mr. Hovinga was in the Phoenix group.  Counselors rarely attended group sessions unless they had something significant to say.  He estimated the counselors attended sessions once every six months, maybe.  The group sessions were recorded and one of the participants was assigned note taking duties.  The counselors theoretically listened to the recorded sessions and reviewed the notes in order to monitor the residents' progress. Each group had a leader who was voted into that position and served a term.  Mr. Hovinga served as group leader.  A group member could become leader if they had reached step 4 or 5.  It was not a set requirement, but usually worked out this way.  If a group member needed to become the leader to progress in treatment, then the group voted him in. This was the case when someone was withdrawn or needed to take a more active role in the group, and so the group would promote that individual.  Thus, according to Deryle, the group leader was not necessarily the best qualified person.

Page 3
11/29/07
Memo: Deryle Hovinga interview on 11/16/07
by J. Davis

I asked Deryle about the criteria for each step advancement. He could not recall the specifics of the criteria, although he did say that memorizing word definitions was part of each step and reading a book was usually also required.

Deryle's group counselor was David Weston. Deryle described Weston as bright, an up and comer. In 1995, Weston was the director of SCC program at McNeil. Deryle indicated that the WSH SOP program came to an end due to the escape of an Oregon participant, David Sterling, in the Summer of 1986. Sterling began the program in either 1984 or 1985. According to Deryle, the program made special accommodations for Sterling to join Phoenix group, including added security. Sterling appeared to be the model program participant, but he was devious and with the aid of a visiting friend, escaped. Deryle believes that Weston was demoted after Sterling's escape. Maureen Saylor took over Phoenix Group when Weston left.

There were about 200 participants in the program. Deryle believed there was also a waiting list to get into the program. Phoenix was a newly formed group when Deryle arrived at WSH. Other groups included: Brotherhood, Sunrise, East, West, South, North, and Aquarius. Counselors were assigned to only one group. He ran into counselors from other groups while he was there, but did not know them well or receive treatment from them.

I asked Deryle his opinion of the following staff members:
Sally Wing - He liked her, but felt that she was more of an evaluator than a counselor. He believe she had a Ph.D.
Brett Trowbridge - Did not know.
W. Harmala - Did not know.
Lang Taylor - He had no direct contact with Lang Taylor, except as an outpatient. When Deryle was out on a date while on outpatient status, he saw Taylor at the dance hall and they chatted briefly. According to Deryle, Taylor was a nice dresser and personable.
Mike Shepherd - Deryle recalled Shepherd's name and that he had visited his group on one occasion. He could not recall what group Shepherd counseled.

Deryle said that, except for groundings, the groups did not mingle. During groundings, they met in the cafeteria to talk about the groundings and any progress that was being made to resolved the grounding, but that was the extent of their interaction as groups.

Deryle described the group sessions as quite confrontational and members became extremely aggressive. According to Deryle, the adult rapists were the most aggressive during group meetings. Their approach could be more damaging to other members due to their approach. Deryle found the child rapists to be much less aggressive.

Deryle believed that a 17 year old who entered the program may very well encounter

Page 4
11/29/07
Memo: Deryle Hovinga interview on 11/16/07
by J. Davis

difficulty in adapting to it than he did at the age of 41. He felt it would have had a negative impact, especially if the 17 year old suffered from a poor self image. Deryle added that if that 17 year old were homosexual or thought that he was, that could also be a problem with assimilating into the group. Deryle pointed out that back then, there was very little known or discussed about homosexuality in society. Lack of life experiences of a 17 years old, would also be a factor in making this a difficult program for a young person to participate in. Overall, Deryle thought that such a program would prove pretty traumatic for a 17 year old.

Even at 41 years of age, the program was a shock to him. Some of the other participants' crimes, especially those involving homosexual acts, shocked him. He felt that until entering the program, he was rather naive about homosexuality. The suicides and attempted suicides of program participants were surprising to him, as well. He could not recall any suicides occurring in 1982, but there were some escape attempts.

Deryle pointed out that the group showered together in one large area. They undressed in front of each other, too. This occurred more regularly during groundings since they did everything as a group during those times. He felt this might have been somewhat intimidating for a 17 year old.

I asked Deryle if he believed there were residents engaging in sexual contact or relationships in the program. He indicated that there were incidents of homosexual contact, but believed this was mutual contact and not rape. Residents also exposed themselves out of the windows of the day room on the 3rd floor with some regularity. One of the night charges who was assigned the task of bed check, was caught exposing himself.

Deryle did not know of any relationships developing between residents and staff, although one group disbanded in the late '70's or early '80's due to some issue with their counselor.

There were no women participating in the program.

