UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JOSEPH EDWARD DUNCAN, III,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

Case No. 2:17-cv-00091-EJL
2:07-cr-00023-EJL

**MEMORANDUM DECISION AND ORDER**

## INTRODUCTION

Pending before the Court in the above-entitled matter is Petitioner's Motion for Collateral Relief seeking to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. (CV 1, 4.)[1] The parties have filed their responsive briefing and matter is ripe for the Court's consideration.

## FACTUAL AND PROCEDURAL BACKGROUND

This is a federal capital case arising from the events occurring in the spring of 2005 when the Petitioner, Joseph Edward Duncan III, traveled from North Dakota to Idaho on

---

[1] In this Order, "(CR )" is used when citing to the criminal case record (2:07-cr-00023-EJL) and "(CV )" is used to cite to the record in the civil case (2:17-cv-00091-EJL).

an orchestrated crime spree looking for children to abduct, abuse, and kill.[2] On May 16, 2005, Duncan carefully choose his victims when he broke into a rural home near Coeur d'Alene, Idaho and savagely killed three individuals living at the home and kidnapped two of the minor children – S.G. and D.G. – who were eight and nine years old at the time. Duncan took the two children to a secluded campsite in the Lolo National Forest in Montana that he had chosen for its privacy where, for the next several weeks, he inhumanely tortured, raped, and sexually assaulted both children. Duncan eventually killed D.G. at the campsite. On June 22, 2005, Duncan returned to Coeur d'Alene, Idaho with S.G. and he was apprehended when an employee of the restaurant where he and S.G. were eating identified the two and called law enforcement.

The State of Idaho charged Duncan with three counts of kidnaping and three counts of murder relating to his killings of the three individuals at the Coeur d'Alene home. Duncan plead guilty to the state charges on October 16, 2006.[3]

On January 18, 2007, a federal grand jury indicted Duncan on ten counts relating to his criminal conduct, including three death-eligible counts. (CR 1.) Duncan was appointed counsel and the trial was set for March 20, 2007. (CR 5, 459.)[4] On January 23, 2007, the

---

[2] The heinous facts of Duncan's criminal conduct have been recited in various briefs, orders, exhibits, and transcripts in the underlying criminal matter. *See e.g.* (CR 191, 246, 264, 323, 349, 550, 585, 595, 671); (CR Exs. 73-78); (CR Transcript, Dkt. 640 at 1600-37.) That this Order only briefly restates those facts should not minimize their disturbing nature, extensiveness, or seriousness.

[3] Duncan was represented in the state case by appointed counsel, John Adams.

[4] Prior to the federal indictment, Roger Peven, of the Federal Defenders of Eastern Washington and northern Idaho, was appointed to represent Duncan. Thomas Monaghan of the Federal

Government filed a Notice of Intent to Seek the Death Penalty. (CR 11.) Capital counsel was appointed to represent Duncan and the Court granted a continuance of the trial date to January 22, 2008. (CR 13, 32.)[5] Just prior to that trial setting, on December 3, 2007, Duncan plead guilty to all ten counts in the Indictment. (CR 188, 189, 204.) The Court scheduled the Penalty Phase to begin on January 28, 2008. (CR 189.)

Both parties filed Motions seeking to continue the start of the Penalty Phase and extend the time to file motions. (CR 192, 193, 195.) The Court agreed and extended the motions deadline to January 22, 2008 and continued the start of the Penalty Phase to April 14, 2008. (CR 202.) After the parties filed their motions, the Court held three days of hearings on the motions and then issued written decisions. (CR 230-231, 266, 314-316.) On March 26, 2008, the Court held a status conference on remaining pending matters. (CR 343, 350.) Prior to the start of the Penalty Phase, the parties submitted additional motions, a proposed Jury Questionnaire, proposed Jury Instructions, and other pre-Penalty Phase filings. The Court granted the defense's Motion to Bifurcate the Penalty Phase into an Eligibility Phase and a Selection Phase. (CR 253, 266, 316.)

The Penalty Phase began on April 14, 2008 when the entire pool of more than 300 prospective jurors was called in to complete a written jury questionnaire. (CR 387.) Jury selection resumed on April 16, 2008 but prior to the prospective jurors being brought in,

---

Defenders in Boise was assigned as local counsel after Duncan was transported to Boise, Idaho. Peven later stepped down and, in September of 2007, Judy Clark of the Federal Defenders of San Diego was appointed as counsel for Duncan.

[5] Attorney Mark A. Larrañaga was appointed as capital counsel pursuant to 18 U.S.C. § 3005.

Duncan made an oral motion to represent himself. (CR 391, 398.) On April 18, 2008, the Court held a hearing on that request and ordered that Duncan be evaluated to determine whether he was competent to waive his right to counsel. (CR 399, 404.) The Court suspended *voir dire* until Duncan could be evaluated and the Court could rule on his request to represent himself. (CR 407.) The defense also filed a Motion to Declare the Defendant Incompetent to Proceed. (CR 415.)

On July 24, 2008, the Court entered an Order finding Duncan competent and set a hearing on his request to proceed *pro se*. (CR 493.) The Court held that hearing on July 28, 2008, where it granted Duncan's oral motion for self-representation finding Duncan to be competent and that his waiver of his right to counsel was knowing and voluntary. (CR 499, 502.) The Court also appointed his defense attorneys as standby counsel. (CR 499, 502.)

Jury selection resumed on August 6, 2008. (CR 529.) Ultimately, on August 27, 2008, the jury returned death verdicts on the three death-eligible counts of the Indictment - Count 1 (Kidnapping a Minor Resulting in Death); Count 5 (Sexual Exploitation of a Child Resulting in Death); and Count 7 (Using a Firearm During and in Relation to a Crime of Violence resulting in Death) – and the Court sentenced Duncan to death on each of those three counts. (CR 582, 602.)

On November 3, 2008, the Court sentenced Duncan on the non-capital crimes to a consecutive term of life imprisonment on Count 4 (Aggravated Sexual Abuse of a Minor), and concurrent terms of life imprisonment on Counts 2 and 3 (Kidnapping a Minor and Aggravated Sexual Abuse of a Minor), and concurrent terms of 120 months of imprisonment on each of the remaining counts – Count 6 (Possession of a Firearm by a

4 - ORDER

Convicted Felon), Count 8 (Transportation of a Stolen Firearm), Count 9 (Possession of an Unregistered Firearm), and Count 10 (Transportation of a Stolen Vehicle). (CR 599, 601, 602.)

On November 17, 2008, standby counsel filed a Notice of Appeal. (CR 605.) On November 19, 2008, the Court received a letter from Duncan dated November 15, 2008, stating "if any appeal is initiated on my behalf, it is done contrary to my wishes." (CR 607.) On the same day, the Government filed a Motion to Strike Standby Counsel's Notice of Appeal. (CR 606.) The Court held a hearing on November 24, 2008 to inquire of Duncan as to whether he desired to waive his appeal. (CR 609, 612.) Following a lengthy colloquy, the Court concluded that Duncan remained competent and that he did not desire to file an appeal. (CR 637.) Accordingly, the Court struck the Notice of Appeal. (CR 612.)

Nevertheless, the Ninth Circuit heard the appeal "for the limited purpose of reviewing the district court's competency determinations" and concluded that the Court erred by not holding a competency hearing to determine whether Duncan competently waived his right to appeal. (CR 671, 677.) The case was remanded with instructions for a retrospective competency hearing. *United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011).

New counsel was appointed to represent Duncan at the retrospective competency hearing. (CR 695, 703.) The twenty-three day retrospective competency hearing began on January 8, 2013. (CR 745, 794, 807-829.) On December 6, 2013, the Court issued its Order on Remand wherein it ruled that Duncan was competent to waive his right to appeal. (CR 843.) The defense appealed the Order on Remand. (CR 844.) On March 27, 2015, the Ninth Circuit issued its Memorandum and Order affirming this Court's Order on Remand

5 - ORDER

concluding the "Defendant was competent in November 2008" and that he had "validly and affirmatively waived his right to appeal." (CR 860.) On February 29, 2016, the United States Supreme Court denied Duncan's Petition for *Writ of Certiorari*. On February 28, 2017, Duncan filed his § 2255 Petition which the Court now takes up. (CR 867) (CV 1, 4.)

## STANDARD OF LAW

Section 2255 permits a federal prisoner in custody under sentence to move the court that imposed the sentence to vacate, set aside, or correct the sentence on the grounds that:

> the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack ....

28 U.S.C. § 2255(a); *see also Hill v. United States*, 368 U.S. 424, 426-27 (1962) (stating the four grounds for § 2255 relief). Relief under § 2255 is afforded "[i]f the court finds that...there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b).

The standard of review for § 2255 petitions is "stringent" and the court "presumes earlier proceedings were correct." *United States v. Nelson*, 177 F.Supp.2d 1181, 1187 (D. Kan. 2001) (citation omitted). To prevail on a § 2255 motion, the "defendant must show a defect in the proceedings which resulted in a 'complete miscarriage of justice.'" *Id.* (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974)). "[R]elief is not available merely because of error that may have justified reversal on direct appeal." *United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. Addonizio*, 442 U.S. 178, 184 (1979).

## ANALYSIS

1.     **The Procedural Default Rule and *Teague* Doctrine**

The Government argues several of Duncan's claims are procedurally barred from being raised in his § 2255 Motion because he waived his right to appeal and/or the claims improperly seek to retroactively apply a new rule of law. (CV 34.) Duncan counters that many of his claims are "essentially ineffective assistance of counsel claims" which are not subject to the procedural default rule or are as-applied challenges relying on extra-record evidence. (CV 4, 37.) Further, Duncan argues the non-retroactivity doctrine does not apply to bar his claims. (CV 4, 37.)

A.     **The Procedural Default Rule**

"The general rule in federal habeas cases is that a defendant who fails to raise a claim on direct appeal is [procedurally] barred from raising the claim on collateral review." *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 350–51 (2006); *see also United States v. Ratigan*, 351 F.3d 957, 962 (9th Cir. 2003) ("A § 2255 movant procedurally defaults his claims by not raising them on direct appeal and not showing cause and prejudice or actual innocence in response to the default."). A petitioner may overcome procedural default and raise the claim in a habeas petition only when they demonstrate either 1) "cause" for not raising the claim sooner and "actual prejudice" resulting from the alleged error or 2) "actual innocence." *United States v. Braswell*, 501 F.3d 1147, 1149 (9th Cir. 2007); *see also Sanchez–Llamas*, 548 U.S. at 351; *Ratigan*, 351 F.3d at 960. Ineffective assistance of counsel claims are an exception to the procedural default rule and may be brought in a collateral proceeding regardless of whether they could have been or were brought on direct appeal. *Massaro v. United States*, 538 U.S. 500, 505 (2003).

Duncan's competent and valid waiver of appeal likely precludes many of the claims and/or arguments made in the § 2255 Petition. Regardless, the Court finds it appropriate and necessary in this case to address the merits of all of the claims made in this case.

### B.    The *Teague* Doctrine

For habeas claims based on new constitutional rules of criminal procedure that are announced after the conclusion of a petitioner's direct appeal, a federal court can only grant relief under 28 U.S.C. § 2255 if the new rule applies retroactively under *Teague v. Lane*, 489 U.S. 288 (1989). *See United States v. Sanchez-Cervantes*, 282 F.3d 664, 667-68 (9th Cir. 2002).