I asked Deryle to describe his daily schedule. They would get up early in the morning, shower, and eat breakfast. At about 9:00 a.m, they had group for three hours, then break for lunch. Lunch was from noon to 1:00 p.m. At 1:00 p.m., they would return to group for another three hours. There was also an evening group meeting which lasted from two to three hours. Special meetings could also be called at any time of the day or night and for any reason by any member of the group or their counselor. Saturdays and Sundays were geared toward family visits.

I asked Deryle if he recalled the following residents:
Les Bergeson - Deryle thought that his first name might have been Wes and that he was in Deryle's group. Wes/Les quit the program in 1983 and went to McNeil Island. In 1988, Deryle ran into him while at Longacres race track on a couple of occasions. Deryle described Wes/Les as a pretty

Exh. 99 - 000690

Page 5
11/29/07
Memo: Deryle Hovinga interview on 11/16/07
by J. Davis

intellectual guy, but they were not friends.  Wes/Les was homosexual.

Lonny Finn - Recalls the name, but nothing specific.

Jim O'Neil - Deryle got Jim 'Neil confused with Tim O'Neil who is now at SCC - McNeil.

Bill Duncan - Now at SCC.

Davere Sarrf - He was old when they were at WSH, and believes he is probably dead by now.

Howard Wingfield - This is the same Howard Wingfield who once lived on Mercer Island.  Ron Golder, 1983-87 WSH SOP alum, keeps in touch with Wingfield.  Wingfield came to the program after Jet had already left.  Deryle had been out to Wingfield's place in Kent, which has since been sold, and met his wife, Ruth.

Kevin Coyne - Deryle knows Kevin well, as they were living together when he reoffended.  They were also at TRCC together.

Ed King - Now at Airway Heights.  Received 100 year sentence for five rapes.  Steve Titus was wrongfully convicted of one of King's rapes.  Deryle thought that King was a bright guy and might have some good information to share about the program.  He came to the WSH program in about January of 1982.

Deryle advised that there were at least a dozen men currently housed at McNeil SCC who were participants in the WSH SOP program.  He offered to talk with these men to see if they were in the program during 1980-1982 and if they would be willing to speak with me.  He mentioned Lance Klienman, Bill Duncan, and Tim O'Neil.

If I meet with Deryle in the future, it should take place at noon, as he works outside of the gates until 11:30 each day.  He is willing to meet again, if the need should arise.

████████████████████
**Cheri Ann D'Andrea Griffin**
████████████████████

Port Orchard, WA 98367
(360) 876-0376
Date of Birth: ████████ 1964
Date of Interview: November 30, 2007

Cheri is Bruce Duncan's ex-wife; Jet's former sister-in-law.

Cheri met Bruce in 1984 at a roller skating rink. She was 17 years old; he was 18. Bruce lived with Joe and Rae. They dated and moved into several different apartments together. One apartment was off Fawcett in downtown Tacoma. Another was on Orchard in Tacoma. Bruce became the apartment manager when the old manager left. His father, Joe also managed complexes. Cheri remembered one in Lakewood and another building in Kena.

There was so physical affection between Joe and Bruce.

They had to move when Bruce "got into it" with the apartment owner. Bruce had a temper but rarely showed it. Bruce got an apartment by himself. Cheri moved back home with her parents in Gig Harbor. Cheri did not want to live with Bruce under her parents' roof before they were married. Her parents did not like Bruce. (Note: Cheri currently resides with her parents. She did not want them involved with Jet's trial.)

**Friends**

Bruce's best friend was Marcus Arilias Santos. Marcus had a brother named Charles. Other than Marcus, Bruce did not have many friends.

**Marriage**

Judge Stone performed the marriage ceremony for Cheri and Bruce on January 6, 1986. Rae did not attend the wedding because Judge Stone put her father in prison for molesting children. In solidarity with Rae, Joe also missed Cheri and Bruce's wedding. Lillian did attend.

Cheri and Bruce married "just to marry" and because they were in love. She was not pregnant. Cheri did not want children.

**Lillian**

Lillian was extremely moral and unloving. She disliked hugging and any public displays of affection. She showed her distaste by making "smart-ass remarks." She believed affection was meant to occur in bed at night with the lights off. Lillian did not like it

U.S. vs. Joseph Duncan III
Mitigation Interview with Cheri Griffin
Prepared by: Angela Mason, LCSW

Exh. 99 - 000692

when Bruce and Cheri mentioned sex. In response to their affection, Lillian said, "It is not even night time. Don't do that." Lillian thought sex was dirty.

Cheri avoided Lillian at all costs. Lillian did not want to be friends with her. When she tried to engage Lillian, she responded with "yes" or "no" answers. Lillian did not talk a lot so Cheri gave up.