Generally, under *Teague*, "'new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.'" *Welch v. United States*, 136 S.Ct. 1257, 1264 (2016) (quoting *Teague*, 489 U.S. at 310). There are two exceptions to the *Teague* retroactivity bar. First, "'new substantive rules generally apply retroactively.'" *Id.* (quoting *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004)). Second, "new watershed rules of criminal procedure, which are procedural rules implicating the fundamental fairness and accuracy of the criminal proceeding, will also have retroactive effect." *Id.* (internal quotation marks omitted). To determine retroactivity under *Teague*, the Court considers: (1) when the petitioner's conviction became final; (2) if the rule sought to be applied is a "new" rule; and if so, (3) whether it falls within either of the two exceptions to the presumption against retroactivity. *Beard v. Banks*, 542 U.S. 406 (2004) (citation omitted).

In this case, the Government argues *Teague* precludes Claims 1, 4, 5, 7, 8, and 10. (CV 34.) Duncan counters that the *Teague* Doctrine is inapplicable because his claims do not raise or implicate the creation of new rules of constitutional procedure. (CV 37.) Although some of Duncan's § 2255 claims may be precluded by *Teague*, the Court has considered each of Duncan's claims.

## 2. Duncan was Provided Effective Assistance of Counsel

Duncan argues his trial attorneys were ineffective in their representation in violation of the Sixth Amendment and 18 U.S.C. § 3006A and his right to a reliable death judgment as guaranteed by the Eighth Amendment. (CV 4, 37.) The central argument on this claim is that there was a breakdown of the system in the criminal proceeding beginning with Peven's deficient performance which infected the entire defense team and its strategy as well as the Court's rulings, resulting in structural errors prejudicial to Duncan which violated his constitutional rights. (CV 4.) The Government maintains Duncan has not shown any deficiency or prejudice by his attorneys' or by the Court's rulings. (CV 34.)

The Sixth Amendment guarantees "the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The two-prong standard for evaluating a Sixth Amendment ineffective assistance of counsel claim is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "To be entitled to habeas relief due to the ineffectiveness of defense counsel, petitioner must establish both that counsel's performance was deficient and that the deficiencies prejudiced the defense." *Medina v. Barnes*, 71 F.3d 636, 368 (9th Cir. 1995) (quoting *Strickland*, 466 U.S. at 687, 689). Mere conclusory allegations do not prove that counsel was ineffective. *See Shah v. United States*,

878 F.2d 1156, 1161 (9th Cir. 1989). A petitioner claiming ineffective assistance of counsel must allege specific facts which, if proved, would demonstrate that counsel's actions were 1) deficient and 2) prejudicial. *Strickland*, 466 U.S. at 687-690, 696; *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1909–10 (2017).

The Court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the movant resulting from the alleged deficiencies. *Strickland*, 466 U.S. at 697. Nor does the court need to address both prongs of the *Strickland* test if the petitioner's showing is insufficient as to one prong. *Id.*

### A.    Defense Counsels' Performance

To establish "deficient performance" under the first prong of the test, the movant must show counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687; *Harrington v. Richter*, 562 U.S. 86, 104 (2011). Counsel's performance is constitutionally deficient when it "so undermine[s] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. "Deficient performance" means representation that is "outside the wide range of professionally competent assistance" and/or "fell below an objective standard of reasonableness." *Id.* at 690; *Stanley v. Cullen*, 633 F.3d 852, 862 (9th Cir. 2011). The Court evaluates "counsel's performance from [their] perspective at the time of that performance, considered in light of all the circumstances, and we indulge a strong presumption that counsel's conduct fell within the 'wide range of reasonable professional assistance.'" *Medina*, 71 F.3d at 368 (quoting *Strickland*, 466 U.S. at 689). A tactical decision by counsel with which the defendant

10 - ORDER

disagrees cannot form the basis of an ineffective assistance of counsel claim. *See Doganiere v. United States*, 914 F.2d 165, 168 (9th Cir. 1990); *Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir. 1984).

Duncan argues his trial attorneys were deficient throughout his criminal proceedings. (CV 4, 37.) The bulk of this claim centers on Peven. Duncan asserts Peven was deficient in his representation and that Peven's actions and inactions caused dysfunction among his attorneys resulting in the denial of his right to adequate representation; specifically, as to his guilty plea and his trial counsels' investigation and preparation. Duncan further asserts his mental illness and the Court's rulings compounded his attorneys' inability to represent him.

### 1.    Peven's Performance

Peven's conduct and performance during his representation of Duncan is documented in the declarations filed in both this case as well as in the underlying criminal case. *See e.g.* (CV 2, Att. 1, 5, 7, 8) (CR 74-78) (CR 194-3, Dec. Larrañaga.) The Court has reviewed the record in both proceedings. For the reasons stated herein, the Court finds Duncan was not prejudiced by Peven's performance.[6]

### 2.    Duncan's Guilty Plea

---

[6] Peven was an experienced criminal defense attorney and the Executive Director of the Federal Defenders of Eastern Washington and Idaho at the time he represented Duncan. Peven had appeared before the Court on many occasions and was respected as an officer of the court. The Court was not aware of any issues with Peven's representation until August 28, 2007 when he requested a meeting with the Court to discuss a personal matter. As addressed later in this Order, the Court exercised its discretion and elected to meet with Peven privately to hear what the issue was and advised counsel that if any discussions about Duncan's case came up, it would go on the record.

Defendants' Sixth Amendment right to counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162-63 (2012). "During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" *Id.* (quoting *McMann*, 397 U.S. at 771). Here, Duncan was represented by a team of experienced and qualified attorneys at the time of his guilty plea.

Duncan asserts his attorneys were deficient, however, because they did not fully advise him of the advantages and disadvantages of waiving trial or discuss potential defenses or strategies before he entered his guilty plea due to their lack of preparedness. (CR 4.) Pointing to Peven's conduct and the Court's denial of a continuance, Duncan argues his attorneys advised him to plead guilty solely for the purpose of gaining additional time to prepare for the Penalty Phase.

"A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, with sufficient awareness of the relevant circumstances and likely consequences." *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005) (citation and internal quotations omitted). "It goes without saying that a plea must be voluntary to be constitutional." *United States v. Kaczynski*, 239 F.3d 1108, 1114 (9th Cir. 2001). A plea is considered voluntary when it "'represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Id.* (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).

Where a defendant enters a plea of guilty upon the advice of counsel, the voluntariness of the plea depends on whether the defendant received the effective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985). To challenge his guilty

plea based on ineffective assistance of counsel, the petitioner must show that counsels'
performance fell below the objective standard of reasonableness and that, but for such
errors, he would not have pled guilty and, instead, would have insisted on going to trial.
*Id.* at 57-60.

However, "a plea of guilty entered by one fully aware of the direct
consequences...must stand unless induced by threats (or promises to discontinue improper
harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps
by promises that are by their nature improper as having no proper relationship to the
prosecutor's business (e.g. bribes)." *Kaczynski*, 239 F.3d at 1114 (quoting *Brady v. United
States*, 397 U.S. 742, 755 (1970)).

Duncan's guilty pleas in this case were entered knowingly, intelligently, and
voluntarily.

In assessing the voluntariness of the plea, the court must accord great weight to
statements made by the defendant contemporaneously with his plea. *Chizen v. Hunter*, 809
F.2d 560, 562 (9th Cir. 1986). At Duncan's plea hearing, the Court made a thorough and
complete inquiry of Duncan before accepting the plea. (CR 204.) The Court fully advised
Duncan of the charges against him, the possible penalties, his constitutional rights, and the
ramifications of entering guilty pleas. (CR 204.) Duncan told the Court that he had gone
over each of the ten charges and discussed them with his attorneys. (CR 204 at 6-7.) Duncan
stated that he understood the charges and the possible penalties, that he agreed with the
factual basis and that it was sufficient to sustain a conviction on each of the charges, and

that he was entering his pleas voluntarily and of his own free will and because he is in fact guilty as charged. (CR 204.)

The Court also inquired of counsel whether they had discussed any and all potential defenses that they were aware of with Duncan to which counsel responded "[t]o the best of our knowledge, yes…." (CR 204 at 25.) The Court asked counsel "Whether the Court has asked it or not, do you know of any reason why Mr. Duncan should not be allowed to enter pleas of guilty to each of these charges," to which counsel answered "[t]o the best of our knowledge, no, Your Honor." (CR 204 at 25.)

The representations made on the record by Duncan and his counsel as well as the Court's own findings, clearly established that Duncan's plea was voluntary, knowing, and intelligent. Such a record "constitute[s] a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). Those "[s]olemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Id.* at 74; *see also Kaczynski*, 239 F.3d at 1115 ("We give 'substantial weight' to [petitioner's] in-court statements.") (quoting *United States v. Mims*, 928 F.2d 310, 313 (9th Cir. 1991)).

That defense's now seeks to minimize, explain, and backpedal from the in-court representations is contrary to the record and representations made at the time of the plea hearing. The Declarations filed by Duncan's trial attorneys after-the-fact now state that they had no meaningful discussion with Duncan about the potential risks and benefits associated with pleading guilty because they had not had sufficient time to investigate and

prepare the case and that the decision to advise Duncan to plead guilty was done without any real appreciation for or understanding of his mental health condition or mental issues. (CV 2, Att. 1, 7.) The record from the plea hearing proves otherwise. (CR 204.)

Further, the defense had adequate time to investigate and prepare the case well before Duncan entered his guilty plea and was aware of the issues raised in this claim. Duncan's federal attorneys were involved in discussions, cooperation, investigation, and preparation into the case and negotiations for a global settlement from at least January of 2006; before the federal Indictment was filed. (CV 2, Att. 14, 16.) The defense attorneys also knew of and were pursuing mitigation evidence as well as investigating Duncan's mental health and competency issues prior to the federal charges being filed. That the defense team ultimately elected to advise Duncan to enter a guilty plea in December of 2007 was a strategical choice to focus their preparation on the Penalty Phase. Although the defense couches this choice as being forced by the lack of time and preparation, the fact remains that none of the defense team doubted Duncan's guilt nor the overwhelming evidence the Government had to prove each of the elements of the charges. Nor is there any dispute that Duncan intended to plead guilty from the beginning of this case. (CV 33, Sealed Govt. Att. 3, *2006 Visit Summaries* at 2, 10, 37, 43-44, 51, 57, 86) (CR 204 at 4.)

The Court finds counsels' performance did not fall below the objective standard of reasonableness with regard to Duncan's guilty plea. *See Hill*, 474 U.S. at 57-60. Defense counsel strategically advised Duncan to plead guilty being aware of the vast amount of evidence establishing Duncan's guilt as well as Duncan's mental health issues and the importance of mitigation at the Penalty Phase. Further, Duncan was not prejudiced because

15 - ORDER

the record does not show that but for any deficiencies, he would not have plead guilty, proceeded to trial, and/or not been sentenced to death. *Id.* Duncan never wavered in his intention to plead guilty. Duncan entered his guilty plea "voluntarily, knowingly, and intelligently, with sufficient awareness of the relevant circumstances and likely consequences" and after being advised by his counsel. *Bradshaw*, 545 U.S. at 183; *Hill*, 474 U.S. at 56–57.

### 3. Defense Team's Investigation and Preparation

"To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.'" *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (quoting *Williams v. Taylor*, 529 U.S. 362, 393, 399 (2000)). Duncan had a team of attorneys, investigators, specialists, and experts who were aware of, investigated, and were prepared to present and explain the significance of the issues surrounding Duncan's mental condition and all the available mitigating evidence.

Duncan's mental competency, mental health issues, and possible mitigation were all part of both the state and federal defense teams discussions, planning, investigation, and preparation as early as August of 2005. (CR 816 at 2646-47) (CR 817 at 2666-76, 2719-22). There was coordination and overlapping personnel between the state and federal defense teams. Before the federal indictment was filed, both defense teams included attorneys, mental health experts, and investigators all of whom were communicating and investigating the issues and concerns they knew would arise including Duncan's history,

16 - ORDER

possible witnesses, mitigation, and his mental health/competency. *See e.g. id.* and (CR 194, Att. 2, Dec. Beaver) (CR 824 at 4524-25.) The federal defense team was meeting and communicating regularly with Duncan and knew of the need to raise competency issues when the charges in this case were filed. *See e.g. id.* and (CR 824 at 4527, 4539-49, 4556-58, 4563.)