If Cheri and Bruce had issues, Bruce went to see Lillian. He saw her when he had to. If Lillian was out of earshot, he called her a "dumb bitch."

When Cheri saw her, Lillian was always alone.

Joe cheated on Lillian with Rae. Cheri noted how much Lillian hated Rae. Cheri went to Lillian's on one occasion to pick up some presents. Lillian never had any family gatherings.

Lillian blamed others, never taking responsibility for her behavior. Joe was similar. He felt vindictive if one of the apartments he managed was trashed.

**Joe**

Cheri believed Joe beat both Jet and Bruce. Bruce described his father, as "punishing" though did not give further details. When they misbehaved they were hit until bruised. The grandchildren and kids feared punishments from Joe.

**Rae**

Rae's children were always center stage, much more than Joe's. Rae had a "constellation of kids." Joe worked and was very quiet. Rae "wore the pants." It was always about Rae's family. Rae referred to Lillian as a "bitch."

**Bruce's Family**

The family all took things as a personal attack as if "everyone was out to get them." Bruce's family was dysfunctional. They got along but "did not care." They were selfish people, always "me, me, me."

Cheri saw Bruce's family at holiday gatherings. There was no connection. Cheri felt excluded, like an outsider. Bruce's family was not interested in getting to know her.

Jet's sisters had not talked to Joe in a long time. The family was estranged. Cheri did not know of Jet's sister Cheri Cox until two years into their relationship. Cheri had a superficial relationship with Cheri Cox.

**Bruce Brings Home Stolen Goods**

U.S. vs. Joseph Duncan III
Mitigation Interview with Cheri Griffin
Prepared by: Angela Mason, LCSW

Exh. 99 - 000693

Bruce stole items from the apartments where he worked. One day he came home with a Weber barbeque. He told Cheri, "It did not have a chain on it so I took it." Cheri also found car stereos in the back of their closet. Bruce stole "to show people how stupid they were." Anyone who left his or her car unlocked was fair game. Bruce soon got rid of the stereos.

### Janine Surpa Girard

Janine Surpa was born July 15, 1965 or 1966.

Cheri had a friend named Chris (she did not wish to disclose her last name). Cheri knew Chris from Gig Harbor High School. They both graduated in 1982. They got high and drank together. Janine was Chris' girlfriend. They were a lesbian couple. Janine later married Curt Girard.

### Bruce's Affair with Janine

Toward the end of 1986, Bruce had an affair with Janine. Chris learned of the affair and told Cheri. Bruce and Cheri tried working things out. Bruce said he would stop seeing Janine. Cheri moved back home with her parents. In May of 1987, Cheri's parents let Bruce move into their back cottage, outside the main house. It was fixed-up shed with a bed and television. The bathroom was in the main house. Bruce and Cheri continued to work on their relationship. Cheri lost trust. She felt Janine stole Bruce. He wanted both a wife and girlfriend.

Bruce worked as an apartment manager and security guard. He was employed with the security company owned by Rae's family. It went defunct around the time Earl Erskine went to prison.

### Cheri Develops Hodgkin's disease

In June or July of 1987, Cheri was diagnosed with Hodgkin's disease. Upon learning of her illness, Bruce said, "How could you do this to me? Who is going to pay the bills?" Cheri worked as an insurance representative for Pierce County Medical Center for more than 10 years. The Hodgkin's disabled her. Bruce's response to her illness signaled their relationship was over.

Once when Cheri came home from the hospital after having the tops of her feet cut open, Bruce took Janine out for her birthday rather than care for Cheri. Cheri also had to have chemotherapy.

Around September 1987, Cheri kicked Bruce out. She saw Bruce again when he came over and demanded his stereo. Cheri got a restraining order against Bruce because she did not want him coming around her older parents. Cheri believed Bruce had stolen the hood ornament off her Cougar and drained the oil out of the car.

U.S. vs. Joseph Duncan III
Mitigation Interview with Cheri Griffin
Prepared by: Angela Mason, LCSW

**Cheri Buys Bruce a Car**

Cheri had a Yamaha motorcycle financed in her name. Bruce drove it. To get the motorcycle back from Bruce, she bought him a Vega ($500). Bruce needed transportation to drive to San Diego, where he planned to join his father. He left during the winter of 1987. Cheri never talked to him again.

After he left, Cheri and Janine hung out together. Cheri never heard from Bruce but one day Janine announced she was headed to San Diego to live with him.

**CJ and Ann Marie**

Another of Bruce's former girlfriends was Ann Marie. He had a child with her, CJ. When Ann Marie decided to get married, she and her prospective husband asked Bruce to give up his custody rights. Bruce refused.