There were certainly frustrations among the defense team which the Court was aware of and appreciated when it made its rulings in the case. Despite those issues within the defense team, the fact remains that the defense was well aware early on that Duncan's mental health/competency would be an issue and that they would need to conduct an extensive mitigation investigation. The defense team therefore started preparing for the capital sentencing hearing by investigating Duncan's mental health/competency and the available mitigation evidence even before the federal charges were filed.

Moreover, the record shows the defense attorneys were well informed and able to skillfully present their position concerning Duncan's mental health/competency and possible mitigation in this case. The defense attorneys expertly addressed those issues and their knowledge and preparation was evident to this Court who presided over the case. That the defense team had investigated and prepared the case became even more clear at the retrospective competency hearing where the testimony and evidence revealed the great extent and length of the defense team's work on the case. Defense counsels' performance was not deficient in this regard.

**B.     Duncan Suffered No Prejudice as a Result of Counsels' Performance**

The second prong of the test requires the Petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, or that the error was so serious it rendered the trial fundamentally unfair, *Weaver*, 137 S.Ct. at 1911. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693). "[A]n attorney's inadequate representation does not rise to the level of a constitutional violation unless the deficiency so infected the adversarial process as to raise doubts about the reliability of the proceeding's outcome." *Howard v. Clark*, 608 F.3d 563, 568 (9th Cir. 2010) (citing *Strickland*, 466 U.S. at 687).

Prejudice may be presumed where counsel's error was a "structural" defect. *Carrera v. Ayers*, 670 F.3d 938, 956 (9th Cir. 2011) (citing cases). The parties dispute whether there was structural error in this case such that prejudice is presumed. (CV 4, 34.) Structural errors are errors that affect "the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). The Supreme Court has "found structural errors only in a very limited class of cases" such as: (1) denying an attorney to an indigent defendant; (2) lack of an impartial trial judge; (3) unlawful exclusion of a juror based on race or ethnicity; (4) right to a public trial; and (5) failure to give a reasonable-doubt jury instruction. *Johnson v. United States*, 520 U.S. 461, 468-69 (1997) (citing cases).

Duncan argues the "breakdown of the system" in his case, including the deprivation of his Sixth Amendment right to counsel, constituted "structural errors" and, therefore, prejudice is presumed. (CV 4 at 38-39.)

There is a distinction, however, between objections to structural errors made at trial and preserved on direct appeal (in which case prejudice is presumed) and where, as here, objections to structural errors are raised later in the context of an ineffective assistance of counsel claim (in which case the burden is on defendant to show prejudice). *See Weaver*, 137 S.Ct. at 1909–11 (holding made in the context of the right to a public trial). Because Duncan waived his direct appeal, he bears the burden here to show prejudice. *Id.*; (CR 860, *United States v. Duncan*, Appeal No. 13-99011).

Duncan argues the errors by his counsel and the Court deprived him of effective assistance of counsel and prejudiced him such that the criminal proceedings were unconstitutional. (CV 4, 37.) Having reviewed the arguments and materials submitted by the parties in this proceeding as well as the record in the underlying criminal action, the Court concludes that Duncan suffered no prejudice from his trial counsels' representation.

Duncan's mental condition did not affect counsel's ability to effectively represent him. The record is clear on this issue. Duncan has been deemed to be competent.[7] While Duncan's unique ideology, beliefs, theories, and the like undoubtedly complicated the work of the defense attorneys, his counsels' performance was not ineffective nor

---

[7] Duncan's competency is addressed elsewhere in this Order and in the record of the underlying criminal case.

prejudicial because of it. The defense attorneys effectively and competently represented Duncan; including while they served as standby counsel.

Neither Duncan's guilty plea nor decision to represent himself were prejudiced by any deficiency of his counsel or the Court's rulings. While Duncan now argues after-the-fact that he would not have plead guilty or chosen to represent himself at sentencing had he been adequately represented, the record reflects otherwise. Again, from the beginning of this case, Duncan repeatedly expressed his desire to plead guilty despite his attorneys' efforts to persuade him otherwise. (CV 33, Sealed Govt. Att. 3, *2006 Visit Summaries* at 2, 10, 37, 43-44, 51, 57, 86) (CR 204 at 4.) Ultimately, Duncan entered a guilty plea to all counts and elected to proceed *pro se*. (CR 188, 189, 204, 391, 399, 493, 494, 499, 502.) Those decisions were Duncan's to make. There was nothing fundamentally unfair or unreliable that resulted from Duncan electing to plead guilty or represent himself. *Lockhart v. Fretwell*, 506 U.S. 364 (1993) (The focus of the prejudice analysis is on whether the result of the proceeding was fundamentally unfair or unreliable.). The record clearly establishes that the Court's colloquy with Duncan was thorough, probing, and ensured that Duncan was competent to enter his guilty plea and that he did so knowingly and voluntarily. (CR 204.) Likewise, as to his decision to self-represent, the record shows Duncan was competent to make that election. (CR 404, 493, 494, 499, 502.)

Further, the Court's rulings were not erroneous nor prejudicial to Duncan. Despite the defense's arguments to the contrary, the Court did grant continuances of the proceedings in this case. While those extensions may not have been for as long as the defense requested, the Court granted continuances to the defense throughout the capital

20 - ORDER

case at critical junctures in order to ensure the defense as well as the Government had adequate time to investigate and prepare for the different phases of the proceeding. The record makes clear that the Court appreciated the fact that this is a capital case, which carries heightened responsibilities on the Court, counsel, and all involved, given the potential of the ultimate penalty. The record further shows that the Court recognized the importance of allowing the parties enough time to perform their duties while also balancing the public's right to a speedy trial as well as the impact on the victims. *See e.g.* (CR 31, 32, 79, 85, 88, 157, 202, 265, 316.) It is further clear from the record that the defense team had ample resources to investigate and prepare in this case and that counsel worked diligently in doing so. The amount of work and level of preparation of the defense attorneys was evident to this Court throughout the capital proceeding based on their filings and arguments. Undoubtedly every attorney desires more time to prepare, especially in a capital case. In this case, the fact remains that the defense team and Duncan were given the time necessary to effectively investigate and prepare.

The Court further finds that after reweighing the evidence, Duncan has not shown that there is a reasonable probability that he would have received a sentence of less than death. *See Mayfield*, 270 F.3d at 928-29.

Determining Penalty Phase prejudice requires courts to "evaluate the totality of the available mitigation evidence" and "carefully weigh the mitigating evidence (both that which was introduced and that which was omitted or understated) against the aggravating evidence…and determine whether there was 'a reasonable probability that, absent the errors, the sentence…would have concluded that the balance of aggravating and mitigating

circumstances did not warrant death.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362 (2000) and *Strickland*, 466 U.S. at 695); *see also Sears v. Upton*, 561 U.S. 945, 955–956 (2010) (per curiam) (same). This determination requires fact-specific balancing where the court "reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *see also Trevino v. Davis*, 138 S.Ct. 1793, 1794 (2018) Sotomayor, J. dissenting (denial of petition for writ of certiorari). That is to say, "the reviewing court must consider all the evidence—the good and the bad— when evaluating prejudice." *Wong v. Belmontes*, 558 U.S. 15, 26 (2009) (per curiam) (holding in a capital case that there was no prejudice due to counsel's failure to introduce more mitigating evidence because the aggravating evidence was "simply overwhelming").

After reweighing all the evidence in this case, using the above standard, the Court finds that even if the jury had been able to consider the mitigating evidence the defense now argues could have been discovered and should have been presented, in addition to what was presented at the capital sentencing, there is no reasonable probability that Duncan might not have been sentenced to death. The aggravating evidence in this case was more than overwhelming to sustain the sentence of death imposed by the jury. The evidence of Duncan's heinousness and sadistic conduct fits squarely within the requirements for the jury to have imposed the death penalty. Duncan carefully calculated and methodically planned out his grisly crimes far in advance, giving great thought and attention to detail as to how he would carry out his acts. (CR 640 at 1600-1652) (CR 641-644.)

The evidence showed that Duncan had attended college, nearly attaining a bachelor's degree in computer science, and tested at a significantly above average IQ level.

(CR 843.) The materials and supplies he purchased, the area he selected to commit the crimes, the ages of the children he stalked, and the scheme he used to kill the adults are consistent with the jury's finding of premeditation and vengeance rather than a mental competency issue. (CR 640 at 1600-1652) (CR 641-644.) The mitigation evidence concerning Duncan's mental health/condition, family circumstances, childhood history, background of abuse, and the like simply do not overcome the evidence supporting the aggravating circumstances which justify the jury's death sentence in this case. In sum, the Court concludes Duncan has not shown a reasonable probability that, absent the alleged errors, the balance of aggravating and mitigating circumstances did not warrant death. *Mayfield*, 270 F.3d at 928-29.

### 3.     The August 28, 2007 Meeting Between Peven and the Court was Proper

Duncan argues his statutory rights and Fifth, Sixth, and Eighth Amendment rights were violated when the Court met with Peven in-chambers and off the record on August 28, 2007. (CV 4.) In particular, Duncan contends his rights to due process, effective assistance of counsel, and fundamental fairness were violated because there is no record of the meeting, he was not present or represented at the meeting where his rights were directly impacted, and the meeting created a substantial risk that the death sentence was imposed arbitrarily and capriciously. (CV 4, 37.) The Government maintains the meeting was proper, within the Court's discretion, and did not violate any of Duncan's rights. (CV 34.)

### A.     Statutory Right to a Record of the Meeting

Duncan argues he was denied his statutory rights under the Court Reporter's Act, 28 U.S.C. § 753, to fundamental fairness and an adequate record because no transcript was made of the in-chambers meeting. (CV 4.) The Court disagrees.

There was no violation of the Court Reporters Act. Pretrial chambers conferences with counsel "do not fit within the 'open court' recording requirements of [§] 753" and the recording of such conferences is left to the discretion of district court except when requested by a party. *United States v. Hein*, 769 F.2d 609, 611 (9th Cir. 1985); *see also United States v. Amico*, 486 F.3d 764, 778 (2nd Cir. 2007); *Von Kahl v. United States*, 242 F.3d 783, 792 (8th Cir. 2001). In this case, counsel did not request that the August 28, 2007 meeting in chambers be recorded. (CR 187.) At the hearing held just prior to the in-chambers meeting, Peven asked that the Court meet with him off the record initially and then decide how to proceed. (CR 187 at 2.) Mr. Larrañaga then stated on the record:

> Good morning, Your Honor. It is my understanding that we are going to have this obviously on the record and then potentially off the record with the Court talking to Mr. Peven. It would be our position or my position that I be present for that, but I understand that the Court intends to talk to Mr. Peven about private matters off the record. Obviously, it is up to the Court to make that decision.

(CR 187 at 3.) Whether the meeting would be recorded was, therefore, subject to the Court's discretion. *Hein*, 769 F.2d at 611. The Court properly exercised its discretion and elected to meet with Peven privately, stating that if anything related to Duncan's case arose during the meeting, it would go back on the record. (CR 187 at 3.) The contents of the meeting involved only Peven's personal matters and, therefore, there was no need to go back on the record at that time.