It was a strange time. Soon after, CJ was tragically beaten. Cheri was not allowed near him because Ann Marie was jealous. Cheri tried to befriend Ann Marie but it did not work.

Bruce and Cheri went to see CJ at Madigan Hospital when Ann Marie was not around. Cheri found herself alone with CJ while Bruce talked to the doctor. CJ was a little baby hooked up to many tubes. Cheri held and talked to him. He was blind. They visited twice. Once when Ann Marie was present, Cheri stayed in the car.

**Visiting Jet**

Bruce never told Cheri why Jet was in prison. Bruce appeared indifferent toward his brother.

Cheri visited Jet at McNeil four times. She recalled a specific time with Bruce and another visit with his sister Cheri Cox. Bruce visited Jet three or four times with Cheri, never alone.

Jet never discussed his family. He considered Cheri a "lady" not someone with whom to divulge information. They never discussed why he went to prison. Jet was happy to have visits and attention.

She described the ordeal involved in getting to McNeil twenty years ago. It took at least an hour and one-half traveling by bus and boat. Cheri confronted a guard about taking away baby formula from another visitor. The guard was rude to her. When they arrived, the warden asked to see Cheri. Since she was in the middle of talking to Jet, they went together to see the warden. Everyone watched as they went to see him. Jet thought there might have been suspicion that he was playing around. The warden did not know Jet. The warden apologized to Cheri for the "smart ass" comments of the guards.

U.S. vs. Joseph Duncan III
Mitigation Interview with Cheri Griffin
Prepared by: Angela Mason, LCSW

Bruce said Jet was given a different crime to tell the other inmates. They feared he'd be killed in the general population.

Jet wrote also wrote to Cheri but she no longer has any of his letters. She remembered his stationery had unicorns. In his correspondence he described his cell, what was on the wall and meals. She does not remember specifics. He never mentioned anyone.

Bruce said Jet would never be able to live outside of prison.

Rae visited Jet. Cheri does not remember Joe visiting him.

**Bruce Trained to be a Prison Guard**

Bruce was fascinated with the idea of working in a prison. Cheri thought he wanted to have power over others. Cheri paid for Bruce to enter a four-month training program for guards. When the school took his class on a visit to McNeil, they put Jet in solitary confinement so he and Bruce would not have contact. The guard school abruptly closed down. Bruce never finished the program. Cheri does not know the name of the school. It was in the Federal Way area.

**Bruce's Drug Use**

Bruce liked tequila and marijuana. They bought an eighth of and ounce of marijuana at a time.

**Bruce's Depression**

Bruce was depressed at times. During these periods he was quiet and did not want to do anything. Toward the end of their relationship he slept all day and stayed up all night. Cheri worked all day so they did not see much of each other.

**Bruce's Sexuality and Interest in Pornography**

Sexually, Bruce was not the greatest. Toward the end of their relationship he had genital warts, which he gave to Cheri. She quit having sex with him because she lost interest. She said, "Bruce's erections were from the porn he watched." Cheri put up with his Penthouse and Playboy magazines. At first Bruce watched soft porn and story videos, then, he began staying up all night. Cheri found him masturbating to hard-core pornography videos. He also had books. One night Cheri found Bruce watching a video of a man penetrating a woman and inserting objects (a police baton) into her anus. Cheri said this "grossed her out." He "got off" on these images.

Bruce wanted to have anal intercourse with Cheri. She recalled a "surprise attack" when he tried to insert his penis into her anus with no lubrication. Following the incident she could not sit for two weeks. She said it was experimental, not rape.

U.S. vs. Joseph Duncan III
Mitigation Interview with Cheri Griffin
Prepared by: Angela Mason, LCSW

**Bruce's Narcissism**

Everything with Bruce was "him, him, him." If Bruce cut someone off in traffic, he said they should not have been there. He blamed others for his behavior. He blamed Cheri for having cancer, leaving no one to pay the bills.

**Mind Tricks and Counseling**

Bruce played mind tricks on Cheri. She was never good enough. Bruce told her she was stupid. This brought down her self-esteem. Cheri felt mentally abused.

Cheri and Bruce had one session with a counselor (she does not remember who they saw) in an office out South Tacoma way. It was Cheri's idea to go see her. She found her in the phone book. Upon observing how Bruce treated Cheri, the counselor told her she needed to divorce Bruce and get away from him. Bruce refused to return for further counseling.

Cheri has no knowledge of Bruce being arrested.

Cheri is home during the day caring for her parents. It is okay to call with follow-up questions.

U.S. vs. Joseph Duncan III
Mitigation Interview with Cheri Griffin
Prepared by: Angela Mason, LCSW

Exh. 99 - 000697