Furthermore, the lack of a transcript or recording of the meeting does not violate Duncan's constitutional rights. The record in this case is sufficiently complete for Duncan to pursue an effective defense or appeal. *See Mayer v. City of Chicago*, 404 U.S. 189, 193–94 (1971); *Britt v. North Carolina*, 404 U.S. 226, 227 (1971). "A 'record of sufficient completeness' does not translate automatically into a complete verbatim transcript." *Mayer*, 404 U.S. at 194. Rather, "[a]lternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise." *Draper v. Washington*, 372 U.S. 487, 495 (1963). Whether a transcript is needed for an effective defense or appeal depends on: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as the transcript." *Britt*, 404 U.S. at 433–34.

Following the August 28, 2007 meeting, Peven filed two Declarations memorializing the information he provided to the Court in-chambers. (CR 68, 90.) The substance of the in-chambers meeting and the arguments concerning the same are further documented in other filings. (CR 74-78, 80, 85, 88, 157, 185.) These materials provide a sufficiently complete record. *See Mayer*, 404 U.S. at 194.

There was no violation of Duncan's statutory or constitutional rights based on the fact that there is no transcript or recording of the meeting. The Court properly exercised its discretion under § 753 and there is an adequate record upon which Duncan can effectively raise a defense and appeal.

**B.** **Constitutional Rights Under the Fifth, Sixth, and Eighth Amendments**

"Under the Fifth Amendment's Due Process Clause, a defendant has 'the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.'" *United States v. McChesney*, 871 F.3d 801, 808 (9th Cir. 2017) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam). Whether a proceeding is "critical" such that it implicates a defendant's constitutional right to be present requires courts to look at the "particular nature" of the proceeding and whether the defendant could be "useful." *Stincer*, 482 U.S. at 745.

The Sixth Amendment ensures a defendant the right to effective assistance of counsel during all critical stages of the criminal process. *See Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008); *Hovey v. Ayers*, 458 F.3d 892, 901 (9th Cir. 2006) (citing *United States v. Wade*, 388 U.S. 218, 224–25 (1967)). "A critical stage is any 'stage of a criminal proceeding where substantial rights of a criminal accused may be affected.'" *Hovey*, 458 F.3d at 901 (quoting *Mempa v. Rhay*, 389 U.S. 128, 134 (1967) and citing *Bell v. Cone*, 535 U.S. 685, 696 (2002) (defining a critical stage as "a step of a criminal proceeding, such as arraignment, that [holds] significant consequences for the accused")). The Ninth Circuit has "distilled a three-factor test for determining what constitutes a critical stage" in the Sixth Amendment context which considers whether: (1) "failure to pursue strategies or remedies results in a loss of significant rights," (2) "skilled counsel would be useful in helping the accused understand the legal confrontation," and (3) "the proceeding tests the

merits of the accused's case." *Id.* at 901 (citation omitted). The presence of any one of these factors may be sufficient for a stage of the proceedings to be considered "critical." *Id.*

The Eighth Amendment requires that the death sentence not be imposed in an arbitrary and capricious manner. *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). The Supreme Court "has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency." *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990); *see also Parker v. Dugger*, 498 U.S. 308, 321 (1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally").

The August 28, 2007 in-chambers meeting with Peven did not violate Duncan's Fifth, Sixth, or Eighth Amendment rights.

The meeting was not a critical proceeding. It did not involve Duncan's loss of significant rights, any legal confrontation requiring counsel to assist or advise Duncan, nor any test of the merits of the case. Duncan's rights were not lost or impacted during or as a result of the in-chambers meeting. Duncan was represented by counsel at the time of the meeting and neither Duncan's presence nor that of his other attorneys at the in-chambers meeting was required nor would their presence have contributed to the proceeding's fairness.

Moreover, there was no confusion over what transpired at the meeting. The purpose and subject matter of the meeting in-chambers was to inform the Court of Peven's personal circumstances underlying his request to stepdown as counsel for Duncan. (CR 68, 185.) The defense knew that was the intent of the meeting as evidenced by the defense filings

made shortly after the meeting wherein they stated Peven had "notified the Court that, for reasons <u>unrelated to Mr. Duncan</u>, he could no longer serve as counsel of record" (CR 69) (emphasis added) and that Peven's meeting with the Court was to "discuss <u>non-case related issues, personal to Mr. Peven</u>" (CR 74 at 5, n. 5) (emphasis added). The parties' arguments and the decision regarding whether Peven would be allowed to step down were taken up on the record in later filed briefing, hearings, and Orders at which Duncan was present and represented. As soon as the Court was put on notice of the personal issues Peven was dealing with, the Court converted Peven to standby counsel and appointed noted capital counsel, Judy Clarke, as the third active attorney to Duncan's defense team. (CR 69, 70, 72, 89, 90, 104.)[8]

The defense filed a Motion to Continue the January 22, 2008 trial setting. (CR 74-78.) The Court held a hearing on the Motion, and other motions, where the defense argued additional time was needed to investigate and prepare their case because they had encountered numerous obstacles in moving forward, many of which were related to Peven's personal issues and deficient performance which had impaired their ability to investigate and prepare the case. (CR 68, 74-78, 80, 85, 88, 90.) The Court denied the continuance. (CR 88, 157.)

The denial of the defense's request for a continuance was not the result of there being no recording of the meeting, any misunderstanding, or the Court not being fully advised as to the basis for the defense's request for a continuance. Again, there was no

---

[8] Judy Clark was and is an extremely experienced and highly regarded capital defense attorney.

confusion regarding what transpired at the meeting. (CR 74-78, 80, 85, 88, 157, 185.) The Court was fully aware of the defense's argument and position that they needed more time to investigate and prepare the case because it had been hamstrung by Peven's performance and personal circumstances. The Court simply disagreed with the defense as to the amount of time required to prepare and investigate the case, denying the request for the reasons stated in the record. (CR 88, 157.) Further, as discussed elsewhere in this Order, counsels' performance was not prejudicial nor did it result in violations of Duncan's constitutional rights.

For these reasons, the Court finds Duncan's constitutional rights were not violated by the August 28, 2007 meeting between Peven and the Court.

**4.      Duncan's Guilty Plea was Valid**

Duncan argues his Fifth, Sixth, and Eighth Amendment rights were violated because he was incompetent to plead guilty; his counsel failed to present sufficient evidence of a bona fide doubt as to his competence to plead guilty; and his plea was not a knowing, intelligent, and voluntary waiver of his right to stand trial. (CV 4.)

**A.      Duncan was Competent to Enter a Guilty Plea**

A defendant is "competent to plead guilty and stand trial if he or she had 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'a rational as well as factual understanding of the proceedings against him [or her].'" *Deere v. Cullen*, 718 F.3d 1124, 1144 (9th Cir. 2013) (quoting *Godinez v. Moran*, 509 U.S. 389, 396–98 (1993); *Drope v. Missouri*, 420 U.S. 162, 172 (1975); *Dusky v. United States*, 362 U.S. 402 (1960)). "Competence 'has a modest aim: It seeks to ensure

29 - ORDER

that [the defendant] has the capacity to understand the proceedings and to assist counsel.'"
*Id.* (quoting *Godinez*, 509 U.S. at 402).

The main thrust of this claim challenges the Court's conclusions that Duncan was competent in the underlying proceeding, pointing mainly to the experts, lay witnesses, and evidence presented at the retrospective competency hearing. (CV 4 at 53-121.) The Court's Order on Remand, as well as the Court's other rulings in the underlying criminal proceeding, however, completely and thoroughly address the defense's arguments raised here. (CR 843.) That the defense disagrees with the conclusion that Duncan is in fact competent does not mean error occurred or that the Court's reasoning and conclusion were wrong. The Court was certain in each of its decisions finding Duncan competent during the criminal case and later at the retrospective competency hearing. Even now with the benefit of hindsight and after having again reviewed the record, materials, and arguments presented on the question, the Court remains firm in its decisions finding Duncan competent.

In particular, the defense argues the Court erred at the retrospective competency hearing by relying on the Riverside County proceedings in assessing credibility. (CV 4 at 112-113.) This argument fails to take into account the entire Order on Remand which did not turn on the materials presented from the Riverside County case. (CR 843.) In the Order, the Court noted the Riverside County proceedings to the extent they were presented at the retrospective competency hearing. (CR 843.) That evidence was not dispositive of this Court's reasoning and/or conclusion finding Duncan competent. The Riverside County proceedings were mentioned in the Order on Remand to note their existence because they

were discussed at the retrospective competency hearing; it was not for the purpose of establishing the truth of any disputed matters or as a basis for this Court's own independent determination of the credibility of the witnesses and, ultimately, Duncan's competency.

For the reasons stated in the Order on Remand and the other rulings in the criminal record, all of which are incorporated herein, and as discussed elsewhere in this Order, the Court denies this claim. Duncan was competent to enter his guilty plea. (CR 843.)

**B.     Counsel was not Ineffective for Failing to Raise Doubt as to Duncan's Competency to Plead Guilty**

Duncan argues he was denied effective assistance of counsel by his trial counsel's failure to raise a bona fide doubt as to his competency and counsel's decision to allow him to plead guilty. (CV 4 at 114-115.) The Court disagrees.

Counsel's performance was not deficient because the decision for Duncan to plead guilty was a reasonable tactical decision and there was no question as to Duncan's guilt. *Strickland*, 466 U.S. at 689 (Tactical decisions that are not objectively unreasonable do not constitute ineffective assistance of counsel.); *Hughes v. Borg*, 898 F.2d 695, 703 (9th Cir. 1990) (same); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (Failure to take futile action can never be deficient performance.). Further, Duncan was not prejudiced by his counsel's failure to raise doubt as to his competency prior to or at the time of his plea and/or by counsel allowing Duncan to plead guilty. *Strickland*, 466 U.S. at 697. Duncan's competence has been thoroughly and completely addressed several times throughout the capital case and he has been determined to be competent. Therefore, Duncan suffered no prejudice in this regard. *See id.* (Prejudice exists where "there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different" or that counsels' errors rendered the proceedings fundamentally unfair.).

### C.    Duncan's Plea was Knowing, Intelligent, and Voluntary

Duncan claims his plea was not knowing, intelligent, or voluntary because it was based on his irrational beliefs and because he was incompetent. (CV 4 at 115-117.)

A guilty plea "is valid only if done voluntarily, knowingly, and intelligently, with sufficient awareness of the relevant circumstances and likely consequences." *Bradshaw*, 545 U.S. at 183 (citation and internal quotations omitted). "[A] plea of guilty entered by one fully aware of the direct consequences...must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)." *Kaczynski*, 239 F.3d at 1114 (citations and marks omitted). A plea is considered voluntary when it "'represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Id.* (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).

Again, as previously discussed, the Court conducted a thorough inquiry of Duncan at the plea hearing to ensure his pleas were in fact knowing, intelligent, and voluntary. (CR 204.) Duncan was fully advised of the charges against him, the possible penalties, his constitutional rights, and the ramifications of his guilty pleas. (CR 204.) Duncan then competently, voluntarily, knowingly, and intelligently entered his pleas of guilty.

### D.    The Retrospective Competency Hearing

### 1. Duncan Received Effective Assistance of Counsel at the Retrospective Competency Hearing

Duncan argues he was denied effective assistance of counsel at the retrospective competency hearing because his attorneys made unreasonable errors and omissions which limited expert testimony favorable to him. (CV 4 at 117-18.) Specifically, with regard to the exclusion or limiting of certain experts' testimony, failure to present expert testimony regarding the effects of familial abuse and incest on Duncan's mental functioning, and expert review of the testimony of Cheri Cox, Duncan's sister.

Having reviewed the record, the Court finds Duncan's counsel at the retrospective competency hearing was not defective nor did he suffer any prejudice as a result of his counsels' performance. Duncan's attorneys at the retrospective competency hearing called numerous witnesses, including five experts all of whom extensively presented the defense position that Duncan was incompetent. Counsels' performance at the retrospective competency hearing was effective. Defense counsel competently and skillfully presented testimony and evidence supporting its position that Duncan was incompetent; including addressing the fact that Duncan had a history of abuse and disfunction in his family.

Cheri Cox's testimony at the retrospective competency hearing describing the abuse Duncan endured from his mother and their family circumstances/history confirmed what the defense and its experts already knew. (CR 815 at 2365-80; CR 816 at 2384-97.) The defense has known about Duncan's family disfunction, including emotional, physical, and sexual abuse by his mother, since before the capital sentencing hearing. (CR 819 at 3366, 3433-3434, 3443-46) (CR 821 at 3990-91) (CR 824 at 4520-21.) Defense team members

had talked to Duncan's family members including his mother and sister. (CR 821 at 3971) (CR 824 at 4650-51.) The defense has also had Duncan's records from the Washington Corrections Center which reveal that the family home situation had a great deal of sexual conflict including inappropriate conduct by his mother. *See e.g.* (CR 799, Def. Exs. A24 and B60.)

After Ms. Cox's testimony, Dr. James R. Merikangas took the stand and testified that the origin of Duncan's psychosis was "multifactorial" with a lot of possible causes including his "upbringing, the abuse, and his genetic family background." (CR 818 at 3088.) In reaching that conclusion, Dr. Merikangas had reviewed Duncan's records from the Washington Corrections Center, interviewed Duncan's mother, and had taken a social history from Duncan; noting the significance of "physical and sexual abuse in childhood, and passing through his adolescence and adulthood where he was raped in prison." (CR 818 at 2932-34, 2941, 3026, 3088.) Dr. Merikangas testified that family history and emotional abuse have an adverse effect on brain development in early life and the impact those factors have on an individual as they grow older. (CR 818 at 2958-59.) He stated that many medical and psychiatric conditions have a familial basis which contribute to the way people develop. (CR 818 at 2938.) Dr. George W. Woods, Jr. also testified that during his first interview, Duncan talked about his relationship with his mother, how she "terrorized" him, and the difficulties he had at home. (CR 828 at 5684.)

That counsel did not question the testifying experts specifically about Ms. Cox's testimony or present an expert such as Dr. David Lisak does not show deficient performance nor prejudice. (CV 2, Ex. 13.) Based on the record from the retrospective

competency hearing, the Court finds defense counsel's performance was effective and not deficient with regard to addressing Duncan's family circumstances and abuse. That evidence was considered by the testifying experts and addressed by counsel. Counsel also presented testimony, evidence, and argument throughout the retrospective competency hearing concerning Duncan's atypical psychiatric and psychological symptomatology as a basis for finding him incompetent. The Court weighed and considered all of that evidence in arriving at its conclusion that Duncan was competent. (CR 843.)

Further, any exclusion or limiting of testimony was not due to deficient performance by counsel and, regardless, did not prejudice Duncan when considering the volume of material presented by the defense. Dr. Michael B. First, Dr. Craig W. Beaver, and Dr. Xavier F. Amador all testified and offered their opinions concluding that Duncan was incompetent. (CR 818, 819, 822.) The defense effectively presented its evidence through these and other witnesses.

Dr. First was qualified as an expert in the field of psychiatry and, specifically, in the area of delusions. Dr. First testified at length about psychiatric manuals, i.e. the DSM-IV, diagnostic instruments, i.e. SCID, and how to diagnose/distinguish between religious beliefs and religious delusion. (CR 819 at 3163.) Dr. Beaver was qualified as an expert in neuropsychology but not forensic psychology. (CR 819 at 3212.) Dr. Beaver testified extensively as an expert in neuropsychology about the tests he administered to Duncan as well as his opinions and conclusions. Dr. Amador was qualified as an expert in clinical psychology and allowed to testify regarding diagnosis and the failures of correct diagnostic

procedures used by some of the Government's experts, in particular Dr. Low, which was the purpose for the defense calling Dr. Amador. (CR 822.)

Having again reviewed the materials from the underlying capital case, the Court concludes that counsels' performance at the retrospective competency hearing was not deficient and, regardless, Duncan was not prejudiced by any deficiency in counsel's performance. Although the Court concluded to the contrary of the defense experts on the question of competency, the testimony and evidence were skillfully presented and argued by counsel.

### 2.   Duncan Received a Full and Fair Determination

Duncan argues he was deprived of a full and fair determination based on all available and admissible evidence pointing to the Government's withdraw of Dr. Ronald Roesch's testimony and consideration of his interviews. (CV 4.) Dr. Roesch testified at the retrospective competency hearing and the transcript of his interview with Duncan was admitted as Defense Exhibit II. (CR 814.) Defense counsel effectively cross-examined Dr. Roesch. (CR 814 at 1950-52, 1973-78, 1982-89, 2015, 2028-2029, 2037.) The Court considered and addressed the same in its Order on Remand. (Dkt. 843 at 18-19.) Duncan was afforded a full and fair determination at the retrospective competency hearing, particularly as to Dr. Roesch's testimony and/or consideration of his interview.

### 5.   Duncan was Competent to Proceed *Pro Se*

Duncan argues he was incompetent to represent himself and the Court erred in allowing him to do so without holding a competency hearing in violation of Due Process

and the Eighth Amendment. (CV 4, 37.) The Government asserts the Court properly permitted Duncan to represent himself. (CV 34.)

In this case, Duncan made an oral motion to represent himself just prior to the start of the individual *voir dire*. (CR 391.) The Court took the request up at a hearing on April 18, 2008 where it advised Duncan of the pitfalls and disadvantages of self-representation and ultimately ordered mental evaluations be completed to determine whether Duncan was competent to waive representation by counsel. (CR 399, 404.) After the evaluations and briefing by counsel were submitted, Court found Duncan competent to proceed. (CR 493, 494.)[9] Thereafter, on July 28, 2008, the Court held a second hearing where it again advised Duncan of the pitfalls and dangers of representing himself. (CR 499, 502.) At that hearing, Duncan knowingly, voluntarily, and unequivocally waived his right to counsel and stated his desire was to represent himself at the capital sentencing hearing. (CR 499, 502.) The Court granted Duncan's request to proceed *pro se* and appointed his defense team as standby counsel. (CR 499, 502.)

This claim essentially is the defense's disagreement with the Court's conclusions finding Duncan competent to waive his right to counsel and to represent himself. The record in the underlying criminal proceeding, however, disproves each of Duncan's arguments.[10] There, the Court addressed why no second competency hearing was needed,

---

[9] For the reasons stated in the Court's July 24, 2008 Order, the Court did not err by declining to hold a second competency hearing before determining that Duncan was competent to waive his right to counsel. (CR 493.)

[10] The Court adopts its reasoning stated in its rulings from the underlying criminal proceeding in this Order as further support for concluding that Duncan's rights were not violated.

whether Duncan was competent to waive his Sixth Amendment right to counsel, and whether Duncan was competent to represent himself under *Indiana v. Edwards*. (CR 493, 502.) That the defense disagrees with the Court's conclusions and/or Duncan's decisions, ideology, and level of participation at the sentencing hearing, does not create error where there was none. The Court held several hearings, considered volumes of material presented by both sides concerning Duncan's competency, conducted thorough and complete colloquies with Duncan, fully analyzed and addressed each of Duncan's arguments, and conscientiously protected Duncan's rights in the criminal case.[11] There was no violation of Due Process, the Sixth Amendment, or the Eighth Amendment. Just the opposite, Duncan's rights were carefully considered and staunchly protected throughout the proceedings.

## 6.    Duncan's Right to Self-Represent was Fundamentally Fair

Even if he was competent, Duncan argues it was fundamentally unfair to allow him to represent himself in the capital case. (CV 4.) Duncan maintains the Sixth Amendment right to self-representation does not extend to a capital sentencing trial and allowing him to do so is contrary to the Eighth Amendment's requirement that a capital sentencing be reliable. (CV 37.)

### A.    Sixth Amendment

---

[11] The defense briefing on this claim quibbles with the Court's competency determinations, pointing to the opinions of the various experts, and arrives at the incorrect conclusion that the Court "struggled" over whether Duncan was competent. (CV 4 at 121-32.) To the extent it is not clear from the record, the Court now makes it clear that there was and is no question in the Court's mind that Duncan is and was competent in all respects. That the Court acknowledged the countering opinions and evidence and appreciated the arguments of both sides in its rulings should not be taken as any indication that the Court's rulings finding Duncan competent were anything but certain, absolute, and made with no doubt or equivocation.

Duncan argues the Sixth Amendment right to self-representation does not apply following a conviction, i.e., on appeal or at sentencing. (Dkt. 4, 37.) The Court disagrees.

In *Faretta v. California*, the Supreme Court held that a criminal defendant has a Sixth Amendment right to self-representation at trial "when he [or she] voluntarily and intelligently elects to do so. 422 U.S. 806, 807 (1975). That right, however, is not absolute. *Id.* at 834, n. 46; *Indiana v. Edwards*, 554 U.S. 164 (2008). A defendant may be denied the right to self-represent if they lack the mental competency to conduct a defense, even though the defendant is competent to stand trial. *Indiana v. Edwards*, 554 U.S. at 178. The right to self-representation does not apply to appeals. *Martinez v. Court of App. of Cal., Fourth App. Dist.*, 528 U.S. 152, 154 (2000). It does, however, apply to capital cases, including at the penalty phase. *See United States v. Davis*, 285 F.3d 378, 381 (5th Cir. 2002) (appointing counsel for *pro se* defendant at the penalty phase of a capital murder case to present mitigating evidence the defendant had specifically declined to present, violated defendant's Sixth Amendment right to self-representation); *Silagy v. Peters*, 905 F.2d 986, 1007–08 (7th Cir. 1990) (The right to self-representation applies in capital sentencing proceedings.)

Here, Duncan waived his right to counsel and elected to proceed *pro se*. A valid waiver includes: (1) a determination by the court that the defendant has the mental capacity to understand the proceedings and (2) a finding that the waiver is knowing and voluntary, which entails a finding that the defendant understands the consequences of the decision and is not being coerced. *Godinez v. Moran*, 509 U.S. 389, 400–401 & n. 12 (1993).

Duncan was competent to represent himself. The Court conducted a thorough and complete *Faretta* colloquy with Duncan to ensure that his election to self-represent was

voluntary and intelligent. *United States v. Farhad*, 190 F.3d 1097, 1099 (9th Cir. 1999) (In order to constitute a knowing and intelligent waiver of the right to counsel, the defendant must be aware of "(1) the nature of the charges against him; (2) the possible penalties; and (3) the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'"). Duncan competently, knowingly, and voluntarily waived his right to counsel after having been fully advised and the Court therefore permitted him to represent himself. (CR 493, 494, 499, 502.) That election was Duncan's to make.

### B. Eighth Amendment

Regardless of whether the Sixth Amendment applies at the penalty phase, Duncan argues it was fundamentally unfair to allow him to represent himself because the strong interests in ensuring the fairness of the Penalty Phase outweighs any interest in self-representation. (CV 4, 37.)

In capital cases, the Eighth Amendment requires that the sentencing decision be reliable, consistently applied, and individualized based on the defendant's circumstances, background, and the crime. *Clemons v. Mississippi*, 494 U.S. at 748-49. The Eighth Amendment's "twin objectives" are "measured consistent application and fairness to the accused." *Eddings v. Oklahoma*, 455 U.S. 104, 110-11 (1982). The foremost concern of the Eighth Amendment is that the death sentence not be imposed in an arbitrary and capricious manner. *Gregg v. Georgia*, 428 U.S. at 188. Because "death is a different kind of punishment" both in its severity and finality, the public, as well as the defendant, have a strong interest in the fairness and reliability of a decision to impose the death penalty.

*See Gardner v. Florida*, 430 U.S. 349, 357-58 (1977). The Eighth Amendment requires increased reliability for the process under which a capital sentence may be imposed. *See Herrera v. Collins*, 506 U.S. 390, 406 (1993).

Here, Duncan argues the Court should not have allowed him to self-represent because it was clear that he had no actual desire to represent himself or present any mitigation evidence. (CV 4, 37.) The Court concludes otherwise. That the defense disagrees with Duncan's decision and/or approach to defending himself at the capital sentencing does not, in and of itself, make his decision to do so unconstitutional or fundamentally unfair. Despite the important distinctions between capital and non-capital cases, there is no requirement that the accused in a capital case be represented by counsel where the defendant has properly exercised the choice to self-represent. *See e.g. United States v. Roof*, 225 F.Supp.3d 394, 398-402 (D.S.C. 2016).

Moreover, the Court took great care to protect Duncan's rights and to ensure that the capital proceeding was fair and that the resulting sentence was reliable. To that end, the Court appointed Duncan's entire defense team as standby counsel to represent him throughout the capital case. Duncan utilized and conferred with his standby counsel during the Penalty Phase. Standby counsel also submitted filings during and after the proceeding which further ensured the fairness and reliability of the capital sentencing.

**7.    A Fair and Impartial Jury was Selected**

Duncan claims he was deprived of his Sixth Amendment right to a fair and impartial jury because trial counsel failed to request a change of venue and the Court failed to do so *sua sponte*. (CV 4.) Duncan argues the extraordinary amount of press coverage of this case

before his arrest and throughout the proceedings made it impossible for him to receive a fair trial by an impartial jury untainted by the extensive publicity. The Government counters that defense counsel had no professional responsibility to make a futile motion for change of venue in this case because the quality and quantity of the publicity did not establish sufficient prejudice to warrant such a request. (CV 34.) Further, the Government argues the Court protected Duncan's right to a fair trial and impartial jury during *voir dire*, a process in which Duncan participated. Duncan's reply brief maintains the systemic break down of his defense counsel compounded by his own mental illness and the Court's errors resulted in the failure to change venue and improper *voir dire* which ultimately lead to empaneling a biased and unqualified jury and an unfair trial. (CV 37.)

"The Sixth Amendment guarantees a defendant's right to trial before an impartial jury." *Murray v. Schriro*, 882 F.3d 778, 802 (9th Cir. 2018) (citing *Skilling v. United States*, 561 U.S. 358, 377 (2010)); U.S. CONST. AMEND VI ("In all criminal prosecutions, the accused shall enjoy the right to a ... trial, by an impartial jury...."). A criminal defendant's right to a fair trial is an essential part of our system of justice. *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 551-55 (1976). Trial courts have the duty to ensure that media coverage does not affect the fairness of the proceeding. *Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966) ("where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity…courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences."). The Ninth Circuit has recognized the duty upon trial courts to take

affirmative steps to insure the fairness of a criminal proceeding in the face of excessive publicity. *Levine v. United States Dist. Ct. for Central Dist. of Cal.*, 764 F.2d 590, 596 (9th Cir. 1985) (citing *Farr v. Pitchess*, 522 F.2d 464, 468 (9th Cir. 1975)).

"When an impartial jury cannot be empaneled due to pretrial publicity, a change of venue at the request of the defendant is appropriate to prevent violation of the defendant's due process right to a fair trial." *Murray*, 882 F.3d at 802. To support a change of venue request on the basis of prejudicial pretrial publicity, a defendant must establish either presumed or actual prejudice. *See Skilling*, *supra* and *Murphy v. Florida*, 421 U.S. 794, 800-01 (1975).

Courts "may presume prejudice only when the 'trial atmosphere [is] utterly corrupted by press coverage,' or when 'a wave of public passion...ma[kes] a fair trial unlikely by the jury....'" *Murray*, 882 F.3d at 802 (quoting *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) and *Patton v. Yount*, 467 U.S. 1025, 1040 (1984)). "Juror exposure to news reports of a crime—even 'pervasive, adverse publicity'—is not enough alone to trigger a presumption of prejudice to the defendant's due process rights." *Id.* (quoting *Skilling*, 561 U.S. at 382-84) (describing the "vivid, unforgettable" and "blatantly prejudicial" information at issue in the handful of cases in which the Supreme Court has presumed prejudice as a result of pretrial publicity) (citations omitted). Rather, a presumption of prejudice "attends only the extreme case." *Id*.

Actual prejudice is established "if, during *voir dire*, potential jurors who have been exposed to pretrial publicity express bias or hostility toward the defendant that cannot be cast aside." *Id.* at 802-03. The trial court's assessment of the impartiality of potential jurors

is given deference "since that assessment is ordinarily influenced by a host of facts impossible to fully capture in the record" *Id.* (citations and marks omitted).

This case received heightened media attention in both the local and national news beginning in May of 2005 with the discovery of the murdered individuals and abduction of the two minor children from the home in Coeur d'Alene, Idaho. There was continuing coverage of the investigation and search for the missing children. Media attention increased in July of 2005 when Duncan was arrested and S.G. was recovered at a Coeur d'Alene restaurant. Once Duncan's identity was known, the news reported on his background and history as well as on the publicly-known facts of the case. The press coverage continued through the resolution of his state case in the fall of 2006 and renewed again when Duncan was federally indicted in January of 2007.

Following the federal indictment, the publicity of this case waxed and waned often due to the continuances in the proceedings, during which the case received much less attention. By the time of jury selection, many potential jurors acknowledged they had heard about the case and the Defendant but, through the *voir dire* process, those jurors who were ultimately selected confirmed that the media coverage did not affect their qualifications to serve as a juror. Contrary to Duncan's arguments, the Court was fully aware of, considered, and addressed the media attention and publicity the case received; in particular during *voir dire*.

The most inflammatory media materials and public reactions cited in Duncan's briefing were from northern Idaho. (CV 4, 37) (CV 2 at Exs. 97, 100, 109.) In contrast to those regionally based news reports and reactions, the coverage of the case by the national

media outlets was mainly factual reports. *See e.g.* (CV 2 at Ex. 109) (reports from CNN, USA TODAY, and Associated Press). It is important, therefore, to recognize that at Duncan's federal arraignment, the Court set the case to be tried in Boise, Idaho. It did so for a myriad of reasons, not the least of which was the concern regarding whether a fair and impartial jury could be empaneled in north Idaho given the nature of the case, the size and makeup of the Coeur d'Alene area, the reaction of local residents to the crimes, and the publicity in northern Idaho. Boise is located approximately 400 miles south of Coeur d'Alene. This Court is intimately familiar with both cities as it is based in Boise and travels to Coeur d'Alene on a regular and frequent basis to preside over cases. While both are located in Idaho, the two cities are distinct in many ways including their size, make up, locations, geography, and regional news coverage. Moreover, Boise and Coeur d'Alene draw potential jurors from different locations.

The Court and counsel all recognized that the case had received heightened publicity and took steps to ensure a fair trial by an unbiased jury in this case. *See e.g.* (CR 62, 379, 469.) On July 6, 2007, the Court entered a Protective Order "to control the trial publicity in this matter" prohibiting the parties, counsel, witnesses, and prospective witnesses from making extrajudicial statements concerning the case and prohibited any recording or photography in the courtroom. (CR 62.) The Court also instituted a jury selection process designed to ensure Duncan received a fair trial by an impartial tribunal which included having the pool of 327 potential jurors complete a 126-question written Jury Questionnaire drafted in large part by the parties, followed by both panel and individual *voir dire* of the jurors, and advance notice of the list of potential jurors. (CR 65, 71, 91, 92, 95, 96, 140,

45 - ORDER

145, 166, 237, 241, 242, 245, 252, 259, 266, 302, 305, 326, 343, 334, 335, 336, 344, 346, 347, 348, 363, 364, 368, 372, 379, 387, 391, 396, 407, 429, 445, 458, 472, 502, 503, 504, 513, 520, 529, 532, 538, 539, 540, 543, 546, 548, 624.) The final jury was empaneled on August 13, 2008 after nine days of jury selection. (CR 548.)

The written Jury Questionnaire was designed for the purpose of ensuring a fair trial, including preserving Duncan's right to a fair and impartial tribunal. While true that many of the jurors had been exposed to the media reports of the case, the Jury Questionnaire and *voir dire* proceedings properly addressed the publicity and any possible bias. *See e.g.* (CR 625 at 44-58.) The fact that Duncan now argues a more probing inquiry should have been made does not create a bias where there was none at the time. The Court was and is confident that the jurors selected in this case were unbiased and impartial.

Further, Duncan participated in the *voir dire* both through his standby counsel as well as *pro se*. The Court cautioned Duncan that if he chose to proceed *pro se*, it would not assist him in the proceedings and advised him of his options with regard to his standby counsel. (CR 627, 630, 631, 632.) After Duncan elected to proceed *pro se*, the Court addressed whether standby counsel could conduct *voir dire* leaving that decision to Duncan who exercised his choice and represented himself during the remainder of *voir dire*. (CR 502, 510, 511, 520, 521, 529, 531, 532, 548, 631-635, 639.)

Based on the record, the Court finds Duncan has not shown actual or presumed prejudice resulted from the publicity of his case. While there was heavy publicity of Duncan and this case which prompted inflammatory public reaction, the record establishes that a fair and impartial jury was selected. Defense counsels' performance was not deficient

for not having requested a change of venue. *See Rupe*, 93 F.3d at 1444–45 (Counsel's failure to take futile action is not deficient performance.). Further, the Court fulfilled its role to protect Duncan's Sixth Amendment rights by taking great measures to ensure the fairness of the proceedings and that the jurors selected were fair and impartial. *See Sheppard*, 384 U.S. at 362-63; *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (The trial court has broad discretion in conducting *voir dire* and retains great latitude in determining what questions may be asked).

**8.    The Future Dangerousness Evidence was Properly Admitted**

Duncan argues the admission, arguments, and jury instructions relating to the future dangerousness evidence violated his Fifth and Eighth Amendment rights resulting in a fundamental miscarriage of justice. (CV 4, 37.) The Government disagrees. (CV 34.)

Future dangerousness is a non-statutory aggravating factor under the Federal Death Penalty Act (FDPA). 18 U.S.C. § 3593(a)(2). Such evidence must meet a three-part test showing the information: 1) is relevant to the jury's consideration of whether the death penalty is appropriate, 2) meets the heightened reliability required in a capital case, and 3) its probative value outweighs the danger of unfair prejudice to the defendant, confusion of the issues, or a likelihood that the jury will be misled. *See United States v. Gilbert*, 120 F.Supp.2d 147, 150 (D. Mass. 2000); *United States v. Fell*, 372 F.Supp.2d 753, 763 (D.Vt. 2005); 18 U.S.C. §§ 3593(a), (c). The Supreme Court has stressed the importance of presenting full information to the jury in a capital case to ensure its sentencing determination is reliable, consistently applied, and individualized based on the defendant's circumstances, background, and the crime. *See, e.g., Jurek v. Texas*, 428 U.S. 262, 276

(1976) ( "[W]hat is essential is that a jury have before it all possible relevant information about the individual defendant whose fate it must determine."); *Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *Gregg v. Georgia*, 428 U.S. at 203–04 (The Eighth Amendment requires the death sentence not be imposed in an arbitrary and capricious manner.). "The finality of the death penalty requires a greater degree of reliability when it is imposed." *Murray v. Giarratano*, 492 U.S. 1, 8–9 (1989).

To achieve the heightened reliability required in capital cases, "more evidence, not less, should be admitted on the presence of aggravating and mitigating factors[.]'" *United States v. Mitchell*, 502 F.3d 931, 980 (9th Cir. 2007) (citing *United States v. Fell*, 360 F.3d 135, 143 (2d Cir. 2004); *Gregg v. Georgia*, 428 U.S. at 203–04). The presentation of full information in capital cases must be balanced against the need to protect defendants from being sentenced based on misinformation or unfair prejudice. *United States v. Fields*, 483 F.3d 313, 338 (5th Cir. 2007); *United States v. Nguyen*, 928 F.Supp. 1525, 1546 (D. Kan. 1996) ("While the court agrees that heightened reliability is essential to the capital process, it must be balanced with the need for a jury to have ample information regarding the offense and offender in order to make an individualized sentencing determination.").

The Court addressed future dangerousness evidence in its ruling finding the FDPA to be constitutional wherein the Court ordered that such evidence would be limited to the context of life imprisonment. (CR 313.) The defense filed a Motion to Exclude the Government's Experts' Future Dangerousness Testimony or, alternatively, Conduct a Hearing to Determine its Reliability and a Motion to Limit the Evidence with regard to future dangerousness evidence. (CR 351, 381, 412.) On August 25, 2008, the Government

48 - ORDER

made a proffer of the evidence it intended to present as to future dangerousness. (CR 571, 590, 647.) Thereafter, the Court granted in part and denied in part the defense motions; again, limiting future dangerousness evidence to the prison context and excluding evidence or argument concerning Duncan's potential of flight from custody. (CR 571, 590, 647.)

In this § 2255 Motion, Duncan claims admission of the evidence allowed by the Court was more prejudicial than probative of his future dangerousness in the prison context and fell below the "heightened reliability" requirements for a capital case because the evidence and arguments related to Duncan's prior unadjudicated homicides committed against children. Further, Duncan argues the Government mischaracterized the evidence and the jury could not understand or follow the limiting instructions that it consider the evidence of his other crimes only for purposes of future dangerousness. (CV 4.) Duncan did not raise any of these challenges in a direct appeal and, therefore is precluded from doing so here. *See United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. McMullen*, 98 F.3d 1155, 1157 (9th Cir. 1996). Regardless, there was no error, unfairness, miscarriage of justice, or constitutional violation that resulted from the admission, arguments, instructions, and/or the jury's consideration of the future dangerousness evidence.

As stated in the Court's rulings in the capital case, the evidence was relevant, met the heightened reliability standard, and its probative value outweighed the danger of unfair prejudice. (CR 313, 571, 590, 647.) The evidence was highly relevant and probative to show a continuing pattern of violence throughout Duncan's adult life; the nature and manner with which he committed his violent crimes; his use of blunt-force as well as

weapons to commit the crimes; and that his violent acts were both meticulously planned and impulsive, all of which is relevant to the prison context and tends to make the death penalty more appropriate. (CR 647 at 2874-76) (CR 590.) Further, the evidence met the heightened standard of reliability for a capital case. (CR 590.) Additionally, Duncan has not shown, nor has this Court's review of the record revealed, the existence of any improper argument or misstatement of this evidence by the Government nor that any such comments deprived Duncan of a fair trial or violated any of his constitutional rights.

Moreover, the jury was properly instructed with regard to the future dangerousness evidence and the jury followed those instructions. It is well established that juries are presumed to follow the Court's instructions absent extraordinary circumstances, including curative instructions to disregard improper statements or evidence. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) ("[It is] the almost invariable assumption of the law that jurors follow their instructions."); *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005) (citing *Francis v. Franklin*, 471 U.S. 307, 324 n. 9 (1985) (The "crucial assumption underlying our constitutional system of trial by jury [is that] that jurors carefully follow instructions.") "[We] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis*, 471 U.S. at 324, n. 9. These presumptions can be rebutted if the petitioner can demonstrate 1) an "overwhelming probability" that the jury will be unable to follow the court's instruction and 2) a strong likelihood that the effect of the improper statements or evidence would be

"devastating" to the defendant. *Greer*, 483 U.S. at 765. Duncan has not shown the jury was unable or failed to follow the Court's clear and proper instructions for this evidence.

In sum, the future dangerousness evidence was properly admitted and Duncan's constitutional rights were not violated. The evidence was relevant, reliable, and its probative value outweighed the danger of unfair prejudice, confusion of the issues, or any possibility of misleading the jury. The Government did not misstate the evidence. The jury was correctly instructed and followed those instructions. Duncan has not shown he was prejudiced, that the sentencing was unfair, or any other violation of his constitutional rights. The future dangerousness evidence was only one part of the overwhelming evidence presented by the Government supporting imposition of the death penalty.

**9.     The Graphic Video Evidence was Properly Admitted**

Duncan claims the admission of graphic videos violated his Fifth and Eighth Amendment rights and resulted in a fundamental miscarriage of justice. (CV 4, 37.) The Government counters that the evidence was relevant to prove Duncan's intent and the aggravating factors. (CV 34.) Duncan maintains the evidence was unnecessary and unduly prejudicial because other evidence was presented to prove those factors. (CV 37.)

At the Penalty Phase proceeding, the Government was required to prove, and the jury had to find, that Duncan was eligible for the death penalty by finding, beyond a reasonable doubt, at least one of the threshold intent factors and one of the noticed statutory aggravating factors as to each of Counts One, Five, and Seven. 18 U.S.C. §§ 3591(a), 3592(c). After determining Duncan was eligible for the death penalty, the jury had to then

weigh the mitigating and aggravating factors to determine whether the death penalty should be imposed. 18 U.S.C. § 3593.

The Government's Notice of Intent to Seek the Death Penalty alleged four statutory threshold intents, six statutory aggravating factors, and two non-statutory aggravating factors. (CR 10.) The statutory threshold intents are: Intentional Acts to Take Life of Another Person; Intentional Infliction of Serious Bodily Injury Resulting in Death; Intentional Acts to Take Life or Use Lethal Force; and Intentional Acts of Violence Creating a Grave Risk of Death. 18 U.S.C. §§ 3591(a)(2)(A)-(D). The alleged statutory aggravating factors relevant to this evidence are: Death During the Commission of Another Crime; Heinous, Cruel or Depraved Manner of Committing Offense; Substantial Planning and Premeditation; and Vulnerability of Victim. 18 U.S.C. §§ 3592(c)(1), (6), (9), and (11). The non-statutory aggravating factors alleged were Effect of the Offense on the Victim and the Victim's Family and Future Dangerousness. 18 U.S.C. § 3593(a)(2).

During the Penalty Phase, the parties may present any information relevant to prove a mitigating or aggravating factor. 18 U.S.C. § 3593(c). The FDPA provides: "Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id.* Again, this evidence must be relevant to the sentencing decision and meet the heightened standard of reliability required in death penalty cases. *See Gregg v. Georgia*, 428 U.S. at 192; *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).

In the underlying capital proceeding, the defense filed motions to exclude graphic evidence pursuant to the Fifth and Eighth Amendments which the parties briefed. (CR 246, 264, 272, 317, 323.) On March 26, 2008, the Court held a hearing on the Motion to Exclude Graphic Evidence wherein it acknowledged the graphic nature and impact of the evidence but ultimately ruled the evidence was highly relevant to the issues the Government had to prove at the Penalty Phase and its probative value outweighed the danger of unfair prejudice, confusion of the issues, or misleading the jury. (CR 350.) Specifically, the Court stated that the images "are very graphic" but that they "are images of what was occurring at the time. They were done by the Defendant, so obviously they are relevant and they are probative of many of the issues that the Government has to prove," "[i]t is evidence of the crime as it was occurring, and in my judgment is certainly probative of the relevant facts in this case." (CR 350 at 9-10.) The Court also denied Duncan's later oral objection to displaying the graphic evidence. (CR 645 at 2704-05.) The evidence was admitted and shown to the jury at the Penalty Phase. (CR Exs. 73-78; CR 645 at 2718-2719.)

Having viewed the videos and photographs, this Court is well aware of their graphic and disturbing nature. *See* Footnote.[12] In determining the admissibility of this evidence, the Court considered their probative value, potential prejudice, impact on the jury, and Duncan's constitutional rights. There is no question that the facts of the case and this

---

[12] The videos are part of the record and are generally described in the parties briefing and more specifically elsewhere in the record. (CR Exs. 73-75) (CR 191, 246, 264, 272, 645 at 2718-19.) Therefore, the Court need not expound further here as there is no dispute as to their contents or that they are horrific. That being said, the videos are important and relevant evidence in this case that should be viewed by anyone making a ruling in this matter. (CR 246-1 at 12, 317, 323.)

evidence in particular are disturbing. Be that as it may, the probative value of the videos outweigh the danger of unfair prejudice. The videos were made by Duncan during the commission of his crimes and are direct evidence of Duncan's crimes, actions, intent, and the aggravating factors. *See e.g.* 18 U.S.C. § 3591(a) and §§ 3592(c)(1), (6), (9), and (11); *Tuilaepa*, 512 U.S. at 97 (The jury can consider the circumstances of the crime when deciding whether to impose a sentence of death.); *United States v. Frank*, 8 F.Supp.2d 253, 277 (S.D.N.Y. 1998) (same).

The videos were the most accurate evidence of the events for the jury to consider when it made its sentencing determination; allowing the jury to witness Duncan committing his crimes. The videos capture the very crimes which Duncan has been charged and plead guilty to; unmistakably showing Duncan's heinous, cruel, and depraved manner in committing the criminal acts against his victims and the circumstances surrounding those acts. They are not evidence from which one must infer what happened. What is captured on the videos is exactly what happened, at the time it happened, how it happened, and the circumstances under which it happened. No witness or after-the-fact evidence is needed to interpret the evidence nor do any credibility determinations need be made. There is no dispute about what is seen and heard on the videos.

The Government also presented other evidence of Duncan's crimes which was relevant and probative of the FDPA factors. The fact that there was other evidence, however, did not make the videos irrelevant, unnecessary, or unduly prejudicial. The other evidence shed some light to the statutory factors but the videos are the most direct, relevant, reliable, and probative evidence of the factors the jury had to weigh in making its

sentencing determination. The videos show the crimes themselves; Duncan's conduct in the commission of those crimes; the nature and circumstances of the events; Duncan's statements and demeanor on the videos; and the victims' actions, statements, appearance, and vulnerability. The videos also evidence the fact that Duncan filmed his crimes; why he made the videos; that he carefully planned and prepared well in advance to make the videos by obtaining equipment to do so at a remote and isolated cabin; the nature of the videos; and how they were taken. That there was other evidence, including photographs, did not diminish or negate the overwhelming probative value of the videos as the most relevant and reliable evidence of the sentencing factors the Government was required to prove and the jury was to consider in making its sentencing determination. Nor did Duncan's guilty plea remove or lessen the Government's burden to prove the threshold intent factors and aggravating factors beyond a reasonable doubt. 18 U.S.C. §§ 3591-3593.

The fact that the videos are prejudicial to Duncan, does not, in and of itself, require their preclusion. Under § 3593, evidence is excluded if its probative value is outweighed by the danger of creating *unfair* prejudice. The videos are very graphic and unfavorable to Duncan. They are not, however, unfairly prejudicial. It is not a violation of Duncan's constitutional rights for the jury to see the very actions and conduct which the Government argued qualify him for the death penalty. *See e.g. Tuilaepa*, 512 U.S. at 97 ("[O]ur capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty."); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("consideration of...the circumstances of the particular offense [is] a

constitutionally indispensable part of the process of inflicting the penalty of death"); *Frank*, 8 F.Supp.2d at 277.

This, as the defense has stated repeatedly, is a capital case and death penalty cases are, and should be, different. (Dkt. 37 at 71) (quoting *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980)); *see also Woodson*, 428 U.S. at 303-04 (Death is "a punishment different from all other sanctions in kind rather than degree."). That maxim has never been lost on this Court throughout these proceedings; particularly with regard to its consideration of this evidence. The Court was extremely cautious and careful to protect Duncan's constitutional rights, particularly with regard to this evidence.[13] At the same time, this is a death penalty case requiring the Government to prove, and the jury to find, all of the FDPA elements and factors; in particular, that Duncan's conduct was heinous and depraved. It necessarily follows that evidence in a capital case will be different from an ordinary criminal case. That is to say, the evidence in a capital case will by its very nature be more sever and disturbing; particularly the evidence going to show the aggravating factors which, again, includes that the offense was committed in an "especially heinous, cruel, and depraved manner, in that it involved torture and serious physical abuse." 18 U.S.C. § 3592(c)(6). Without such evidence, the case does not rise to the level of a capital case. *See e.g. Tuilaepa*, 512 U.S. at 972 (aggravating factors accomplishes the objective of narrowing the class of those eligible for death by distinguishing particular conduct from other murders).

---

[13] Duncan took numerous videos during the commission of his crimes, three of which were shown to the jury at the penalty phase.

Determining the admissibility of this evidence cannot be made in a vacuum looking only at the possible prejudice of the evidence. The evidence must also be considered within the context of the entire proceeding. The Government had the burden to prove, beyond a reasonable doubt, a threshold intent factor and the aggravating factors for each of the three death eligible counts. The videos are themselves direct evidence of Duncan's crimes, the threshold intent factors, and the aggravating factors. They clearly show Duncan acted with at least one, if not all, of the necessary threshold intent factors. 18 U.S.C. §§ 3591(a)(2)(A)-(D). Moreover, the evidence was directly relevant to proving the aggravating factors. 18 U.S.C. §§ 3592(c)(1), (6), (9), (11) and § 3593(a)(2).

The jury in this capital case was tasked with the heavy burden of deciding whether Duncan should be sentenced to death. The Eighth Amendment's demand for heightened reliability in capital cases requires the jury to consider the particularized nature of the crime and the particularized characteristics of the individual defendant in order to prevent the death penalty from being imposed in an arbitrary and capricious manner. *Gregg v. Georgia*, 428 U.S. at 203-07. To that end, "more evidence, not less" should be admitted so the jury has full information upon which to make its sentencing determination. *Mitchell*, 502 F.3d at 980. Providing the jury with the most reliable and relevant information necessary for it to render an individualized sentencing determination, includes consideration of the circumstances of the crimes. *Tuilaepa*, 512 U.S. at 973; *Gregg v. Georgia*, 428 U.S. at 204 (The Supreme Court has stressed that a capital jury should receive "as much information as possible when it makes the sentencing decision."). The videos are that evidence in this case. Moreover, the videos' clear and overwhelming probative value to the jury's

57 - ORDER

consideration of Duncan's eligibility and selection for the death penalty outweighs their prejudice. *See Fields*, 483 F.3d at 338 (balancing the need to present full information against the need to protect against misinformation or unfair prejudice).

For all of these reasons, the Court finds this evidence was properly admitted. It was the most direct, relevant, and reliable evidence of the crimes, Duncan's intent, and the aggravating factors. The probative value of the evidence far outweighed its prejudice. Any person considering the outcome of this case would be remiss in passing judgment if it did so without viewing the videos.

**10.     Claim Nine: The Constitutionality of the Statute Charged in Count 7**

Count 7 charged Duncan with Using a Firearm During and in Relation to a Crime of Violence resulting in Death in violation of 18 U.S.C. §§ 924(c) and 924(j). (CR 1.) To be guilty of that charge requires that Duncan used a firearm during and in relation to a "crime of violence." 18 U.S.C. § 924 (c)(1)(A)(ii). Subsection 924(c)(3) defines a "crime of violence" to mean an offense that is a felony and –

> (A) has as element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

In this case, the predicate crimes of violence charged in Count 7 are kidnapping as alleged in Counts One and Two. (CR 1.) Kidnapping does not fit within § 924(c)(3)(A)'s element's clause for a crime of violence. *Delgado-Hernandez v. Holder*, 697 F.3d 1125, 1130 (9th Cir. 2012) ("The federal kidnapping statute has no force requirement"); 18 U.S.C.

§ 1201(a). Therefore, kidnapping can only qualify as a crime of violence if it falls under the residual clause in § 924(c)(3)(B). The parties dispute whether the residual clause of § 924(c)(3)(B) is constitutional. (CV 4, 34, 37, 41, 42.) That question is currently unsettled.

The Supreme Court recently decided *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018) wherein it affirmed the Ninth Circuit's conclusion that § 16(b)'s residual clause, which is materially identical to § 924(c)(3)(B), is unconstitutionally vague.[14] Since *Dimaya* was issued, other district courts in the Ninth Circuit have concluded that § 924(c)(3)(B) is also unconstitutionally vague. *See United States v. Capenhurst*, No. 2:18-cr-00055-KJM, 2018 WL 6101003, at *8 (E.D. Cal. Nov. 21, 2018) (citing *United States v. Tinh Huy Nguyen*, Nos. 98-CR-20060-LHK & 16-CV-03543-LHK, 2018 WL 3972271 (N.D. Cal. Aug. 20, 2018)); *United States v. Chavez*, No. 15-CR-00285-LHK, 2018 WL 3609083 (N.D. Cal. July 27, 2018). Nationwide, however, there is a split among the circuit courts on the question of whether § 924(c)(3)(B) is unconstitutionally vague which the Supreme Court has granted cert on. *United States v. Garcia-Gomez*, Case No. 14-cr-00120-EMC, 2019 WL 331279, at * 2 (N.D. Cal. Jan. 25, 2019) (citing cases); *see also United States v. Davis*, No. 18-431, 2018 WL 4896751 (cert. granted Jan. 4, 2019). The parties' positions in this

---

[14] 18 U.S.C. § 16(b) states "that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B) states "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

case echo the diverging arguments presented in the cases pending before the appellate courts on this issue.[15]

The defense argues this Court should follow the reasoning in *Dimaya* and deem § 924(c)(3)(B) to be unconstitutional and vacate Duncan's sentence as to Count 7. (Dkt. 4, 37, 41.) The Government urges the Court to apply a "case-specific approach" to determine whether the underlying offense qualifies as a crime of violence under § 924(c)(3)(B). (Dkt. 34, 42.) The Supreme Court and Ninth Circuit both have cases under consideration where the Government has raised this argument but no decisions have been issued. *See United States v. Davis*, 2018 WL 4896751; *United States v. Dominguez*, No. 14-10268; *United States v. Begay*, No. 14-10080.

Given the uncertainty of when the appellate courts will render their decisions on this issue, the Court takes this claim under advisement until the appellate courts have ruled in the cases currently pending before them. Regardless of the outcome on this issue and Duncan's conviction in Count 7, the imposition of the sentence of death on Counts 1 and 5 were lawfully imposed and remain in full effect. So as not to delay further proceedings, the Court affirms the Judgement and sentences in the underlying criminal case in all respects as to all counts with the exception of Count 7, which the Court will decide following the appellate courts' rulings as stated above.

## 11.    Duncan's Waiver of Appeal was Valid

---

[15] The parties filed supplemental briefing on this issue. (CV 41, 42.)

Duncan argues his rights to due process, appellate review, and a reliable determination of sentence were violated by the acceptance of his waiver of appeal that was neither clear and unequivocal nor knowing, intelligent, or voluntary. (CV 4, 37.) Duncan challenges the Court's inquiry at the November 24, 2008 hearing, asserting the Court failed to appreciate his irrational and deluded thought process and that his responses did not express an unequivocally or voluntarily waiver of his right to appeal. Further, Duncan argues his "choice" to not authorize an appeal was uninformed and unintelligently made.

The record is clear on this claim. The Court made a thorough and complete inquiry of Duncan at the November 24, 2008 hearing where Duncan competently, clearly, knowingly, intelligently, voluntarily, and unequivocally elected to waive his right to appeal. The Court fully advised Duncan of the ramifications of his choice to not pursue an appeal such that Duncan understood and knew the pros and cons of his decision and that the decision was his to make. (CR 637.)

Prior to the November 24, 2008 hearing, the Court had repeatedly considered and concluded that Duncan was competent. Any question in that regard has been answered in the retrospective competency Order. (CR 843.) The Ninth Circuit affirmed that ruling and concluded that Duncan "was competent in November 2008" and he "had validly and affirmatively waived his right to file an appeal." (CR 860.)

No constitutional violation occurred with regard to Duncan's appellate waiver. That Duncan disagrees with the outcome and conclusions in the record does not amount to a constitutional violation subject to collateral attack.

**12.    There is No Combination of Errors**

61 - ORDER

Duncan claims the combination and cumulative effect of the problems and errors he alleges occurred from the beginning to the end of his case, deprived him of his constitutional rights to a fair and reliable proceedings and due process and, as a result, his conviction and death sentence should not be allowed to stand. (CV 4, 37.) For the reasons stated in this Order, except as to Count Seven, the Court finds Duncan's claims are without merit. No combination or cumulative errors have occurred as to the claims decided herein which deprived Duncan of his constitutional rights or that warrant reversal of his conviction and/or sentences.

**13.  The Federal Death Penalty Act is Constitutional**

The defense filed a number of motions challenging the constitutionality of the FDPA in Duncan's criminal case. (CR 116, 135, 136, 137, 139.) The Court denied those Motions, ruling that the FDPA was constitutional. (CR 283, 284, 294, 313.) In his § 2255 Petition, Duncan argues the legal and factual landscape has changed since this Court made its rulings, pointing to Justice Breyer's dissenting opinion in *Glossip v. Gross*, 135 S.Ct. 2726, 2755 (2015) and the district court opinion in *United States v. Fell*, 224 F.Supp.3d 327, 359 (D.Vt. Dec. 13, 2016). (CV 4.) Those decisions, Duncan asserts draw into question whether the FDPA is unconstitutionally imposed in an arbitrary manner. (CV 4, 37.) The Government maintains that the FDPA remains constitutional. (CV 34.)

The Court denies Duncan's challenge to the constitutionality of FDPA for the reasons stated in the Orders of the underlying criminal case. (CR 283, 284, 294, 313.) The Supreme Court has not declared the FDPA unconstitutional. *See Glossip*, 135 S.Ct. at 2732 ("[I]t is settled that capital punishment is constitutional."); *see also Fell*, 224 F.Supp.3d at

358-59 ("*Gregg* is still the law of the land" and it is the Supreme Court's "prerogative alone to overrule one of its precedents.").

**14.     The Certificate of Appealability is Denied**

Duncan cannot appeal from the denial or dismissal of his § 2255 Motion unless he first obtains a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A certificate of appealability will issue only when a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A certificate of appealability is warranted when "jurists of reason could disagree with the district court's resolution of [the petitioner's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003); 28 U.S.C. § 2253(c). No such showing has been made in this case as to the claims decided herein and, therefore, the certificate of appealability is denied on those claims. 28 U.S.C. § 2253(c)(2).

**ORDER**

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1) Petitioner's § 2255 Motion to Vacate, Set Aside, or Correct Sentence (CV 1, 4) is **DENIED IN PART** and **UNDER ADVISEMENT IN PART**. The Petition is denied as to all claims except Claim Nine challenging the constitutionality of the statute charged in Count Seven. Claim Nine is under advisement pending resolution of the cases under consideration by the Ninth Circuit and the United States Supreme Court. Petitioner is directed to notify the Court within **five (5) days** of the appellate courts ruling on the legal issue presented in Claim Nine.

2) The Certificate of Appealability is **DENIED**.

3) The Clerk of the Court is directed to file this Order in both the civil and criminal cases.

DATED: March 22, 2019

Honorable Edward J. Lodge
U.S. District Judge